



VIA ECF AND U.S. MAIL                                                September 10, 2019

Honorable William H. Pauley III
United States District Judge
500 Pearl Street, Room 1920
New York, NY 10007

      Re:     *In re Weight Watchers Int'l, Inc. Sec. Litig.*, Master File No. 1:19-cv-02005

Dear Judge Pauley:

We respectfully submit this letter on behalf of Plaintiffs[1] in response to Defendants' August 28, 2019, pre-motion conference letter concerning their proposed motion to dismiss (ECF No. 83).

## I.     Plaintiffs Adequately Allege Actionable Misstatements and Omissions

Plaintiffs allege two categories of misrepresentations and omissions for their claims under §§11, 12(a)(2), and 15 of the Securities Act, arising from WW's May 2018 Offering (*see generally Herman & MacLean v. Huddleston*, 459 U.S. 375, 382 (1983) ("Liability against the issuer of a security is virtually absolute, even for innocent misstatements.")), and under §§10(b) and 20(a) of the Exchange Act, arising from Defendants' other Class Period statements.

First, the Registration Statement failed to state that WW could not achieve the growth it touted without recruiting former, or lapsed, members to rejoin WW. For example, the Registration Statement emphasized that WW was recruiting new members and said nothing about the importance of lapsed members to its future financial results; of the three "levers" for WW's growth, the first was to "increase recruitment of *new* subscribers." ¶71. This communicated to investors that WW could grow without lapsed members; in fact, WW later revealed its growth *required* extensive recruitment of *lapsed* members, generally middle-aged, Caucasian women, who CW3 confirmed were WW's "bread and butter." ¶55. While Defendants claim that the Offering Materials did disclose WW's reliance on lapsed members, they did not; Defendants' letter cherry-picks statements regarding brand affinity that say nothing about WW's dependence on recruiting lapsed members to achieve growth. In any event, Defendants' argument addresses the "total mix of information," whether the omission regarding lapsed member recruitment was material, an issue which is "rarely . . . dispositive in a motion to dismiss[.]" *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 360 (2d Cir. 2010).

Further, the CAC alleges that WW abandoned its core "bread and butter" demographic (and did not disclose that it had). Defendants say that the CAC does not allege particularized facts showing the abandonment, but, in fact, the CAC does so, providing information from multiple former employees. Thus, CW1, a former WW executive, confirmed that Defendant Grossman took lapsed members "for granted" (¶55), targeting instead new members outside of WW's traditional demographic (¶¶60, 93), and CW4 stated that WW ignored feedback from lapsed

---

[1]     All cites to "¶" are to the Consolidated Amended Class Action Complaint for Violations of the Federal Securities Laws ("CAC") (ECF No. 74). Capitalized terms have the same meaning as those given to them in the CAC. *See also* appended table of citations. Unless otherwise indicated, all emphasis is added and citations are omitted.

Honorable William H. Pauley III                                    September 10, 2019
Page 2

members.  ¶68.  The alleged abandonment was confirmed when, at the end of the Class Period, WW announced that its dismal results for the fourth quarter of 2018 occurred because WW's results depended on recruiting lapsed members and WW had failed to "drive recruitment" of such members.  ¶¶87-89.

Second, the Offering Materials, and other WW Class Period statements, failed to disclose that, by the SPO, WW had decided to depart from its established formula of capitalizing on the seasonality of its business by launching a major "program innovation" in the critical "New Years' resolution" period that would attract new and lapsed members.  As CW1 made clear, this type of major program innovation (such as the Freestyle program launched in December 2017) involved extensive research, testing, and related preparations.  Defendants respond by claiming that WW did introduce "program innovations" in late 2018, notably, a partnership with "Blue Apron" and certain digital "add-ons."  But "WW x Blue Apron" was simply an expensive added option for a niche group of WW customers who were willing to spend hundreds more dollars per month for home delivery of *ingredients* for WW-approved meals.  *See* Ex. A.  Moreover, adding access to "AAptiv" and "Headspace" (neither of which appear to be well-known brands) through WW's existing "app" were marginal additions that were not at all akin to a traditional year-end "program innovation," and they also involved payment of additional fees after expiry of initial trial periods (rather than a more lasting program benefit).  *E.g.*, Ex. B at 7-8 (listing AAptiv and Headspace among a number of other minor product developments).  Indeed, WW admitted in early 2019 that it did *not* expect these partnerships "to be significant revenue contributors in 2019."  Ex. C at 5.[2]  At most, Defendants offer fact-intensive issues incapable of resolution at this stage, given the Court's duty to "construe[] all reasonable inferences in a plaintiff's favor."  *Okla. Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.*, 367 F. Supp. 3d 16, 27 (S.D.N.Y. 2019) (Pauley, J.).

Defendants also cite the "bespeaks caution doctrine," but that doctrine "do[es] not preclude liability for a statement warning of a risk that a company knows has already transpired."  *Lopez v. Ctpartners Exec. Search Inc.*, 173 F. Supp. 3d 12, 40 (S.D.N.Y. 2016).  As Plaintiffs allege, by the time of the SPO, Defendants had *already* abandoned recruitment of lapsed members and had no plan to (and could not) launch any major new program innovations in December 2018.  ¶¶181-82.

## II.    Plaintiffs Adequately Plead Scienter and Loss Causation Under the Exchange Act

Defendants' scienter argument misses the mark.  Plaintiffs do not allege that "WW should have kept its focus on middle-aged women," but that Defendants knew and failed to disclose that WW's financial health depended on persuading lapsed members to re-join, while making statements about recruiting new members.  Defendants also knew or recklessly disregarded from the start of the Class Period that, *inter alia*, the lack of a major new program innovation in the pipeline for launch in late 2018 constituted a material event or uncertainty that was likely to render past results not indicative of future performance – and that had to be, but was not, disclosed.  ¶¶230-35.

