**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE WEIGHT WATCHERS INTERNATIONAL, INC. SECURITIES LITIGATION | Master File No. 1:19-cv-02005-WHP<br><br>CLASS ACTION |
| CITY OF OMAHA POLICE AND FIRE RETIREMENT SYSTEM; EQUITY-LEAGUE PENSION TRUST FUND; and OKLAHOMA FIREFIGHTERS PENSION AND RETIREMENT SYSTEM,<br><br>Plaintiffs,<br><br>v.<br><br>WEIGHT WATCHERS INTERNATIONAL, INC.; ARTAL LUXEMBOURG S.A.; ARTAL INTERNATIONAL S.C.A.; ARTAL GROUP S.A.; RAYMOND DEBBANE; MINDY GROSSMAN; and NICHOLAS P. HOTCHKIN,<br><br>Defendants. | **SECOND CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>DEMAND FOR JURY TRIAL |

# TABLE OF CONTENTS


I. PRELIMINARY STATEMENT ........ 1

II. THE CLAIMS ASSERTED IN THIS COMPLAINT ........ 7

III. CONFIDENTIAL WITNESSES ........ 8

PART ONE: CLAIMS UNDER THE SECURITIES ACT OF 1933

IV. JURISDICTION AND VENUE ........ 11

V. THE SECURITIES ACT PARTIES ........ 12

A. The Securities Act Plaintiff ........ 12

B. The Securities Act Defendants ........ 12

C. Relevant Non-Parties ........ 16

VI. SUBSTANTIVE ALLEGATIONS ........ 17

A. Background of Weight Watchers ........ 17

B. The Seasonal Nature of Weight Watchers' Business and the Development of Its Established Formula of Relying on a Year-End "Product Innovation" to Generate the Coming Year's Largest "Pop" in Subscribers in the Critical December and Post-New Year's Period ........ 18

C. As Weight Watchers Launches Freestyle, Artal Plans to Cash Out Its Position .. 22

D. Weight Watchers Announces a New Strategic Vision in February 2018 – But Does Not Disclose that It Will Not Be Launching a New Program Innovation in December 2018 ........ 24

E. Artal Cashes Out in May 2018 ........ 24

F. Artal Luxembourg's $571 Million Cash Out SPO Was Conducted Pursuant to Materially Misleading and Incomplete Offering Materials ........ 25

1. Weight Watchers Did Not Disclose that Its Growth Depended on Recruiting Significant Numbers of Lapsed Members ........ 25

2. The Offering Materials Did Not Disclose that Weight Watchers Had Abandoned Its Business Model of Launching a New Program Innovation Late in the Year to Boost Subscribers in January ........ 30

G. Weight Watchers Reveals that Implementing Its Strategic Plan Depended on Attracting Lapsed Members ........ 32

VII. THE OFFERING MATERIALS VIOLATED SECURITIES REGULATION S-K, ITEM 103 .......... 35

VIII. CLAIMS FOR RELIEF UNDER THE SECURITIES ACT .......... 37

PART TWO: CLAIMS UNDER THE SECURITIES EXCHANGE ACT OF 1934

IX. JURISDICTION AND VENUE .......... 44

X. THE EXCHANGE ACT PARTIES .......... 44

A. The Exchange Act Plaintiffs .......... 44

B. The Exchange Act Defendants .......... 45

1. Weight Watchers .......... 45

2. The Section 10b Individual Defendants .......... 45

3. Defendant Artal Luxembourg .......... 47

4. The Section 20(a) Control Defendants .......... 48

XI. SUBSTANTIVE ALLEGATIONS .......... 50

A. Background Concerning Weight Watchers .......... 50

B. The Seasonal Nature of Weight Watchers' Business and the Development of Its Established Formula of Relying on a Year-End "Product Innovation" to Generate the Coming Year's Largest "Pop" in Subscribers in the Critical December and Post-New Year's Period .......... 51

C. As Weight Watchers Launches Freestyle, Artal Plans to Cash Out Its Position .. 55

D. Weight Watchers Announces a New Strategic Vision in February 2018 – But Omits That It Will Not Be Launching a New Program Innovation in December 2018 .......... 57

E. Spring 2018: Weight Watchers Increases Its Projected Financial Performance Just Days Before Its Secondary Offering .......... 58

F. Defendant Artal Group Sells $595.5 Million of Its Weight Watchers' Holdings in the SPO .......... 60

G. The SPO Was Conducted Pursuant to Materially Misleading and Incomplete Offering Materials .......... 61

1. Weight Watchers Did Not Disclose that Its Growth Depended on Recruiting Significant Numbers of Lapsed Members .......... 61

2. The Offering Materials Did Not Disclose that Weight Watchers Had Abandoned Its Business Model of Launching a New Program Innovation Late in the Year to Boost Subscribers in January .................................... 65

H. Summer 2018: Weight Watchers Raises Guidance a Second Time After the Second Quarter of 2018 ........................................................................ 68

I. Defendant Artal Group Sells Another 6 Million Shares for $465 Million in August 2018........................................................................................................ 70

J. Fall 2018: Weight Watchers Announces More Details of Its Rebranding Strategy and Increases Its Guidance Yet Again ................................................................ 71

K. The Full Extent of the Deterioration in Weight Watchers' Business and Operations Is Disclosed ........................................................................... 74

XII. THE SECTION 10(b) DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD .......................... 75

XIII. FALSE AND MISLEADING STATEMENTS IN WEIGHT WATCHERS' SEC FILINGS IN VIOLATION OF ITEM 303 ...................................................................... 75

XIV. ADDITIONAL ALLEGATIONS OF SCIENTER......................................................... 78

A. The Artal Defendants and Defendant Hotchkin Had Motive and Opportunity to Commit Fraud ............................................................................................ 78

B. Imputed Knowledge of Facts Critical to the Company's Core Operations .......... 81

XV. ADDITIONAL LOSS CAUSATION ALLEGATIONS ................................................. 83

XVI. PRESUMPTION OF RELIANCE—FRAUD ON THE MARKET ................................ 84

XVII. INAPPLICABILITY OF STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE ......................................................................................................... 85

XVIII. CLASS ACTION ALLEGATIONS ............................................................................ 86

XIX. CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT............................................ 88

XX. PRAYER FOR RELIEF .......................................................................................... 93

XXI. JURY DEMAND....................................................................................................... 93

Court-appointed Co-Lead Plaintiffs City of Omaha Police and Fire Retirement System, Equity-League Pension Trust Fund, and Oklahoma Firefighters Pension and Retirement System (together, "Plaintiffs," and each a "Plaintiff"), together and on behalf of all others similarly situated, allege the following upon information and belief, except as to those allegations concerning Plaintiffs, which are alleged upon personal knowledge. Plaintiffs' information and belief are based on, among other things, their counsel's investigation, which includes without limitation: (a) a review and analysis of regulatory filings made by Defendant Weight Watchers International, Inc. ("Weight Watchers" or the "Company") with the U.S. Securities and Exchange Commission ("SEC"); (b) a review and analysis of press releases and media reports issued and disseminated by the Company; (c) a review of other publicly available information concerning the Company, including news stories and court filings; and (d) investigative interviews with former Weight Watchers employees having first-hand knowledge of the Company's business and operations. This investigation is continuing, and many of the relevant facts are known only by, or are exclusively within the custody or control of, the Defendants (defined herein).

## I. PRELIMINARY STATEMENT

1. This federal securities class action asserts strict liability-based claims under the Securities Act of 1933 (the "Securities Act") and arises from Defendants' materially false and misleading statements and omissions to investors concerning Weight Watchers' business and financial performance. As set forth below, Defendants conducted a secondary offering (the "Secondary Public Offering" or "SPO") in May 2018 using a materially false and misleading Registration Statement and Prospectus (the "Offering Materials"). As a result, Weight Watchers' controlling shareholder, Defendant Artal Luxembourg S.A. ("Artal Luxembourg") unloaded over 8.5 million shares of Weight Watchers common stock at an inflated price of $69 per share in the SPO, reaping gross proceeds of nearly $600 million.

2. Plaintiffs also bring fraud-based claims under the Securities Exchange Act of 1934 (the "Exchange Act"), alleging that, in the wake of a series of additional misleading quarterly earnings reports and related quarterly reports on Form 10-Q, the Artal Defendants and certain other Exchange Act Defendants (as defined herein) were able to reap roughly an additional $450 million by selling over 6 million additional shares at prices that were even higher than the $69 per share SPO price, such that the Artal Defendants alone had reaped ***over $1 billion*** in proceeds from their sales of Weight Watchers stock by mid-August 2018. However, with no new product innovation in the pipeline to launch in December 2018 (which marked the start of the all-important year-end and post-New Year's holiday season that had historically been critical to the Company's ability to generate a "pop" in its subscriber base), on February 26, 2019, the Company was forced to pre-announce a disastrous start to its critical December 2019 and early post-New Year's period, which the Company attributed largely to its failure to recruit lapsed members (*i.e.*, those individuals who had previously been Weight Watchers members, left the program, but signed up again at a later point). In response, Weight Watchers' shares plummeted over 33% to only $19.37 per share on February 27, 2019. Plaintiffs, on behalf of themselves and the Class (defined herein), now seek damages for the substantial losses they suffered in the wake of Defendants' violations of the securities laws.

3. Weight Watchers was founded in 1961, and thereafter grew into a well-known company that offers various weight loss and maintenance services and related products. Weight Watchers historically generated subscriber growth through three channels: (i) retaining members who were currently signed up; (ii) recruiting lapsed members to sign up; and (iii) attracting new members who had no previous experience with Weight Watchers. The second group – lapsed

members – historically comprised a large percentage of any reported subscriber increases in a given period.

4. Defendant Artal Group, S.A. ("Artal Group") acquired Weight Watchers in 1999, and thereafter controlled Weight Watchers through Artal Luxembourg's majority ownership of Weight Watchers' voting shares, its power to elect Weight Watchers' directors, and its admitted ability to influence all major corporate decisions. Indeed, at the time of the SPO, Artal Group, together with its parents and subsidiaries, "effectively control[led]" Weight Watchers, as stated in the Offering Materials.

5. Historically, weight loss programs experience a significant seasonal increase in subscriptions over the post-Thanksgiving year-end holidays, which peaks by the end of the following first calendar quarter (the period during which many people make New Year's resolutions regarding fitness and weight loss and sign up for related programs). Accordingly, it was the Company's practice and established "formula" to capitalize on this established seasonal pattern by developing a "program innovation" that it could commercially launch and market beginning in December. Although a year-end "program innovation" could take different forms, historically it always took the form of offering a new benefit or an attractive modification to the Company's program (*e.g.*, a simpler or improved diet plan, a new counseling program, or other new service benefit) that would entice existing customers to renew their subscriptions, attract former subscribers ("lapsed members") to rejoin, and tempt new customers to sign up for the first time. Because of the work entailed in researching, developing, market-testing, training staff for implementation of, and ultimately launching a meaningful new program innovation, the lead time required from initial planning to commercial launch was at least one to two years.

6. For example, in December 2017 – after more than two years in development and testing – Weight Watchers launched its "Freestyle" program. This program represented a meaningful modification to the Company's pre-existing "SmartPoints" program. The SmartPoints program had assigned a certain number of "points" to servings of a wide variety of foods (points that members would then "count" in order to stay within the program's recommended total points "budget" for weight loss). By contrast, the new Freestyle program reflected a significant program innovation by allowing members to eat an unlimited number of servings of food that were assigned a "zero points" value. Consistent with the views of Defendant Mindy Grossman ("Grossman"), who joined Weight Watchers as its new Chief Executive Officer ("CEO") in July 2017, the Company also sought to market the new Freestyle program in a manner that was aimed much more heavily than in the past at attracting new members outside of Weight Watchers' traditional demographic base of subscribers (which tended to skew towards middle-aged Caucasian women).

7. During the first quarter of 2018 ("1Q18"), the number of Weight Watchers subscribers increased significantly following the launch of the new Freestyle program. On May 4, 2018, the first day of the Class Period, the Company announced its results for 1Q18, reporting that its total number of subscribers had hit 4.6 million and that its revenues for the quarter had hit $408 million. In addition, the Company significantly increased its projected earnings per share ("EPS") for the full 2018 year to between $3.00 and $3.20, compared to its prior guidance of only $2.40 to 2.70. In response, Weight Watchers' share price began to rise. Just days later, on May 15, 2018, the Company conducted its SPO. In the SPO, Artal Luxembourg sold over 8.6 million of its shares of Weight Watchers common stock at $69 per share pursuant to the Offering Materials, reaping approximately $595.5 million in proceeds.

8. The Offering Materials explained that Weight Watchers would achieve its ambitious plans to grow its subscriber numbers and profitability through recruitment of new subscribers, *i.e.*, individuals who had had no previous experience with Weight Watchers. This objective was emphasized by Weight Watchers' announced marketing plan that would target individuals in demographic groups far beyond its traditional customers, who were middle aged women. The advertising would thus be employed to appeal to different age groups and diverse ethnicities, as well as men. The Offering Materials omitted to mention that it would be impossible for the Company to grow its profits and membership without recruiting ***lapsed*** members, *i.e.*, individuals who had previously been, but were no longer, Weight Watchers subscribers. These customers were primarily members of the traditional Weight Watchers demographic – middle aged women – and fell outside the scope of Weight Watchers' new marketing campaign. At the time of the SPO, investors were unaware that Weight Watchers would not be able to achieve its objectives without lapsed member recruitment.

9. Further unbeknownst to investors, by May 2018 – when the Company issued both its 1Q18 Form 10-Q and the Offering Materials for the SPO – Weight Watchers' management knew that it did ***not*** have a meaningful new program innovation in the pipeline to launch in December of 2018. Accordingly, the Company's 1Q18 Form 10-Q and the Offering Materials were materially false and misleading because, in violation of Item 303 of SEC Regulation S-K, they failed to disclose a known material event or uncertainty – namely, that Weight Watchers' inability to (and decision not to) launch a year-end new program innovation in December 2018 would cause its reported historical financial information not to be indicative of future operating results.

10. On August 6, 2018, the Company reported disappointing second quarter results and declining membership numbers, causing the Company's stock price (which had risen after the SPO to a peak of $103 on June 20, 2018) to fall to slightly less than $80 per share. However, the decline in the Company's stock price would have been even more severe except that the Company's quarterly report on Form 10-Q for second quarter of 2018 (issued August 7, 2018) again failed to disclose that the Company had no plans to, and was unable to, launch a year-end program innovation.

11. In mid-August 2018, Artal Luxembourg sold an additional six million shares at an inflated average price of $77.39 per share, thereby reaping an additional $465 million in proceeds. These additional sales brought its total Class Period sales to more than 14.6 million shares, or roughly half of the roughly 29 million shares it held (without any intervening sales) over the prior several years. In addition, Defendant Nicholas Hotchkin ("Hotchkin"), the Company's Chief Financial Officer ("CFO"), sold a large percentage of his Weight Watchers shares in August 2018, reaping more than $9.9 million in insider selling proceeds.

12. On November 1, 2018, Weight Watchers announced its results for the third quarter of 2018 ("3Q18") and reported a further large sequential decline in membership numbers and disappointing results. In response, the Company's share price tumbled once again, falling almost 30% to close at $48.13 per share on November 2. Yet once again, the Company's quarterly report on Form 10-Q (issued November 2, 2018) failed to disclose that the Company had no plans to, and was unable to, launch a year-end program innovation.

13. After the markets closed on February 26, 2019, Weight Watchers reported disappointing results for the fourth quarter of 2018 and a horrific start to 2019 and the critical post-New Year's Day period. These disclosures effectively revealed the truth concerning the

Company's actual condition, the full extent of the damage caused by its failure, throughout the Class Period, to have a new program for launch in December 2018, as well as its previously undisclosed dependence on recruiting lapsed members. In the wake of its predictably dismal December 2018-January 2019 start, the Company was also finally forced to admit that its strategic plan was not on track, as it admitted that it would "take longer than expected" to reach its previously touted goal of 5 million subscribers by the end of 2020, and that it now expected full year EPS for 2019 to be a mere $1.25-$1.50 per share (down sharply from $3.19 in 2018). Tellingly, Defendant Grossman attributed Weight Watchers' poor performance and reduced expectations largely to its inability to recruit lapsed members for whom the introduction of a new, year-end program innovation had historically provided a major draw.

14. In response, the Company's stock plummeted again, falling from $29.57 at the close on February 26, 2019 to only $19.37 on February 27, 2019 – a one-day decline of over 33%. This decline also represented a staggering ***72%*** decline from the stock's May 2018 SPO price of $69, and an even more staggering ***75%*** decline from the average $77.39 price at which Artal Group had dumped additional millions of shares just six months earlier.

15. Plaintiffs, on behalf of themselves and the Class they seek to represent, now bring this suit to recover the losses they have suffered as a result of Defendants' materially false, misleading, and incomplete statements.

## II. THE CLAIMS ASSERTED IN THIS COMPLAINT

16. As further set forth below, Plaintiffs assert two separate sets of claims. Counts One, Two and Three, set forth in Part One of this Second Consolidated Amended Class Action Complaint (the "Complaint"), assert strict liability and negligence claims under Sections 11, 12(a)(2), and 15 of the Securities Act in connection with a secondary public offering of Weight Watchers common stock conducted in May 2018 pursuant to the defective Offering Materials.

Claims under the Securities Act are asserted against Weight Watchers (as issuer), its CEO Grossman, its Chairman of the Board of Directors Raymond Debbane ("Debbane"), and Artal Luxembourg, Artal Group S.A. ("Artal Group") and Artal International S.C.A. ("Artal International") (collectively, Artal Luxembourg, Artal Group, and Artal International are referred to herein as the "Artal Defendants").

17. Plaintiffs specifically disclaim any allegations of fraud or fraudulent intent in the separately pleaded non-fraud Securities Act claims asserted in Counts One, Two and Three, with the proviso that any challenged statements of opinion or belief made in connection with the Offering Materials are alleged to have been materially misstated statements of opinion or belief as of the date they were made and/or as of the date of the SPO.

