**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE WEIGHT WATCHERS INTERNATIONAL, INC. SECURITIES LITIGATION | No. 1:19-cv-02005-WHP |

**MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' SECOND
CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**

Lynn K. Neuner
George S. Wang
Rachel S. Sparks Bradley
SIMPSON THACHER & BARTLETT LLP
425 Lexington Avenue
New York, New York 10017
Telephone: (212) 455-2000
Facsimile: (212) 455-2502

*Attorneys for Defendants*

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ...................................................................................1

STATEMENT OF FACTS ........................................................................................4

    A. Defendants ................................................................................... 4

    B. WW And The Shift From "Weight" To "Wellness" ........................................ 4

        1. Expanded Member Recruitment Focus............................................. 5

        2. Expanded Program Innovation Strategy ........................................... 5

    C. The May 2018 Secondary Public Offering ................................................ 7

    D. Other Stock Sales ........................................................................... 8

    E. The WW Statements At Issue ............................................................. 8

    F. The February 2019 Stock Drop............................................................ 9

LEGAL STANDARD ...........................................................................................9

ARGUMENT....................................................................................................11

    I. PLAINTIFFS FAIL TO ALLEGE ANY FALSE OR MISLEADING STATEMENT
       OR OMISSION.......................................................................... 11

    A. WW Expressly Disclosed Its Membership Recruitment Targets ............................ 11

    B. WW Engaged in Year-Round Program Innovations Including At
       Year-End 2018 .......................................................................... 13

    C. WW's Statements About Its Prospects for Success Are
       Protected Forward-Looking Statements ................................................. 15

    D. Alleged Corporate Mismanagement Is Not Actionable Under The Securities
       Laws.................................................................................... 16

    E. Confidential Witness Allegations Provide No Support For Plaintiffs' Claims .......... 17

    II. PLAINTIFFS FAIL TO PLEAD A STRONG INFERENCE OF SCIENTER AS
       REQUIRED FOR THEIR SECTION 10(b) CLAIM ........................................ 17

    A. The Stock Sales Are Not "Suspicious" or "Unusual"................................... 18

    B. Plaintiffs Fail To Plead Conscious Misbehavior Or Recklessness ........................ 20

    C. Plaintiffs' Scienter Theory Is Implausible ............................................... 20

i

III. PLAINTIFFS FAIL TO ADEQUATELY PLEAD LOSS CAUSATION ....................... 21

IV. PLAINTIFFS' SECTION 10(b) CLAIM AGAINST ARTAL MUST BE
    DISMISSED ..................................................................................................... 22

V.  PLAINTIFFS FAIL TO ADEQUATELY PLEAD A SECTION 12(a)(2) CLAIM ........ 23

VI. PLAINTIFFS FAIL TO PLEAD CONTROL PERSON CLAIMS UNDER
    SECTION 15 AND SECTION 20(a) ................................................................ 24

CONCLUSION ............................................................................................................ 25

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*Amgen Inc. v. Conn. Ret. Plans*,
    133 S. Ct. 1184 (2013) ...................................................................................................... 10

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
    493 F.3d 87 (2d Cir. 2007) ......................................................................................... *passim*

*Bd. of Trs. of City of Ft. Lauderdale Gen. Emps. Ret. Sys. v. Mechel OAO*,
    811 F. Supp. 2d 853 (S.D.N.Y. 2011) ............................................................................. 20

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ............................................................................................................ 9

*Citiline Holdings, Inc. v. iStar Fin., Inc.*,
    701 F. Supp. 2d 506 (S.D.N.Y. 2010) ............................................................................. 24

*City of Brockton Ret. Sys. v. Avon Prods., Inc.*,
    2014 WL 4832321 (S.D.N.Y. Sept. 29, 2014) ................................................................. 20

*DeMaria v. Andersen*,
    153 F. Supp. 2d 300 (S.D.N.Y. 2001) ................................................................... 11, 24, 25

*Dorchester Invs. v. Peak Int'l Ltd.*,
    134 F. Supp. 2d 569 (S.D.N.Y. 2001) ............................................................................. 23

*ECA, Local 134 IBEW Joint Pension Tr. of Chicago v. JPMorgan Chase & Co.*,
    553 F.3d 187 (2d Cir. 2009) ................................................................................. 10, 18, 20

*FDIC for Colonial Bank v. First Horizon Asset Sec. Inc.*,
    291 F. Supp. 3d 364 (S.D.N.Y. 2018) ............................................................................. 23

*Glaser v. The9, Ltd.*,
    772 F. Supp. 2d 573 (S.D.N.Y. 2011) ............................................................................. 18

*In re Bank of Am. AIG Disclosure Sec. Litig.*,
    980 F. Supp. 2d 564 (S.D.N.Y. 2013) ............................................................................... 9

*In re BioScrip, Inc. Sec. Litig.*,
    95 F. Supp. 3d 711 (S.D.N.Y. 2015) ............................................................................... 25

*In re Bristol-Myers Squibb Secs. Litig.*,
    312 F. Supp. 2d 549 (S.D.N.Y. 2004) ............................................................................. 19

*In re Citigroup, Inc. Sec. Litig.*,
    330 F. Supp. 2d 367 (S.D.N.Y. 2004) ......................................................................... 16, 17

*In re Deutsche Telekom AG Sec. Litig.*,
    2002 WL 244597 (S.D.N.Y. Feb. 20, 2002) ........................................................... 23, 24, 25

*In re Elan Corp. Sec. Litig.*,
543 F. Supp. 2d 187 (S.D.N.Y. 2008) .................................................................. 17

*In re eSpeed, Inc. Sec. Litig.*,
457 F. Supp. 2d 266 (S.D.N.Y. 2006) .................................................................. 19

*In re Global Crossing, Ltd. Sec. Litig.*,
2005 WL 1881514 (S.D.N.Y. Aug. 5, 2005) ....................................................... 25

*In re Millennial Media, Inc. Sec. Litig.*,
2015 WL 3443918 (S.D.N.Y. May 29, 2015) ...................................................... 17

*In re Morgan Stanley Info. Fund Sec. Litig.*,
592 F.3d 347 (2d Cir. 2010) ........................................................................... 10, 23

*In re MRU Holdings Sec. Litig.*,
769 F. Supp. 2d 500 (S.D.N.Y. 2011) .................................................................. 17

*In re NQ Mobile, Inc. Sec. Litig.*,
2015 WL 1501461 (S.D.N.Y. Mar. 27, 2015) ..................................................... 25

*In re Omnicom Grp., Inc. Sec. Litig.*,
541 F. Supp. 2d 546 (S.D.N.Y. 2008) .................................................................. 22

*In re Weight Watchers Int'l, Inc. Sec. Litig.*,
2016 WL 2757760 (S.D.N.Y. May 11, 2016) ................................................. 13, 17

*Janus Capital Grp., Inc. v. First Derivative Traders*,
564 U.S. 135 (2011) ............................................................................................. 22

*Lentell v. Merrill Lynch & Co.*,
396 F.3d 161 (2d Cir. 2005) ................................................................................. 21

*Local No. 38 Int'l Broth. of Elec. Workers Pension Fund v. Am. Express Co.*,
724 F. Supp. 2d 447 (S.D.N.Y. 2010) .................................................................. 17

*Lorenzo v. S.E.C.*,
139 S. Ct. 1094 (2019) ......................................................................................... 22

*Morris v. Smith Micro Software*,
2012 WL 12948541 (C.D. Cal. May 21, 2012) .................................................... 21

