# EXHIBIT YY

J9K5weiC                          conference

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

In Re:  WEIGHT WATCHERS,


                                    19 Civ. 2005 (WHP)
                                    19 Civ. 2528 (WHP)

------------------------------x

                                    September 20, 2019
                                    10:15 a.m.

Before:

                HON. WILLIAM H. PAULEY III,

                                    District Judge


                      APPEARANCES


GRANT & EISENHOFER, PA
     Attorneys for Plaintiff Equity League Pension Fund
BY:  DANIEL BERGER
BY:   CAITLIN MOYNA
          -and-
SCOTT & SCOTT, LLP
BY:  LAUREN McCABE
     WILLIAM C. FREDERICKS


SIMPSON THACHER & BARTLETT, LLP
     Attorneys for Defendant
BY:  RACHEL BRADLEY
BY:   LYNN K. NEUNER
BY:  GEORGE WANG

                SOUTHERN DISTRICT REPORTERS, P.C.
                      (212) 805-0300

(Case called)

THE DEPUTY CLERK:  Appearances.

MR. FREDERICKS:  William Fredericks, Scott + Scott, Attorneys at Law, LLP, for plaintiffs.

MS. MOYNA:  Caitlin Moyna, Grant & Eisenhofer.

MS. McCABE:  Lauren McCabe from Scott + Scott for the plaintiffs.

THE COURT:  Good morning.

Counsel for defendant?

MS. NEUNER:  Good morning, your Honor.  Lynn Neuner of Simpson Thacher & Bartlett, here with my colleagues who I will let introduce themself, and we represent all defendants.

MR. WANG:  George Wang, Simpson, Thacher & Bartlett.

MS. BRADLEY:  And Rachael Bradley Simpson, Thacher & Bartlett also.

THE COURT:  Good morning to all of you.

Please, be seated.  This is a pre-motion conference and Ms. Neuner, do you want to be heard?

MS. NEUNER:  Your Honor, we would be happy to be heard.  We are also happy to make this brief, and let me also start by apologizing.  We were trapped on the subway for 45, 50 minutes this morning, so apologies for that.

THE COURT:  Apologies accepted and fully understood.

MS. NEUNER:  With respect to our pre-motion letter, we tried to succinctly set forth the grounds for which all

defendants would move to dismiss the complaint.  As you are aware, there is both 33 act claims and 34 Act claims.  We believe fundamentally we have a very strong set of defenses in particular on the no actionable misstatements or omissions. There are essentially two misstatements that are being asserted by plaintiffs.  First is that we didn't tell the market that we depended on recruitment of lapsed members to drive our growth; the second that we had abandoned doing a program innovation for the end of the year 2018.

Your Honor, our point of view is that we did in fact routinely describe our subscriber and enrollment numbers, that we routinely stated that it was important to Weight Watchers both to grow new members and to retain our members and that includes both existing, length of duration, and former members coming back into the fold and re-subscribing.

Throughout, our CEO and CFO did in fact refer to the need to grow additional subscribers through both new members and retention of existing members.  With respect to program innovation, the record, undisputed and through publicly available filings, will show that we in fact had program innovations in December and those are described on page 2 of our letter, there are multiple ones.  What we now see in the response letter is plaintiff saying, ah, but we don't think those were major.  In our world view, those were minor.  In Weight Watchers' world view they were major.  So, Weight

J9K5weiC                        conference

Watchers does not rehabilitate its food program every single December -- that would be illogical and confusing to our members.  That typically happens every other year and you see the last time there was a major food innovation was December 2015, and the one that was massively successful was the Freestyle December 2017.  That's what Weight Watchers was working against in their year-over-year comparisons for December 2018, and the innovations there went to online, audio workout, partnering with Blue Apron.  In addition, different technological advances to the Connect webline, the subscriber for invite a friend, and so on that we have set forth here, your Honor.

Unfortunately, what we found is in December 2018 our subscription rates were not where we were projecting and we had a very bad January 2019, and the company actually pre-announced that disappointing set of results from December and January in their February 26 earnings call.  You recall that earnings call would have been for the prior fourth quarter which was announced but they also gave enlightenment to the market about the poor subscriber enrollment in December and January ahead of what would have been their first quarter earnings.