Further (although insider selling is not a prerequisite for alleging scienter), Artal's and Hotchkin's sales of WW stock were unusual in their size and timing, which provide further grounds

---

[2]    Defendants' citation to certain alleged *minor* innovations from *mid*-2018 are irrelevant, as Plaintiffs' key allegation is WW's abandonment of its historic practice of launching a *major* innovation at *year-end* to leverage a large increase in subscribers during the vitally important pre- and post- New Year's holiday period.

Honorable William H. Pauley III                                    September 10, 2019
Page 3

for inferring scienter.  Indeed, after not selling *any* WW stock since 2012, Hotchkin sold 131,466 of his 215,395 shares (or 61%) at $75.66 in August 2018 for almost ***$10 million*** (¶240; *see also* Ex. D), and Artal sold 8.625 million shares at $69 per share in the SPO, plus another 6 million shares, at roughly $77.39 in August 2018, for total proceeds of ***$1 billion*** (¶¶236-51).  These allegations suffice at the pleading stage.  *See*, *e.g.*, *Stevelman v. Alias Research Inc.*, 174 F.3d 79, 85 (2d Cir. 1999) (CEO's sale of roughly 40% of his holdings for about $3.5 million "could clearly be characterized as 'unusual'" and thus "'permit an inference of bad faith and scienter'"); *In re Oxford Health Plans, Inc., Sec. Litig.*, 187 F.R.D. 133, 140 (S.D.N.Y. 1999) (insider sales of "only" 11% of holdings, or for "massive" $78 million profit, adequately alleged scienter).

Plaintiffs also adequately allege loss causation under Rule 8's notice pleading standard, which simply requires "provid[ing] a defendant with some indication of the loss and the causal connection that the plaintiff has in mind."  *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 347 (2005).  The CAC details how the value of WW shares fell after the truth was revealed concerning the damage caused by its failure to launch a major new program innovation in late 2018, and its previously undisclosed dependence on recruiting lapsed members.  ¶¶252-56.  Any argument that other factors caused the drop is "is a matter of proof at trial," not at the pleadings.  *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 187 (2d Cir. 2015).

### III.    Plaintiffs Adequately Plead that Artal Luxembourg, S.A. Was a Statutory Seller

No direct privity is required for §12(a)(2) claims, *Pinter v. Dahl*, 486 U.S. 622, 641 (1988), and Artal Luxembourg, S.A. ("AL") was a statutory seller because it facilitated the SPO for its own financial gain.  AL (a) solicited the sale of 8.625 million shares in the SPO for proceeds of nearly $600 million; (b) owned all the shares sold in the SPO; (c) received $600 million in proceeds; and (d) was a party to the SPO underwriting agreement.  *See In re Am. Bank Note Holographics, Inc. Sec. Litig.*, 93 F. Supp. 2d 424, 438 (S.D.N.Y. 2000) (allegations that a seller was motivated to solicit sales to raise money suffice to allege §12(a)(2) claims).  In addition, AL's Managing Director (Defendant Debbane) signed the Registration Statement, as did four other AL-affiliated WW directors (¶¶40, 42-45), effectively on behalf of AL.  At this stage, these persons, and thus AL, are deemed to have solicited the SPO stock sales.  *See Briarwood Invs. Inc. v. Care Inv. Tr. Inc.*, No. 07 civ. 8159(LLS), 2009 WL 536517, at *4 (S.D.N.Y. Mar. 4, 2009) (collecting cases).

### IV.    Plaintiffs Adequately Plead Control Person Claims Against Artal and Debbane

Claims under §15 of the Securities Act require only a primary violation and the defendant's control of a primary violator.  *See Youngers v. Virtus Inv. Partners Inc.*, 195 F. Supp. 3d 499, 523 (S.D.N.Y. 2016).  The CAC pleads that AL was WW's controlling stockholder and the selling shareholder of all SPO shares, that Artal International wholly owned AL, and that Artal Group wholly owned Artal International and Artal International's managing partner.  The CAC also pleads that Debbane was WW's Chairman and a Managing Director and/or CEO of each Artal entity.  ¶¶35-40.  Although not even required to do so by the Second Circuit, the CAC also alleges that the §20(a) Defendants were culpable participants in WW's fraudulent conduct.  *See Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 236 (2d Cir. 2014) (plaintiffs need not plead culpable participation to allege §20(a) claim).

For these reasons, Defendants' request to file a motion to dismiss should be denied.

Honorable William H. Pauley III                                      September 10, 2019
Page 4

Respectfully submitted,

GRANT & EISENHOFER P.A.                    SCOTT+SCOTT ATTORNEYS AT LAW LLP

 */s/ Daniel Berger*                         */s/ William C. Fredericks*
Daniel Berger                               William C. Fredericks


Cc:    All Counsel of Record (via ECF)

| Table of Citations | | |
|---|---|---|
| **Ex.** | **Date** | **Description** |
| A | Dec. 20, 2018 | Press Release, WW and Blue Apron, Introducing WW x Blue Apron: Inspiring Healthier Home Cooking |
| B | Nov. 1, 2018 | WW Q3 2018 Earnings Call |
| C | Feb. 26, 2019 | WW Q4 2018 Earnings Call |
| D | Sept. 4, 2018 | Form 4 filed with the SEC by Nicholas Hotchkin |