18. Counts Four and Five, set forth in Part Two of this Complaint, assert securities fraud claims under Sections 10(b) (and Rule 10b-5 promulgated thereunder) and 20(a) of the Exchange Act. These claims are asserted against the Exchange Act Defendants, consisting of (1) Weight Watchers; (2) Grossman; (3) Hotchkin; (4) Debbane; and (5) the Artal Defendants. These claims specifically incorporate all allegations and inferences from the facts alleged that these Defendants made the materially false, misleading, and incomplete statements and omissions alleged herein with scienter (*i.e.*, intentionally or recklessly) in violation of Section 10(b) and Rule 10b-5 promulgated thereunder, and/or are liable as control persons under Section 20(a).

## III. CONFIDENTIAL WITNESSES

19. Throughout this Complaint, Plaintiffs attribute certain allegations to information provided through discussions with various former employees of Weight Watchers (the "Confidential Witnesses" or "CWs"). These CWs provided evidence that supports the claims asserted herein, including that Weight Watchers could not grow its profitability through the recruitment of new members alone (*i.e.*, without lapsed members), and that, not later than May 4,

2018, when the Class Period began, Weight Watchers had no plans to launch, and by the beginning of the Class Period would be unable to launch, a new year-end program innovation in December 2018. The CWs relied upon are as follows:

20. CW1 is a former Weight Watchers executive with extensive knowledge of the Company's business and operations acquired over several years with the Company until CW1 left shortly before the SPO, and who was closely involved in developing Weight Watchers' practice (abrogated in 2018) of ensuring that there was a meaningful new program innovation that was developed, researched and tested for launch in December of each year. In the years immediately preceding the SPO, CW1 worked and/or communicated regularly with other senior officers of the Company, including officers at the senior vice president level or above in the areas of, respectively, Finance, Marketing and Operations, concerning matters related to Company's business, operations, projections, plans and strategy.

21. CW2 was a Strategic Account Executive in the Health Solutions division of Weight Watchers from the latter half of 2017 through and including the end of 2018. CW2 reported to Nicole Campagna, the Director of Account Management, who in turn reported to a General Manager. CW2's responsibilities involved managing clients, which were employers and benefits providers who provided their employees with Weight Watchers memberships and related services. Weight Watchers' clients that CW2 managed included financial institutions, banks, state agencies, insurers, and other private employers. CW2's duties included meeting with clients, assisting them with marketing the programs, and responding to any issues they had regarding the programs.

22. CW3 was employed by Weight Watchers for several years prior to the start of the Class Period until leaving the Company in mid-May 2018. During this time, CW3 served as a territory manager, focusing on the Massachusetts territory. In CW3's role as territory manager,

CW3 provided insight into the programs used to track new subscribers and subscriber retention. CW3 managed 12 locations and 130 employees in the center of Massachusetts. CW3's direct supervisor was a regional manager.

23. CW4 was a product design manager at Weight Watchers during the entirety of the Class Period. CW4 led a team of six product designers at the Weight Watchers office in New York City. CW4 reported to the head of design, Vlad Margulis, who joined Weight Watchers in 2015 when Weight Watchers acquired Hot5. CW4 worked on the design of the Freestyle program, described *infra* ¶¶ 56-61. CW4 also had significant experience with tracking member feedback and other data, which ostensibly should have been used to improve members' experience with Weight Watchers, but was often disregarded.

24. CW5 was the Director of Marketing for Weight Watchers' Health Solutions Division, who left the Company in 2019 after roughly a decade. CW5 reported to Mike Maluccio, and later Chere Scythe, who both held the title of "General Manger." CW5 reported indirectly to Gary Foster, the Company's Chief Scientific Officer. CW5's responsibilities were to lead Weight Watchers' marketing efforts directed at employers, encouraging them to offer Weight Watchers as a benefit to their employees.

**PART ONE:**
**CLAIMS UNDER THE SECURITIES ACT OF 1933**

25. In this Part One and in Counts One through Three below (the "Securities Act Claims"), Plaintiffs assert strict liability and negligence claims under Sections 11, 12(a)(2), and 15 of the Securities Act. Plaintiffs expressly disclaim any allegations of scienter or fraud for these Securities Act claims, and any challenged statements of opinion or belief are alleged to have been materially misstated statements of opinion or belief. Among other things, Plaintiffs disclaim the allegations of scienter or fraud in Section XIV below.

26. The Securities Act Claims arise out of the offering and sale of Weight Watchers common stock in the SPO conducted in May 2018.

27. The SPO was conducted pursuant to a Registration Statement (defined herein) filed on May 7, 2018, on Securities and Exchange Commission ("SEC") Form S-3 and incorporated a Prospectus (also defined herein) filed on May 14, 2018 (collectively, the "Offering Materials").

28. This action was brought within one year after the discovery of the untrue statements and omissions in the Offering Materials (and within one year after this discovery should have been made in the exercise of reasonable diligence) and within three years of the SPO.

## IV. JURISDICTION AND VENUE

29. The claims asserted in Part One of this Complaint arise under Sections 11, 12(a)(2), and 15 of the Securities Act (15 U.S.C. §§ 77k, 77*l*, and 77o).

30. This Court has jurisdiction over these claims under Section 22 of the Securities Act (15 U.S.C. §77v) and 28 U.S.C. § 1331.

31. Venue is proper in this Judicial District under Section 22 of the Securities Act (15 U.S.C. §77v) and 28 U.S.C. § 1391. Weight Watchers is headquartered in this Judicial District, many of the acts and transactions alleged in this Part One of the Complaint, including the

dissemination of materially untrue and misleading statements, occurred in substantial part in this Judicial District, and Weight Watchers common stock trades on the NASDAQ within this Judicial District.

32. In connection with the acts, conduct and other wrongs alleged in this Part One of the Complaint, Defendants either directly or indirectly used the means and instrumentalities of interstate commerce, including but not limited to the United States mails, interstate wire and telephone communications, and the facilities of the New York Stock Exchange and the NASDAQ, both national securities exchanges.

## V. THE SECURITIES ACT PARTIES

### A. The Securities Act Plaintiff

33. Plaintiff OFP purchased or otherwise acquired Weight Watchers common stock in domestic transactions in the SPO pursuant to the Registration Statement and Prospectus. On May 11, 2018, OFP purchased 6,200 shares of Weight Watchers common stock in the SPO at the offering price of $69 per share from Goldman Sachs & Co. LLC, which was an underwriter of the SPO. This transaction settled on May 15, 2018.

### B. The Securities Act Defendants

34. Defendant Weight Watchers is a Virginia corporation headquartered at 675 Avenue of the Americas, 6th Floor, New York, New York. Claiming to be the "the world's leading commercial weight management program," Weight Watchers offers subscription-based "commitment plans" intended to help its subscribers lose weight. Weight Watchers was the issuer of common stock in the SPO. As of February 1, 2019, Weight Watchers had approximately 67 million shares of common stock issued and outstanding. Throughout the Class Period, Weight Watchers common stock was listed and traded in an efficient market under the ticker symbol

"WTW."[1] Before the Class Period and until October 15, 2018, Weight Watchers common stock was listed and traded on the New York Stock Exchange. Effective October 15, 2018, Weight Watchers switched its stock listing to the NASDAQ; on that day, Weight Watchers common stock began trading on the NASDAQ.

35. Defendant Artal Luxembourg, a Luxembourg-headquartered corporation, was the controlling shareholder of Weight Watchers at the time of the SPO and, as the record holder of all shares sold in the SPO, offered and sold those shares.

36. Artal Luxembourg acquired Weight Watchers from the H.J. Heinz Company ("Heinz") in 1999 and continued to hold over 50% of Weight Watchers' outstanding common stock until October 2015, when Weight Watchers entered into a strategic collaboration with the media mogul Oprah Winfrey and issued and sold 6,362,103 shares of common stock to Ms. Winfrey. Though this reduced Artal Luxembourg's equity stake to less than 50%, Artal Luxembourg maintained control of Weight Watchers by, simultaneously with the issuance and sale of Weight Watchers shares to Ms. Winfrey, entering into a voting agreement with Ms. Winfrey (the "Voting Agreement") whereby the latter agreed to vote all of her Weight Watchers common stock to elect as directors any nominees designated by Artal Luxembourg. As set forth in the Company's pre-SPO SEC filings, by virtue of the Voting Agreement, Artal Luxembourg and Ms. Winfrey were deemed, for purposes of Section 13(d) of the Exchange Act, to constitute a "group" that collectively beneficially owned Weight Watchers common stock. At the time of the SPO, Artal Luxembourg "effectively control[led]" Weight Watchers, as stated in the Registration Statement and the Prospectus. The SPO was an underwritten offering, and Artal Luxembourg was a party to the underwriting agreement for the SPO, along with Weight Watchers, Goldman Sachs

[1] On April 16, 2019, after the Class Period, the ticker symbol for the Company's common stock changed to "WW."

& Co., LLC, Morgan Stanley & Co. LLC, and UBS Securities LLC (the "Underwriting Agreement"). Pursuant to the Underwriting Agreement, Artal Luxembourg made representations and warranties to Weight Watchers and to the underwriters, including warranting that the information provided by or on Artal Luxembourg's behalf for use in the Registration Statement and the Prospectus did not contain any material misrepresentations. Furthermore, at the time it acquired Weight Watchers, Artal Luxembourg entered into a registration rights agreement entitling it to cause Weight Watchers to register with the SEC shares held by Artal Luxembourg (the "Registration Rights Agreement"), and the SPO was conducted as a result of Artal Luxembourg exercising such rights. The Registration Rights Agreement required Artal Luxembourg's consent to the Company's choice of underwriters for any public offering of shares owned by Artal Luxembourg (such as the SPO).

37. Defendant Artal International is, and was at the time of the SPO, the 100% owner of Defendant Artal Luxembourg, and is also headquartered in Luxembourg. Artal International Management S.A. ("Artal International Management"), another Luxembourg corporation, is, and was at the time of the SPO, the managing partner of Artal International, and thereby had authority to direct both Artal International and, through Artal International, Defendant Artal Luxembourg.

38. Defendant Artal Group, a Luxembourg corporation is, and was at the time of the SPO, the 100% owner of both Artal International and Artal International Management. Artal Group is, and was at the time of the SPO, a wholly owned subsidiary of Westend S.A. ("Westend"), a Luxembourg corporation, which in turn is, and was at the time of the SPO, a wholly owned subsidiary of Stichting Administratiekantoor Westend (the "Stichting"), a Dutch entity.

39. Artal Luxembourg, Artal International, Artal International Management, Artal Group, Westend, and the Stichting jointly filed statements on Schedule 13D with the SEC

regarding their direct and/or indirect ownership of Weight Watchers common stock. In 2015, prior to the SPO, all of these entities jointly filed a Schedule 13D indicating that they together beneficially owned, and had sole voting and dispositive power over, 29,443,000 shares of Weight Watchers common stock—equal to 46.3% of the then-outstanding shares. Following the SPO, these same entities filed a Schedule 13D stating that, as a result of Artal Luxembourg's sale of 8.625 million shares in the SPO, they together beneficially owned, and had sole voting and dispositive power over, 20,818,000 shares of Weight Watchers common stock—equal to 31.4% of the outstanding shares.

40. Defendant Debbane has been Weight Watchers' Chairman of the Board since Weight Watchers was acquired by Artal Luxembourg in 1999. Debbane has also been CEO and Managing Director of Artal Group since well before the Class Period, as well as a Managing Director of Artal Luxembourg and Artal International Management. He is also a co-founder and President and CEO of The Invus Group, LLC ("Invus Group"), an investment management company created in 1985, and he has managed Artal's investments for years. As confirmed by CW1, Artal and Invus, including Debbane specifically, were closely involved in managing Weight Watchers according to CW1, with relevant non-parties Amouyal, Fajgenbaum and Sobecki (together with Debbane) constituting an active "office of the chairman" at Weight Watchers. Debbane signed the Registration Statement.

41. Defendant Grossman joined Weight Watchers in July 2017 as its President, CEO, and member of the Board, and continues to serve in these roles. Grossman signed the Registration Statement. Grossman also signed and, pursuant to Rule 13(a)-14(a) and the Sarbanes-Oxley Act of 2002 ("SOX"), certified the Company's 2017 10-K, 1Q18 10-Q, 2Q18 10-Q, and 3Q18 10-Q (all of which are defined herein).

**C. Relevant Non-Parties**

42. Philippe J. Amouyal ("Amouyal") has served on Weight Watchers' Board since 2002. Amouyal has been a Managing Director of Invus Group since 1999, and has served as a director of numerous private companies in which Artal or Invus have invested. Amouyal acted as part of the "office of the Chairman" at Weight Watchers' and was actively involved in the Company's management, particularly with respect to technology and product development, according to CW1. Amouyal signed the Registration Statement.

43. Jonas M. Fajgenbaum ("Fajgenbaum") has been a member of Weight Watchers' Board since Artal Luxembourg S.A acquired Weight Watchers in 1999. Fajgenbaum is also a Managing Director of Invus Group, which he joined in 1996, and has also served as a director of numerous private companies in which Artal and/or Invus have invested. As CW1 confirmed, Fajgenbaum acted as the third member of Weight Watchers' "office of the Chairman" and was actively involved in the Company's management, particularly with respect to operations, according to CW1, and CW1 worked with Fajgenbaum while CW1 was an executive at Weight Watchers. Fajgenbaum signed the Registration Statement.

44. Sacha Lainovic ("Lainovic") was a member of Weight Watchers' Board from Artal Luxembourg S.A.'s acquisition of Weight Watchers in 1999 until August 9, 2018, when Lainovic resigned from the Board. Lainovic co-founded Invus Group with Debbane in 1985, and served as its Executive Vice President from 1985 to 2006. In 2007, Lainovic co-founded Invus Financial Advisors, LLC ("IFA"), an investment firm that works closely with Invus Group (and Invus Group is the largest investor in IFA funds). Lainovic has served as IFA's Managing Partner since its founding. Lainovic signed the Registration Statement.

45. Christopher J. Sobecki ("Sobecki") has served as a member of Weight Watchers' Board since Artal Luxembourg acquired Weight Watchers in 1999, and served as a member of the

Company's Interim Office of the Chief Executive Officer, an office that existed from September 2016, when Grossman's predecessor left the Company, to July 2017, when Grossman joined the Company as CEO. In addition, Sobecki acted as part of the "office of the Chairman" and was actively involved in the Company's management, particularly with respect to financial matters, according to CW1. Sobecki is a Managing Director of Invus Group, which he joined in 1989, and he has served as a director of numerous private companies in which Artal or Invus have invested. Sobecki signed the Registration Statement.

## VI. SUBSTANTIVE ALLEGATIONS

### A. Background of Weight Watchers

46. Historically, Weight Watchers has offered various products and services to assist weight loss and maintenance. The philosophy behind the Company's programs is to use a science-driven approach to help participants lose weight by controlling their eating, staying active, and supporting—and receiving support from—other Weight Watchers members.

47. The Company was founded in 1961 when its founder, Jean Nidetch, invited friends to her home in Queens to discuss the best ways to lose weight, and to serve as a support group for individuals seeking to lose weight. Over the course of the next several decades, Weight Watchers expanded upon this initial model to organize in-person meetings for those looking for support and accountability in their weight loss efforts. This model was highly successful, and Weight Watchers expanded into an operation that had millions of members attending meetings in countries around the world by the turn of the century. CW3 explained that Weight Watchers' "bread and butter" customers consisted of middle-aged, white women.

48. Weight Watchers built upon its model of in-person support groups and provided tools to its members to assist their weight loss efforts. For example, in the years preceding the Class Period, Weight Watchers had developed a "points" system, whereby its members could keep

track of their food intake by matching the food with "points" assigned by Weight Watchers. The points were assigned in a manner that reflected each food's caloric and fat content, and members were encouraged to keep their daily food intake below a certain number of points.

49. Weight Watchers earns revenues from subscriptions to the Company's digital products and by conducting workshops, for which it charges a fee, predominantly through commitment plans, prepayment plans, and "pay-as-you-go" arrangements (collectively, "subscriptions"). Weight Watchers also earns revenues by selling consumer products (including publications) in its workshops, online and to its franchisees, collecting commissions from franchisees, collecting royalties related to licensing agreements, selling magazine subscriptions, publishing, selling advertising space on its websites and in copies of its publications and By Mail product sales.

**B. The Seasonal Nature of Weight Watchers' Business and the Development of Its Established Formula of Relying on a Year-End "Product Innovation" to Generate the Coming Year's Largest "Pop" in Subscribers in the Critical December and Post-New Year's Period**

50. As the Company's own public statements concede and as CW1 and CW2 confirmed, Weight Watchers' business is highly seasonal. In particular, the period immediately before and after each New Year's Day is the most critical part of the Company's seasonal business cycle, as diet and weight loss programs historically experience their biggest membership gains in the period beginning shortly after Thanksgiving in early December, and then running into the year-end holiday season and into the New Year, as large number of people begin to focus on implementing a "New Year's Resolution" to lose weight.

51. Accordingly, as CW1 described, Weight Watchers developed a policy and practice to capitalize on this seasonality by always having a significant new "program innovation" that the Company would commercially launch in early December, which would help ensure that its

employees in the field had had an adequate opportunity to be practiced in delivering and/or presenting the new program innovation in the peak of the new subscriber season around and after New Year's, and that it would have a program innovation that (as CW1 put it) could be put at the center of accompanying marketing and advertising efforts that would answer a prospective customer's question "what new program innovation is being offered that should make me sign up with this year." Similarly, CW2 described how, at the end of each calendar year before the year-end holidays, Weight Watchers had a strategy of launching a substantive service or program innovation or revision (sometimes referred to internally as "Program News") that would be used to attract prospective members looking to lose weight as a part of their New Years' Resolutions, which would be supported by a robust marketing of the program innovation that would give existing, lapsed and prospective members reason to believe that the new program innovation would work for them (or represent a further improvement on what was already working for existing members). CW5, a former Director of Marketing in Weight Watchers Health Solutions Division, also explained that Weight Watchers launched a new twist on its program before the end of the year, which would be particularly critical to efforts to convince the Company's "lapsed members" (*i.e.*, those who had previously been Weight Watcher's members but had dropped their memberships) to sign up again.