*Nguyen v. New Link Genetics Corp.*,
2019 WL 591556 (S.D.N.Y. Feb. 13, 2019) ........................................................ 22

*Novak v. Kasaks*,
216 F.3d 300 (2d Cir. 2000) ................................................................................. 17

*Pinter v. Dahl*,
486 U.S. 622 (1988) ............................................................................................. 23

*Rombach v. Chang*,
355 F.3d 164 (2d Cir. 2004)..................................................................................... 15

*Santa Fe Indus., Inc. v. Green*,
430 U.S. 462 (1977)................................................................................................ 16

*Schwab v. E\*TRADE Fin. Corp.*,
752 F. App'x 56 (2d Cir. 2018) .............................................................................. 11

*Shain v. Duff & Phelps Credit Rating Co.*,
915 F. Supp. 575 (S.D.N.Y. 1996) ......................................................................... 23

*Singh v. Cigna Corp.*,
918 F.3d 57 (2d Cir. 2019)...................................................................................... 16

*Sloane Overseas Fund, Ltd. v. Sapiens Int'l Corp., N.V.*,
941 F. Supp. 1369 (S.D.N.Y. 1996)........................................................................ 24

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007)............................................................................................ 2, 18

*Wilson v. Merrill Lynch & Co., Inc.*,
671 F.3d 120 (2d Cir. 2011)............................................................................. 10, 25

**Statutes**

15 U.S.C. § 77l............................................................................................................ 10

15 U.S.C. § 78u-4 ................................................................................................... 1, 18

Fed. R. Civ. P. 9(b) ................................................................................................. 1, 11

Fed. R. Civ. P. 12(b)(6)........................................................................................... 1, 10

Defendants WW International, Inc. ("WW" or the "Company," and f/k/a Weight Watchers International, Inc.), Artal Luxembourg S.A. ("Artal"), Artal International S.C.A., Artal Group S.A. (collectively, with Artal and Artal International S.C.A., the "Artal Defendants"), Raymond Debbane, Mindy Grossman, and Nicholas Hotchkin (collectively, with Mr. Debbane and Ms. Grossman, the "Individual Defendants") respectfully submit this memorandum of law in support of their motion to dismiss the Second Consolidated Amended Complaint ("SAC") pursuant to Rules 12(b)(6) and 9(b) and the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4(b).

## PRELIMINARY STATEMENT

In 2018, WW reinvented itself in keeping with a bold new strategic vision, pivoting from a concentrated focus on weight loss to becoming a holistic "wellness" business guided by the principle that healthy living should be accessible to everyone. It rebranded from "Weight Watchers" to "WW," broadened its marketing to appeal to a wider cross-section of people, and expanded its marketing emphasis from shedding extra pounds, chiefly in connection with post-holiday New Years' resolutions, to year-round wellness.

The year 2018 turned out to be a transformative one for WW in many respects, and year-over-year member subscriptions were up. Still, execution of its reinvention was not bump-free. When WW reported its full-year 2018 results in February 2019, it also provided lower-than-expected earnings guidance for 2019. As part of that announcement, WW's CEO discussed the factors that resulted in a slow start to the year, including competition from the "cultural meme" of the ketogenic diet; rebranding struggles in refocusing from "weight" (Weight Watchers) to "wellness" (WW); and the difficult year-over-year comparison to the phenomenally successful prior year launch of the overhauled "Freestyle" weight management program. WW's stock began to decline.

In March 2019, Plaintiffs filed this putative class action, alleging that WW's transformation difficulties and stock drop were the result of an intentional fraud under the Securities Exchange Act of 1934 ("Exchange Act").  In July 2019, Plaintiffs amended their complaint to add Securities Act of 1933 (the "Securities Act") claims that WW's secondary stock offering documents in May 2018 contained misstatements and omissions.  Plaintiffs claim that WW misrepresented and failed to disclose (1) that it needed to recruit "lapsed" (*i.e.*, former) members to reach its membership goals, and (2) that it had no "meaningful" program innovation to launch in December 2018.  But the truth, evidenced by numerous disclosures during the Class Period (May 4, 2018 – February 26, 2019), is that WW repeatedly and candidly disclosed that it sought to recruit both brand-new and former members.  And WW launched numerous innovations *both* at year-end 2018 and before that throughout the year, consistent with its shift to year-round wellness as opposed to a predominant focus on New Year's weight loss.  Nothing was misrepresented.  All of Plaintiffs' claims fail as a matter of law for this reason alone.

Plaintiffs' Exchange Act claims should also be dismissed because they fail to plead a strong inference of scienter.  Scienter is a high burden; the Court must find that an inference of scienter is "at least as compelling as any opposing inference." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314, 324 (2007).  Here, Plaintiffs' scienter allegations defy common sense.  Plaintiffs criticize WW's strategy of expanding its focus to include demographics (*e.g.*, young people and men) outside of its traditional member base.  With the benefit of hindsight, Plaintiffs assert that WW should have kept its focus on middle-aged women.  But Plaintiffs offer no explanation as to why WW, or any of the Defendants, would have intentionally concocted an unprofitable scheme.  The only plausible inference from the pleaded facts is that of ***non***-fraudulent intent—*i.e.*, that WW was trying to modernize strategically to expand its membership

2

and thereby drive higher revenues.

Plaintiffs allege that certain Defendants had "motive and opportunity" to commit fraud, citing stock sales by Artal and CFO Nicholas Hotchkin.  But they cannot allege that the Company's CEO or Chairman (also named Defendants) sold *any* stock.  This substantially undermines any inference of scienter.  As to Artal and Mr. Hotchkin, Plaintiffs do not allege any facts to establish scienter.  Artal was acting in the common, universal manner of a private equity company by creating liquidity for its investors; it remains the largest WW shareholder.  And Mr. Hotchkin ended the Class Period with 18% *more* WW shares than at the beginning of the Class Period.  Moreover, many WW directors and officers *increased* their WW holdings during the Class Period.  These facts are dispositive of scienter.

Plaintiffs' Exchange Act Section 10(b) claim is defective for yet another reason—it fails to allege a coherent theory of loss causation.  The SAC alleges that the "truth" was disclosed on February 26, 2019 when WW supposedly announced the damage caused by "its failure . . . to have a new program [innovation] for launch in December 2018, as well as its previously undisclosed dependence on recruiting lapsed members."  SAC ¶ 13.  WW did not make such an announcement—it rendered its full-year 2018 results.  Moreover, the earnings call was not "corrective" because it did not reveal any previously withheld information about the importance of "lapsed" members or the Company's cycle of introducing innovations.

Plaintiffs also fail to allege facts showing that Artal is a "statutory seller" under Securities Act Section 12(a)(2) because Artal neither passed title to Plaintiffs (it sold only to underwriters) nor solicited the purchase of securities, as a matter of law.  Plaintiffs' "control person" claims against Artal and the Individual Defendants are deficient because the SAC does not demonstrate that they controlled WW or culpably participated in any primary securities law violations.

3

At bottom, Plaintiffs cannot cogently allege anything wrongful about Defendants'

conduct or disclosures during the Class Period.  As the Court raised during the September 20,

2019 hearing, Plaintiffs may disagree with WW's business reinvention, but such complaints are

not securities violations.  Ex. YY at 8:19–20.[1]

## STATEMENT OF FACTS

### A.      Defendants

WW is a global wellness company and the world's leading commercial weight

management program.  Ex. L at 1.  Mindy Grossman is WW's President and CEO; Nicholas

Hotchkin is WW's CFO.  Ex. L at 23.  Raymond Debbane is the Chairman of WW's Board of

Directors.  Ex. L at 23.  He is also the CEO of Artal Group S.A.  Ex. L at 24.  Artal was WW's

majority shareholder from September 1999 until May 2018, when it sold approximately 29% of

its interest in a firm underwritten secondary public offering.  Ex. R at S-24.