So, your Honor, there is no one more disappointed about that performance than the CEO and CFO who tie their bonuses toward growth and didn't get full bonuses, but from our perspective we think that we have a very strong motion on the

J9K5weiC                        conference

face of the complaint.  We have been through this once before with Judge Kaplan and we argue that this was a stock drop in search of a fraud theory.  Now we have both fraud theory and a prospectus misstatement theory.  Respectfully, your Honor, we don't think either wash and we will eventually ask for a dismissal with prejudice.

THE COURT:  Thank you, Ms. Neuner.

Mr. Fredericks .

MR. FREDERICKS:  Thank you, your Honor.

I think my friend Ms. Neuner has accurately summarized the nature of the disputes but, respectfully, we have a different view on the merits of the dispute.

With respect to lapsed members, notwithstanding what is said in defendant's letter and what Ms. Neuner has stated, it is certainly strongly our position that the company never made adequately clear the vital importance of bringing back lapsed members as a discrete category and that although the company made clear that it was spending a great deal of emphasis, proved to be too much emphasis for sure on re-branding, reaching out and grabbing new constituencies beyond the more traditional Weight Watchers demographic -- they're trying to reach for young demographic, trying to reach to other different demographics other than age -- what was lost in the sauce -- was not communicated to investors -- was that lapsed members, people who had previously been part of the

J9K5weiC                        conference

Weight Watchers program but had fallen by the wayside were not only not being targeted but were really, nonetheless, critical to meeting the company's needs so that I think what we had was an environment in which the market felt that all these lofty projections of the company were going to be met by sort of the new razzle-dazzle and celebrity endorsements by people who I would say probably don't appeal to my demographic as an older white male, that lost in that was that there were a lot of other people in the lapsed member demographic who were not going to be reached but who were, nonetheless, vital to making their numbers and when the truth came out in January, the company in fact admitted not only the importance of lapsed members but that they had really let them fall by the wayside and that's something the investors certainly should have known about throughout.

With respect to the innovation issue, again, what Ms. Neuner understates is that Ms. Grossman, the CEO and the management at the time of the secondary offering during the class period, made a lot of -- drew a lot of attention to their plans to expand demographics, have new celebrity endorsements to do various things at the margin including during the year, the regular calendar year.  Let me explain why that is important.

The business of Weight Watchers is highly seasonal. It always experiences a ramp up in membership in late

J9K5weiC                         conference

December/January, the New Year's resolution seasons, and I don't think there is any dispute about that. But, the company's historic practice had been to launch a coordinated marketing effort at the end of the calendar fourth quarter that would play on a major new innovation which would really drive home the message of this is why, if you are a new member, an old member or a lapsed member, you should be signing up for Weight Watchers because we know a lot of you are going to be signing up or are susceptible to signing up for a weight loss program in January.

What management did here was they sort of, through drips and drabs through the summer, through the fall, announced a couple of tweaks to their programs -- oh, we have a partnership with Active or Headspace, you can get a free trial membership. But, with those programs and that is sort of a little perk of membership, but nothing remotely like the kind of year-end product innovation which had historically helped to drive the bounce in late December and January and, in fact, the complaint makes clear from -- or what is alleged in the complaint is that we have sources from inside the company saying typically year-end innovation of the type we are talking about takes at least a year or two to develop; you have to market test it, you have to do perhaps the science behind it if it relates to a new diet program, you have to train staff in how to use it, you have to fine tune your whole marketing

J9K5weiC                         conference

program and it's a major event.  It is like a car company.  You don't just roll out a new model on three or six months' notice. There was nothing of that sort that was in the pipeline as of the SPO which was the spring of 2018.

So, by 2018 -- May 2018, the start of the class period, everybody knew there wasn't going to be a big, new innovation but that was never disclosed to the market.  As they had new programs, partnership with Blue Apron if you want Blue Apron to send you the ingredients for a healthy meal for a cost of $18 a meal you could sign up for that are or a trial subscription but that's not really a new reason for people to say the Weight Watchers program is something to sign up for.

So, again, for us they say they were terribly disappointed by their numbers at the end of December/January. Our position is that this was foreseeable the proverbial mile a way.  That's our view of the case, we think it is defensible, and I am happy to address any other issues the Court would have.

THE COURT:  Why aren't these just bad business decisions as opposed to securities fraud?

MR. FREDERICKS:  Well, let me address that at two levels.