52. CW1 further described how a "program innovation" could be generally categorized as involving a "food program" innovation, a "fitness" innovation, a "mindset" innovation, or "service channel" innovation. An example of a "food" based program innovation would be a modification in the types or amounts of food recommended to members (for example, the significant modification to the Company's prior SmartPoints "points" system that had been launched in December 2017 as part of the Freestyle program). A "mindset" program innovation

might be, for example, offering a free counseling session. An example of a "fitness change" might be to offer a promotion that partnered with a health club chain to offer a discounted health club membership to Weight Watcher members. An example of a "service channel" program innovation would be offering a new app, or a 24/7 "chat" service through which members could connect to a Weight Watchers representative online at any time, day or night. Regardless of the precise nature of the innovation, CW1 stressed that the core of this "formula" was always to offer a former or prospective new member a new reason to join – as opposed to relying simply on more marketing, celebrity endorsements, or otherwise offering what was basically the same old product in a new or more aggressive way.

53. In sum, the year-end holiday period and the first quarter of every year were historically the key peak season for the Company to entice existing customers to renew their subscriptions, to persuade "lapsed members" to rejoin Weight Watchers, and to get brand new customers who had no prior experience with the Company's programs to become members. As a result of Weight Watchers' established "formula" of capitalizing on this seasonality by having a meaningful new program innovation that would be commercially launched (together with a coordinated marketing and advertising campaign) beginning in December of each year, Weight Watchers historically experienced a significant "pop" in subscriptions by the end of the first quarter of each year, including particularly strong "pops" in the first quarter of each of the three years immediately preceding the start of the Class Period, as reflected in its quarterly reports filed with the SEC and as corroborated by CW1, CW2, and CW3.

54. As CW1 also described, in order to have a meaningful new program innovation that was ready to roll out in December in the lead up to the critical year-end holiday and post-New Year's period, preparation for such a launch would require significant lead time. CW1 explained,

for example, that staff in the field would have to be fully briefed and trained by the end of the third quarter (September), final market testing would have to have begun in the second quarter and be completed by the summer in advance of staff training, and of course the initial conceptualization and subsequent research and development of the program innovation would have to be started – and completed – still earlier. Accordingly, as CW1 confirmed, a meaningful programmatic innovation would require at least one to two years from conception to actual launch.

55. Also of crucial importance to Weight Watchers' business model, according to CW1 and as later acknowledged by the Company at the end of the Class Period, was its ability to sign up lapsed members, who often comprised a majority of the new members. In particular, CW1 explained that encouraging lapsed members to rejoin Weight Watchers was a key component of the Company's success in the years 2016-2017. CW1 stated that the number of returning lapsed members was significant, and that the number was tracked by the Director of Finance. Grossman, however, decided that it was no longer important to market to lapsed members. Instead Grossman decided that the Company would target new members, which would create a more diverse membership. As CW1 put it, Grossman took the lapsed members "for granted," and stated that Grossman thought Weight Watchers should no longer be associated with "middle-aged white women," which CW3 described as the "bread and butter" of Weight Watchers. A problem with this, CW1 stated, was that even if the Company were successful in attracting members new to the Weight Watchers experience, as Grossman sought to do, the new members were not nearly as numerous as the existing and returning lapsed members in a given period. For example, although the Company might sign up five new, diverse, younger members, consistent with Grossman's new Strategic Vision, in January they could very well end up joining an existing meeting group that

had previously consisted overwhelmingly of older white women – which might not appeal to the new members.

### C. As Weight Watchers Launches Freestyle, Artal Plans to Cash Out Its Position

56. As noted above, in December 2017, Weight Watchers followed its established practice of commercially launching a significant new program innovation just before year-end by launching its Freestyle program. This time was different, however, because its largest shareholder, Artal Luxembourg, would sell a large portion of its position in Weight Watchers at lofty stock prices that resulted from the traditional new year subscriber bump.

57. With great fanfare, on December 4, 2017, Weight Watchers announced the launch of Freestyle, which modified its prior SmartPoints system by, among other things, significantly expanding the number of foods that were allocated zero "points." Previously, only fruits and vegetables were "zero Points" foods. With the launch of Freestyle, the list of zero Points foods swelled to over two hundred, including a number of high-protein foods such as eggs, all fish and seafood, skinless chicken breast, and non-fat plain yogurt. CW3 explained that the Freestyle system was designed around the nutritional benefits of food, rather than simply taking into account the number of calories, sugars and fat, which is why certain foods like chicken and eggs were ascribed zero points. Part of the appeal of this expansion was that it would make it easier for subscribers to track the number of points on their Weight Watchers app because there were fewer foods they needed to input. Oprah Winfrey noted that "the fish, beans and corn in my favorite tacos are now zero Points!" The Freestyle program also allowed members to "rollover" unused daily points to other days of the week for more flexibility. Marketing materials quoted Oprah Winfrey boasting that "Freestyle brings an even greater level of ease." Weight Watchers hoped that the convenience would entice younger members outside its previous core demographic of middle-aged, white women.

58. Along with greater ease of tracking food intake, Freestyle sought to attract those hoping to improve their overall health and wellness, as opposed to just lose weight. In its press release announcing Freestyle, Weight Watchers quoted its Chief Scientific Officer, Gary Foster, as saying, "[t]he new Freestyle program offers a wide range of zero Points foods that guide members toward a healthier pattern of eating. It gives people the freedom and flexibility to make significant changes on and off the scale."

59. The Freestyle launch was a success. CW5 explained that internally, employees were told that members liked the program, and were particularly enthusiastic about the fact that many foods were ascribed a zero points value.

60. Soon after, as part of its concerted effort to keep up with demands and competition, on January 1, 2018, Weight Watchers announced in a press release that it had engaged a "social media ambassador" – DJ Khaled, a music magnate, producer and recording artist. The January 1, 2018 press release stated that DJ Khaled's mission was to "document his experience and progress on the new Weight Watchers Freestyle program on his social channels – including Snapchat (@djkhaled305), Twitter, Instagram, and Facebook – speaking candidly about how the program has given him the freedom and flexibility to make healthier choices while keeping up with his busy lifestyle." In connection with this announcement, DJ Khaled stated that "the new Freestyle program is all about healthier habits for my life," and Grossman stated that "[b]eing healthier is not just about weight anymore. It's about overall health and wellness – being your best self." DJ Khaled's engagement was also designed to attract subscribers beyond the traditional Weight Watchers subscriber, who was typically a middle-aged, white woman.

61. The launch of Freestyle was the culmination of well over a year of development and clinical trials. Backed by a significant marketing effort, the introduction of Freestyle resulted

in a large jump in subscriber numbers, which increased over 42% during 1Q18 (compared to the end of 4Q17).

**D. Weight Watchers Announces a New Strategic Vision in February 2018 – But Does Not Disclose that It Will Not Be Launching a New Program Innovation in December 2018**

62. In the wake of the positive 1Q 2018 results generated by the Freestyle launch, on February 7, 2018, Weight Watchers announced an ambitious new "strategic vision" that called for achieving even more aggressive record-breaking membership and revenue figures by the end of 2020. As the Company's press release stated, "[b]y the end of 2020," the Company aimed to "[h]elp 10 million people adopt healthy habits, with 5 million people in the Weight Watchers program and an additional 5 million people engaging through other Weight Watchers experiences and content." This expansion would "[i]ncrease revenue to more than $2 billion, driven primarily by new member growth and improved retention."

63. In response, the Company's stock price rose from $63.06 on February 6, 2018 (the day before the Company announced its 2020 goals), to $73.97 the following day, an increase of $10.91, or 17%.

**E. Artal Cashes Out in May 2018**

64. On May 4, 2018, the day that the Company filed its quarterly report for 1Q18, Weight Watchers' stock closed at $69.83. On the next trading day, May 7, 2018, the Company filed the Offering Materials for the SPO, pursuant to which 8.625 million of the Weight Watchers shares owned by Artal were offered and sold to the public at a price of $69 per share.

65. The SPO was conducted pursuant to the Offering Materials. Specifically, on May 7, 2018, Weight Watchers filed a shelf registration statement on Form S-3 in connection with the public offering of its common stock (the "Registration Statement"), which became effective that same day. The Registration Statement included a prospectus dated May 7, 2018, which is part of

the Registration Statement. The Registration Statement permitted Defendant Artal Luxembourg to sell shares of Weight Watchers common stock whenever it sought to do so in the future, and stated that Weight Watchers would provide a prospectus supplement each time that Artal Luxembourg sold Weight Watchers common stock using the prospectus in the Registration Statement.

66. On May 14, 2018, Weight Watchers filed a prospectus supplement and accompanying prospectus for the sale, by Artal Luxembourg, of 8.625 million shares of Weight Watchers common stock (including up to 1.125 million shares pursuant to an option granted to the underwriters of the SPO), at an offering price of $69 per share (the "Prospectus," and with the "Registration," the "Offering Materials"). The Prospectus is part of the Registration Statement. Both the Prospectus and the Registration Statement incorporated by reference the Company's annual report on Form 10-K for the year ended December 31, 2017 (the "2017 10-K") and the Company's quarterly report on Form 10-Q for the first quarter of 2018 (the "1Q18 10-Q").

67. The SPO closed on May 15, 2018. The underwriters exercised their option in full, and Artal received proceeds of approximately $571 million (net of underwriting discounts). The investors who purchased Artal's shares were not so fortunate. Following the disclosure of the truth at the end of the Class Period, Weight Watchers' stock was trading at less than a third of the offering price.

### F. Artal Luxembourg's $571 Million Cash Out SPO Was Conducted Pursuant to Materially Misleading and Incomplete Offering Materials

#### 1. Weight Watchers Did Not Disclose that Its Growth Depended on Recruiting Significant Numbers of Lapsed Members

68. Weight Watchers' announced strategy to boost subscribers and hit its target of 5 million new members by 2020 was a focus on attracting members outside of Weight Watchers' traditional base of subscribers. It was apparent that Weight Watchers' announced strategy was

focused on new subscribers (and had little regard for boosting its subscriber numbers by signing up lapsed members), as it was specifically targeting new members through its marketing campaigns, while neglecting efforts to draw in lapsed members. This was corroborated by CW4, a former Product Design Manager, who explained that feedback from lapsed members about potential improvements to the Freestyle program was ignored. Thus, CW4 was directed not to make iterative changes to the Freestyle program based on user and lapsed user feedback. Further, CW1 spoke of Grossman's disregard for lapsed members, saying that Grossman took lapsed members for granted, and specifically did not want the Weight Watchers brand to be associated with middle-aged white women.

69. In the Offering Materials, the Company repeatedly emphasized that its plans for growth focused on attracting new members. On February 25, 2019, however, the Company disclosed that the Company's growth, in particular its plans to meet its 2020 goals, required active recruitment of lapsed members – namely, those who had previously joined, and then left, Weight Watchers – and that because the Company was failing to attract lapsed members, its strategy for growth was in doubt.

70. The Prospectus, which formed part of the Registration Statement, contained several material misstatements and omissions as further described in the paragraphs below.

71. For example, page S-6 of the Prospectus stated that there were three components to Weight Watchers' business plan, as follows:

> We intend to continue to rapidly grow our business and profitability by continuing to offer compelling value to our members. We are focused on driving growth through the following levers:
>
> - ***increase recruitment of new subscribers*** to expand our member base through a growing influencer community, effective marketing, and agile, brand-led innovations;

- sustained focus on member retention through continued expansion of our social network Connect and enhancements to our products and services to create valuable customer experiences; and

- continue brand-led consumer product innovation to drive licensing and partnership revenue.[2]

72. These statements were false and misleading. The Prospectus failed to disclose that Weight Watchers could not "rapidly grow [its] business and profitability" without continuing to recruit and attract lapsed members. Instead, these statements misleadingly represented that Weight Watchers would be able to "driv[e] growth" through "recruitment of new subscribers," retention and product innovation. In fact, recruitment of lapsed subscribers was required for the Company to grow its profits and membership, and achieve the goals set forth in its Strategic Vision. Investors were not able to discern that, in fact, growth would also require recruitment of lapsed members.

73. This omission was material to investors, because Weight Watchers' marketing campaign was directed at recruiting ***only new members***, while neglecting lapsed members. Because Weight Watchers had not previously mentioned anything in its public filings and statements about the significant contribution that lapsed members made to its subscriber numbers, investors would not have known that growth could only possibly be achieved through active recruitment of significant numbers of lapsed members.

74. If investors had known that Weight Watchers could not "grow [its] business and profitability" without lapsed member subscriptions, they would have evaluated the Company's stated growth strategy and Strategic Vision in a materially different light, recognizing the serious risks it posed to such plans. For example, the Prospectus states, at page S-2, that "***[w]e believe that, with only 5% of U.S. adults who are trying to lose weight in a commercial weight management plan, we have a significant opportunity to drive increased penetration of and***

---

[2] All emphases added unless otherwise noted.

***engagement with our brand***." The Prospectus further stated that "[o]ur strong, widely-recognized and trusted brand allows us to more efficiently ***acquire new members and broaden our appeal to new audiences***."

75. The Prospectus further emphasized recruitment of ***new*** members where it stated, on page S-7:

> ***Continue to Broaden and Diversify our Influencer Network to Attract Members***[3]
>
> Our influencers increase awareness of Weight Watchers through social media engagement and other outlets and allow us to more efficiently and effectively recruit and retain members. We are continually expanding our scope of influencers to include a diverse range of individuals, from celebrities to member ambassadors, ***to promote our brand and expand its appeal to a broader group of people across ethnicities, geographies, age, lifestage and gender.***

76. The Prospectus echoed this statement on page S-5, stating

> ***We seek to expand and strengthen our communities and diversify our reach across ethnicities, geographies, age, lifestage and gender*** through our strategic relationships with influencers. Celebrities, health and wellness influencers, brand ambassadors and chief share their experiences with our products and program to ***attract new members*** and inspire current members.

77. Furthermore, on page S-2, the Prospectus stated that Weight Watchers had "partnered with several key celebrities and influencers to begin diversifying our global reach across ethnicity, geography and gender, including most notably our strategic partnership with Oprah Winfrey."

78. On page S-4, the Prospectus stated that "[o]ur strong, widely-recognized and trusted brand allows us to more efficiently acquire new members and broaden our appeal to new audiences."

79. In these foregoing statements, Weight Watchers emphasized its goal of increasing the demographic diversity in its subscriber base—an aim that required Weight Watchers to focus

[3] Bold and italics in original.

on signing up new members, rather than returning ones. A "broader" or more diverse membership meant the Company would attempt to appeal to and attract people who had not previously been Weight Watchers members. This strategy would also mean that the marketing would neglect the lapsed members who had historically been a significant component of the Company's subscriber numbers.

80. These statements above in ¶¶ 71 and 74-78 were materially false and misleading because Weight Watchers omitted to explain to investors that it could only grow its subscriber numbers and profitability with a significant contribution made by lapsed members. Without that disclosure, the statements (on page S-6 of the Prospectus) that Weight Watchers would "driv[e] growth" by "increas[ing] recruitment of new subscribers" with "effective marketing and agile brand-led innovations" were materially false and misleading because it misled investors into thinking that the aggressive goals that Weight Watchers set could be reached by signing up new members alone, with little or no regard for lapsed members. In addition, the statements that Weight Watchers would focus its marketing on attracting a new base of customers – diverse in age, gender and ethnicity – were materially false and misleading because they gave investors the impression that this marketing strategy would enable Weight Watchers to grow its profitability. In fact, this was a marketing strategy that neglected lapsed members, and investors did not know that lapsed members were crucial to its ability to grow its profitability.

81. By the end of 2018, Weight Watchers realized it would be unable to "rapidly grow its business and profitability," *see* Prospectus at page S-6, without recruiting lapsed members, and that its marketing targeted at new members was failing to entice lapsed members to re-up. Indeed, as CW2 stated, in the fourth quarter of 2018 Weight Watchers entered "panic mode" in an effort

to get lapsed members to return, engaging a big push toward lapsed members and an aggressive email marketing campaign.

**2. The Offering Materials Did Not Disclose that Weight Watchers Had Abandoned Its Business Model of Launching a New Program Innovation Late in the Year to Boost Subscribers in January**

82. The Offering Materials, which incorporated the 2017 10-K and the 1Q18 10-Q, omitted to disclose that Weight Watchers had abandoned its prior established business strategy of developing a new program innovation in time to launch in December, before the start of the all-important first-quarter and the "New Years' Resolution" season (which program would be designed, in significant part, to give lapsed members a new reason to rejoin Weight Watchers, as well as reasons for existing members to extend their membership and for entirely new members to sign up), and thus was materially misleading.

83. The Company's intention to engage in a "rebranding" initiative, which had been discussed as part of the Company's pre-Class Period discussion of its "Strategic Vision", was the product of the efforts of the Company's new CEO, Defendant Grossman, who joined the Company in July 2017. The rebranding initiative was predicated on implementation of a broader marketing plan (that was intended to reach a broader array of demographic groups, including younger and more ethnically diverse groups that had historically been under-represented in Weight Watchers members compared to, *e.g.*, more middle-aged Caucasian women), combined with increased emphasis on celebrity endorsements and marketing of a newly emphasized "WW" brand (together with a "WW" logo) that would, it was hoped, help promote Weight Watchers (or, more accurately, "WW") as a Company that would promote "wellness" generally, rather than identify it more narrowly as a weight-loss company.

84. However, although the Company disclosed that it intended to launch a significant rebranding initiative, it did ***not*** disclose that, as conceived and implemented, the Company's plans

for 2018 did not involve the development of a program innovation to be launched in the fourth quarter of 2018, which had historically been critical to the Company's success in increasing subscriber recruitment (including lapsed member recruitment) in the all-important December-March period.