### B.      WW And The Shift From "Weight" To "Wellness"

WW is a member-focused business and derives 80% of its revenues from member fees.

Ex. P at 6.  It provides member services through in-person meetings and digital offerings

(including an award-winning mobile app).  It also sells and licenses food products, cookbooks,

restaurant guides, magazines, and other products.  Ex. L at 3.  The core of WW's business is its

weight management program, which assigns "points" to particular foods that members then

spend according to a personalized daily points "budget."  Ex. L at 2.  At the end of 2017, WW

introduced a revamped program called "Freestyle," which introduced significant ease and

flexibility to the program, by introducing over 200 "zero Point" foods, including fruits,

vegetables, certain lean proteins, and non-fat plain yogurt.  Ex. G.  The Freestyle program launch

---

[1]      All citations to "Ex. __" refer to exhibits to the Declaration of George S. Wang.

was a resounding success, and WW began 2018 with a record number of members (4.6 million),

an increase of over one million from the beginning of 2017.  Ex. P at 6.

Following on the heels of the Freestyle success, WW announced in February 2018 a

"bold" new "strategic vision" to make wellness "accessible to all" by becoming a leading healthy

living and wellness brand rather than predominately a weight loss program.  Ex. I; Ex. J at 7.  By

expanding its focus from "weight" to "wellness," WW aimed to grow its business and

profitability.  Ex. J at 5.  In keeping with that vision, it also rebranded from "Weight Watchers"

to "WW," with the tagline "Wellness That Works."  Ex. GG.

### 1.    Expanded Member Recruitment Focus

WW's implementation of its new vision included efforts to broaden its member base

from roughly 90% women (predominantly middle-aged) to "the broad cross-section of diversity:

age, gender, race, ethnicity, geography and life stage."  Ex. K at 13.  WW openly reported in

prior years that approximately two-thirds of its member signups were former members, while the

other one-third were brand-new to WW.  Ex. T at 6.  To "democratize" wellness and encourage

signups from brand-new members in the "broad cross-section of diversity," WW targeted its

marketing on "presenting [WW] in new ways and with new voices. . . [and] appealing to a

broader audience who may not have considered Weight Watchers as a program for them in the

past."  Ex. K at 5; *see also* Ex. P at 5.  Its efforts were fruitful, and by the end of the first quarter

of 2018, WW reported that overall recruitment numbers were up over the same period in 2017,

and that more than 40% of the signups were brand-new to WW.  Ex. P at 5.

### 2.    Expanded Program Innovation Strategy

WW's new strategic vision also included an effort to overcome the seasonal "lumpiness"

associated with the weight-loss business.  This seasonality was expected as WW's member

numbers decrease each quarter during a calendar year.  Ex. ZZ; Ex. JJ at 7 ("[T]he highest volumes of member recruitments occur[] in winter, particularly January . . . each year, Q1 is our peak for end-of-period subscribers, and each year-end is our low point.").  In 2018, as in prior years, WW ended the first quarter with the highest number of members it had that year; members decreased each quarter thereafter.  Ex. P at 6; Ex. BB at 6; Ex. JJ at 6; Ex. QQ at 7.  While recognizing that it would face some seasonality owing to post-holiday New Year's resolutions, WW's vision was to "inspire people to be healthier all year long" in order "truly to become a health and wellness brand."  Ex. K at 9.  WW thus shifted to year-*round* innovation: "We now innovate throughout the year, which helps reduce the seasonality of our business."  Ex. R at S-7.

WW launched numerous innovations throughout 2018 to spark interest in the brand as part of its efforts to counter seasonality.  Ex. R at S-7.  These program innovations included:

- the launch of WW Healthy Kitchen, WW's new line of kitchen tools and products, in March 2018;

- the launch of WW Good, a social impact campaign in May 2018;

- a first-ever summer marketing campaign that started in June 2018;

- the launch of the highly successful "Invite a Friend" program in the summer of 2018;

- a partnership with FreshRealm to create WW-branded quick-prep fresh meal kits in the second half of 2018; and

- the launch of a membership rewards program "WellnessWins" in October 2018.

Ex. J at 18; Ex. M; Ex. X; Ex. Y; Ex. JJ at 4.

Historically, WW launched an innovation only in December.  These year-end innovations varied widely in scale, scope, and focus.  Every few years or so (but never two years in a row), WW launched an updated weight management program reflecting the latest in scientific and clinical information, usually changing the "points" assigned to certain foods.  *E.g.*, Ex. D; Ex. G.

In 2017, the December innovation was the launch of Freestyle, WW's overhauled weight management program. Ex. G. WW had previously revamped its program in 2015 and 2011. Ex. D. In other years, it offered other new incentives to members:

| Year | Year-End Innovation | Type of Innovation |
|------|---------------------|--------------------|
| 2011 | PointsPlus (program overhaul) | Program Revamp |
| 2012 | WW 360 (new digital and other program tools) | Member Incentive |
| 2013 | Simple Start (two-week easy starter plan) | Member Incentive |
| 2014 | 24/7 Expert Chat (coaches available for member questions) | Member Incentive |
| 2015 | Beyond the Scale (introducing "SmartPoints") | Program Revamp |
| 2016 | Apple Watch 2 (free gift with online membership) | Member Incentive |
| 2017 | Freestyle (adding 200 "zero Points" foods) | Program Revamp |

Ex. A; Ex. B; Ex. C; Ex. D; Ex. E; Ex. G.

In December 2018, WW launched *several* new program innovations, including improvements to its digital offerings:

- a partnership with Aaptiv, an app offering curated workouts to WW members;

- a partnership with Headspace, a meditation and mindfulness app;

- improvements to the WW social network "Connect";

- a new "FitPoints" system for personalized activity choices; and

- a partnership with Blue Apron so that members could get WW meal kits delivered to their homes.

Ex. MM; Ex. NN.

## C.    The May 2018 Secondary Public Offering

On May 15, 2018, WW conducted a secondary public offering ("SPO") in which the Company announced that Artal was selling 8.625 million of WW shares. Ex. R at S-9, S-10. The SPO was conducted via a firm underwriting, pursuant to which the underwriters (including Goldman Sachs, Morgan Stanley, UBS, JPMorgan, Merrill Lynch, Citigroup, KeyBank, and

SunTrust) purchased all the shares of common stock in the offering. Ex. R at S-30.[2] As a result of the SPO, Artal reduced its holding of WW from 44% to 33%, for net proceeds of $571,320,000. Ex. R at S-10. The underwriters then sold the acquired shares to the public. Ex. R at S-30. The offering materials for the SPO included a registration statement (Ex. S) and prospectus supplement (Ex. R), which incorporated certain of WW's prior annual and quarterly SEC filings by reference. *See* Ex. R at S-36, S-37.