First, there is a secondary public offering here.  As your Honor is aware, under SEC reg 303, there are affirmative disclosure obligations including -- I mean, commentators really

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

J9K5weiC                          conference

talk about 303 as putting a burden on management to be candid with investors and to present the business as prospects and operations through the eyes of management.  If the company has been doing something in a successful way for a number of years and then the company internally decides we aren't going to do that again this year, we are going to go a different route, I don't think we would have a problem if they did additional things on top of the traditional year-end innovations.  That would not be a problem.  But, if you are doing something different in the coming year, you have an obligation to disclose that and I think the simplest principal, and this is in a fairly famous SEC release on the meaning of item 303, if there are circumstances that make it probable for management to believe that future results may differ from historical results, you need to disclose or you need to disclose that risk.  This was a very specific risk which was not disclosed.

THE COURT:  Didn't they think that they were going to make money by making these changes?

MR. FREDERICKS:  Your Honor, I generally believe that most companies, including companies that are occasionally brought to the bar for securities fraud, ultimately want to make money but it's a question of fair disclosure of risk and it is a question of are investors paying the right price for the stock given the risk?  And defendants may have well believed that all was going to work out in the end but that is

J9K5weiC                        conference

never an excuse for violating the disclosure obligation under the federal securities laws.

THE COURT:  With respect to that branch of your claim that relates to the lapsed members, is that a misrepresentation or an omission?

MR. FREDERICKS:  I would say it has elements of both because there were certainly statements made in the offering documents and during the class period which we would contend put the subject of retention rates, membership growth in play and, even aside from my own 303, once you put a subject in play your statements need to be materially complete.

THE COURT:  Just so that I am clear, you are basing your claims on omissions, not misstatements?

MR. FREDERICKS:  I think we would say based on misleading statements, if your question is is there a statement that the company said lapsed members are unimportant and we allege that that affirmative statement was false, we don't have a black and white affirmative misrepresentation of that category but we certainly have statements which we would contend are half truths or materially incomplete, as well as breach of an independent affirmative obligation to disclose under 303.

Caitlin, would you say that's fair?

MS. MOYNA:  Yes, I would say the lapsed members are based on omissions that made affirmative statements misleading.

J9K5weiC                        conference

Can I be heard on one other issue?

THE COURT:  Is this going to be an Affiliated Ute issue is really what I am raising.  I mean, I will see it all in the motion papers but just --

MR. FREDERICKS:  Of course we don't have a motion to dismiss, I think we would reserve all of our rights to make all omissions argument.

MS. MOYNA:  I have one other point to add to what Mr. Fredericks said.

You asked why this is a fraud case.  As to the 33 Act claims of course it is not a fraud case, and as long as we allege a material omission or misstatement there is strict liability as to the company.  So, at least as to the 33 Act piece we don't have to allege any fraud and we have not alleged any fraud for the 33 Act piece.

MR. FREDERICKS:  Thank you.  That's an important clarification.

Consistent with your Honor's directives we have again tried to divide up pieces of the case and I may be a little more geared on the 34 Act claims and Ms. Moyna's firm has spoke used through the 33 Act prism.  So, apologies for the material omission in my comments.

THE COURT:  Obviously the amended consolidated complaint is vastly expanded from what the original complaint was in terms of the number of allegations.  In view of the

J9K5weiC                        conference

defendant's proposed arguments that they wish to raise on their motion to dismiss, do the plaintiffs wish to amend their complaint further in any respect before we proceed with this motion?  And, obviously, I think you are familiar with my practice of posing this question to plaintiff's counsel in all cases where motions to dismiss are going to come before me so that we are not going to have a do-over.  If I grant a portion or all of the motion to dismiss it would not be with leave to replead because that's the purpose of having this conference and the exchange of letter memoranda in advance.

So, I put that question to you, whether you wish to amend before I tee up the motion.

MR. FREDERICKS:  Your Honor, I discussed briefly with Ms. Neuner before your Honor went on the bench that there are potentially two relatively smaller areas where we may wish to clarify or supplement the complaint, one relates to possible additional allegations of insider selling where, frankly, I think Ms. Neuner and I have -- I have raised the issue with her and I think we are going to have a call on Monday just to clarify what the nature of some of these transactions are.  If it is appropriate to add them, my understanding is that defendants are unlikely to have an objection to us doing so but we are happy to take defendants up on the opportunity to sort of pre-vet them.  But, that won't fundamentally change the nature of the allegations.