85. Although CW1 left WW in the first quarter of 2018, CW1 still saw Company marketing and promotional materials and continued to stay in touch with some of CW1's former colleagues over the following year, so CW1 was able to observe that the Company's traditional formula of launching a meaningful year end program innovation was not followed in 2018. Instead, as confirmed by CW1, by the time CW1 left (and by the date of the SPO), it was already clear internally that Weight Watchers would not be launching a meaningful program innovation in December 2018 and would thus not be in a position to leverage its seasonal increase in subscriber numbers through a traditional December-January "pop" in membership as it had done in prior years. Indeed, as CW1 explained, the process of readying a meaningful new program innovation for commercial launch (including researching, developing, and testing the program innovation, developing marketing content, and training field staff for implementation), required *at least* one or two years. Thus, as of the May 2018 SPO, there was no meaningful "program news" or programmatic enhancement that would be ready to market and promote starting in December 2018 that would leverage the seasonal growth in membership during the upcoming New Year's season, and indeed, consistent with Defendant Grossman's abandonment of the traditional formula, there had never been any plans as of the SPO or thereafter to introduce any such meaningful program innovation in the critical December 2018/early 2019 period.

86. The false and misleading statements in the Offering Materials generated short-term investor enthusiasm that enabled the price of Weight Watchers' stock to soar, providing an

opportune moment for Artal to cash out. Soon thereafter, the truth behind Weight Watchers' business model manifested itself through flagging subscriber numbers, and investors watched as the price of Weight Watchers' stock declined precipitously.

### G. Weight Watchers Reveals that Implementing Its Strategic Plan Depended on Attracting Lapsed Members

87. After the close of trading on February 26, 2019, Weight Watchers issued a press release that reported its actual 4Q18 and FY18 results. As that release reported, at the end of 4Q18 the Company's total subscriber count had declined to 3.9 million subscribers. Moreover, the press release "pre-announced" that January 2019 had been a "hard month," and that given the shortfall in the critical late 2018 and post-New Year's period, the Company was ***now only targeting revenues of $1.4 billion for FY19*** – well below the nearly $1.7 billion it had led the market to expect for FY19. Weight Watchers also disclosed that it was ***now only targeting EPS of $1.25 to $1.50 per share for full year FY19,*** compared to reported EPS of $3.19 for the full year 2018.

88. More specifically, the Company disclosed that its critically important first quarter yielded far fewer recruits than the Company had predicted and that were necessary to achieve the Company's "Strategic Vision." In fact, recruitment in January 2019 was "well below" that in 2018 and, on page 6 of the transcript of the conference call, Grossman was forced to admit that achieving the goals set in Weight Watchers' strategic plan would now clearly "take longer than expected."

89. During the February 26, 2019 conference call, Grossman attributed the Company's failure to achieve the goals in the strategic plan, *i.e.*, to increase its profitability, to its inability to recruit ***lapsed members*,** rather than to any short fall in recruiting the new members that the Prospectus stated would "driv[e]" the Company's growth. In particular, Grossman noted that the Weight Watchers "campaign did not drive recruitment of our significant universe of lapsed members," and reiterated that "our winter advertising did not drive consumers, ***particularly our***

***former members*** to action in the way we had hoped." For the first time, the Company, through Hotchkin, stated that Weight Watchers had hoped that "newness in [its] program [would] appeal[] not only to those who have not Weight Watchers before, but ***also to former members*** who have an affinity for the brand and know that Weight Watchers works." Grossman further admitted, for the first time, that the Freestyle marketing was "geared to both ***attracting*** new members as well as ***lapsed members***," but that the competitive environment "***does affect lapsed member recruitment*** when we're not lapping something new."

90. During the conference call, Defendant Grossman also acknowledged that the "January time period [was] such a critical component of [the Company's] recruitment for the year," emphasizing that she "had to be ***realistic and transparent*** about what that meant for the balance of the year" when issuing the Company's FY19 guidance.

91. Prior to this point, Weight Watchers had never disclosed that its ability to "driv[e] growth" and to "grow [its] business and profitability," as stated on Page S-6 of the Prospectus, would depend on attracting lapsed members.

92. Information disclosing the importance of recruiting lapsed members was material to investors. In particular, they were evaluating the soundness and prospects of a strategy that was clearly aimed at attracting a new clientele to Weight Watchers – younger, ethnically diverse, focused on wellness. Its prior subscribers were primarily middle-aged, Caucasian women. Thus, if investors had known that Weight Watchers could not have reached its goals without recruiting its lapsed members, as well as new members, they may have been more critical of the marketing strategy.

93. For example, the partnership with DJ Khaled was not engineered to draw in middle-aged white women. Thus, an investor might be cautious in assuming that the new Weight Watchers

marketing plan would enable the Company to achieve its goals because this plan was not designed to encourage the lapsed members to sign on to its new program, which did not focus on weight loss, and which did not include in-person meetings as its centerpiece.

94. Analysts also observed that it was the apparent failure to sign up lapsed members that caused Weight Watchers to fall short on its strategic plan. For example, on February 27, 2019, in a report titled "Shrinking Members & Margins; Reiterate Underweight & Adding to AFL on Risk to Slashed 2019 Guide", JP Morgan lowered its price target for Weight Watchers stock from $25 per share to $14 following the announcement that Weight Watchers' "marketing has missed the mark particularly with lapsed subscribers." Morgan Stanley, for its part, announced on February 27, 2019, in a report titled "2019 Outlook Well Below, Putting the 'Show Me' Story More in Question," that it was now "more cautious" about the Company, noting that the "winter ad campaign . . . did not yield desired member recruitment (including from lapsed members)," and lowered its price target for Weight Watchers stock from $50 to $21 the following day.

95. But the inclusion of lapsed members was never disclosed as a part of the Company's plan to reach its goals, and the statements that Weight Watchers planned to achieve its strategic goals and grow its profits by focusing on signing up brand new members were materially misleading. In fact, an essential element of being able to meet their growth plans was recruitment of lapsed members.

96. In addition, the risk that Weight Watchers took in deciding to abandon its proven model of success – which would normally have involved the introduction of a program innovation late in 2018 to boost subscriber numbers in January 2019 – manifested itself when Weight Watchers announced that its January numbers were disappointing. Moreover, because program

innovations require one to two years of planning, development and testing before launch, Defendants knew that any risk had already transpired by the time of the SPO.

97. In response to these disclosures, the Company's stock plummeted, falling from $29.57 at the close on February 26 ***to only $19.37*** on February 27, 2019 – equal to a further one-day decline of over 33%. This decline also represented a staggering ***72%*** decline from the stock's May 2018 SPO price of $69, and an even more staggering ***75%*** decline from the roughly $77.39 price at which Artal Luxembourg had dumped an additional 6 million shares just five months earlier in August 2018.

## VII. THE OFFERING MATERIALS VIOLATED SECURITIES REGULATION S-K, ITEM 103

98. The Company's Offering Materials, including the 2017 10-K, and the 1Q18 10-Q incorporated therein, violated Item 303 of Regulation S-K (17 C.F.R. § 229.303). Pursuant to the instructions to Form S-1, Weight Watchers was required to comply with the "Management's Discussion and Analysis of Financial Condition and Results of Operations" ("MD&A") disclosure requirements of Item 303 of Regulation S-K in connection with preparing the Registration Statement. The MD&A requirements are intended to provide material historical and prospective textual disclosures that enable investors and others to assess the financial condition and results of operations of a company, with emphasis on that company's prospects for the future.

99. Specifically, Item 303 requires the disclosure of "any known trends or any known demands, commitments, events or uncertainties that will result in or that are reasonably likely to result in the registrant's liquidity increasing or decreasing in any material way." Item 303 further requires disclosure of "any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."

100. Importantly, as the SEC made clear, Item 303 is "intended to give the investor an opportunity to look at the company through the eyes of management by providing both a short and long-term analysis of the business of the company . . . with particular emphasis on the registrant's prospects for the future." Management's Discussion and Analysis of Financial Condition and Results of Operation, Securities Act Release No. 6835, 1989 WL 1092885, at *3 (May 18, 1989). Thus, "material forward-looking information regarding known material trends and uncertainties is required to be disclosed as part of the required discussion of those matters and the analysis of their effects." Commission Guidance Regarding Management's Discussion and Analysis of Financial Condition and Results of Operation, Securities Act Release No. 8350, 2003 WL 22996757, at *11 (Dec. 29, 2003). Equally important, as the instructions to Item 303 expressly state, the MD&A "shall focus specifically on material events and uncertainties known to management that would cause reported financial information to be not necessarily indicative of future operating results or of future financial condition." 17 C.F.R. 229.303(a), Instruction 3.

101. Specifically, Weight Watchers failed to disclose that, by the time of the SPO, the Company was committed to a path that would deviate from its prior established strategy of having a significant new program innovation ready to launch and market by December, which would be used to leverage and drive subscriber demand during the critical late December and first quarter period. While the Company represented that "program innovation" was at the "core" of the Company's business and that "retention increase[s]" are "driven by…new exciting features in our programs," unbeknownst to investors Weight Watchers had consciously decided ***not*** to develop a new program innovation that would be launched over the 2018-2019 winter holidays by the start of the Class Period.

## VIII. CLAIMS FOR RELIEF UNDER THE SECURITIES ACT

### COUNT I
**Violations of Section 11 of the Securities Act**
**In Connection with the Secondary Public Offering**
**(Against Weight Watchers, Debbane, and Grossman)**

102. Plaintiffs repeat and reallege every allegation contained above as if fully alleged in this Count, only to the extent, however, that the allegations do not allege fraud, scienter, or the intent of the Defendants to defraud Plaintiffs or members of the Class.

103. This Count is brought pursuant to Section 11 of the Securities Act against Weight Watchers, Debbane, and Grossman in connection with the SPO. Weight Watchers is strictly liable under this Count. Weight Watchers was the issuer of the common stock sold in the SPO pursuant to the Registration Statement and issued and filed the Registration Statement (as well as the Prospectus, which formed part of the Registration Statement, and the materials incorporated in the Registration Statement).

104. Debbane and Grossman are liable because they were directors of Weight Watchers when the Registration Statement was filed, when it became effective, and when Weight Watchers common stock was sold pursuant to that document, which they signed. Debbane and Grossman acted negligently in that none of them conducted a reasonable investigation to ensure, or had reasonable grounds to believe at the time the relevant parts became effective, that the statements contained in (or incorporated by reference in) the Registration Statement were true and there was no omission of material fact required to be stated therein or necessary to make the statements therein not misleading.

105. This Count does not sound in fraud. Rather, this Count is based solely on strict liability and negligence. For purposes of asserting this and their other claims under the Securities Act, Plaintiffs do not allege that any Defendant acted with intentional, reckless or otherwise

fraudulent intent, and any challenged statements of opinion or belief made in (or incorporated by) the Registration Statement are alleged to have been materially misstated statements of opinion or belief when made and at the time of the SPO.

106. The Registration Statement, at the time when the relevant parts became effective, contained (and/or incorporated by reference) untrue statements of material fact or omitted to state (and/or incorporated by reference documents that omitted to state material facts) required to be stated therein or necessary to make the statements therein not misleading.

107. When OFP, and other members of the Class, acquired Weight Watchers common stock in, pursuant to, and/or traceable to the SPO, they did not know, nor in the exercise of reasonable care could they have known, of the untruths or omissions contained (and/or incorporated by reference) in the Registration Statement.

108. OFP, and other members of the Class, suffered damages in connection with the purchase or acquisition of Weight Watchers common stock in, pursuant to, and/or traceable to the SPO.

## COUNT II
## Violations of Section 12(a)(2) of the Securities Act In Connection with the Secondary Public Offering (Against Artal Luxembourg)

109. Plaintiffs repeat and reallege every allegation contained above as if fully alleged in this Count, only to the extent, however, that the allegations do not allege fraud, scienter, or the intent of the Defendants to defraud Plaintiffs or members of the Class.

110. This claim is brought pursuant to Section 12(a)(2) of the Securities Act against Artal Luxembourg in connection with the SPO.

111. The stock that was sold in the SPO was owned specifically by Artal Luxembourg. Thus, Artal Luxembourg was an offeror and seller of the Weight Watchers common stock that was sold in the SPO pursuant to defective Offering Materials.

112. Artal Luxembourg offered, sold, and/or solicited the purchase of (or assisted in the offer, sale, or solicitation of the purchase of) Weight Watchers common stock within the meaning of the Securities Act, by means of the Prospectus.

113. The Prospectus included (and/or by incorporated by reference) untrue statements of material fact and/or omitted to state (and/or incorporated by reference documents that omitted to state) material facts necessary in order to make the statements, in light of the circumstances under which they were made, not misleading.

114. Artal Luxembourg acted negligently in that it did not exercise reasonable care to ensure that the Prospectus did not include, or incorporate by reference, untrue or misleading statements or omissions of material fact.

115. This Count does not sound in fraud. Rather, this Count is based solely on negligence. For purposes of asserting this and their other claims under the Securities Act, Plaintiffs do not allege that any Defendant acted with intentional, reckless or otherwise fraudulent intent, except that any challenged statements of opinion or belief made in (or incorporated by) the Registration Statement are alleged to have been materially misstated statements of opinion or belief when made and at the time of the SPO.

116. When they acquired Weight Watchers common stock directly from Artal Luxembourg, OFP and other members of the Class did not know, nor in the exercise of reasonable care could they have known, of the untruths or omissions contained (and/or incorporated by reference) in the Prospectus.

117. OFP and other members of the Class suffered damages in connection with the purchase or acquisition of Weight Watchers common stock in, pursuant to, and/or traceable to the SPO.

118. By reason of the foregoing, Artal Luxembourg is liable to OFP and other members of the Class for either (i) the consideration paid for Weight Watchers common stock, with interest thereon, less the amount of any income received thereon, upon tender of such securities; or (ii) damages as to the Weight Watchers common stock no longer owned.

**COUNT III**
**For Violations of Section 15 of the Securities Act**
**In Connection with The Secondary Public Offering**
**(Against Artal Luxembourg, Artal International, Artal Group, and Debbane)**

119. Plaintiffs repeat and reallege every allegation contained above as if fully alleged in this Count, only to the extent, however, that the allegations do not allege fraud, scienter, or the intent of the Defendants to defraud Plaintiffs or members of the Class.

120. This Count is brought pursuant to Section 15 of the Securities Act against Defendants Artal Luxembourg, Artal International, Artal Group, and Debbane in connection with the SPO. Plaintiff OFP, and other members of the Class, purchased or otherwise acquired Weight Watchers common stock in, pursuant to, and/or traceable to the SPO and were damaged thereby.

121. There are two controlled entities relevant to this Count: Weight Watchers and Artal Luxembourg.

122. When each of the Registration Statement, the Prospectus, the 2017 10-K, and the 1Q18 10-Q were prepared and filed, Weight Watchers, the issuer, was controlled by Artal Luxembourg and Debbane. Artal Luxembourg controlled Weight Watchers because, at the time of the SPO, Artal Luxembourg was party to a Voting Agreement with Oprah Winfrey, whereby Ms. Winfrey agreed to vote all of her Weight Watchers common stock to elect as directors any

nominees designated by Artal. By virtue of the Voting Agreement, Artal and Ms. Winfrey were deemed, for purposes of the securities laws, to constitute a "group" that collectively beneficially owned Weight Watchers common stock. Thus, at the time of the SPO, Artal Luxembourg "effectively control[led]" Weight Watchers, as stated on page iv of the Registration Statement and Prospectus. Debbane exercised his control over Weight Watchers because he has been the Chairman of the Board of Weight Watchers since it was acquired by Artal Luxembourg in 1999. Moreover, Debbane signed the Registration Statement.

123. When each of the Registration Statement, the Prospectus, the 2017 10-K, and the 1Q18 10-Q were prepared and filed, Artal Luxembourg, the selling shareholder, was controlled by Artal International, Artal Group, and Debbane. Artal International exercised its control over Artal Luxembourg because it wholly owned Artal Luxembourg at the time of the SPO. Artal Group exercised its control over Artal Luxembourg because it wholly owned Artal International at the time of the SPO. Finally, Debbane exercised his control over Artal Luxembourg because he was a Managing Director of Artal Luxembourg, and also the CEO and managing director of Artal Group, and a managing director of Artal International. Moreover, Debbane signed the Registration Statement.

124. Thus, each of the Defendants named in this count were controlling persons within the meaning of the Securities Act.

125. The Defendants named in this Count, by virtue of their positions of control and authority and their direct participation in and/or awareness of Weight Watchers' operations and finances, possessed the power to, and did, direct or cause the direction of the management and policies of Weight Watchers and its employees, or cause Weight Watchers to issue, offer, and/or sell securities pursuant to the defective Offering Materials. Debbane, moreover, by virtue of his

positions of control and authority and their direct participation in and/or awareness of the Artal Defendants' operations and finances, possessed the power to, and did, direct or cause the direction of the management and policies of Artal and its employees, or cause Artal to offer and/or sell securities pursuant to the defective Offering Materials.

126. The Defendants named in this Count had the power to, and did, control the decision-making of Weight Watchers, including the content and issuance of the statements contained (and/or incorporated by reference) in the Offering Materials. These Defendants were provided with or had unlimited access to copies of the Offering Materials (and/or the documents incorporated by reference therein) alleged herein to contain actionable statements or omissions prior to and/or shortly after such statements were issued. They had the power to prevent the issuance of the statements or omissions or to cause them to be corrected. Debbane signed the Registration Statement (and/or certain of the Company's SEC filings incorporated by reference therein) and was directly involved in or responsible for providing false or misleading information contained in the Offering Materials (and/or documents incorporated by reference therein) and/or certifying and approving that information.

127. Plaintiffs expressly exclude from this Count any allegations of fraud or intentional misconduct. This Count is based solely on negligence.