### D.     Other Stock Sales

Artal also sold 6 million of its WW shares in August 2018 at $76.00 per share, for net proceeds of $456,000,000. Ex. DD; Ex. EE. After this sale, Artal retained a 22% equity interest in WW. Ex. VV at 68. Later that same month, Mr. Hotchkin exercised 131,466 of his oldest, least in-the-money options and sold the resulting shares, for net proceeds of $6,328,399. Ex. FF. Despite these sales, Mr. Hotchkin ended the Class Period with 18% *more* WW shares than at the beginning of the Class Period. Ex. V; Ex. VV at 68. Likewise, many WW directors and officers *increased* their WW holdings during the Class Period, including the CEO, who increased her WW shares by more than 500%. *See* Ex. O at 70; Ex. VV at 68.

### E.     The WW Statements At Issue

The SAC alleges that the offering materials for the SPO, as well as WW's quarterly 2018 filings and other public disclosures misstated or omitted information about two principal issues: (1) that recruiting "lapsed" members was critical for WW to meet its membership goals, and (2) that WW supposedly had no meaningful product innovation to launch in December 2018.

---

[2]     In a firm commitment underwriting, title to the shares passes "from [the seller] to the underwriters and then from the underwriters to the purchaser-plaintiffs." *In re Deutsche Telekom AG Sec. Litig.*, 2002 WL 244597, at *4 (S.D.N.Y. 2002). Accordingly, "the underwriter agrees to purchase . . . the offering irrespective of whether the securities can be sold in the public market; therefore, the underwriter [*i.e.*, not the seller] bears the risk if the offering is undersubscribed." *Id.*

*See, e.g.*, SAC ¶¶ 1–2, 8–9.  WW's public disclosures during the Class Period directly contradict

Plaintiffs' assertion that WW was withholding key information on these subjects.  *See infra*

Part I.  Appendices A and B set forth WW's disclosures on these issues, respectively.

### F.        The February 2019 Stock Drop

In February 2019, in addition to reporting full-year 2018 results and providing lower-

than-expected 2019 guidance, WW reported "very disappointing" initial winter recruitment

performance.  Ex. QQ at 4.  WW's stock price fell as a result.  Reflecting on the disappointing

recruitment, Ms. Grossman identified a "perfect storm" of causes including (1) "anniversarying

what was truly a Freestyle phenomenon," (2) "keto becoming a cultural meme," and (3) WW's

rebranding execution not being "more weight loss-focused, especially in the January season" as

well as not providing an overt "bridge from Weight Watchers to WW."  Ex. QQ at 12.  WW

noted the impact of external factors, but looking back also acknowledged "self-inflicted"

mistakes related to the rebranding and the shift from "weight" to "wellness."  But Mr. Hotchkin

reminded investors that WW "ended the year with 3.9 million subscribers, up 22% from the end

of 2017."  Ex. QQ at 7.  Though it had hit some bumps in the road, WW still believed in its

strategic vision—"a transformative journey and one that isn't linear."  Ex. QQ at 9.

### LEGAL STANDARD

Under Rule 12(b)(6), a court should dismiss a complaint if, after taking its allegations as

true, the pleading fails to state a viable claim for relief.  *Bell Atl. Corp. v. Twombly*, 550 U.S.

544, 555 (2007).  A court need not credit conclusory statements and may reference documents

relied on in the complaint or that are publicly available, such as SEC filings.  *ATSI Commc'ns,*

*Inc. v. Shaar Fund*, *Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007); *see also In re Bank of Am. AIG*

*Disclosure Sec. Litig.*, 980 F. Supp. 2d 564, 570 (S.D.N.Y. 2013) (courts may take notice of

"press coverage establishing what information existed in the public domain during periods relevant to the plaintiffs' claims"). A court can dismiss with prejudice where the plaintiff has been given notice of the complaint's defects and declined to amend. *Wilson v. Merrill Lynch & Co., Inc.*, 671 F.3d 120, 139 (2d Cir. 2011). Here, the Court held a hearing on September 20, 2019, after pre-motion letter practice, and Plaintiffs elected to make only minor edits in their amended operative complaint. There is thus no basis to provide another opportunity to replead, as is consistent with this Court's individual practice. *Id.*; *see also* Ex. YY at 12:7–10.

To state a Section 11 claim under the Securities Act, a plaintiff "must allege facts demonstrating plausibly that . . . the registration statement 'contained an untrue statement of material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading.'" *Nguyen v. MaxPoint Interactive, Inc.*, 234 F. Supp. 3d 540, 545 (S.D.N.Y. 2017). To state a claim under Section 12(a)(2) of the Securities Act a plaintiff must similarly allege an actionable misstatement or omission and must establish that the named defendant is a "statutory seller." *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 359 (2d Cir. 2010); 15 U.S.C. § 77l(a)(2).

A plaintiff asserting a claim under Section 10(b) of the Exchange Act must allege (1) a material misrepresentation or omission, as well as "(2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Amgen Inc. v. Conn. Ret. Plans*, 133 S. Ct. 1184, 1191–92 (2013). The heightened pleading standards of the PSLRA and Rule 9(b), moreover, require Plaintiffs to "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading." *ECA & Local 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 196 (2d Cir. 2009).

10

Control person claims under Section 15 of the Securities Act or Section 20(a) of the Exchange Act require a primary violation of Section 11 or Section 10(b), respectively, as well as specific allegations of control and culpable participation.  *ATSI Commc'ns.*, 493 F.3d 87, 108 (2d Cir. 2007) (discussing Section 20(a)); *DeMaria v. Andersen*, 153 F. Supp. 2d 300, 314 (S.D.N.Y. 2001) (discussing Section 15).

<u>ARGUMENT</u>

## I.    PLAINTIFFS FAIL TO ALLEGE ANY FALSE OR MISLEADING STATEMENT OR OMISSION

Plaintiffs fail to plead any actionable misstatements or omissions.[3]  For this reason alone, all of their claims under the Securities Act and the Exchange Act should be dismissed.

### A.    WW Expressly Disclosed Its Membership Recruitment Targets

Plaintiffs' claim that WW failed to disclose the importance of re-enrolling its traditional target demographic population is belied by WW's express public disclosures.  Defendants repeatedly disclosed before and during the Class Period that the members it sought to attract included *both* people brand-new to WW and former WW members (*i.e.*, so-called "lapsed" members), and that these resubscribers were a large portion of signups each quarter:

- **2017 10-K, filed February 28, 2018**:  WW's marketing efforts are geared towards "attract[ing] new and returning customers."  "The word of mouth generated by our current and former customers, combined with our strong brand and known effectiveness, enable us to attract new and returning customers." Ex. L at 5.

- **Prospectus Supplement, filed May 14, 2018**: "The quality, credibility and

---

[3]    At the September 20, 2019 pre-motion conference, the Court asked Plaintiffs' counsel whether this is a misstatement case or an omission case.  Plaintiffs' reply was that it is "both." *See* Ex. YY at 10:3–11.  In the Second Circuit, where alleged omissions are simply the inverse of alleged misrepresentations, it is a misrepresentation case. *E.g.*, *Schwab v. E*TRADE Fin. Corp.*, 752 F. App'x 56, 59 (2d Cir. 2018) (plaintiffs' "purported 'omissions' were 'simply the inverse of the [p]laintiffs' misrepresentation allegations,' because the only thing they omitted was the 'truth that the statement misrepresents.'  Thus, the plaintiffs' case was one primarily about misrepresentations, not omissions, and the *Affiliated Ute* presumption did not apply.").

11

compelling consumer value of our offerings engender a deep affinity to Weight Watchers and enable us to attract new and returning customers efficiently. Our meeting members have historically demonstrated consistent loyalty to the brand and a significant percentage have repeatedly resubscribed to the program." Ex. R at S-4.