J9K5weiC                           conference

          And then, as I also mentioned to Ms. Neuner, there was one paragraph which I think was ambiguous and requires a minor amendment.  I think that we are going to be in a position to make amendments or not as appropriate by the end of next week, certainly, and I think we will definitely make that one small amendment, we may make a larger one.

          Ms. Neuner, I don't know whether you have a comment on my representations.

          MS. NEUNER:  We are in agreement, Mr. Fredericks.  We will agree to have a conversation on Monday about one of the trading issues so that there is no need for an amendment if it is a misunderstanding of the forms, and we have no objection to the other proposed amendment to paragraph 85.

          THE COURT:  So, then with that, let's tee up the motion to dismiss.  I'll issue an order today authorizing the plaintiffs to file a second amended consolidated complaint and you say that by next Friday is sufficient?  I will give you more time.

          MR. FREDERICKS:  We were going to do less so Friday already built in a little bit of a cushion, so Friday is should suffice, your Honor.

          THE COURT:  So by September 27th then.  All right?

          MR. FREDERICKS:  Yes.

          THE COURT:  Ms. Neuner, when would you like to file your motion to dismiss?

J9K5weiC                          conference

MS. NEUNER:  Your Honor, we were looking for 40 days from today which would bring us approximately to October 30.

THE COURT:  Why don't you file your papers by October 31.  All right?

MS. NEUNER:  Very good.  Thank you, your Honor.

THE COURT:  Mr. Fredericks, how much time would you like to oppose the motion?

MR. FREDERICKS:  We would request until December 10, and that's taking into account the intervening Thanksgiving holiday.

THE COURT:  December 10 it is.

Ms. Neuner, what about a reply?

MS. NEUNER:  Your Honor, looking at the calendar and how the holiday falls, I think the 23rd would be the Monday before the holiday.

THE COURT:  All right.  That's fine with me; December 23.

Now, I am going to set the case down for argument.  I will put it down on January 23.  Actually, excuse me, we will put it down on January 24 at 11:30.

MR. FREDERICKS:  Your Honor, may I just inquire what day of the week that is?

THE COURT:  That's a Friday.  Will that work?

MR. FREDERICKS:  That will work.  I have a 25th anniversary a little bit prior so I just want to make sure I'm

J9K5weiC                          conference

getting the -- that I'm not blocking off the right weekend or my wife will get me in trouble.

THE COURT:  Well, we don't want that.

MS. NEUNER:  For the record, we support 25th anniversaries being celebrated.  Your Honor, I should speak up. I am scheduled to start a trial in, of all places St. Thomas on January 21, that runs for three weeks.

THE COURT:  How do you get a gig like that?  I thought only senior judges could get visits to the tropics during that time.

MS. NEUNER:  It's an insurance coverage case over a hurricane to damage to the resort Frenchman's Reef.

MR. FREDERICKS:  Maybe I can arrange to have my anniversary in St. Thomas and your Honor can come down and borrow some space in the Virgin Island's court house.

THE COURT:  So, if I move it to the 23rd, is that easier?  What are you really asking for, Ms. Neuner?

MS. NEUNER:  Well, your Honor, I hate to be the inconvenient one.  I am happy to do it the week before, which would be the week of the 13th, and then unfortunately it's slated to be a three-week trial so I would be looking at the week of February 10th.  And, I do apologize for this conflict.

THE COURT:  Let's shoot for January 17 or is that going to interfere with --

MS. NEUNER:  Your Honor, I will do it.

J9K5weiC                              conference

MR. FREDERICKS:  I think that's going to be -- I think if we can do on or before January 15th, or on or after whatever date Ms. Neuner.  I apologize.

THE COURT:  That's all right.  Let's put it down for February 14th, that's a Friday, at 10:00.

MS. NEUNER:  Thank you very much, your Honor.

THE COURT:  All right?  I will enter a scheduling order.

Anything further?

MR. FREDERICKS:  No, your Honor.  Of course I am familiar with your practice of having pre-motion conferences and wanting complaints to be the last.  We certainly aren't pulling any punches.

Just, for the record, if there is some new event or circumstance we are unaware of, we reserve our rights but we understand the Court obviously has the last word and reserves all its policies and practices but we are familiar with your practices.

THE COURT:  All right.

Thank you, all.  Have a good weekend.

MR. FREDERICKS:  Thank you, your Honor.

MS. NEUNER:  Thank you very much, your Honor.

o0o