128. The Defendants named in this Count acted negligently in that none of them exercised reasonable care to ensure, or had reasonable grounds to believe, that the Offering Materials were true and not misleading as to all material facts and did not omit to state any material fact required to be stated therein or necessary to make to the statements therein not misleading.

129. OFP and other members of the Class suffered damages in connection with the purchase or acquisition of Weight Watchers common stock in, pursuant to, and/or traceable to the SPO.

# PART TWO:
# CLAIMS UNDER THE SECURITIES EXCHANGE ACT OF 1934

## IX. JURISDICTION AND VENUE

130. The claims asserted in this Part Two arise under Section 10(b) of the Exchange Act (15 U.S.C. §78j(b) and SEC Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5), and under Section 20(a) of the Exchange Act (15 U.S.C. and 78t(a)).

131. This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1331, and Section 27 of the Exchange Act (15 U.S.C. §§78aa).

132. Venue is proper in this Judicial District under Section 27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b) as Weight Watchers' common stock trades on the NASDAQ, located within this Judicial District.

133. In connection with the acts, conduct and other wrongs alleged in this Part Two, Defendants either directly or indirectly used the means and instrumentalities of interstate commerce, including but not limited to the United States mails, interstate telephone communications and the facilities of national securities exchanges, the New York Stock Exchange and the NASDAQ.

## X. THE EXCHANGE ACT PARTIES

### A. The Exchange Act Plaintiffs

134. Plaintiff City of Omaha Police and Fire Retirement System ("Omaha P+F"), as set forth in its previously filed certification, purchased Weight Watchers common stock during the Class Period and suffered damages as a result of the federal securities law violations and false and misleading statements and material omissions alleged in this Part Two.

135. Plaintiff Equity-League Pension Trust Fund ("Equity League"), as set forth in its previously filed certification, purchased Weight Watchers common stock during the Class Period

and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged in this Part Two.

136. Plaintiff OFP, as set forth in its previously filed certification, purchased Weight Watchers common stock during the Class Period and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged in this Part Two.

**B. The Exchange Act Defendants**

**1. Weight Watchers**

137. Defendant Weight Watchers is a Virginia corporation headquartered in New York, New York. Claiming to be the "the world's leading commercial weight management program," Weight Watchers offers subscription-based "commitment plans" intended to help its subscribers lose weight. As of February 1, 2019, Weight Watchers had approximately 67 million shares of common stock issued and outstanding. Throughout the Class Period, Weight Watchers common stock was listed and traded in an efficient market under the ticker symbol "WTW."[4] Before the Class Period and until October 15, 2018, Weight Watchers common stock was listed and traded on the New York Stock Exchange. Effective October 15, 2018, Weight Watchers switched its stock listing to the NASDAQ, and its shares thereafter traded on the NASDAQ.

**2. The Section 10b Individual Defendants**

138. Defendant Grossman joined Weight Watchers in July 2017 as its President, CEO, and member of the Board, and continues to serve in these roles. Grossman signed the Offering Materials. Grossman also signed and, pursuant to SEC Rule 13(a)-14(a) and the Sarbanes-Oxley

---

[4] On April 16, 2019, after the Class Period, the ticker symbol for the Company's common stock changed to "WW."

Act of 2002 ("SOX"), certified the Company's 2017 10-K, 2Q18 10-Q, and 3Q18 10-Q filings with the SEC.

139. Defendant Hotchkin has been the Company's CFO since 2012. He also has served as the Company's President, Emerging Markets since March 2018 and as its Operating Officer, North America since March 2019. Hotchkin signed the Offering Materials. He also signed and, pursuant to SEC Rule 13(a)-14(a) and SOX, certified the Company's 2017 10-K, 2Q18 10-Q, and 3Q18 10-Q filings with the SEC. On August 30, 2018, Hotchkin sold 131,466 (or roughly 61%) of his personally held shares of Weight Watchers at an average price of roughly $75.66 per share, reaping more than $9.9 million in gross proceeds. The sale was unusual both as to its size and timing, especially as Hotchkin had not sold any of his personally held Weight Watchers shares for at least the two prior years.

140. Defendant Debbane has been Weight Watchers' Chairman of the Board since Weight Watchers was acquired by Artal Luxembourg S.A. in 1999. Debbane has also been CEO and Managing Director of Artal Group since well before the Class Period, as well as a Managing Director of Artal Luxembourg and Artal International Management. He is also a co-founder and President and CEO of The Invus Group, LLC ("Invus Group"), an investment management company created in 1985, and he has managed Artal's investments for years. As confirmed by CW1, Artal and Invus, including Debbane specifically, were closely involved in managing Weight Watchers according to CW1, with Amouyal, Fajgenbaum and Sobecki (together with Debbane) constituting an active "office of the chairman" at Weight Watchers. Debbane signed the Registration Statement, as well as the 2017 10-K.

141. Defendants Grossman, Hotchkin and Debbane are referred to herein as the "Section 10b Individual Defendants."

142. The Section 10b Individual Defendants possessed and exercised their power and authority to control the contents of the Company's SEC filings, press releases, and other market communications. The Section 10b Individual Defendants were provided with copies of the Company's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected or supplemented so as to not be materially misleading or incomplete. Because of their control over the Company, and their access to material information available to them but not to the public, the Section 10b Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading. The Section 10b Individual Defendants are liable for the false statements and omissions pleaded herein.

### 3. Defendant Artal Luxembourg

143. Defendant Artal Luxembourg, a Luxembourg-headquartered corporation, was the direct controlling shareholder of Weight Watchers from the beginning of the Class Period through at least the SPO. During the Class Period, Artal Luxembourg offered and sole roughly 8.63 million shares in the May 2018 SPO, and sold another six million shares in August 2018, representing (together) roughly 50% of Artal Luxembourg's (and the Artal Defendants') total holdings of Weight Watchers' shares. These sales were unusual both as to their size and timing, especially as none of the Artal Defendants had sold any of their Weight Watchers shares for at least the prior six years.

144. Defendant Artal Luxembourg possessed and exercised its power and authority to control the contents of the Company's SEC filings, press releases, and other market communications. Defendant Artal Luxembourg was provided with copies of the Company's SEC filings, including the Offering Materials, alleged herein to be misleading prior to or shortly after

their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected or supplemented so as to not be materially misleading or incomplete. Because of their control over the Company, and their access to material information available to them but not to the public, the Section 10b Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading. The Section 10b Individual Defendants are liable for the false statements and omissions pleaded herein.

145. Weight Watchers, the Individual Section 10b Defendants and Artal Luxembourg are collectively referred to as the "Section 10b Defendants."

146. The Section 10b Defendants are liable for making materially false or misleading statements and failing to disclose adverse facts known to them about Weight Watchers, including for making statements that were materially incomplete and misleading in violation of Item 303 of SEC Regulation S-K. Defendants' misconduct and course of business that operated as a fraud or deceit on purchasers of Weight Watchers common stock was a success, as it: (i) deceived the investing public regarding Weight Watchers' financial condition and prospects; (ii) artificially inflated the prices of Weight Watchers common stock; (iii) allowed Defendant Artal Luxembourg, Defendant Hotchkin, and various other Weight Watchers insiders to sell more than a billion dollars of their holdings of Weight Watchers shares at fraudulently inflated prices; and (iv) caused plaintiffs and other members of the Class to purchase Weight Watchers common stock at artificially inflated prices.

### 4. The Section 20(a) Control Defendants

147. Defendants Artal Luxembourg, Artal International, and Artal Group, as well as Defendant Debbane, are named herein as "control person" defendants (collectively, the Section 20(a) Control Defendants") under Section 20(a) of the Exchange Act.

148. Plaintiffs incorporate herein by reference the text of ¶¶ 34-45 and of Count III above that further describe *(inter alia)* Defendant Artal Luxembourg, Defendant Artal International, Artal International Management, Defendant Artal Group, Westend, the Stichting, and Ms. Oprah Winfrey and Debbane, Amouyal, Fajgenbaum, Lainovic, and Sobecki, and the relationships between and among each of the foregoing persons and entities, and between and among themselves and Defendant Weight Watchers and each of Section 10b Individual Defendants.

149. Defendant Artal Luxembourg, Defendant Artal International, Artal International Management, Defendant Artal Group, Westend, and the Stichting jointly filed statements on Schedule 13D with the SEC regarding their ownership of Weight Watchers common stock. In 2015, prior to the Class Period, all of these entities jointly filed a Schedule 13D indicating that they together beneficially owned, and had sole voting and dispositive power over, 29,443,000 shares of Weight Watchers common stock — equal to 46.3% of Weight Watchers' then-outstanding shares. In addition, according to the Offering Materials, immediately prior to the SPO these same entities could each be deemed to be the beneficial owner of, with voting and dispositive power over, 29,443,000 shares (or 46.3% of Weight Watchers') then-outstanding shares. In addition, as previously discussed, through a Voting Agreement with Ms. Winfrey, prior to the SPO Artal Luxembourg was effectively able to vote all of Ms. Winfrey's additional 11.01% of the Company's shares, giving Artal Luxembourg and each of the other Section 20(a) Control Defendants control over a majority of the Company's shares and the power to appoint the members of its Board of Directors.

150. From the start of the Class Period through the SPO, Defendants Artal Luxembourg, Artal International, and Artal Group, and each of them, continued to exercise control over Weight Watchers by virtue of (a) their direct or indirect ownership, through Artal Luxembourg, of 46.3%

of the outstanding shares of Weight Watchers stock, and their power, in conjunction with the Voting Agreement with Ms. Winfrey, to elect the majority of the members of Weight Watcher's board of directors, including Debbane, Amouyal, Fajgenbaum, Lainovic, and Sobecki.

151. Following the SPO and through to the end of the Class Period, Defendants Artal Luxembourg, Artal International, and Artal Group, and each of them, continued to exercise control over Weight Watchers by virtue of (a) their continued ownership, through Artal Luxembourg, of 31.44% – reduced to 22% as of August 14, 2018 – of the outstanding shares of Weight Watchers stock; and (b) through Debbane, Amouyal, Fajgenbaum, Lainovic, and Sobecki, Artal's appointed board members, who continued to serve on Weight Watchers' Board of Directors after the SPO.

152. Defendants Weight Watchers, the Section 10b Defendants and the Section 20(a) Control Defendants are sometimes collectively referred to herein as the "Exchange Act Defendants."

## XI. SUBSTANTIVE ALLEGATIONS

### A. Background Concerning Weight Watchers

153. Historically, Weight Watchers has offered various products and services to assist weight loss and maintenance. The philosophy behind the Company's programs is to use a science-driven approach to help participants lose weight by controlling their eating, staying active, and supporting—and receiving support from—other Weight Watchers members.

154. The Company was founded in 1961 when its founder, Jean Nidetch, invited friends to her home in Queens to discuss the best ways to lose weight, and to serve as a support group for individuals seeking to lose weight. Over the course of the next several decades, Weight Watchers expanded upon this initial model to organize in-person meetings for those looking for support and accountability in their weight loss efforts. This model was highly successful, and Weight Watchers expanded into an operation that had millions of members attending meetings in countries around

the world by the turn of the century. CW3 explained that Weight Watchers' "bread and butter" customers consisted of middle-aged, white women.

155. Weight Watchers built upon on its model of in-person support groups, and provided tools to its members to assist their weight loss efforts. For example, in the years preceding the Class Period, Weight Watchers had developed a "points" system, whereby its members could keep track of their food intake by matching the food with "points" assigned by Weight Watchers. The points were assigned in a manner that reflected each food's caloric and fat content, and members were encouraged to keep their daily food intake below a certain number of points.

156. Weight Watchers earns revenues from subscriptions to the Company's digital products and by conducting workshops, for which it charges a fee, predominantly through commitment plans, prepayment plans, and "pay-as-you-go" arrangements (collectively, "subscriptions"). Weight Watchers also earns revenues by selling consumer products (including publications) in its workshops, online and to its franchisees, collecting commissions from franchisees, collecting royalties related to licensing agreements, selling magazine subscriptions, publishing, selling advertising space on its websites and in copies of its publications and By Mail product sales.

**B. The Seasonal Nature of Weight Watchers' Business and the Development of Its Established Formula of Relying on a Year-End "Product Innovation" to Generate the Coming Year's Largest "Pop" in Subscribers in the Critical December and Post-New Year's Period**

157. As the Company's own public statements concede and as CW1 and CW2 confirmed, Weight Watchers' business is highly seasonal. In particular, the period immediately before and after each New Year's Day is the most critical part of the Company's seasonal business cycle, as diet and weight loss programs historically experience their biggest membership gains in the period beginning shortly after Thanksgiving in early December, and then running into the year-

end holiday season and into the New Year, as large number of people begin to focus on implementing a "New Year's Resolution" to lose weight.

158. Accordingly, as CW1 described, Weight Watchers developed a policy and practice to capitalize on this seasonality by always having a significant new "program innovation" that the Company would commercially launch, which would help ensure that its employees in the field had had an adequate opportunity to be practiced in delivering and/or presenting the new program innovation in the peak of the new subscriber season around and after New Year's, and that it would have a program innovation that (as CW1 put it) could be put at the center of accompanying marketing and advertising efforts that would answer a prospective customer's question "what new program innovation is being offered that should make me sign up with this year." Similarly, CW2 described how, at the end of each calendar year before the year-end holidays, Weight Watchers had a strategy of launching a substantive service or program innovation or revision (sometimes referred to internally as "Program News") that would be used to attract prospective members looking to lose weight as a part of their New Years' Resolutions, which would be supported by a robust marketing of the program innovation that would give existing, lapsed and prospective members reason to believe that the new program innovation would work for them (or represent a further improvement on what was already working for existing members). CW5, a former Director of Marketing in Weight Watchers Health Solutions Division, also explained that Weight Watchers launched a new twist on its program before the end of the year, which would be particularly critical to efforts to convince the Company's "lapsed members" (*i.e.*, those who had previously been Weight Watcher' members but had dropped their memberships) to sign up again.

159. CW1 further described how a "program innovation" could be generally categorized as involving a "food program" innovation, a "fitness" innovation, a "mindset" innovation, or

"service channel" innovation. An example of a "food" based program innovation would be a modification in the types or amounts of food recommended to members (for example, the significant modification to the Company's prior SmartPoints "points" system that had been launched in December 2017 as part of the Freestyle program). A "mindset" program innovation might be, for example, offering a free counseling session. An example of a "fitness change" might be to offer a promotion that partnered with a health club chain to offer a discounted health club membership to Weight Watcher members. An example of a "service channel" program innovation would be offering a new app, or a 24/7 "chat" service through which members could connect to a Weight Watchers representative online at any time, day or night. Regardless of the precise nature of the innovation, CW1 stressed that the core of this "formula" was always to offer a former or prospective new member a new reason to join – as opposed to relying simply on more marketing, celebrity endorsements, or otherwise offering what was basically the same old product in a new or more aggressive way.

160. In sum, the year-end holiday period and the first quarter of every year were historically the key peak season for the Company to entice existing customers to renew their subscriptions, to persuade "lapsed members" to rejoin Weight Watchers, and to get brand new customers who had no prior experience with the Company's programs to become members. As a result of Weight Watchers' established "formula" of capitalizing on this seasonality by having a meaningful new program innovation that would be commercially launched (together with a coordinated marketing and advertising campaign) beginning in December of each year, Weight Watchers historically experienced a significant "pop" in subscriptions by the end of the first quarter of each year, including particularly strong "pops" in the first quarter of each of the three

years immediately preceding the start of the Class Period, as reflected in its quarterly reports filed with the SEC and as corroborated by CW1, CW2, and CW3.

161. As CW1 also described, in order to have a meaningful new program innovation that was ready to roll out in December in the lead up to the critical year-end holiday and post-New Year's period, preparation for such a launch would require significant lead time. CW1 explained, for example, that staff in the field would have to be fully briefed and trained by the end of the third quarter (September), final market testing would have to have begun in the second quarter and be completed by the summer in advance of staff training, and of course the initial conceptualization and subsequent research and development of the program innovation would have to be started – and completed – still earlier. Accordingly, as CW1 confirmed, a meaningful programmatic innovation would require at least one to two years from conception to actual launch.

162. Also of crucial importance to Weight Watchers' business model, according to CW1 and as later acknowledged by the Company at the end of the Class Period, was its ability to sign up lapsed members, who often comprised a majority of the new members. In particular, CW1 explained that encouraging lapsed members to rejoin Weight Watchers was a key component of the Company's success in the years 2016-2017. CW1 stated that the number of returning lapsed members was significant, and that the number was tracked by the Director of Finance. Grossman, however, decided that it was no longer important to market to lapsed members. Instead Grossman decided that the Company would target new members, which would create a more diverse membership. As CW1 put it, Grossman took the lapsed members "for granted," and stated that Grossman thought Weight Watchers should no longer be associated with "middle-aged white women," which CW3 described as the "bread and butter" of Weight Watchers. A problem with this, CW1 stated, was that even if the Company were successful in attracting members new to the

Weight Watchers experience, as Grossman sought to do, the new members were not nearly as numerous as the existing and returning lapsed members in a given period. For example, although the Company might sign up five new, diverse, younger members, consistent with Grossman's new Strategic Vision, in January they could very well end up joining an existing meeting group that had previously consisted overwhelmingly of older white women – which might not appeal to the new members.

### C. As Weight Watchers Launches Freestyle, Artal Plans to Cash Out Its Position

163. As noted above, in December 2017, Weight Watchers followed its established practice of commercially launching a significant new program innovation just before year-end by launching its Freestyle program. This time was different, however, because its largest shareholder, Artal Luxembourg, would sell a large portion of its position in Weight Watchers at lofty stock prices that resulted from the traditional new year subscriber bump.