- **May 17, 2018 JPMorgan Conference**: Mr. Hotchkin noted that "Getting new voices on the brand is making a difference. Typically, 2/3 of the people in our program have done Weight Watchers before, 1/3 of the people are new to the brand. In Q1, in the U.S., that 1/3 ratcheted up to 40% [of the] people who joined us were new to the brand. I think that shows the power of the new integrated marketing messages we have." Ex. T at 6.

- **November 1, 2018 earnings call**: Mr. Hotchkin explained that "[s]imilar to what we saw in the first half in the U.S., more than 40% of our member sign-ups in Q3 were new to WW. An increase in the proportion of first-time members compared to recent years." Ex. JJ at 6.

Indeed, in the February 26, 2019 earnings call that Plaintiffs cite as the corrective disclosure that "effectively revealed the truth," (SAC ¶ 13), Ms. Grossman was clear that WW had focused both on new and former members throughout 2018, even though it was not as successful as hoped regarding the latter: "Our winter advertising did not drive consumers, *particularly our former members*, to action in the way we had hoped" but "was very geared to both attracting new members *as well as lapsed members*." Ex. QQ at 5, 12 (emphases added).

Plaintiffs cannot dispute that WW made these disclosures. Nor can Plaintiffs reasonably dispute that, contrary to their allegations, WW did in fact disclose the "significant contribution that lapsed members made to its subscriber numbers" (SAC ¶ 73)—specifically, that over half of its signups in any time period were former members who were re-subscribing.

Instead, Plaintiffs mischaracterize WW's disclosures to allege that WW was focused *only* on brand-new members at the expense of former members during 2018. But they plead no particularized facts to support this conclusory assertion. And what is more, such a theory defies common sense. WW expanded its marketing to cover people of different ages, gender, or other demographics, but it was not giving up on the middle-aged female demographic that formed its

12

core traditional membership base.  *See, e.g.*, Ex. K at 13.  ("[W]e're really focused on the broad cross-section of diversity: age, gender, race, ethnicity, geography and life stage.  So you will see that continue in our marketing efforts to be inclusive because we know it works.").  As the CEO Ms. Grossman commented: "[E]verybody asks me who our customer is and I said, 'I don't know, people with bodies,' right?" Ex. N at 11.

WW discloses information on its enrollment figures *every quarter*.  *See* Ex. P at 6; Ex. Q at 28 ("[t]urning to our Q1 performance . . . approximately 40% of our annual member recruitments . . . occurr[ed] in the first quarter . . . bringing end of period subscribers to 4.6 million"); *see also* Ex. Z at 6; Ex. CC at 30 ("Year-over-year recruitment growth rates in Q2 continued to be well above those obtained during Q2 2016 and 2017, bringing our end-of-period subscribers to 4.5 million."); *see also* Ex. HH at 6; Ex. KK at 35 ("Our results in Q3 were solid . . . well above prior years bringing our end of period subscribers to 4.2 million . . . more than 40% of our members sign-ups in Q3 were new to WW."); *see also* Ex. PP at 7; Ex. SS at 45 ("We ended the year with 3.9 million subscribers, up 22% from year end 2017.").  Indeed, Judge Kaplan previously noted that WW consistently discloses "enrollment trends in public SEC filings." *In re Weight Watchers Int'l, Inc. Sec. Litig.*, 2016 WL 2757760, at *8 (S.D.N.Y. May 11, 2016).

### B.    WW Engaged in Year-Round Program Innovations Including At Year-End 2018

Plaintiffs' allegations about the lack of meaningful program innovations in December 2018 are not actionable.  *First*, WW <u>did</u> release year-end program innovations in December 2018, just as it had done in prior years.  These included new digital and meal program innovations like on-demand audio workouts (through Aaptiv) and meditation exercises (through Headspace) customized for members on the WW app; a partnership with Blue Apron to offer in-

home delivery of WW-approved recipes and ingredients; and improvements to its social network "Connect" and a revamped version of its "FitPoints" app to allow members to personalize their physical activity.  Ex. MM; Ex. NN.

Plaintiffs compare the scope of the 2018 innovations unfavorably to the "Freestyle" program overhaul that WW launched in December 2017.  But such comparison ignores WW's historical innovation cycle, which does not include yearly program overhauls.  Indeed, before 2017, the last weight program revamp was in 2015 (Beyond the Scale) and before that, in 2011 (PointsPlus).  Ex. D.  Back-to-back years of program overhauls has *never* been WW's practice. Other prior-year innovations were on par with those announced in December 2018, such as giving away an Apple Watch 2 with an online membership in 2016, and offering 24/7 expert chat availability in 2014. Ex. C; Ex. E; *see* Ex. A (WW 360 in 2012); Ex. B (Simple Start in 2013).

*Second*, Plaintiffs ignore WW's roll out of extensive program updates and innovations *during* 2018.  Early in 2018, WW announced a "bold" "strategic vision" to make wellness "accessible to all" by becoming a leading healthy living and wellness brand and year-long partner to its members, rather than solely a weight-loss program.  Ex. G; Ex. I.  To execute that vision, Ms. Grossman announced WW would start "showing how we can be a powerful partner for health in people's lives all year long" to shift to a "365 strategy."  Ex. J at 18.

 Consistent with this bold new vision for the Company, WW disclosed in WW's May 14, 2018 Prospectus:  "We now innovate throughout the year, which helps reduce the seasonality of our business and increases excitement around our brand."  Ex. R at S-7; *see also* Ex. P at 8 ("People want to get healthy year around, not just in January.  And as we move to WW 365 mindset, we will begin to have activations and events year-round.").  WW's innovations throughout 2018 included:

14

| Date | Innovation | Description |
|------|-----------|-------------|
| Feb. 7, 2018 | WW Fresh | "I'm also excited to announce a new partnership with Fresh Realm, the leading challenger brand in the fresh food market . . . to create WW branded fresh convenient ready-to-cook meal kits and individual products." Ex. J at 18. |
| Mar. 7, 2018 | WW Healthy Kitchen | WW "announced the launch of the WW Healthy Kitchen™: a collection of inspirational and innovative products, content and experiences designed to make it easier than ever to cook and eat healthier at home and on-the-go." Ex. M. |
| May 30, 2018 | WW Good | WW "is launching WW Good, a global social impact campaign that aims to make health and wellness more accessible to all." As part of WW Good, WW hosted "six, free mini-festivals." Ex. X. |
| June 19, 2018 | Summer of Impact Campaign | WW "announces that it has launched a global, summer marketing campaign that celebrates the livability of the WW Freestyle." Summer of Impact "marks . . . the first time [WW] has launched a fully integrated marketing campaign in the summer." Ex. Y. |
| Summer 2018 | Invite a Friend | "This past summer, we added an[] Invite a Friend feature into our mobile app. When an invited friend signs up for WW, both members receive 1 free month added to their membership." Ex. JJ at 5. |
| Sept. 24, 2018 | Rebranding Effort | "To reflect the next stage of the company's evolution to focus on overall health and wellness, Weight Watchers International, Inc. today announced that the company will become WW . . . . A new tagline, "Wellness that Works" will be used globally." Ex. GG. |
| Oct. 4, 2018 | WellnessWins | "Today, WW launches WellnessWins, an innovative rewards program that recognizes members for everyday behaviors that are proven to lead to healthier habits. Members will earn 'Wins' for engaging with the program, which can then be redeemed for special offerings and experiences, or with various WW partners such as ClassPass, Rent the Runway, and Thrive Market." Ex. II. |

## C.    WW's Statements About Its Prospects for Success Are Protected Forward-Looking Statements

Plaintiffs impermissibly fault Defendants for failing to predict the future. Both the PSLRA statutory safe harbor and the common law "bespeaks caution" doctrine protect statements that are accompanied by meaningful cautionary statements that, as here, address the issues of which Plaintiffs complain. *See Rombach v. Chang*, 355 F.3d 164, 173 (2d Cir. 2004). WW specifically, directly, and repeatedly cautioned investors about the risks associated with its prospects for success and implementation of its strategic vision. For example, in the 2017 10-K incorporated into the offering materials for the SPO, WW cautioned that:

15

- "Our business success depends on our ability to attract and retain members."