164. With great fanfare, on December 4, 2017, Weight Watchers announced the launch of Freestyle, which modified its prior SmartPoints system by, among other things, significantly expanding the number of foods that were allocated zero "points." Previously, only fruits and vegetables were zero Points foods. With the launch of Freestyle, the list of zero Points foods swelled to over two hundred, including a number of high-protein foods such as eggs, all fish and seafood, skinless chicken breast, and non-fat plain yogurt. CW3 explained that the Freestyle system was designed around the nutritional benefits of food, rather than simply taking into account the number of calories, sugars and fat, which is why certain foods like chicken and eggs were ascribed zero points. Part of the appeal of this expansion was that it would make it easier for subscribers to track the number of points on their Weight Watchers app because there were fewer foods they needed to input. Oprah Winfrey noted that "the fish, beans and corn in my favorite tacos are now zero Points!" The Freestyle program also allowed members to "rollover" unused

daily points to other days of the week for more flexibility. Marketing materials quoted Oprah Winfrey boasting that "Freestyle brings an even greater level of ease." Weight Watchers hoped that the convenience would entice younger members outside its previous core demographic of middle-aged, white women.

165. Along with greater ease of tracking food intake, Freestyle sought to attract those hoping to improve their overall health and wellness, as opposed to just lose weight. In its press release announcing Freestyle, Weight Watchers quoted its Chief Scientific Officer, Gary Foster, as saying, "[t]he new Freestyle program offers a wide range of zero Points foods that guide members toward a healthier pattern of eating. It gives people the freedom and flexibility to make significant changes on and off the scale."

166. The Freestyle launch was a success. CW5 explained that internally, employees were told that members liked the program, and were particularly enthusiastic about the fact that many foods were ascribed a zero points value.

167. Soon after, as part of its concerted effort to keep up with demands and competition, on January 1, 2018, Weight Watchers announced in a press release that it had engaged a "social media ambassador" – DJ Khaled, a music magnate, producer and recording artist. The January 1, 2018 press release stated that DJ Khaled's mission was to "document his experience and progress on the new WW Freestyle program on his social channels – including Snapchat (@djkhaled305), Twitter, Instagram, and Facebook – speaking candidly about how the program has given him the freedom and flexibility to make healthier choices while keeping up with his busy lifestyle." In connection with this announcement, DJ Khaled stated that "the new Freestyle program is all about healthier habits for my life," and Grossman stated that "[b]eing healthier is not just about weight anymore. It's about overall health and wellness – being your best self." DJ Khaled's engagement

was also designed to attract subscribers beyond the traditional Weight Watchers subscriber, who was typically a middle-aged, white woman.

168. The launch of Freestyle was the culmination of well over a year of development and clinical trials. Backed by a significant marketing effort, the introduction of Freestyle resulted in a large jump in subscriber numbers, which increased over 42% during 1Q18 (compared to the end of 4Q17).

### D. Weight Watchers Announces a New Strategic Vision in February 2018 – But Omits That It Will Not Be Launching a New Program Innovation in December 2018

169. In the wake of the positive 1Q18 results generated by the Freestyle launch, on February 7, 2018, Weight Watchers announced an ambitious new "strategic vision" that called for achieving even more aggressive record-breaking membership and revenue figures by the end of 2020. As the Company's press release stated, "[b]y the end of 2020," the Company aimed to "[h]elp 10 million people adopt healthy habits, with 5 million people in the Weight Watchers program and an additional 5 million people engaging through other Weight Watchers experiences and content." This expansion would "[i]ncrease revenue to more than $2 billion, driven primarily by new member growth and improved retention."

170. In response, the Company's stock price rose from $63.06 on February 6, 2018 (the day before the Company announced its 2020 goals), to $73.97 the following day, an increase of $10.91, or 17%.

171. In announcing these new strategic goals, the Company did not, however, disclose, that it did not have a new program innovation that it was preparing to launch (or would otherwise be ready to launch) in December 2018.

### E. Spring 2018: Weight Watchers Increases Its Projected Financial Performance Just Days Before Its Secondary Offering

172. The Class Period starts on May 4, 2018.

173. On May 3, 2018, after the close of trading, Weight Watchers issued a press release announcing its financial results for 1Q18 and increased its FY18 financial guidance. The release emphasized that Weight Watchers' "End of Period Subscribers" in 1Q18 increased to 4.6 million and that its revenues increased to $408 million, up 24%, or 20% on a constant currency basis, year-over-year.

174. Defendants Grossman and Hotchkin were quoted in this press release, in part, as follows:

> ***Driven by the enthusiastic, global response to our new WW Freestyle™ program***, we ended the first quarter with 4.6 million subscribers – the highest level in the history of Weight Watchers and an increase of 1 million compared to a year ago. Member engagement has been incredible with members staying longer than ever before. Average retention is now well over 9 months," said Mindy Grossman, the Company's President and CEO.

175. Updating the Company's FY18 earnings guidance, the release also stated that the Company was raising its full year fiscal 2018 earnings guidance to between $3.00 and $3.20 per fully diluted share, up from the prior earnings guidance of between $2.40 and $2.70 per fully diluted share, adding that "[t]his guidance increase reflects the operating strength of the Company's business and expected continued global momentum through the year."

176. On May 3, 2018, also after the close of trading, Weight Watchers conducted a conference call with investors and stock analysts, during which the Defendants Grossman and Hotchkin provided additional positive commentary about the Company's then present financial condition and prospects.

177. In particular, Defendant Hotchkin provided updated, increased guidance for FY18, stating, in pertinent part, as follows:

> And finally, looking further ahead, we recently outlined our three-year goal to increase ***our revenue to more than $2 billion in 2020 versus $1.3 billion in 2017***. We expect about 80% of this revenue growth to be driven by continued positive recruitment and improvements in retention with opportunities in products, licensing, partnerships, B2B and new geographies also contributing to the overall growth picture.

178. Defendant Hotchkin also confirmed that the Company remained on track to achieve its end-of-2020 goals of five million subscribers driving revenues in excess of $2 billion.

179. On May 4, 2018, Weight Watchers also filed its 1Q18 Form 10-Q, which was signed by Defendants Grossman and Hotchkin, and which reiterated the second quarter financial performance numbers referenced in the Company's second quarter earnings release.

180. At the close on May 4, 2018, Weight Watchers' stock closed at $69.83.

181. However, in violation of Item 303 of SEC Regulation S-K, and in order to facilitate the Artal Defendants' efforts to reap maximum proceeds from their forthcoming sale of over 8.6 million shares just ten days later in the SPO, the 1Q18 10-Q failed to disclose that disclose that Weight Watchers, contrary its prior established policy and practice, did not have (and by this late date could no longer develop and prepare even if it had wanted to) a new year-end program innovation that would be ready to launch in December 2018. As such, and as further explained in ¶¶ 230-35, this SEC filing was materially false and misleading because, in violation of Item 303 of Regulation S-K, it failed to disclose a known trend or uncertainty that the registrant reasonably expected would have a material impact on net sales, revenues or income from continuing operations, and failed to disclose material events and uncertainties known to management that would cause reported historical financial information not to be necessarily indicative of future operating results or of future financial condition.

182. Moreover, the statements in ¶¶ 173-78 were materially false and misleading and/or failed to disclose material adverse information, required in order to render them not materially

misleading or incomplete, because (i) they failed to disclose that Weight Watchers' growth strategy and Strategic Vision depended on luring lapsed subscribers back to Weight Watchers; and that (ii) the alleged "risk" that Weight Watchers would not have the ability to develop new "program innovations" had, in fact, already transpired by the time of the SPO when Weight Watchers, departing from its established strategy, had no plans to, and would be unable to, implement a new program innovation in the fourth quarter of 2018. As a result, these statements were materially false and misleading and lacked a reasonable basis at all relevant times.

**F. Defendant Artal Group Sells $595.5 Million of Its Weight Watchers' Holdings in the SPO**

183. On the next trading day, May 7, 2018, the Company filed the Offering Materials for the SPO, pursuant to which 8.625 million of the Weight Watchers shares owned by Artal were offered and sold to the public at a price of $69 per share.

184. The SPO was conducted pursuant to the Offering Materials. Specifically, on May 7, 2018, Weight Watchers filed a shelf registration statement on Form S-3 in connection with the public offering of its common stock (the "Registration Statement"), which became effective that same day. The Registration Statement incorporated by reference a prospectus dated May 7, 2018, which is part of the Registration Statement. The Registration Statement permitted Defendant Artal Luxembourg to sell shares of Weight Watchers common stock whenever it sought to do so in the future, and stated that Weight Watchers would provide a prospectus supplement each time that Artal Luxembourg sold Weight Watchers common stock using the prospectus in the Registration Statement.

185. Thereafter, on May 14, 2018, Weight Watchers filed a final prospectus with the SEC on Form 424b that comprised part of the Registration Statement (with the final prospectus, the "Registration Statement") and priced the SPO being undertaken for the benefit of the Artal

Defendants at $69 per share. The Registration Statement stated that Defendant Artal Luxembourg would sell 7.5 million shares and would sell another 1.125 million shares in the event (which did in fact subsequently occur) that the underwriters of the SPO exercised their overallotment option. Both the Prospectus and the Registration Statement incorporated by reference the 2017 10-K and the 1Q18 10-Q.

186. The SPO closed on May 15, 2018. The underwriters exercised their option in full, and Artal received proceeds from the sales of its Weight Watchers shares of approximately $571 million (net of underwriting discounts). The investors who purchased Artal's shares were not so fortunate. Following the disclosure of the truth at the end of the Class Period, Weight Watchers' stock was trading at less than a third of the $69 per share offering price.

### G. The SPO Was Conducted Pursuant to Materially Misleading and Incomplete Offering Materials

#### 1. Weight Watchers Did Not Disclose that Its Growth Depended on Recruiting Significant Numbers of Lapsed Members

187. Weight Watchers' announced strategy to boost subscribers and hit its target of 5 million new members by 2020 was a focus on attracting members outside of Weight Watchers' traditional base of subscribers. It was apparent that Weight Watchers' announced strategy was focused on new subscribers (and had little regard for boosting its subscriber numbers for lapsed members), as it was specifically targeting new members through its marketing campaigns, while neglecting efforts to draw in lapsed members. This was corroborated by CW4, a former Product Design Manager, who explained that feedback from lapsed members about potential improvements to the Freestyle program was ignored. Thus, CW4 was directed not to make iterative changes to the Freestyle program based on user and lapsed user feedback. Further, CW1 spoke of Grossman's disregard for lapsed members, saying that Grossman took lapsed members

for granted, and specifically did not want the Weight Watchers brand to be associated with middle-aged white women.

188. In the Offering Materials, the Company repeatedly emphasized that its plans for growth focused on attracting new members. On February 25, 2019, however, the Company disclosed that the Company's growth, in particular its plans to meets its 2020 goals, required active recruitment of lapsed members—namely, those who had previously joined, and then left, Weight Watchers —and that because the Company was failing to attract lapsed members, its strategy for growth was in doubt.

189. The Prospectus, which formed part of the Registration Statement, contained the following material misstatements and omissions as further described in the paragraphs below.

190. For example, page S-6 of the Prospectus stated that there were three components to Weight Watchers' business plan, as follows:

> We intend to continue to rapidly grow our business and profitability by continuing to offer compelling value to our members. We are focused on driving growth through the following levers:
>
> - ***increase recruitment of new subscribers*** to expand our member base through a growing influencer community, effective marketing, and agile, brand-led innovations;
> - sustained focus on member retention through continued expansion of our social network Connect and enhancements to our products and services to create valuable customer experiences; and
> - continue brand-led consumer product innovation to drive licensing and partnership revenue.[5]

191. These statements were false and misleading. The Prospectus failed to disclose that Weight Watchers could not "rapidly grow [its] business and profitability" without continuing to

---

[5] All emphases added unless otherwise noted.

recruit and attract lapsed members. Instead, these statements give the false impression that Weight Watchers would be able to "driv[e] growth" through "recruitment of new subscribers," retention and product innovation. In fact, recruitment of lapsed subscribers was required for the Company to grow its profits and membership, and achieve the goals set forth in its Strategic Vision. Investors were not able to discern that, in fact, growth would also require recruitment of lapsed members.

192. This omission was material to investors, because Weight Watchers' marketing campaign was directed at recruiting ***only new members***, while neglecting lapsed members. Because Weight Watchers had not previously mentioned anything in its public filings and statements about the significant contribution that lapsed members made to its subscriber numbers, investors would not have known that growth could only possibly be achieved through recruitment of significant numbers of lapsed members.

193. If investors had known that Weight Watchers could not "grow [its] business and profitability" without lapsed member subscriptions, they may have evaluated the Company's stated growth strategy and Strategy Vision in a materially different light, recognizing the serious risks it posed to such plans. For example, the Prospectus states, at page S-2, that "***[w]e believe that, with only 5% of U.S. adults who are trying to lose weight in a commercial weight management plan, we have a significant opportunity to drive increased penetration of and engagement with our brand***." The Prospectus further stated that "[o]ur strong, widely-recognized and trusted brand allows us to more efficiently ***acquire new members and broaden our appeal to new audiences***."

194. The Prospectus further emphasized recruitment of ***new*** members where it stated, on page S-7:

***Continue to Broaden and Diversify our Influencer Network to Attract Members***[6]

Our influencers increase awareness of Weight Watchers through social media engagement and other outlets and allow us to more efficiently and effectively recruit and retain members. We are continually expanding our scope of influencers to include a diverse range of individuals, from celebrities to member ambassadors, ***to promote our brand and expand its appeal to a broader group of people across ethnicities, geographies, age, lifestage and gender.***

195. The Prospectus echoed this statement on page S-5, stating

***We seek to expand and strengthen our communities and diversify our reach across ethnicities, geographies, age, lifestage and gender*** through our strategic relationships with influencers. Celebrities, health and wellness influencers, brand ambassadors and chief share their experiences with our products and program to ***attract new members*** and inspire current members.

196. Furthermore, on page S-2, the Prospectus stated that Weight Watchers had "partnered with several key celebrities and influencers to begin diversifying our global reach across ethnicity, geography and gender, including most notably our strategic partnership with Oprah Winfrey."

197. On page S-4, the Prospectus stated that "[o]ur strong, widely-recognized and trusted brand allows us to more efficiently acquire new members and broaden our appeal to new audiences."

198. In these foregoing statements, Weight Watchers emphasized its goal of increasing the demographic diversity in its subscriber base—an aim that required Weight Watchers to focus on signing up new members, rather than returning ones. A "broader" or more diverse membership meant the Company would attempt to appeal to and attract people who had not previously been Weight Watchers members. This strategy would also mean that the marketing would neglect the lapsed members who had, historically, been a significant component of the Company's subscriber numbers.

---

[6] Bold and italics in original.

199. These statements above in ¶¶ 190 and 193-97 were false and misleading because Weight Watchers omitted to explain to investors that it could only grow its subscriber numbers and profitability with a significant contribution made by lapsed members. Without that disclosure, the statements (on page S-6 of the Prospectus) that Weight Watchers would "driv[e] growth" by "increase[ing] recruitment of new subscribers" with "effective marketing and agile brand-led innovations," were false and misleading because it misled investors into thinking that the aggressive goals that Weight Watchers set could be reached by signing up new members alone, with little or no regard for lapsed members. In addition, the statements that Weight Watchers would focus its marketing on attracting a new base of customers – diverse in age, gender and ethnicity – were false and misleading because they gave investors the impression that this marketing strategy would enable Weight Watchers to grow its profitability. In fact, this was a marketing plan that neglected lapsed members, and investors did not know that lapsed members were crucial to its ability to grow its profitability.

200. By the end of 2018, Weight Watchers realized it would be unable to "rapidly grow its business and profitability," *see* Prospectus at page S-6, without recruiting lapsed members, and that its marketing targeted at new members was failing to entice lapsed members to re-up. Indeed, as CW2 stated, in the fourth quarter of 2018 Weight Watchers entered "panic mode" in an effort to get lapsed members to return, engaging a big push toward lapsed members and an aggressive email marketing campaign.

### 2. The Offering Materials Did Not Disclose that Weight Watchers Had Abandoned Its Business Model of Launching a New Program Innovation Late in the Year to Boost Subscribers in January

201. The Offering Materials, which incorporated the 2017 10-K and the 1Q18 10-Q, omitted to disclose that Weight Watchers had abandoned its prior established business strategy of developing a new program innovation in time to launch in December, before the start of the all-

important first-quarter and the "New Years' Resolution" season (which program would be designed, in significant part, to give lapsed members a new reason to rejoin Weight Watchers, as well as reasons for existing members to extend their membership and for entirely new members to sign up), and thus was materially misleading.

202. The Company's intention to engage in a "rebranding" initiative, which had been discussed as part of the Company's pre-Class Period discussion of its "Strategic Vision", was the product of the efforts of the new CEO, Defendant Grossman, who joined the Company in July 2017. The rebranding initiative was predicated on implementation of a broader marketing plan (that was intended to reach a broader array of demographic groups, including younger and more ethnically diverse groups that had historically been under-represented in Weight Watchers members compared to, *e.g.*, more middle-aged Caucasian women), combined with increased emphasis on celebrity endorsements and marketing of a newly emphasized "WW" brand (together with a "WW" logo) that would, it was hoped, help promote Weight Watchers (or, more accurately, "WW") as a Company that would promote "wellness" generally, rather than identify it more narrowly as a weight-loss company.

203. However, although the Company disclosed that it intended to launch a significant rebranding initiative, it did ***not*** disclose that, as conceived and implemented, the Company's plans for 2018 did not involve the development of a program innovation to be launched in the fourth quarter of 2018, which had historically been critical to the Company's success in increasing subscriber recruitment (including lapsed member recruitment) in the all-important December-March period.