- "Our business depends on the effectiveness of our advertising and marketing programs, including the strength of our social media presence, to attract and retain members and subscribers."

- "Our future success depends on our ability to develop and market new, innovative services and products and to enhance our existing services and products, each on a timely basis . . . we may not be successful in developing, introducing on a timely basis or marketing any new or enhanced product services."

- "We may not be able to successfully implement our strategic initiatives and realize the intended business opportunities, growth prospects . . . ."

Ex. L.  These warnings clearly put Plaintiffs on notice that WW depends on the ability to attract members (*i.e.*, brand-new members, returning "lapsed" members, existing members) to its subscription-driven business, and further, that WW's failure to successfully implement new initiatives (such as rebranding or pivoting to "wellness") could adversely affect its business.

> **D.    Alleged Corporate Mismanagement Is Not Actionable Under The Securities Laws**

At bottom, Plaintiff's complaint is a disagreement with WW's strategic shift from "weight" to "wellness" and the reality that the initial execution of that shift was bumpy. Plaintiffs second-guess WW management's strategic decisions, including decisions as to marketing and the timing and types of innovations.  But these "corporate mismanagement" claims are inactionable under the securities laws.  *E.g.*, *Santa Fe Indus., Inc. v. Green*, 430 U.S. 462 (1977) ("Congress by § 10(b) did not seek to regulate transactions which constitute no more than internal corporate mismanagement."); *see also Singh v. Cigna Corp.*, 918 F.3d 57 (2d Cir. 2019) ("[t]his case presents us with a creative attempt to recast corporate mismanagement as securities fraud" which "cannot form the basis of a fraud case"); *In re Citigroup, Inc. Sec. Litig.*, 330 F. Supp. 2d 367, 377 (S.D.N.Y. 2004) ("allegations of garden-variety mismanagement are not actionable under section 10(b)").

As Judge Kaplan found the last time WW was sued for securities fraud (that time alleging that WW did not adequately disclose competition from free online apps and difficulties implementing a new technology platform), "there is nothing fraudulent about a disappointing year." *In re Weight Watchers*, 2016 WL 2757760, at \*8 (dismissing complaint with prejudice).

### E. Confidential Witness Allegations Provide No Support For Plaintiffs' Claims

Plaintiffs offer vague statements purportedly made by confidential witnesses ("CWs") to bolster their unsupportable claim that WW took "for granted" former members and had no program innovation in 2018. SAC ¶¶ 54–55, 68, 161–62, 187. These CW allegations do not help their complaint at all. None of these CWs supports Plaintiffs' claim that WW abandoned its traditional target demographic. Instead, these CWs simply critique WW's marketing and program-development decisions—*i.e.*, they are nothing more than a different vehicle for the "corporate mismanagement" allegations made elsewhere in the Complaint, which are inactionable under the securities laws. *E.g.*, *Citigroup*, 330 F. Supp. 2d at 377.[4]

### II. PLAINTIFFS FAIL TO PLEAD A STRONG INFERENCE OF SCIENTER AS REQUIRED FOR THEIR SECTION 10(b) CLAIM

The SAC fails to plead "with particularity facts giving rise to a strong inference that the defendant acted with the requisite state of mind." 15 U.S.C. § 78u-4(b)(2). To survive a motion to dismiss, scienter allegations "must be more than merely plausible or reasonable—[they] must be ***cogent*** and ***at least as compelling*** as any opposing inference of nonfraudulent intent."

---

[4] Where Plaintiffs rely on confidential sources, the Court must examine "the corroborative nature of other facts alleged, . . . the coherence and plausibility of the allegations, and similar indicia." *In re Elan Corp. Sec. Litig.*, 543 F. Supp. 2d 187, 207 (S.D.N.Y. 2008). There is inherent skepticism of confidential witnesses. *See In re Millennial Media, Inc. Sec. Litig.*, 2015 WL 3443918, at \*6, 13–14 (S.D.N.Y. May 29, 2015) (noting, for instance, the "potential for inaccuracy" with respect to confidential witnesses); *In re MRU Holdings Sec. Litig.*, 769 F. Supp. 2d 500, 516 (S.D.N.Y. 2011) (anonymous sources "must be discounted" because "[i]t is hard to see how information from anonymous sources could . . . take account of plausible opposing inferences. Perhaps these confidential sources have axes to grind.").

17

*Tellabs*, 551 U.S. at 314 (emphasis added).  While a court typically draws all inferences in favor of the non-movant at the motion to dismiss stage, "the PSLRA establishes a more stringent role for inferences involving scienter because the PSLRA requires particular allegations giving rise to a ***strong*** inference of scienter."  *ECA*, 553 F.3d at 196 (emphasis added).  Accordingly, the courts must consider all "plausible, nonculpable explanations for the defendant's conduct."  *Tellabs*, 551 U.S. at 324.

Plaintiffs attempt to show scienter by asserting (1) "motive and opportunity" based on "unusual" stock sales by Artal and Mr. Hotchkin and (2) "conscious misbehavior or recklessness" by Ms. Grossman, Mr. Hotchkin, Mr. Debbane and the Artal Defendants.  SAC ¶¶ 236–251.[5]  Neither comes close to satisfying the "strong inference" standard.  Non-culpable explanations for Defendants' conduct are far more plausible than Plaintiffs' theories.

### A.    The Stock Sales Are Not "Suspicious" or "Unusual"

Plaintiffs' allegations that Defendants were motivated to keep WW's stock price high fail to raise an inference of scienter as a matter of law.  A plaintiff's pleadings "do not constitute 'motive'" where they are based on "[m]otives that are common to most corporate officers, such as . . . the desire to keep stock prices high to increase officer compensation."  *ECA*, 553 F.3d at 198.  Mere allegations that "insider stock sales occurred" are insufficient to prove scienter.  *Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 587 (S.D.N.Y. 2011).  Here, the facts surrounding the sales by Artal and Mr. Hotchkin do not support a finding that the sales "were unusual in terms of their timing . . . [and] size."  SAC ¶¶ 241, 243.

On August 30, 2018, Mr. Hotchkin exercised 131,466 of his oldest RSU and PSU options, which form part of his annual compensation, for a total price of $3,617,760.82, and then

---

[5]    Plaintiffs do not attempt to use CW allegations to show scienter.  Moreover, none of the CWs is alleged to have had contact with any of the Individual Defendants.

18

sold those shares at an average price of $75.66, netting proceeds of $6,328,399.12. [6]  Ex. FF.  Mr.

Hotchkin's sales on August 30, 2018 did not actually reduce his WW holdings.  Both before and

after the August 30, 2018 transactions, Mr. Hotchkin owned 83,929 shares in the Company.  Mr.