204. Although CW1 left WW in the first quarter of 2018, CW1 still saw Company marketing and promotional materials and continued to stay in touch with some of CW1's former

colleagues over the following year, so CW1 was able to observe that the Company's traditional formula of launching a meaningful year end program innovation was not followed in 2018. Instead, as confirmed by CW1, by the time CW1 left (and by the date of the SPO), it was already clear internally that Weight Watchers would not be launching a meaningful program innovation in December 2018 and would thus not be in a position to leverage its seasonal increase in subscriber numbers through a traditional December-January "pop" in membership as it had done in prior years. Indeed, as CW1 explained, the process of readying a meaningful new program innovation for commercial launch (including researching, developing, and testing the program innovation, developing marketing content, and training field staff for implementation), required *at least* one or two years. Thus, as of the May 2018 SPO, there was no meaningful "program news" or programmatic enhancement that would be ready to market and promote starting in the fourth quarter of 2018 that would leverage the seasonal growth in membership during the upcoming New Year's season, and indeed, consistent with Defendant Grossman's abandonment of the traditional formula, there had never been any plans as of the SPO or thereafter to introduce any such meaningful program innovation in the critical December 2018/early 2019 period.

205. Instead, in violation of Item 303 of SEC Regulation S-K, and in order to facilitate the Artal Defendants' efforts to reap maximum proceeds from their forthcoming sale of an additional 6 million shares just a week later, the Offering Materials failed to disclose that Weight Watchers, contrary its prior established policy and practice, did not have (and by this late date could no longer develop and prepare even if it had wanted to) a new year-end program innovation that would be ready to launch in December 2018. As such, and as further explained in ¶¶ 230-35, this SEC filing was materially false and misleading because, in violation of Item 303 of Regulation S-K, it failed to disclose a known trend or uncertainty that the registrant reasonably expected would

have a material impact on net sales, revenues or income from continuing operations, and failed to disclose material events and uncertainties known to management that would cause reported historical financial information not to be necessarily indicative of future operating results or of future financial condition.

### H. Summer 2018: Weight Watchers Raises Guidance a Second Time After the Second Quarter of 2018

206. On August 6, 2018, after the close of trading, Weight Watchers issued a press release announcing its financial results for the interim period ended June 30, 2018 ("2Q18"). The release stated that the Company's End of Period Subscribers in 2Q18 increased to 4.5 million and that in 2Q18 revenues increased to $410 million, up 20%, or 18% on a constant currency basis, year-over-year. Weight Watchers also ***again*** raised its FY18 earnings guidance, on an EPS basis, to a range of $3.10 to $3.25.

207. The earnings release also stated as follows:

> "Our WW Freestyle™ program is resonating globally, driving continued strong performance in all of our major markets. We ended the second quarter with 4.5 million subscribers – an increase of 1 million compared to a year ago – as our momentum continued during our first global, summer marketing campaign," said Mindy Grossman, the Company's President and CEO. "We have embarked on an exciting journey – from being the global leader in weight management to becoming the world's partner in wellness."

208. The release also announced that the Company was raising its full year fiscal 2018 earnings guidance to between $3.10 and $3.25 per fully diluted share, up from its prior earnings guidance of between $3.00 and $3.20 per fully diluted share, emphasizing that "[t]his guidance increase reflect[ed] the operating strength of the Company's business and expected continued global momentum through the year."

209. On August 6, 2018, also after the close of trading, Weight Watchers conducted a conference call with investors and stock analysts, during which Defendants Grossman and

Hotchkin provided additional positive commentary about the Company's then present financial condition and prospects.

> In his remarks, Defendant Hotchkin discussed the Company's increased FY18 guidance and reassured investors that the Company remained on track to achieve its end-of-2020 goals of five million subscribers driving in excess of $2 billion in revenues.

210. Despite having disclosed that the Company had lost 100,000 subscribers during 2Q18, because Defendants once again raised Weight Watchers' FY18 financial guidance and made other bullish statements reassuring investors it remained on track to achieve its end-of-2020 goals of five million subscribers driving revenues in excess of $2 billion, the stock price only declined approximately 15% that day. Analysts attributed the stock drop in large part to the declining subscriber numbers. William O'Neill removed its buy recommendation on September 5, 2018, and stated that "investors were concerned about the declining sequential growth of subscribers in Q2 despite the beat-and-raise quarter." JP Morgan commented, on September 24, 2018, that investors were concerned "that member recruitment and retention growth is decelerating."

211. On August 7, 2018, Weight Watchers filed its quarterly financial report for the second quarter of 2018 on Form 10-Q with the SEC (the "2Q18 10-Q"), which was signed by Defendants Grossman and Hotchkin, and which reiterated the second quarter financial performance numbers referenced in the Company's second quarter earnings release.

212. However, in violation of Item 303 of SEC Regulation S-K, and in order to facilitate the Artal Defendants' efforts to reap maximum proceeds from their forthcoming sale of an additional 6 million shares just a week later, the 2Q18 10-Q failed to disclose that Weight Watchers, contrary its prior established policy and practice, did not have (and by this late date could no longer develop and prepare even if it had wanted to) a new year-end program innovation that would be ready to launch in December 2018. As such, and as further explained in ¶¶ 230-35,

this SEC filing was materially false and misleading because, in violation of Item 303 of Regulation S-K, it failed to disclose a known trend or uncertainty that the registrant reasonably expected would have a material impact on net sales, revenues or income from continuing operations, and failed to disclose material events and uncertainties known to management that would cause reported historical financial information not to be necessarily indicative of future operating results or of future financial condition.

213. Moreover, the statements in ¶¶ 206-11 were materially false and misleading and/or failed to disclose material adverse information, required in order to render them not materially misleading or incomplete, because (i) they failed to disclose that Weight Watchers' growth strategy and Strategic Vision depended on luring lapsed subscribers back to Weight Watchers, and (ii) they failed to disclose that Weight Watchers, departing from its historical strategy, had no plans to, and would be unable to, implement a new program innovation in the fourth quarter of 2018. As a result, Defendants' statements about Weight Watchers' financial condition and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

### I. Defendant Artal Group Sells Another 6 Million Shares for $465 Million in August 2018

214. Shortly after Weight Watchers announced its financial results for 2Q18 and announced increased guidance in July, on August 14, 2018, Defendant Artal Group sold a further six million of its shares through investment banker Morgan Stanley (which had served as a lead underwriter in the May 2018 underwritten SPO). Rather than selling these shares through another public offering, Morgan Stanley sold these shares in individual sales exempt from registration pursuant to SEC Rule 144A. As a result of these sales, Defendant Artal Luxembourg and (indirectly) the other Artal Defendants reaped a further ***$464.34 million in proceeds,*** selling 6 million shares at an average price of $77.39.

215. Just two weeks later, on August 30, 2018, Defendant Hotchkin sold 131,466 of his personal holdings of Weight Watchers common stock at an average price of $75.66 per share, reaping insider selling proceeds of $9,946,160. Such sales were unusual in both magnitude and timing, as they constituted sale of roughly 61% of Hotchkin's total holdings, and Hotchkin had engaged in no insider selling since at least 2012.

### J. Fall 2018: Weight Watchers Announces More Details of Its Rebranding Strategy and Increases Its Guidance Yet Again

216. On September 24, 2018, Weight Watchers officially announced that Weight Watchers would rebrand from Weight Watchers – the name associated with the Company for decades – to "WW." The Company also changed its tagline to "Wellness that Works" from "Beyond the Scale." As described by CW1 and CW5, the rebrand reflected an attempt to focus less on weight loss and more on maintaining general health. CW2 further explained that the rebrand sought to diversity Weight Watchers' customer base. Importantly, as confirmed by CW1, the rebrand did not involve any new program innovation. Instead, the rebrand involved a new brand identity consisting of, among other changes, a new logo, color palette, font and photography style.

217. On October 2, 2018, Defendant Hotchkin presented for Weight Watchers at the Deutsche Bank Leveraged Financial conference, providing additional positive commentary about the Company's financial condition and prospects. Hotchkin commented on the importance of recent rebranding and the continued success of the Freestyle program and also emphasized that "program innovation" is at the "core" of the Company's business and that "retention increase[s]" are "driven by…new exciting features in our programs." Further, Hotchkin reiterated that Weight Watchers was "targeting over $2 billion in revenue in 2020" and was "***very well-poised to meet our long-term goals and our 2020 targets***."

218. On November 1, 2018, after the close of trading, Weight Watchers issued a press release announcing its financial results for the 3Q18. Weight Watchers reported that it had now ***lost another 300,000 subscribers*** in the quarter, bringing its subscriber count down to 4.2 million (from 4.6 million at the end of the 1Q18), causing the Company's reported net revenues of $366 million to significantly underperform the $379 million that Defendants had led the market to expect. The Company also reported an EPS of just $0.94 per share, compared to Wall Street expectations (based on the Company's guidance) of $0.99 per share on revenues of $365.8 million.

219. On this news, the price of Weight Watchers common stock declined almost 30% from its close of $68.49 per share on November 1, 2018, down from $48.13 per share on November 2, 2018, on heavy volume of more than 13.8 million shares traded.

220. Analysts expressed concern about the declining subscriber numbers, the rebranding, and the lack of the announcement of a new program. Morgan Stanley lowered its price target for Weight Watchers, stating that "3Q results fell short of expectations, with subscriber grown below MSe [Morgan Stanley estimates] and retention rates flat vs. 2Q, pausing the trend of consistent increases since 2Q17." and UBS expressed concern that the "change to the WW brand in September 2018…could be influencing subscriber trends" and that, even though "WTW [was] lapping the introduction of the WW Freestyle program last year," the Company had not announced any "[n]ew program launches" in the pipeline for the end of 2018 "to generate interest & subscriber growth."

221. However, to keep the price of Weight Watchers common stock from falling any further, during the Company's conference call later that evening, Defendant Hotchkin assured analysts and investors that Weight Watchers was continuing to experience "***strong subscriber***

***trends***," and that it "continue[d] to make ***solid progress towards [its] three-year goal to increase our revenues to more than $2 billion in 2020***."

222. On November 2, 2018, Weight Watchers filed its quarterly financial report for the third quarter on Form 10-Q with the SEC (the "3Q18 10-Q"), which was signed by Defendants Grossman and Hotchkin, and which reiterated the third quarter financial performance numbers referenced in the Company's second quarter earnings release.

223. However, in violation of Item 303 of SEC Regulation S-K, the 3Q18 10-Q failed to disclose that disclose that, contrary its prior established policy and practice, Weight Watchers did not have (and by this late date could no longer develop and prepare even if it had wanted to) a new year-end program innovation that would be ready to launch in December 2018. As such, and as further explained in ¶¶ 230-35, this SEC filing was materially false and misleading because, in violation of Item 303 of Regulation S-K, it failed to disclose a known trend or uncertainty that the registrant reasonably expected would have a material impact on net sales, revenues or income from continuing operations, and failed to disclose material events and uncertainties known to management that would cause reported historical financial information not to be necessarily indicative of future operating results or of future financial condition.

224. Moreover, the statements in ¶¶ 217-18 were materially false and misleading and/or failed to disclose material adverse information, which was required to be disclosed, because (i) they failed to disclose that Weight Watchers' growth strategy and Strategic Vision depended on luring lapsed subscribers back to Weight Watchers; and (ii) they failed to disclose that Weight Watchers, departing from its historical strategy, had no plans to, and would be unable to, implement a new program innovation in the fourth quarter of 2018. As a result, Defendants'

statements about Weight Watchers' financial condition and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

### K. The Full Extent of the Deterioration in Weight Watchers' Business and Operations Is Disclosed

225. Less than four months after again raising its EPS guidance in November 2018, after the close of trading on February 26, 2019 Weight Watchers issued a press release that reported its 4Q18 and full year FY18 results. As that release reported, as of the end of 4Q18 the Company's total subscriber count had again declined to 3.9 million subscribers. Moreover, the press release "pre-announced" that January 2019 had been a "hard month," and that given the prior shortfall of the 2019 calendar year and the critical post-New Year's period, the Company was ***now only targeting revenues of $1.4 billion for FY19*** – well below the nearly $1.7 billion it had led the market to expect for FY19. Weight Watchers also disclosed that it was ***now only targeting EPS of $1.25 to $1.50 per share for full year FY19,*** compared to reported EPS of $3.19 for the full year 2018.

226. During the conference call, Defendant Grossman also acknowledged that the "January time period [was] such a critical component of [the Company's] recruitment for the year," emphasizing that she "had to be ***realistic and transparent*** about what that meant for the balance of the year" when issuing the Company's FY19 guidance.

227. In response to these disclosures, the Company's stock plummeted again, falling from $29.57 at the close on February 26 ***to only $19.37*** on February 27, 2019 – equal to a further one-day decline of over 33%. This decline also represented a staggering ***72%*** decline from the stock's May 2018 SPO price of $69, and an even more staggering ***75%*** decline from the roughly $77.39 price at which Artal Luxembourg had dumped an additional 6 million shares just five months earlier in August 2018.

## XII. THE SECTION 10(b) DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD

228. During the Class Period, Defendants made numerous false and misleading statements and omissions:

229. As summarized in the preceding section, the statements referenced in ¶¶ 173-78, 206-11, and 217-18 were materially false and misleading and/or failed to disclose material adverse information, required to be disclosed in order to render them not materially misleading or incomplete, because (i) they failed to disclose that Weight Watchers' growth strategy and Strategic Vision depended on luring lapsed subscribers back to Weight Watchers; and (ii) they failed to disclose that Weight Watchers, departing from its established policy and practice, had no plans to, and would be unable to, implement a new program innovation in the fourth quarter of 2018. As a result, Defendants' statements about Weight Watchers' financial condition and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

## XIII. FALSE AND MISLEADING STATEMENTS IN WEIGHT WATCHERS' SEC FILINGS IN VIOLATION OF ITEM 303

230. Weight Watchers' Offering Materials for the SPO, as well as its 1Q18 10-Q, 2Q18 10-Q and 3Q18 10-Q, were materially misleading and actionably incomplete because they failed to disclose information required to be disclosed therein by Item 303 (17.C.F.R. §229.303). Pursuant to the instructions to Form S-1, Weight Watchers was required to comply with the "Management's Discussion and Analysis of Financial Condition and Results of Operations" ("MD&A") disclosure requirements of Item 303 of Regulation S-K in connection with preparing these SEC filings. The MD&A requirements are intended to provide material historical and prospective textual disclosures that enable investors and others to assess the financial condition and results of operations of a company, with emphasis on that company's prospects for the future.

231. Specifically, Item 303 requires the disclosure of "any known trends or any known demands, commitments, events or uncertainties that will result in or that are reasonably likely to result in the registrant's liquidity increasing or decreasing in any material way." Item 303 further requires disclosure of "any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."

232. Importantly, as the SEC has made clear, Item 303 is "intended to give the investor an opportunity to look at the company through the eyes of management by providing both a short and long-term analysis of the business of the company . . . with particular emphasis on the registrant's prospects for the future." Management's Discussion and Analysis of Financial Condition and Results of Operation, Securities Act Release No. 6835, 1989 WL 1092885, at *3 (May 18, 1989). Thus, "material forward-looking information regarding known material trends and uncertainties is required to be disclosed as part of the required discussion of those matters and the analysis of their effects." Commission Guidance Regarding Management's Discussion and Analysis of Financial Condition and Results of Operation, Securities Act Release No. 8350, 2003 WL 22996757, at *11 (Dec. 29, 2003). Equally important, as the instructions to Item 303 expressly state, the MD&A "shall focus specifically on material events and uncertainties known to management that would cause reported financial information to be not necessarily indicative of future operating results or of future financial condition." 17 C.F.R. 229.303(a), Instruction 3.

233. As detailed above, Weight Watchers' Offering Materials and Class Period quarterly reports on Form 10-Q failed to disclose that the Company deviated from its established policy and practice of driving subscriber demand by always having a significant new program innovation ready to launch and market by December, in anticipation of further leveraging that program

innovation during the critical December and first quarter of the New Year periods. While the Company represented that "program innovation" was at the "core" of the Company's business and that "retention increase[s]" are "driven by…new exciting features in our programs," unbeknownst to investors, at all material times the Exchange Act Defendants knew or recklessly disregarded that Weight Watchers (a) had decided by not later than the start of the Class Period ***not*** to develop a new program innovation that would be launched in December 2018 (and could be leveraged to further subscriber growth in the first quarter of 2019) and that (b) thereafter, in the absence of plans for such a new program innovation being well advanced by the start of the Class Period, it would no longer be possible (given the 1-2 year lead times required) to launch such an innovation by December 2019 or the start of the New Year, even if the Company had wanted to.

234. Instead, in February 2019, the Company was belatedly forced to effectively concede the disastrous consequences of its lack of a new program innovation for launch in December 2018/early 2019, as it belatedly tried to assure investors during the 4Q18 earnings call on February 26, 2019 that the situation would be different in the coming cycle (the 2020 cycle) by emphasizing that the Company had been "working for over a year on our next evolution of innovation" for 2010. The Company also acknowledged that, "with any new program launch or innovation launch, we obviously start that earlier than going into the January time period" because Weight Watchers is "constantly relooking at our marketing strategies" and, as Grossman stated in a May 2019 earnings call, knows that "new news innovation . . . tends to drive lapsed members even more."

235. As CW2 also stated, management recognized that the uptick in enrollment caused by Freestyle would not occur in 2019, and in fact, told employees not to compare the 2018-2019

season with the 2017-2018 season because, without the introduction of another new program innovation in late 2018, the comparison was "not apples to apples."

## XIV. ADDITIONAL ALLEGATIONS OF SCIENTER

236. Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

237. The Exchange Act Defendants acted with scienter in that defendants knew, or recklessly disregarded, that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements and documents as primary violations of the federal securities laws. These Defendants, by virtue of their association with and control over the Company, which made them privy to confidential information, participated in the fraudulent scheme designed to mask Weight Watchers' financial prospects, Weight Watchers' departure from its established practice of launching new programs and recruiting lapsed members to drive subscriber demand.

### A. The Artal Defendants and Defendant Hotchkin Had Motive and Opportunity to Commit Fraud

238. The Exchange Act Defendants engaged in this scheme in order to inflate the price of Weight Watchers' securities and, in the case of the Artal Defendants and Defendant Hotchkin, to enhance the value of their personal holdings of Weight Watchers common stock and allow for profitable insider sales yielding proceeds in excess of ***$1.05 billion*** for the Artal Defendants and in excess of $9 million for Defendant Hotchkin, thereby generating huge insider trading profits.