Hotchkin simply exercised his RSU and PSU options he had received as part of his

compensation, and then sold the resulting shares.  There is nothing nefarious about a corporate

insider redeeming equity awards, particularly where such awards comprised 53% of total 2018

compensation for officers like Mr. Hotchkin.  Ex. VV at 43.

Plaintiffs' scienter allegations are eviscerated by the fact that Mr. Hotchkin *increased* his

WW holdings during the Class Period by 18% by virtue of significant RSUs vesting in

November 2018.  Ex. O at 70; Ex. VV at 68; *see In re Bristol-Myers Squibb Secs. Litig.*, 312 F.

Supp. 2d 549, 561 (S.D.N.Y. 2004) (defendant's increase in holdings during purported class

period is "a fact wholly inconsistent with fraudulent intent").  And it was not just Mr. Hotchkin

who increased his holdings—of the 16 directors, officers, or significant shareholders who file

Form 4s relating to their WW share activity, half (comprised of a mix of directors and officers)

*increased* their holdings over the Class Period.  Ex. O at 70; Ex. VV at 68.  Moreover, the

absence of any allegations of stock sales by WW's CEO (Ms. Grossman, who increased her

holdings by 500%) and Chairman (Mr. Debbane), both of whom are named Defendants, further

undermines Plaintiffs' attempt to plead scienter.  *In re eSpeed, Inc. Sec. Litig.*, 457 F. Supp. 2d

266, 289–92 (S.D.N.Y. 2006) ("the dispositive factor is that other insiders, including the other

---

[6]    WW compensates certain executives, including Ms. Grossman and Mr. Hotchkin, with grants of restricted stock units ("RSUs") and performance stock units ("PSUs").  RSU awards have time-vesting criteria and PSUs have performance- and time-vesting criteria.  WW's PSU awards typically vest in three years if performance criteria is met, but only have value to grantees "if the stock price increases in comparison to the exercise price."  Accordingly, PSUs "directly incentivize creation of shareholder value after the grant date" by aligning the interests of management and shareholders with the long-term interests of WW.  Ex. O at 32; Ex. VV at 33.

two individual defendants, did not sell during the putative class period").

As to Artal, Plaintiffs conclusorily allege the sales were unusual in timing and size, but do not plead any specific facts to support their allegations. While Artal's sales were large, they were not unusual. Plaintiffs have not pleaded otherwise. That Artal created liquidity and returns for its investors is not unusual and is not evidence of scienter. Artal was acting in the common, universal manner of a private equity company by creating liquidity for its investors. Regardless of these transactions, Artal was not cutting and running—it remains WW's largest shareholder.

### B.    Plaintiffs Fail To Plead Conscious Misbehavior Or Recklessness

Plaintiffs do no better in trying to plead conscious misbehavior or recklessness. SAC ¶¶ 18, 233, 237, 245. Recklessness is considered "an extreme departure from the standards of ordinary care" such that "the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *ECA*, 553 F. 3d at 198. Plaintiffs' allegations are, in essence, that Defendants must have known of wrongdoing (or were themselves involved) given their senior positions or long-term affiliations with WW. SAC ¶¶ 245–51. Courts routinely reject these types of claims based on nothing more than imputation of knowledge based on someone's position in a company. *See, e.g.*, *Bd. of Trs. of City of Ft. Lauderdale Gen. Emps. Ret. Sys. v. Mechel OAO*, 811 F. Supp. 2d 853, 873 (S.D.N.Y. 2011) ("courts in this District have long held that accusations founded on nothing more than a defendant's corporate position are entitled to no weight"); *City of Brockton Ret. Sys. v. Avon Prods., Inc.*, 2014 WL 4832321, at *19 (S.D.N.Y. Sept. 29, 2014) (same).

### C.    Plaintiffs' Scienter Theory Is Implausible

Plaintiffs' scienter allegations, taken as a whole, are implausible. At bottom, Plaintiffs claim that Defendants intentionally adopted a losing strategy and set WW up for failure by

expanding their focus to new demographics and attempting to reduce the seasonality of their business by innovating all year instead of only at year-end.  That makes no sense.  And there is a much simpler, far more plausible explanation, which WW clearly disclosed.  Defendants adopted new strategies in 2018 because they thought they were in the best interests of and profitable for WW.  WW had a disappointing start to 2019, but there is nothing fraudulent about that.

Plaintiffs' scienter allegations are further undermined by the structure of the annual compensation packages awarded to Ms. Grossman and Mr. Hotchkin.  In 2018, Ms. Grossman was awarded 22,988 PSUs at an exercise price of $80.18.  Ex. VV at 42, 47.  Similarly, Mr. Hotchkin was awarded 11,755 PSUs at an exercise price of $80.18.  Ex. VV at 42, 47.  None of these PSUs vests until 2021, and only then if WW achieves certain financial targets.  Ex. VV at 47.  These PSUs have no value to Ms. Grossman or Mr. Hotchkin unless WW's stock price exceeds the exercise price at vesting and WW achieves certain income objectives.  Ex. VV at 33.  Plaintiffs' claims are neither plausible nor reasonable, and certainly not cogent and compelling.  *See, e.g.*, *Morris v. Smith Micro Software*, 2012 WL 12948541, at *8 (C.D. Cal. May 21, 2012) ("It is also difficult to reconcile Defendants' 'long-term equity incentives' with a fraudulent scheme that, according to [the Complaint], was bound to fail.").

## III.    PLAINTIFFS FAIL TO ADEQUATELY PLEAD LOSS CAUSATION

Plaintiffs' Section 10(b) claim also fails because they do not adequately allege loss causation.  *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 172 (2d Cir. 2005) ("To establish loss causation, a plaintiff must allege . . . that the subject of the fraudulent statement or omission was the cause of the actual loss suffered . . . .").  "Under the corrective disclosure theory, Plaintiffs must demonstrate that the available public information regarding the company's financial condition was corrected, and . . . the market reacted negatively to the corrective disclosure."

*Nguyen v. New Link Genetics Corp.*, 2019 WL 591556, at \*7 (S.D.N.Y. Feb. 13, 2019); *In re Omnicom Grp., Inc. Sec. Litig.*, 541 F. Supp. 2d 546, 552 (S.D.N.Y. 2008) (corrective disclosure must "reveal the falsity of the alleged misstatements").

Plaintiffs allege that on February 26, 2019, WW revealed that implementing its strategic plan depended on attracting lapsed members.  SAC ¶¶ 89–97.  But that fact was disclosed long ago.  Repeatedly throughout the Class Period, WW disclosed that a majority of its "new" members consisted of returning customers.  *See* App'x A.  That information was not new or corrective in February 2019.  Moreover, Plaintiffs cite to no so-called "corrective" disclosure relating to WW's innovation strategy, an apparent recognition of the fact that WW disclosed throughout the Class Period that innovations were central to WW's growth strategy.  *See* App'x B.  And while WW's lower-than-expected earnings guidance was new information, Plaintiffs offer no explanation as to how unexpected earnings guidance could be a corrective disclosure in this circumstance.

## IV.    PLAINTIFFS' SECTION 10(b) CLAIM AGAINST ARTAL MUST BE DISMISSED

Plaintiffs' Section 10(b) claim against Artal (the only Artal Defendant named in this claim) must also be dismissed for the separate reason that Artal never made a statement and therefore cannot be subject to liability under Section 10(b).  *See Janus Capital Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 141–43 (2011) (only those who "have 'made' the material misstatements" may be subject to liability).  The "maker" of a statement is the individual with "ultimate authority over the statement" because "it is the speaker who takes credit—or blame—for what is ultimately said."  *Id.*  Here, Plaintiffs have failed to allege that Artal is the "speaker" of any alleged misstatement.  Therefore, Plaintiffs' Section 10(b) claim fails as a matter of law.  The Supreme Court's *Lorenzo v. S.E.C.* decision does not alter this conclusion, as Plaintiffs do

22

not and cannot allege that Artal knowingly disseminated false statements by others.  139 S. Ct. 1094, 1099 (2019).