239. In addition, these Defendants' insider sales are probative of the Exchange Act Defendants' scienter. While these Defendants were issuing materially false and misleading

statements about the Company's business and concealing negative information and trends, the Artal Defendants and Hotchkin, who or which had access to confidential information and were aware of the truth about the Company and its business, benefitted from the Exchange Act Defendants' wrongful course of conduct by selling large amounts of the Company's stock at artificially inflated prices during the Class Period, without disclosing or causing to be disclosed the materially adverse facts about the Company that they were privy to.

240. The following table shows the heavy insider sales of the Artal Defendants and Defendant Hotchkin during the Class Period:

| Insider | Shares Held[7] | Shares Sold | Average Share Price | Gross Proceeds | Date |
|---|---|---|---|---|---|
| Artal Luxembourg | 29,443,300 | 8,630,000 | $69 | $595,500,000 | 5/15/18 |
| Artal Luxembourg | | 6,000,000 | $77.39 | $464,340,000 | 8/14/18 |
| Hotchkin | 215,395 | 131,466 | $75.28 | $9,946,160 | 8/30/18 |
| Total: | | | | $1,069,786,160 | |

241. These sales were unusual in terms of their timing. Neither the Artal Defendants nor Hotchkin had sold any Weight Watchers stock ***since 2012***. Further, the Artal Defendants sold on May 15, 2018 in the SPO, at $69 per share, just after Weight Watchers announced strong financial results for 1Q18 and had confirmed its lofty targets for future revenue and subscriber growth through 2020 and then sold again on August 14, 2018, at approximately $77.39 per share, shortly after Weight Watchers reaffirmed its long term guidance. Two weeks later, Defendant

[7] "Shares Held" are as of the SPO for Artal Luxembourg and as of August 30, 2018 for Hotchkin.

Hotchkin also sold at a price far above the SPO price on August 30, 2018, at approximately $75.28 per share.

242. The following chart shows the timing of the sales of the Artal Defendants and Defendant Hotchkin in relation to Weight Watchers' key announcements:




243. Moreover, each of the selling defendants' insider sales were also unusual in terms of their size. The Artal Defendants' Class Period sales were staggering in absolute size by any measure, totaling ***over $1 billion*** in proceeds, and represented the sale of roughly 50% of the 29.443 million shares they had held (without any intervening sales) over several years immediately before the SPO. Although far smaller in absolute size (though obviously still significant even in raw dollar terms), Defendant Hotchkin's insider sales were also unusual in terms of the percentage

of his total holdings, as his August 2018 insider transactions involved the sale of over 61% of his total holdings of Weight Watchers shares.

244. In addition to the sales outlined above, numerous other directors and employees also engaged in significant sales of their Weight Watchers shares, reflecting a Company-wide lack of confidence in management's publicly stated optimism and expectations. For example, Weight Watchers' insiders collectively sold roughly 60,000 shares for almost $5 million in additional insider selling proceeds during the Class Period, even though none of these insiders had previously sold any of their Weight Watchers shares in the prior ten years before the start of the Class Period: Amouyal, Fajgenbaum, Stacey Mowbray (former President, North America), Michael Colosi (General Counsel and Secretary), and Thilo Semmelbauer (member of the Board of Directors).

**B. Imputed Knowledge of Facts Critical to the Company's Core Operations**

245. Defendants Grossman (the Company's President and CEO), Hotchkin (the Company's CFO), and controlling shareholder Artal Luxembourg (through its designees on Weight Watchers' board of directors, including Weight Watchers' board chairman Debbane and the other Artal-appointed directors) were well aware of and informed of matters relating to the Company's core operations, as well as its established business policies and practices. Consequently, their experience and responsibilities necessarily further support a strong inference that they knew (or at least recklessly disregarded) that the statements at issue herein and made during the Class Period were materially false and misleading and contained material omissions.

246. Defendant Grossman has served on Weight Watchers' board of directors and as President and CEO since July 2017.

247. Defendant Hotchkin has served as Chief Financial Officer since 2012. In addition to his role as Chief Financial Officer, he was appointed as President, Emerging Markets in March 2018.

248. Indeed, Weight Watchers highly touted the experience that its management brought to the table. According to the Prospectus:

> Highly Experienced and Passionate Management Team
>
> Our executive team is led by Mindy Grossman, who became our President and Chief Executive Officer in July 2017. Ms. Grossman joined Weight Watchers from HSN, Inc. where she served as Chief Executive Officer since 2008, growing HSN to become a $4 billion direct-to-consumer content and commerce leader that today derives over half its revenue from digital commerce. Ms. Grossman has more than 35 years of experience in building and transforming consumer brands. ***As the Chief Executive Officer, her passion for the Weight Watchers brand propels the continued evolution of our business***. Nicholas Hotchkin has served as our Chief Financial Officer since August 2012 and has led our initiative to reduce our cost structure. To position us for continued growth, we have further bolstered our management team of passionate, mission-driven individuals by adding Michael Korcuska as our new Chief Product Officer to lead our end-to-end experience and Gail Tifford as our new Chief Brand Officer to continue our brand evolution. ***We believe our management team has the vision and experience to position Weight Watchers for continued success and to implement our business strategies over the long term. We believe that our executive team's extensive experience, passion for the brand, relationships, industry knowledge and reputation give us strong competitive advantages.***

249. Defendant Debbane has served as Chairman of the Board of Directors of Weight Watchers since the Company's acquisition by Artal Group in 1999. Debbane is also a co-founder and the Chief Executive Officer of The Invus Group, LLC. He is also the Chief Executive Officer and a director of Artal Group S.A., and the Chairman of the Board of Directors of a number of private companies of which Artal Group S.A. or Invus, L.P. are shareholders.

250. As detailed above, Weight Watchers considers its subscription and retention metrics, as integrally important to the Company's success, and the Section 10b (like the other Exchange Act) Defendants can therefore also be presumed to have had knowledge of inadequacies of their disclosures in this regard.

251. Moreover, the Company's policy and practice of having an annual new product innovation ready for launch in December of each year was an established "core" aspect of the

Company's business, and it defies credulity to believe that each of the Exchange Act Defendants would not have been well aware of the Company's decision to abandon this established policy and practice by the start of the Class Period, and of the fact that, after the start of the Class Period, it would also be impossible to reverse this decision in time to have a new program innovation ready for launch in late December 2018 given the minimum of 1 to 2 years' lead time required to launch such an innovation.

## XV. ADDITIONAL LOSS CAUSATION ALLEGATIONS

252. Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiffs and the Class. Throughout the Class Period, Weight Watchers' stock price was artificially inflated as a result of Defendants' materially false and misleading statements and omissions.

253. As set forth above, on February 26, 2019, Weight Watchers announced disappointing financial results for the fourth quarter and fiscal year, and also pre-announced disastrous results for the critical end of December through January period for 2019. In response, analysts downgraded the Company, and Morgan Stanley expressed concerns over the Company's performance, which "f[e]ll short" of expectations due to "management['s] acknowledged missteps" and which JP Morgan commented "brought initial 2019 guidance ***well below expectations***."

254. In addition, on February 26, 2019, the Company admitted its shortcomings in lapsed member recruitment, thereby revealing the importance of lapsed members to being able to implement its goals, as further described in ¶¶ 87-97 above.

255. The negative disclosures on February 26, 2019 concerning Weight Watchers' performance caused Weight Watchers' stock price to plummet $10.20 per share, or approximately

***35%***, from $29.57 per share at the close on February 26 to $19.37 per share on February 27, on extremely heaving trading volume of more than 37.4 million shares.

256. It was entirely foreseeable that Defendants' materially false and misleading statements and omissions discussed herein would artificially inflate the price of Weight Watchers common stock, and the stock price decline described above was directly and proximately caused by Defendants' materially false and misleading statements and omissions.

## XVI. PRESUMPTION OF RELIANCE—FRAUD ON THE MARKET

257. Plaintiffs will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a) Defendants made public misrepresentations or failed to disclose material facts required to be disclosed;

(b) The omissions and misrepresentations were material;

(c) The Company's stock traded in an efficient market;

(d) The misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's stock; and

(e) Plaintiffs and other members of the Class purchased Weight Watchers common stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts or their consequences were disclosed, without knowledge of the misrepresented or omitted facts.

258. At all relevant times, the market for Weight Watchers' common stock was efficient for the following reasons, among others:

(a) As a regulated issuer, Weight Watchers filed periodic public reports with the SEC;

(b) Weight Watchers regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of

press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts and other similar reporting services; and

(c) Weight Watchers' stock traded on the New York Stock Exchange, and thereafter on the NASDAQ, which are both efficient markets.

259. As a result of the foregoing, the market for Weight Watchers' common stock promptly digested current information regarding Weight Watchers from all publicly available sources and reflected such information in Weight Watchers' stock price. Under these circumstances, all purchasers of Weight Watchers' common stock during the Class Period suffered similar injury through their purchases of Weight Watchers' common stock at artificially inflated prices, and a presumption of reliance applies.

260. In addition, Plaintiffs are entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the claims asserted herein are predicated in part upon material omissions of fact that Defendants had a duty to disclose.

## XVII. INAPPLICABILITY OF STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE

261. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements described in this Complaint. Many of the specific statements described herein were not identified as "forward-looking" when made. To the extent that there were any forward-looking statements, there was no meaningful cautionary language identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements described herein, Defendants are liable for those false forward-looking statements because, at the time each was

made, the particular speaker knew that the particular forward-looking statement was false or misleading, and/or that the forward-looking statement was authorized and/or approved by an executive officer of Weight Watchers who knew that those statements were false or misleading when made.

## XVIII. CLASS ACTION ALLEGATIONS

262. Plaintiffs bring this action as a class action, pursuant to Fed. R. Civ. P. 23(a) and 23(b)(3), on behalf of a class consisting of all persons and entities that purchased, or otherwise acquired, the common stock of Weight Watchers between May 4, 2018 and February 26, 2019, both dates inclusive (the "Class Period"), including in, pursuant to, and/or traceable to the SPO (the "Class").

263. Excluded from the Class are: (i) Defendants; (ii) present or former executive officers of Weight Watchers, members of Weight Watchers' Board, and members of their immediate families (as defined in 17 C.F.R. § 229.404, Instructions (1)(a)(iii) and (1)(b)(ii)); (iii) any of the foregoing persons' legal representatives, heirs, successors, or assigns; and (iv) any entities in which Defendants have or had a controlling interest, or any affiliate of Weight Watchers.

264. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, the Company's common stock was actively traded on national securities exchanges, first the New York Stock Exchange and then, as of October 15, 2018, the NASDAQ. While the exact number of Class members is unknown to Plaintiffs at this time, and can only be ascertained through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the Class. Millions of Weight Watchers shares were traded publicly during the Class Period on the New York Stock Exchange and the NASDAQ. Record owners and other members of the Class may be identified from records maintained by Weight

Watchers or its transfer agent and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

265. Plaintiffs' claims are typical of the claims of Class members, who were all similarly affected by Defendants' wrongful conduct in violation of the federal securities laws. Further, Plaintiffs will fairly and adequately protect the interests of Class members and have retained counsel competent and experienced in class and securities litigation.

266. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the members of the Class are:

(a) Whether the Securities Act Defendants violated the Securities Act;

(b) Whether the Exchange Act Defendants violated the Exchange Act;

(c) Whether Defendants' statements to the investing public during the Class Period omitted and/or misrepresented material facts;

(d) Whether Defendants' statements to the investing public during the Class Period omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(e) Whether Defendants knew or recklessly disregarded that their statements were false and misleading;

(f) Whether the price of Weight Watchers common stock was artificially inflated; and

(g) The extent of damage sustained by Class members and the appropriate measure of damages.

267. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy, since joinder of all members is impracticable. Further, as the

damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for Class members to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## XIX. CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT

### COUNT IV
**Violation of Section 10(b) of The Exchange Act and Rule 10b-5 Promulgated Thereunder (Against the Section 10b Defendants)**

268. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

269. This Count is asserted on behalf of all members of the Class against Weight Watchers and Defendants Grossman, Hotchkin, and Artal Luxembourg for violations of Section 10(b) of the Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5.

270. These Defendants carried out a plan, scheme and course of conduct which was intended to and did: (1) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; and (2) cause Plaintiffs and other members of the Class to purchase Weight Watchers' common stock at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, each of the Defendants took the actions set forth herein.

271. During the Class Period, these Defendants disseminated or approved the false statements specified herein, among others, which they knew or recklessly disregarded were materially misleading in that they contained material misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

272. These Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements made not misleading; and (c) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for Weight Watchers common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

273. These Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business and future prospects of Weight Watchers as specified herein.

274. These Defendants employed devices, schemes, and artifices to defraud while in possession of material adverse non-public information, and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Weight Watchers' value and performance and continued substantial growth, which included the making of, or participation in the making of, materially false and misleading statements, including statements that omitted to state material facts necessary in order to make the statements made about Weight Watchers and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business that operated as a fraud and deceit upon the purchasers of Weight Watchers common stock.

275. As described above, these Defendants acted with scienter throughout the Class Period, in that they either had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to

ascertain and to disclose such facts, even though such facts were available to them. These Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing the Company's true condition and growth prospects, thereby artificially inflating the price of its common stock. As demonstrated by Defendants' omissions and misstatements concerning the Company's business strategy, these Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were materially false or misleading, or suffered from actionable material omissions.

276. As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Weight Watchers common stock was artificially inflated. In ignorance of the fact that market prices of Weight Watchers' common stock was artificially inflated, and relying directly or indirectly on the false, misleading, and materially incomplete statements made and approved by these Defendants, or upon the integrity of the market in which its common stock traded, and/or on the absence of material adverse information that was known to or recklessly disregarded by these Defendants but not disclosed in public statements by Defendants, Plaintiffs and the other members of the Class acquired Weight Watchers common stock at artificially high prices and were damaged thereby.

277. At the time of said misrepresentations and omissions, Plaintiffs and other members of the Class were ignorant of their falsity and incompleteness, and believed them to be true and free of any omissions of material fact required to be disclosed. Had Plaintiffs and the other members of the Class and the marketplace known the truth regarding the Company's business, which was not disclosed by Defendants, Plaintiffs and other members of the Class would not have

purchased or otherwise acquired their Weight Watchers common stock, or, if they had acquired such common stock, they would not have done so at the artificially inflated prices that they paid.

278. By virtue of the foregoing, these Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

279. As a direct and proximate result of these Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's common stock.

280. This action was filed within two years of discovery of the fraud and within five years of plaintiffs' purchases of Weight Watchers common stock giving rise to the cause of action.

## COUNT V
## Violation of Section 20(a) of The Exchange Act
## (Against the Section 20(a) Control Defendants)

281. Plaintiffs repeat and reallege each and every allegation contained above (including in Count III above) as if fully set forth herein.

282. Defendants Grossman, Hotchkin, Debbane, and each of the Artal Defendants acted as controlling persons of Weight Watchers within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, agency, ownership and contractual rights, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, these Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that Plaintiffs contend are false and misleading. These Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiffs to have been misleading prior to

and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or to cause the statements to be corrected.

283. In particular, Defendants Grossman, Hotchkin, Debbane and the Artal Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions, statements and SEC filings giving rise to the securities violations as alleged herein, and exercised the same.

284. As set forth above, Weight Watchers, Grossman, Hotchkin and Artal Luxembourg each violated Section 10(b), and Rule 10b-5 promulgated thereunder, by their acts and omissions as alleged in this Complaint.

285. By virtue of their positions as CEO and CFO respectively of the Company, Defendants Grossman and Hotchkin are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of these Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's common stock.

286. In addition, by virtue of their ownership stake and contractual rights and direct or indirect power to appoint the members of Weight Watchers' board, each Artal Defendant had the power to control or influence Weight Watchers and the particular transactions, statements and SEC filings giving rise to the securities violations as alleged herein, and exercised the same. By virtue of their positions as direct and indirect controlling persons, each Artal Defendant is also liable pursuant to Section 20(a) of the Exchange Act for Weight Watchers' violations of Section 10(b).

287. In addition, by virtue of his position as a Company director and by virtue of his high-level positions with the Artal Defendants, Defendant Debbane had the power to control or influence the Artal Defendants, Weight Watchers, and the particular transactions, statements and

SEC filings giving rise to the securities violations as alleged herein, and exercised the same. By virtue of being a controlling person, Defendant Debbane is also liable pursuant to Section 20(a) of the Exchange Act for Weight Watchers' violations of Section 10(b).

288. As a direct and proximate result of the foregoing wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's common stock.

289. This action was filed within two years of discovery of the fraud and within five years of each Plaintiffs' purchases of Weight Watchers common stock giving rise to the cause of action.

## XX. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

A. Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure and (i) appointing Plaintiffs as representatives of the proposed Class; and (ii) appointing their undersigned counsel as Class Counsel for the Class;

B. Awarding compensatory damages in favor of Plaintiffs and all other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D. Such other and further relief as the Court may deem just and proper.

## XXI. JURY DEMAND

Plaintiffs hereby demand a trial by jury.

DATED: September 27, 2019

**SCOTT+SCOTT ATTORNEYS AT LAW LLP**

*/s/ William C. Fredericks*
William C. Fredericks
Lauren McCabe
Anjali Bhat
The Helmsley Building
230 Park Avenue, 17th Floor
New York, NY 10169
Telephone: (212) 223-6444
Facsimile: (212) 223-6334
wfredericks@scott-scott.com
lmccabe@scott-scott.com
abhat@scott-scott.com

**GRANT & EISENHOFER P.A.**

*/s/ Daniel L. Berger*
Jay W. Eisenhofer
Daniel L. Berger
Caitlin M. Moyna
Jonathan D. Park
485 Lexington Avenue
New York, NY 10017
Telephone: (646) 722-8500
Facsimile: (646) 722-8501
jeisenhofer@gelaw.com
dberger@gelaw.com
cmoyna@gelaw.com
jpark@gelaw.com

*Co-Lead Counsel for Lead Plaintiffs and the Proposed Class*