## V.    PLAINTIFFS FAIL TO ADEQUATELY PLEAD A SECTION 12(a)(2) CLAIM

Plaintiffs' Section 12(a)(2) claim against Artal fails because Plaintiffs do not and cannot plead that Artal was a "statutory seller."  *Pinter v. Dahl*, 486 U.S. 622, 642 (1988); *In re Morgan Stanley*, 592 F.3d at 359 (interpreting *Pinter's* definition of statutory seller and establishing two "*Pinter* tests").  A defendant may be considered a "statutory seller" under *Pinter* if "(1) he passed title, or other interest in the security, to the buyer for value, or (2) successfully solicited the purchase of a security, motivated at least in part by a desire to serve his own financial interests or those of the securities' owner."  *FDIC for Colonial Bank v. First Horizon Asset Sec. Inc.*, 291 F. Supp. 3d 364, 376 (S.D.N.Y. 2018).  Artal is not a "statutory seller" under either test.

*First*, Artal did not "pass title" to Plaintiffs.  Artal sold in the SPO only to the underwriters, not to any of the Plaintiffs.  Ex. R at S-30.  In a firm commitment underwriting, title to the shares passes "from [the seller] to the underwriters and then from the underwriters to the purchaser-plaintiffs."  *In re Deutsche Telekom AG Sec. Litig.*, 2002 WL 244597, at *4 (S.D.N.Y. Feb. 20, 2002).  As a buyer cannot recover "from a seller's seller," Plaintiffs may not rely on the first *Pinter* test in support of their Section 12(a)(2) claim against Artal.  *Id.*

*Second*, where, as here, a seller has had no "direct contact with plaintiff, [the seller], as a matter of law, is not subject to § 12 liability" as a solicitor seller or otherwise.  *Shain v. Duff & Phelps Credit Rating Co.*, 915 F. Supp. 575, 577 (S.D.N.Y. 1996).  The fact that a seller's name "appears frequently in the Prospectus" is "insufficient" to create solicitor seller status because that fact alone fails to prove that a seller "solicited the sale."  *Dorchester Invs. v. Peak Int'l Ltd.*, 134 F. Supp. 2d 569, 580 (S.D.N.Y. 2001).  Similarly, the fact that someone affiliated with the

23

defendant signed the Registration Statement is inapposite as "every Court of Appeals to have considered the issue . . . has held that an individual's signing a registration statement does not itself suffice as solicitation under Section 12(a)(2)." *Citiline Holdings, Inc. v. iStar Fin., Inc.*, 701 F. Supp. 2d 506, 512 (S.D.N.Y. 2010).

Here, Plaintiffs do nothing more than generically state that "Artal Luxembourg was an offeror and seller" because "Artal Luxembourg offered, sold, and/or solicited the purchase of . . . Weight Watchers stock within the meaning of the Securities Act by means of the Prospectus." SAC ¶ 111–12. However, "bald allegations of solicitation are insufficient to sustain . . . liability as a 'seller' pursuant to the second *Pinter* test." *Deutsche Telekom*, 2002 WL 244597, at \*5.

## VI. PLAINTIFFS FAIL TO PLEAD CONTROL PERSON CLAIMS UNDER SECTION 15 AND SECTION 20(a)

Plaintiffs' control person claims against Ms. Grossman, Mr. Hotchkin, Mr. Debbane, and the Artal Defendants under Section 20(a) and against Mr. Debbane and the Artal Defendants under Section 15 fail as a matter of law for several reasons.

*First*, Plaintiffs' control person claims must be dismissed because they fail to plead a primary violation for the reasons set forth above. *See supra* Points I–V; *see also ATSI Commc'ns.*, 493 F.3d at 108; *DeMaria*, 153 F. Supp. at 314.

*Second*, Plaintiffs fail to plead control. The SAC's generic allegations regarding Ms. Grossman's, Mr. Hotchkin's, and Mr. Debbane's "high-level positions," and "supervisory involvement" (SAC ¶¶ 282–83) are insufficient as a matter of law. *See, e.g.*, *Sloane Overseas Fund, Ltd. v. Sapiens Int'l Corp., N.V.*, 941 F. Supp. 1369, 1378 (S.D.N.Y. 1996) (analyzing liability under Section 15 and Section 20(a) and noting "a person's status as an officer, director, or shareholder, absent more, is not enough to trigger liability").

As for the Artal Defendants, Artal was a minority shareholder for nearly the entirety of

24

the Class Period.  This severely undermines Plaintiffs' control person claims against the Artal Defendants.  But regardless of the Artal Defendants' ownership position, Plaintiffs' position amounts to conclusory allegations that this private equity firm exercised control by virtue of its status as a significant WW shareholder.  SAC ¶¶ 119–29, 281–89.  Control person claims must allege "actual control," and conclusory contentions that a private equity firm had the ability to exercise "substantial influence" over a company's decisions are insufficient as a matter of law to support a control person claim.  *In re BioScrip, Inc. Sec. Litig.*, 95 F. Supp. 3d 711, 740 (S.D.N.Y. 2015); *see also In re Global Crossing, Ltd. Sec. Litig.*, 2005 WL 1881514, at *12 (S.D.N.Y. Aug. 5, 2005) ("Conclusory allegations of control are insufficient as a matter of law."); *In re Deutsche*, 2002 WL 244597 at *6 (conclusory allegations of control based on "stock ownership . . . and/or . . . participation in [the company's] operations . . . including the content and dissemination of the public statements," without more, are insufficient as a matter of law).

Third, Plaintiffs have not pled culpable participation by any defendant.  *See ATSI Commc'ns.*, 493 F.3d 87, 108 (2d Cir. 2007).  Allegations of culpable participation must be alleged with particularity, *see DeMaria*, 153 F. Supp. at 314, and are subject to the heightened pleading standards of the PSLRA, *In re NQ Mobile, Inc. Sec. Litig.*, 2015 WL 1501461, at *4 (S.D.N.Y. Mar. 27, 2015).  As discussed above, Plaintiffs have not pled any facts about specific actions taken by Artal or any of the Individual Defendants showing that they committed a securities violation or that they had culpable intent.  *See supra* Parts I, II, IV; SAC ¶¶ 119–29, 281–89.

## CONCLUSION

For the foregoing reasons, the SAC should be dismissed with prejudice.  *See Wilson*, 671 F.3d at 139.

25

Dated: New York, New York
       October 31, 2019

SIMPSON THACHER & BARTLETT LLP

By: _____
Lynn K. Neuner (lneuner@stblaw.com)
George S. Wang (gwang@stblaw.com)
Rachel S. Sparks Bradley (rachel.sparksbradley@stblaw.com)
425 Lexington Avenue
New York, New York 10017-3954
Tel.: (212) 455-2000
Fax: (212) 455-2502

*Attorneys for Defendants WW International, Inc. (f/k/a Weight Watchers International, Inc.), Artal Luxembourg S.A., Artal International S.C.A., Artal Group S.A., Raymond Debbane, Mindy Grossman, and Nicholas Hotchkin*

26