**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE WEIGHT WATCHERS INTERNATIONAL, INC. SECURITIES LITIGATION | Master File No. 1:19-cv-02005-WHP <br><br> CLASS ACTION |
| CITY OF OMAHA POLICE AND FIRE RETIREMENT SYSTEM; EQUITY-LEAGUE PENSION TRUST FUND; and OKLAHOMA FIREFIGHTERS PENSION AND RETIREMENT SYSTEM, <br><br> Plaintiffs, <br><br> v. <br><br> WEIGHT WATCHERS INTERNATIONAL, INC.; ARTAL LUXEMBOURG S.A.; ARTAL INTERNATIONAL S.C.A.; ARTAL GROUP S.A.; RAYMOND DEBBANE; MINDY GROSSMAN; and NICHOLAS P. HOTCHKIN, <br><br> Defendants. | |

**MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' SECOND CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**

**TABLE OF CONTENTS**

Page

I.    FACTS .................................................................................................................. 1

    A.    WW's Business and Its Established Pre-SPO Business Model ............................ 1

    B.    Artal ................................................................................................................ 3

    C.    The May 2018 Secondary Public Offering ........................................................ 3

    D.    The Misleading SPO Offering Documents ........................................................ 4

    E.    Misleading Statements and Material Omissions After the SPO ........................... 5

    F.    The Truth Emerges ......................................................................................... 6

II.   THE SAC STATES SECURITIES ACT CLAIMS ............................................... 7

    A.    Standards for 1933 Act Claims ....................................................................... 7

    B.    The SAC States Actionable Statements and Omissions Under
        the 1933 Act ................................................................................................... 8

        1.    Defendants Omitted to Disclose Material Facts Concerning
            the Importance of Lapsed Members in Achieving Growth ...................... 8

        2.    Defendants Failed to Disclose that WW Abandoned Its Traditional
            Business Strategy of Relying on a Major Year-End Program
            Innovation ....................................................................................... 10

    C.    Defendants' Remaining Arguments Fail ......................................................... 13

        1.    The False Statements Are Not Protected "Forward-Looking"
            Statements ....................................................................................... 13

        2.    The Complaint Alleges More Than Mere Corporate
            Mismanagement ............................................................................... 14

    D.    The SAC Pleads a Section 12(a)(2) Claim Against Artal ................................. 15

III.  THE SAC STATES EXCHANGE ACT CLAIMS ............................................. 17

    A.    The SAC Alleges Actionable 1934 Act Omissions .......................................... 17

    B.    The SAC Adequately Alleges Scienter ........................................................... 17

        1.    The SAC Pleads That Defendants Artal and Hotchkin Had
            Motive and Opportunity to Commit Fraud .......................................... 18

        2.    The SAC Also Pleads That Defendants Acted with Conscious
            Recklessness ................................................................................... 20

    C.    The SAC Alleges a Section 10(b) Claim Against Artal .................................... 23

    D.    The SAC Alleges Loss Causation .................................................................. 23

i

IV.    THE SAC ALLEGES CONTROL PERSON LIABILITY ............................................ 24

V.    CONCLUSION ................................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*In re Aceto Corp. Sec. Litig.*,
   2019 WL 3606745 (E.D.N.Y. Aug. 6, 2019).............................................................................21

*In re Alstom SA Sec. Litig.*,
   406 F. Supp. 2d 433 (S.D.N.Y. 2005)...............................................................................24, 25

*In re Am. Int'l Grp., Inc. 2008 Sec. Litig.*,
   741 F. Supp. 2d 511 (S.D.N.Y. 2010)......................................................................................14

*In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*,
   324 F. Supp. 2d 474 (S.D.N.Y. 2004)................................................................................. 20-21

*Basic Inc. v. Levinson*,
   485 U.S. 224 (1988)....................................................................................................................9

*In re Bear Stearns Mortg. Pass-Through Certificates Litig.*,
   851 F. Supp. 2d 746 (S.D.N.Y. 2012).....................................................................................25

*In re BioScrip, Inc. Sec. Litig.*,
   95 F. Supp. 3d 711 (S.D.N.Y. 2015)........................................................................................24

*In re BISYS Sec. Litig.*,
   397 F. Supp. 2d 430 (S.D.N.Y. 2005)......................................................................................22

*Briarwood Invs. Inc. v. Care Inv. Tr., Inc.*,
   2009 WL 536517 (S.D.N.Y. Mar. 4, 2009) .............................................................................17

*Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*,
   750 F.3d 227 (2d Cir. 2014)...............................................................................................23, 24

*In re Citigroup Inc. Sec. Litig.*,
   330 F. Supp. 2d 367 (S.D.N.Y. 2004)......................................................................................14

*City of Roseville Emp's Ret. Sys. v. Energy Sols., Inc.*,
   814 F. Supp. 2d 395 (S.D.N.Y. 2011)......................................................................................23

*City of Westland Police and Fire Ret. Sys. v. MetLife, Inc.*,
   928 F. Supp. 2d 705 (S.D.N.Y. 2013)......................................................................................25

*In re Complete Mgmt. Inc. Sec. Litig.*,
   153 F. Supp. 2d 314 (S.D.N.Y. 2001)................................................................................. 19-20

*DoubleLine Capital LP v. Odebrecht Fin., Ltd.*,
   323 F. Supp. 3d 393 (S.D.N.Y. 2018).................................................................................11

*Fed. Hous. Fin. Agency for Fed. Nat'l Mortg. Ass'n v. Nomura Holding Am., Inc.*,
   873 F.3d 85 (2d Cir. 2017)...........................................................................................15, 16

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
   352 F. Supp. 2d 429 (S.D.N.Y. 2005)................................................................................17

*Freudenberg v. E\*Trade Fin. Corp.*,
   712 F. Supp. 2d 171 (S.D.N.Y. 2010)...............................................................................21

*Galestan v. OneMain Holdings, Inc.*,
   348 F. Supp. 3d 282 (S.D.N.Y. 2018)................................................................................15

*George v. China Auto. Sys., Inc.*,
   2012 WL 3205062 (S.D.N.Y. Aug. 8, 2012).....................................................................19

*In re Giant Interactive Grp., Inc. Sec. Litig.*,
   643 F. Supp. 2d 562 (S.D.N.Y. 2009)..................................................................................7

*Herman & MacLean v. Huddleston*,
   459 U.S. 375 (1983).............................................................................................................7

*In re IndyMac Mortgage-Backed Sec. Litig.*,
   718 F. Supp. 2d 495 (S.D.N.Y. 2010)................................................................................16

*In re Initial Public Offering Sec. Litig.*,
   241 F. Supp. 2d 281 (S.D.N.Y. 2003)................................................................................11

*Janus Capital Grp., Inc. v. First Derivative Traders*,
   564 U.S. 135 (2011)...........................................................................................................23

*Levy v. Gutierrez*,
   2017 WL 2191592 (D.N.H. May 4, 2017).........................................................................20

*Litwin v. Blackstone Grp., L.P.*,
   634 F.3d 706 (2d Cir. 2011)............................................................................................7, 11

*Makor Issues & Rights, Ltd. v. Tellabs, Inc.*,
   513 F.3d 702 (7th Cir. 2008) .............................................................................................22

*Matana v. Merkin*,
   957 F. Supp. 2d 473 (S.D.N.Y. 2013)................................................................................12

*Milman v. Box Hill Sys. Corp.*,
   72 F. Supp. 2d 220 (S.D.N.Y. 1999)..................................................................................17

iv

*In re Morgan Stanley Info. Fund Sec. Litig.*,
 592 F.3d 347 (2d Cir. 2010)......................................................................................7, 9

*N.J. Carpenters Health Fund v. Royal Bank of Scotland Grp. PLC*,
 709 F.3d 109 (2d Cir. 2013)..........................................................................................7

*Neubauer v. Eva-Health USA, Inc.*,
 158 F.R.D. 281 (S.D.N.Y. 1994) .................................................................................24

*Novak v. Kasaks*,
 216 F.3d 300 (2d Cir. 2000).................................................................................15, 18

*Okla. Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.*,
 367 F. Supp. 3d 16 (S.D.N.Y. 2019).........................................................................21

*In re OSG Sec. Litig.*,
 971 F. Supp. 2d 387 (S.D.N.Y. 2013)........................................................................16

*In re Oxford Health Plans, Inc.*,
 187 F.R.D. 133 (S.D.N.Y. 1999) ...............................................................................20

*In re Parmalat Sec. Litig.*,
 383 F. Supp. 2d 616 (S.D.N.Y. 2005)................................................................... 24-25

*Pinter v. Dahl*,
 486 U.S. 622 (1998).............................................................................................15, 16

*Plumbers and Pipefitters Nat'l Pension Fund v. Tableau Software, Inc.*,
 2019 WL 2360942 (S.D.N.Y. Mar. 4, 2019) .............................................................9

*In re Refco, Inc. Sec. Litig.*,
 503 F. Supp. 2d 611 (S.D.N.Y. 2007)........................................................................18

*Roth v. Jennings*,
 489 F.3d 499, 509 (2d Cir. 2007)..............................................................................12

*In re Salix Pharm., Ltd.*,
 2016 WL 1629341 (S.D.N.Y. Apr. 22, 2016)............................................................18

*In re Scholastic Corp. Sec. Litig.*,
 252 F.3d 63 (2d Cir. 2001)...................................................................................18, 19

*Schuh v. HCA Holdings, Inc.*,
 947 F. Supp. 2d 882 (M.D. Tenn. 2013)....................................................................11

*SEC v. Lek Sec. Corp.*,
 276 F. Supp. 3d 49 (S.D.N.Y. 2017).........................................................................24

*Singh v. Cigna Corp.*,
   918 F.3d 57 (2d Cir. 2019)..................................................................................................14

*Slayton v. Am. Express Co.*,
   604 F.3d 758 (2d Cir. 2010)..............................................................................................14

*Sloane Overseas Fund, Ltd. v. Sapiens Int'l Corp., N.V.*,
   941 F. Supp. 1369 (S.D.N.Y. 1996)...................................................................................25

*Stevelman v. Atlas Res. Inc.*,
   174 F.3d 79 (2d Cir. 1999).................................................................................................19

*Stratte-McClure v. Morgan Stanley*,
   776 F.3d 94 (2d Cir. 2015)............................................................................................ 21-22

*In re SunEdison, Inc. Sec. Litig.*,
   300 F. Supp. 3d 444 (S.D.N.Y. 2018)........................................................................9, 10, 11

*Teamsters Loc. 445 Freight Div. Pension Fund v. Dynex Capital Inc.*,
   531 F.3d 190 (2d Cir. 2008)..........................................................................................18, 22

*Tellabs Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007)......................................................................................................17, 18

*TSC Indus. v. Northway, Inc.*,
   426 U.S. 438 (1976)............................................................................................................9

*In re Twinlab Corp. Sec. Litig.*,
   103 F. Supp. 2d 193 (E.D.N.Y. 2000) ...............................................................................16

*In re Virtus Inv. Partners, Inc. Sec. Litig.*,
   195 F. Supp. 3d 528 (S.D.N.Y. 2016).................................................................................23

*In re WorldCom, Inc. Sec. Litig.*,
   294 F. Supp. 2d 392 (S.D.N.Y. 2003).................................................................................25

STATUTES AND RULES

15 U.S.C. §77k............................................................................................................. *passim*

15 U.S.C. §77l.............................................................................................................. *passim*

15 U.S.C. §77o...................................................................................................................17

15 U.S.C. §78j....................................................................................................................23

15 U.S.C. §78t....................................................................................................................25

17 C.F.R. §229.303.............................................................................................................11

Fed. R. Civ. P. 8(a) ..................................................................................................................24

**OTHER AUTHORITIES**

SEC Release No. 6835, 1989 WL 1092885 (May 18, 1989)........................................................11

Court-appointed Co-Lead Plaintiffs City of Omaha Police and Fire Retirement System, Equity-League Pension Trust Fund, and Oklahoma Firefighters Pension and Retirement System (together, "Plaintiffs"), respectfully submit this memorandum in opposition to Defendants' Motion to Dismiss Plaintiffs' Second Consolidated Amended Class Action Complaint.

## I.    FACTS

### A.    WW's Business and Its Established Pre-SPO Business Model

WW[1] was founded in 1961, and soon grew into a well-known company that offers various products and services to assist weight loss and maintenance.  ¶¶46-47, 153-54.  WW earns significant revenues from its in-person and online programs, and from magazine subscriptions and consumer products.  Traditionally, WW's customer base has been middle-aged, Caucasian women, and its marketing had focused on this demographic.  ¶47.  In any given period, moreover, WW's "new" subscribers included "lapsed members," *i.e.* former customers who had allowed their membership to expire in a prior period. ¶55. Because of the importance of middle-aged Caucasian women to WW, a marketing shift away from this demographic would risk WW's ability to sign up its lapsed members and grow its subscriber base.

Yet WW did just that.  In the beginning of 2018, the recently-hired CEO Defendant Mindy Grossman, who believed that WW should no longer be associated with "middle-aged white women," engineered a stark turn in WW's marketing strategy.  WW would now focus on new members from outside of WW's traditional demographic subscriber base, including women from diverse ethnicities and younger age groups, as well as men.  In particular, WW partnered with "brand influencers" and celebrities who could draw in a younger audience.  ¶¶6, 8, 55, 92-93, 162.

---

[1] Capitalized terms not defined herein have the meanings set forth in the Second Consolidated Amended Class Action Complaint (ECF 86) ("SAC").  "¶_" citations are to the SAC.

WW's business is highly seasonal, and historically experiences its biggest subscriber gains during the critical Thanksgiving to post-New Year's period when many people make resolutions regarding diet and weight loss. ¶¶49-50, 156-7. To capitalize on this well-understood seasonality, WW had implemented what was internally known as "the formula," whereby it would ensure that it would have a major new "program innovation" ready to launch and market by early December of each year. ¶¶5, 50-54. By having a major new program innovation at the end of every year, WW could incentivize its existing subscribers to renew, tempt new customers to enroll for the first time, and give "lapsed" members a rationale to return to WW – and generate maximum leverage from the timing to capitalize on the business's year-end seasonality. ¶¶51-55, 158-62.

Such major program innovations could take different forms: for example, it could be a food program innovation (such as a new way to count "food points"), a fitness innovation (such as a discounted health club membership), a "mindset" innovation (such as free counseling sessions), or a service channel innovation (such as introducing a major new WW "app"). A ***meaningful*** programmatic innovation of the type called for by the "formula", however, required one to two years from conception to launch to allow for adequate research and development, market testing, post-testing modifications, and staff training (so that WW staff would be prepared to handle the hoped-for waves of existing, new and returning "lapsed" members attracted by the innovation). Thus, WW's management already knew by the beginning of each year – if not well before – the nature of that year's year-end major program innovation. *Id*.

In early December 2017, WW executed upon its established business formula by launching its "Freestyle" program – a meaningful food program innovation. Freestyle, which had been in research, development and testing for over two years, allowed members to eat an unlimited amount of certain types of food. As a result, on May 4, 2018, WW announced that it ended 1Q18 with 4.6

million subscribers, a 42% increase in a single quarter, resulting in a significant increase in WW's stock price by early May 2018. ¶¶56-61, 163-68. WW also announced plans to grow to 5 million subscribers and $2 billion in revenue by the end of 2020, followed by plans to launch the SPO. However, these positive announcements concealed material adverse facts. ¶¶62-64, 169-80.

### B.    Artal

Artal Group acquired WW in 1999, and thereafter controlled the Company through Artal Luxembourg's majority ownership of WW's voting shares, its power to elect WW's directors, and its admitted ability to influence all major corporate decisions. ¶¶4, 36. Artal Luxembourg was 100% owned by Artal International, ¶37, which in turn was 100% owned by Artal Group, ¶38 (the three Artal entities are collectively referred to herein as "Artal").[2] By the spring of 2018, however, Artal[3] was ready to significantly reduce its 46.3% equity stake in WW. ¶39.

### C.    The May 2018 Secondary Public Offering

Defendants appreciated that the Freestyle launch and resulting success created an opportunity to capitalize on the Company's increased share price by conducting a secondary public offering. Artal in particular, recognized a particularly lucrative opportunity to sell hundreds of millions of dollars' worth of its WW stock. Accordingly, just eleven days after it announced its first quarter earnings, on May 15, 2018, the Company conducted the SPO. In the SPO, Artal Luxembourg sold over 8.6 million of its shares of WW common stock at $69 per share, reaping approximately *$595.5 million* in proceeds. ¶¶64-67, 183-186.

---

[2] In their brief (ECF 93) ("Def. Br."), Defendants refer to Artal Luxembourg as "Artal."

3

D.       **The Misleading SPO Offering Documents**

The Offering Documents (including the May 7, 2018 Prospectus and the May 10, 2018 Prospectus Supplement) represented that WW planned to achieve its ambitious growth by recruiting *new members* from a target pool that would be *diverse in age, gender and ethnicity*. ¶¶68-79.  This was a marked shift away from its traditional strategy of focusing on middle-aged, Caucasian women.  The new marketing plan and business strategy was explained in several places in the Prospectus as follows:

- the first of three "levers" to "driv[e] growth" was "increas[ing] recruitment of new subscribers to *expand our member base through a growing influencer community, effective marketing*, and agile, brand-led innovations" was one of three pillars of WW's business plan (¶71);

- "Our strong, widely-recognized and trusted brand allows us to more efficiently acquire new members and *broaden our appeal to new audiences*" (¶74);

- Under the heading, "*Continue to Broaden and Diversify our Influencer Network to Attract Members*," WW said, "*[w]e are continually expanding our scope of influencers to include a diverse range of individuals, from celebrities to member ambassadors, to promote our brand and expand its appeal to a broader group of people across ethnicities, geographies, age, lifestage and gender*" (¶75);

- "We seek to expand and strengthen our communities and *diversify our reach across ethnicities, geographies, age, lifestage and gender through our strategic relationships with influencers*" (¶76);

- Weight Watchers had "*partnered with several key celebrities and influencers to begin diversifying our global reach across ethnicity, geography and gender*, including most notably our strategic partnership with Oprah Winfrey" (¶77); and

- "Our strong, widely-recognized and trusted brand allows us to more efficiently acquire new members and broaden our appeal to new audiences" (¶78).

However, the statements describing the new marketing strategy were materially misleading because WW failed to tell investors that, even with all of the new efforts and attention directed toward recruiting new members from demographics other than middle-aged Caucasian women (their traditional demographic), WW's financial success *depended* upon persuading lapsed

4

members – i.e., Caucasian women – to return to WW.  ¶¶80, 92, 93.  Thus, WW's statements concerning its marketing strategies that were aimed at younger, more diverse demographics, and including men, were misleading, because they did not explain that WW's growth and financial success depended on lapsed members.  Indeed, as WW later revealed, its results were disappointing, which it admitted were due to its failure to recruit lapsed members.  Investors may have understood that WW shifted its marketing away from middle-aged Caucasian women, but they did *not* know that WW depended on recruiting these same women (i.e., the lapsed member pool) to grow its subscriber base, and that even with inroads into new demographics, WW simply could not achieve growth without its lapsed members.

Moreover, the Offering Documents (as well as WW's earlier 1Q18 10-Q and 2017 10-K incorporated by reference therein) also failed to disclose that WW's management knew, and had known since at least the end of 1Q18, that WW had *abandoned* its established "formula."  Simply stated, under Grossman's leadership but unbeknownst to investors, WW had decided that it would not launch a meaningful program innovation in late 2018 – and as of the SPO there was no meaningful program innovation in the pipeline that could have been launched at the end of 2018 even if WW might want to "change its mind" later.  ¶¶82-86, 201-205.  This omission violated Item 303 of Regulation S-K, as WW's failure to develop a program innovation was a "known trend or uncertainty" that WW expected was likely to "cause reported financial information not to be necessarily indicative of future operating results or of future financial condition."

### E.      Misleading Statements and Material Omissions After the SPO

After the SPO, WW issued further materially misleading Forms 10-Q for its second and third quarters of 2018 (dated August 6 and November 2, 2018 respectively).  ¶¶206-212, 218-222. These 10-Qs and accompanying ambitious management guidance for increased subscribers and

revenue (¶¶175, 178-179, 206-209, 222) also failed to disclose that WW had abandoned its prior practice of having a new year-end program innovation.  ¶¶206-13, 218-24.

In the meantime, Artal continued to take advantage of the market's ignorance concerning WW's abandonment of its traditional business strategy of having a major year-end program innovation and exposure to weak lapsed member growth.  Indeed, on August 14, 2018 – just seven days after WW issued its 2Q18 Form 10-Q – Artal Luxembourg sold a further *six million* WW shares at an average price of $77.39 per share, thereby reaping another *$465 million* in insider selling proceeds.  ¶214.  In addition, WW's CEO, Hotchkin, sold roughly 61% of his WW shares on August 14, 2018, reaping roughly $9.9 million in insider selling proceeds.  ¶215.  Before the SPO sales in May 2018 and the later open market sales in August 2018, neither Artal nor Hotchkin had sold *any* of their WW holdings in at least the prior six years.  ¶241.

### F.    The Truth Emerges

On February 26, 2019, WW pre-announced disappointing results for the fourth quarter of 2018 and dismal performance for the initial weeks of the critical post-New Year's period. Significantly, that same day, Grossman also conceded that WW had failed to "drive recruitment of our significant universe of lapsed members," and that its marketing "did not drive consumers, particularly our former members."  Thus, Grossman admitted that WW's poor performance was due to its inability to recruit lapsed members.  ¶¶87-96, 225-6.  The marketing strategies that had abandoned the lapsed member demographic failed, as did the lack of a program innovation, but investors had not been told that WW depended on lapsed members to grow and succeed.

In response, WW's stock plummeted, falling 33% from $29.57 at the close on February 26, 2019 to just $19.37 on February 27, 2019.  This decline also represented a staggering *72%* decline from the stock's May 2018 SPO price of $69, and a *75%* decline from the average $77.39 price at which Artal had dumped additional millions of shares in August 2018.  ¶¶97, 227.

6

## II.    THE SAC STATES SECURITIES ACT CLAIMS

### A.  Standards for 1933 Act Claims

Sections 11 and 12(a)(2) create "three potential bases for liability based on registration statements and prospectuses filed with the SEC: (1) a misrepresentation; (2) an omission in contravention of an affirmative legal disclosure obligation; and (3) an omission of information that is necessary to prevent existing disclosures from being misleading." *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 360 (2d Cir. 2010).

Unlike securities fraud cases brought under the 1934 Act, if a plaintiff alleges a material misstatement or omission, then "in a Section 11 case, the general rule is the issuer's liability . . . is absolute," *Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 716 (2d Cir. 2011) (citation and quotation omitted), while the remaining potential defendants under sections 11 and 12(a)(2) may be held liable for mere negligence. *In re Morgan Stanley*, 592 F.3d at 359.  Pleading 1933 Act claims does not depend on allegations of scienter, reliance or loss causation. *Id.*  Accordingly, "[p]leading a Section 11 claim is not difficult." *In re Giant Interactive Grp., Inc. Sec. Litig.,* 643 F. Supp. 2d 562 (S.D.N.Y. 2009); *see also Herman & MacLean v. Huddleston*, 459 U.S. 375, 381-82 (1983) ("Section 11 places a relatively minimal burden on a plaintiff.").

Section 11 and 12(a)(2) claims that, as here, do not rest on fraudulent intent (¶¶102, 103, 105, 109, 115) present "an ordinary notice pleading case" that is not subject to heightened burdens associated with pleading fraud. *N.J. Carpenters Health Fund v. Royal Bank of Scotland Grp. PLC*, 709 F.3d 109, 120 (2d Cir. 2013) (citation omitted).  "Thus, courts may draw a reasonable inference of liability when the facts alleged are suggestive of, rather than merely consistent with, a finding of misconduct." *Id.* at 121.

7

> **B.**      **The SAC States Actionable Statements and Omissions Under the 1933 Act**
>
>     **1.**      **Defendants Omitted to Disclose Material Facts Concerning the Importance of Lapsed Members in Achieving Growth**

The Offering Documents emphasized that WW's focus on driving new membership would be on recruiting a newer, broader, more diverse population than its previous core demographic of middle-aged Caucasian women.  ¶¶68-79.  For example, a central message in the Prospectus was that WW's new focus would be on drawing in a "diverse" new subscriber base.  Specifically, WW said it would "driv[e] growth" by "expand[ing] our member base through a growing influence community," (¶72); by "broaden[ing] our appeal to new audiences" (¶74); by "expanding our scope of influences to include a diverse range of individuals . . . to promote our brand and expand its appeal to a broader group of people across ethnicities, geographies, age, lifestage and gender" (¶75); by "diversify[ing] our reach across ethnicities, geographies, age, lifestage and gender" (¶76); and by "partner[ing] with several key celebrities and influencers to begin diversifying our global reach across ethnicity, geography and gender" (¶77).

However, the Offering Documents never announced that WW depended heavily on recruiting lapsed members – i.e., the middle-aged Caucasian women who had formerly subscribed to Weight Watchers – to meet its membership targets.  ¶¶80-81.  Nor did it disclose that Grossman, who took lapsed members "for granted" and thought WW should "no longer be associated with 'middle-aged white women,'" would be essentially abandoning them altogether.  ¶55.  Thus, an investor deciding whether to participate in the SPO was not able to evaluate properly the impact of the new marketing campaign – reoriented towards diverse ages, genders and ethnicities – on WW's ability to grow its membership.  ¶¶92, 93, 95.

In other words, without knowing that WW had historically required a significant portion of its lapsed member to join in order for the Company to grow its subscriber numbers, an investor

8

evaluating WW's more diversity-oriented market strategy would erroneously believe that abandoning its traditional demographic of middle aged Caucasian women would not present any problems for WW.  Had investors known that WW was dependent on signing up its lapsed members, this information would have materially altered the "total mix" of information that investors had about WW's marketing strategy and caused them to view it more critically.  The statements regarding the new marketing strategy were thus misleading.  ¶¶71, 74-78.

Defendants do not dispute that they should have disclosed WW's dependence on recruiting lapsed members, or that the statements in the Prospectus were rendered misleading by their failure to do so.  Rather, they simply state that they *did* make such disclosures.  Def. Br. at 11-13. Although they do not label their argument, Defendants are asserting that disclosure of the omitted information would not have "altered the total mix of information available," and is thus immaterial. Such materiality arguments, however, are seldom resolved on the pleadings.  *In re Morgan Stanley*, 592 F.2d at 360 (materiality is "rarely dispositive in a motion to dismiss"); *Basic Inc. v. Levinson*, 485 U.S. 224, 236 (1988) ("Materiality is an 'inherently fact-specific finding.'"); *TSC Indus. v. Northway, Inc.*, 426 U.S. 438, 450 (1976) (even at the summary judgment phase, the "determination [of materiality] requires delicate assessments of the inferences a 'reasonable shareholder' would draw from a given set of facts and the significance of those inferences to him, and these assessments are peculiarly ones for the trier of fact"); *Plumbers and Pipefitters Nat'l Pension Fund v. Tableau Software, Inc.*, 2019 WL 2360942, at *4 (S.D.N.Y. Mar. 4, 2019) ("Materiality depends on all relevant circumstances, and a complaint normally should not be dismissed based on a lack of materiality.").

*In re SunEdison, Inc. Sec. Litig.*, 300 F. Supp. 3d 444, 471-72 (S.D.N.Y. 2018) is instructive.  There, defendants had argued investors could have inferred the alleged omitted facts

9

from a review of prior SEC filings. The court dismissed this argument, noting that "whether an alleged omission was material in light of the information already disclosed to investors" is "inherently fact-specific." *Id.* at 472. Further, the previously disclosed information would "leave a reasonable investor uncertain" as to the omitted facts, and investors should not be "expected to engage in estimation and guesswork" when the facts were known to management. *Id.* at 473.

Here, Defendants point to only two statements in the Offering Documents that purportedly disclosed WW's historic dependence on re-signing lapsed members to grow its membership. But neither achieve this result. The first, read in context, states only that "word of mouth generated by [WW's] current and former members," together with WW's strong brand, allowed it to "attract new and returning customers." Def. Br. at 11. Similarly, Defendants' second statement, from WW's Prospectus Supplement, simply stated that WW's "consumer value" could "enable [it] to attract new and returning customers." *Id.* at 11-12. But neither statement discloses anything about WW's *dependence* on returning lapsed members. Finally, the May 14, 2018 statement includes a reference to "a significant percentage" of prior subscribers who "repeatedly resubscribed to the program," *id.* at 12, but this fleeting and vague reference to former subscribers falls short of the evidence required to demonstrate that the omissions were immaterial. At best, investors would be left guessing as to the importance of lapsed members. *In re SunEdison*, 300 F. Supp. 3d at 473.

### 2. Defendants Failed to Disclose that WW Abandoned of Its Traditional Business Strategy of Relying on a Major Year-End Program Innovation

The SAC also alleges that the Offering Documents violated Item 303 of Regulation S-K because they failed to disclose that there was no major year-end program innovation that would be ready for launch in December in 2018. ¶101. The Company had represented that "program innovation" was the core of its business, but by the time of the SPO WW had decided not to introduce a major program innovation in the crucial 2018-2019 winter recruitment season. *Id.*

10

This amounts to a "known trend . . . event[] or uncertaint[y]" that the Company could "reasonably expect to have a "material . . . unfavorable impact on net sales or revenues." ¶ 99; Item 303 of Reg. S-K, 17 C.F.R. § 229.303(a)(3)(ii). *See generally Litwin v. Blackstone Group, L.P.*, 634 F.3d 706, 716 (2d Cir. 2011).   Moreover, as Instruction 3 to Item 303 states, the MD&A section of a company's SEC filings "shall focus specifically on material events and uncertainties known to management that would cause reported financial information ***not to be necessarily indicative of future operating results.***"  SEC Release No. 6835 at \*3, 1989 WL 1092885 (May 18, 1989).[4]

Defendants do not contest the Item 303 disclosure principles at issue, but instead assert that Plaintiffs' theory should be rejected at the pleadings because "the facts" will purportedly show that WW actually did release year-end program innovations in the second half of 2018, including in December 2018.  Def. Br. at 13-14.  However, Defendants' argument relies on various self-serving documents that are neither cited in the Complaint nor otherwise properly subject to judicial notice on a motion to dismiss.  *See In re Initial Public Offering Sec. Litig.*, 241 F. Supp. 2d 281, 331 (S.D.N.Y. 2003) ("When deciding a [Rule 12(b)(6)] motion . . . [c]ourts may not consider matters outside the pleadings but [only] documents attached to the pleadings, documents referenced in the pleadings, or documents that are integral to the pleadings."); *DoubleLine Capital LP v. Odebrecht Fin., Ltd.*, 232 F. Supp. 3d 393, 457 (S.D.N.Y. 2018) (declining to consider extrinsic evidence that plaintiffs did not cite in or rely upon for their complaint).[5]

---

[4] In other words, "Item 303(a)(3)(ii) essentially says to a registrant:  If there has been an important change to your company's business … that significantly or materially decreases the predictive value of your reported results, explain this change in the prospectus.  The obvious focus is on preventing the latest financial results from misleading potential investors, thereby promoting a more accurate picture of the registrant's future prospects." *Schuh v. HCA Holdings, Inc.,* 947 F. Supp. 2d 882, 891 (M.D. Tenn. 2013) (citation omitted).

[5] Exhibits M, N, T, X, Y, GG, HH, II, MM, NN and RR to the Wang Declaration (ECF 94) should be stricken as they are neither referenced in nor integral to the Complaint, and are being offered

In any event, even if Defendants' extrinsic submissions are considered, they do not remotely show that any of their cited "innovations" constituted the kind of major year-end program innovation that was called for under WW's prior "formula." For example, WW's partnership with Blue Apron, far from being a meaningful program innovation, was simply an expensive, add-on option for a *niche* group of WW customers who were willing to pay hundreds more dollars per month for home delivery of the *ingredients* for WW-approved meals. Similarly, WW's offerings of digital "AAptiv" and "Headspace" applications amounted primarily to limited *trial* subscriptions to these products (via an existing WW digital app), with WW members then having to pay additional fees after expiry of the trial period. *See e.g.* Ex. JJ at 9. As alleged in the SAC, a major year-end program innovation was one that would give new or lapsed customers a significant *new* reason to *join* (or *rejoin*) WW; helping other companies introduce their products to WW customers (especially when their main products could be purchased without a WW membership) was not the kind of year-end innovation that anyone would have ever expected to drive customer gains during the critical year-end period. Indeed, Exhibit JJ (at 7-8) (transcript of 11/1/18 3Q call) listed Aaptiv and Headspace as examples of mere "complementary" product developments – and it ***admitted*** that it did not expect these partnerships "to be significant revenue contributors in 2019." Ex. QQ at 5. Further, Defendants' citation to certain alleged minor "innovations" launched in *mid*-2018 are simply irrelevant, as Plaintiffs' allegation is that WW

---

for the improper purpose of asking the Court to rely on the substance of their contents to refute Plaintiffs' allegations that WW did not introduce a major year-end program innovation in late 2018 consistent with WW's past business strategy. *Matana v. Merkin*, 957 F. Supp. 2d 473, 485 (S.D.N.Y. 2013) (with SEC filings, "the court considers the documents 'only to determine *what* the documents stated, and not to prove the truth of their contents'") (quoting *Roth v. Jennings,* 489 F.3d 499, 509 (2d Cir. 2007)).

abandoned its practice of launching a ***major*** innovation ***<u>at year end</u>*** (in order to leverage a large increase in subscribers in the critical late December/New Year's period.[6]

### C.    Defendants' Remaining Arguments Fail

### 1.  The False Statements Are Not Protected "Forward-Looking" Statements

Defendants argue that the false statements at issue are protected because they were "forward-looking" and accompanied by "meaningful cautionary language."  Def. Br. at 15-16. Defendants are wrong.  *First*, for purposes of the Section 11 claim, Plaintiffs do not allege that any forward-looking statements are false or misleading.  Rather, Plaintiffs allege that statements about WW's ***then-existing*** marketing strategy, designed to focus on diverse members, were materially misleading.  For example, the statement that WW was "continually expanding [its] scope of influencers to include a diverse range of individuals, from celebrities to member ambassadors, to promote [its] brand and expand its appeal to a broader group of people across ethnicities, geographies, age, lifestage and gender," ¶75, is not forward-looking, nor was the critical, omitted information that WW depended heavily on recruiting lapsed members.  Similarly, its decision not to introduce a meaningful program innovation in late 2018 concerned then-present circumstances.

*Second*, contrary to their argument, Def. Br. at 15-16, and to the extent that any statement at issue was forward-looking, Defendants have not pointed to any meaningful associated cautionary language.  Instead, they simply cite to statements that WW's success depends on its "ability to attract and retain members," and the "effectiveness of [its] advertising and marketing

---

[6]  Even if they are not stricken (as they should be) Exhibits J, K, L, M, N, P, Q, R, T, X, Y, BB, CC, GG, HH and II are irrelevant, as they are all documents that reference modest program additions made well ***before*** the critical year-end period.  Such additions (in addition to being relatively minor) clearly did not constitute part of a major ***year-end*** program innovation that could ever be mistaken as being consistent with WW's per-SPO business formula (which was based on timing the launch of a major new innovation at year-end to leverage the business's seasonality).

programs." Def. Br. at 16. These vague statements merely explain that marketing efforts may not be successful, and are not the specific types of risk statements that might insulate Defendants from liability. *Cf. Slayton v. Am. Express. Co.*, 604 F.3d 758, 773 (2d Cir. 2010) (rejecting "vague" cautionary language that did not disclose the particular risk at issue); *In re Am. Int'l Grp., Inc. 2008 Sec. Litig.*, 741 F. Supp. 2d 511, 531 (S.D.N.Y. 2010) (rejecting "general" risk disclosures in light of "hard facts critical to appreciating the magnitude of the risks described"). While investors may have understood that advertising campaigns can fail, they were unable to evaluate the risks posed by a marketing effort designed to recruit demographics *other* than middle-aged Caucasian women in light of the "hard fact" that WW had historically derived most of its subscribers from that very demographic in the form of lapsed members.

### 2. The Complaint Alleges More Than Mere Corporate Mismanagement

Defendants argue that the SAC reflects a mere "disagreement with WW's strategic shift." Def. Br. at 16-17. But the SAC does not simply allege a failed strategic shift or poor corporate decision-making. Rather, it alleges that by omitting material information, investors were not able to evaluate the probability that the new strategy would succeed. Similarly, the SAC alleges that Defendants failed to disclose that it faced a known risk resulting from its failure to develop a program innovation for launch in time for the critical New Year's resolution marketing push, which similarly prevented investors from evaluating the risks of WW's business.[7]

---

[7] The cases Defendants cite in support of their argument are distinguishable. *Singh v. Cigna Corp.*, 918 F.3d 57, 59-60 (2d Cir. 2019) was dismissed because the alleged false statements were "vague" and "generic," referring generally to the importance of regulatory compliance. Similarly, *In re Citigroup Inc. Sec. Litig.*, 330 F. Supp. 2d 367, 376 (S.D.N.Y. 2004) focused on allegations that the business "would have been conducted differently" had management adhered to risk management policies. Here, in contrast, Plaintiffs do not claim statements of compliance or risk management are false; rather they point to specific statements about WW's marketing that were rendered misleading because of specific material information that was omitted.

14

Defendants also argue that the statements from confidential witnesses ("CWs") do not support Plaintiffs' claims because the CW allegations are simply another "vehicle" for corporate mismanagement claims.[8] Def. Br. at 17. Defendants are incorrect; the CWs provide meaningful and critical allegations that support the claims.[9] In particular, CW1 and CW3 confirmed that the new marketing plan abandoned the traditional demographic. ¶55. CW1 confirmed that signing lapsed members had historically been integral to WW's success. *Id.*

The CWs likewise provide important information supporting the allegations that WW's failure to disclose that it had not developed a major innovation in 2018 violated Item 303. CW1 detailed WW's traditional model of developing a major innovation for launch during the critical year-end recruiting season, and its abandonment of that model in 2018. ¶¶50-55. These allegations were corroborated with information from CW2, CW3 and CW5. ¶¶51-53.

**D.      The SAC Pleads a Section 12(a)(2) Claim Against Artal**

Artal is a statutory seller under Section 12(a)(2). A defendant is a statutory seller if it (1) "passed title, or other interest in the security, to the buyer for value," or (2) "successfully solicit[ed] the purchase [of a security], motivated at least in part by a desire to serve his own financial interests or those of the securities owner." *Pinter v. Dahl*, 486 U.S. 622, 647 (1998). Artal (1) successfully solicited sales of Weight Watchers stock and (2) was motivated, at least in part, by his own

---

[8] Defendants also argue that the CW statements do not allege that "WW abandoned its traditional target demographic." Def. Br. at 17. To the contrary, CW1 explained that Grossman "decided that it was no longer important to market to lapsed members" and took them "'for granted.'" ¶55.

[9] Defendants argue that the CW statements should be "discounted." Def. Br. at 17 n.4. However, they point to no issues with the CW allegations that give cause to discount them. *Novak v. Kasaks*, 216 F.3d 300, 314 (2d Cir. 2000) (CW allegations may be relied on if CWs are described "with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged"); *Galestan v. OneMain Holdings, Inc.*, 348 F. Supp. 3d 282, 300 (S.D.N.Y. 2018) (same). The SAC's descriptions of the CWs meets this standard (¶¶20-25) and Defendants do not argue otherwise.

financial interests.  The definition of "statutory seller" in *Pinter* is "expansive."  *Fed. Hous. Fin. Agency for Fed. Nat'l Mortg. Ass'n v. Nomura Holding Am., Inc*., 873 F.3d 85, 138 (2d Cir. 2017).

Defendants have "solicited the purchase" of stock where, as here, they participated in the preparation of offering materials.  *See In re OSG Sec. Litig.*, 971 F. Supp. 2d 387, 403 (S.D.N.Y. 2013) (finding a statutory seller where defendants "prepar[ed] the defective and inaccurate Prospectus and participat[ed] in efforts to market the Offering to investors"); *In re IndyMac Mortgage-Backed Sec. Litig*., 718 F. Supp. 2d 495, 502 (S.D.N.Y. 2010) (Defendants who "solicited, sold and distributed" were statutory sellers).  Here, Artal used its majority ownership to elect directors to influence corporate decisions, including what to disclose in the Offering Documents.  ¶36.  Further, Artal made representations and warranties guaranteeing that the information it provided to be used in the Offering Documents did not contain any material misrepresentations, further indicating its active participation. ¶36.   Further, WW and Artal were also parties to a Registration Rights Agreement, requiring Artal's consent to WW's choice of underwriters for any public offering of shares owned by Artal.  ¶36.  Artal's ability to help select the SPO's underwriters also constitutes participation in the solicitation of the stock sales that occurred as a result of the underwriters' efforts.[10]

Finally, Artal profited from the SPO, reaping gross proceeds of nearly $600 million in the sale, evidencing that it was motivated by its own financial interest.  ¶7; *see In re Twinlab Corp. Sec. Litig.,* 103 F. Supp. 2d 193, 206 (E.D.N.Y. 2000) (financial gain was "clearly sufficient" to

---

[10] Defendants urge an overly narrow interpretation of the term "statutory seller" in arguing that Artal did not "pass title" to Plaintiffs, Def. Br. at 23, an argument which has been expressly rejected.  Rather, the rule is that "statutory seller 'is not limited to persons who pass title' for value" and that related statutory terms are "expansive enough" to "encompass the entire selling process." *Nomura*, 873 F.3d at 138.

16

establish the requisite motivation); *Milman v. Box Hill Sys. Corp.*, 72 F. Supp. 2d 220, 229 (S.D.N.Y. 1999) (holding that the profits Defendants earned from the Offering were sufficient to establish that Defendants were motivated by their own financial interests). Artal was the only seller in the SPO and reaped all of the proceeds. ¶¶7, 64.[11]

## III.   THE SAC STATES EXCHANGE ACT CLAIMS

### A.  The SAC Alleges Actionable 1934 Act Omissions

Plaintiffs also allege actionable statements for purposes of the Exchange Act. For the reasons described *supra* at §II.B.2, Item 303 required WW to disclose in its quarterly reports that it had deviated from its established business practice of having a major year-end program innovation that would be ready to launch by year-end 2018. ¶¶173-178; 206-211; 217-218; 229. Such deviation presented a "known trend or uncertainty" that Defendants reasonably expected to have a material, negative impact on WW's future prospects for success.[12]

### B.      The SAC Adequately Alleges Scienter

In considering scienter, Plaintiffs' allegations must be viewed in their totality, rather than parsed piecemeal. *See Tellabs Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 323 (2007). The

---

[11] Defendants also argue that officers' and directors' Registration Statement signatures alone do not make Artal a statutory seller. Def. Br. at 23-24. But numerous courts have held to the contrary. *See e.g.*, *Briarwood Invs. Inc. v. Care Inv. Tr., Inc.*, 2009 WL 536517, at *4 (S.D.N.Y. Mar. 4, 2009) ("Numerous courts in this circuit hold that on a motion to dismiss, officers or directors of the stock issuer who signed its registration statement are deemed to have solicited the purchase of the offered stock."); *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 352 F.Supp.2d 429, 454 (S.D.N.Y.2005) ("An officer or director who signs a Registration Statement containing materially false or misleading statements or omissions is deemed, for pleading purposes, to have solicited a purchase within the meaning of this section.").

[12] Although the SAC also alleges that WW's failure to disclose its reliance on lapsed members to achieve subscriber growth violated §10(b) of the 1934 Act, Plaintiffs hereby withdraw all 1934 Act claims with regard to the lapsed member allegations. Instead, Plaintiffs allege solely violations of §§11, 12(a)(2) and 15 of the 1933 Act with regard to the lapsed member omissions and resulting misleading statements.

17

requisite inference of scienter need not be "irrefutable, i.e., of the 'smoking-gun' genre,' or even 'the most plausible of competing inferences;'" instead, the inquiry is simply this: "When the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?" *Id*. at 326; *In re Salix Pharm., Ltd.*, 2016 WL 1629341, at *13 (S.D.N.Y. Apr. 22, 2016) (a tie "goes to the plaintiff").

The requisite strong inference may be established through factual allegations showing either (a) "strong circumstantial evidence of conscious misbehavior or recklessness" or (b) "motive and opportunity to commit fraud." *Novak*, 216 F.3d 300 at 307.  A plaintiff may plead scienter by alleging facts showing that defendants "(1) benefitted in a concrete and personal way from the purported fraud; (2) engaged in deliberately illegal behavior; (3) knew facts or had access to information suggesting that their public statements were not accurate; *or* (4) failed to check information they had a duty to monitor." *Teamsters Loc. 445 Freight Div. Pension Fund v. Dynex Capital Inc*., 531 F.3d 190, 194 (2d Cir. 2008) (citation omitted) (emphasis added).

### 1. The SAC Pleads That Defendants Artal and Hotchkin Had Motive and Opportunity to Commit Fraud

In the Second Circuit, motive[13] "is generally met when corporate insiders misrepresent material facts to keep the price of stock high while selling their own shares at a profit." *In re Scholastic Corp. Sec. Litig*., 252 F.3d 63, 74 (2d Cir. 2001); *In re Refco, Inc. Sec. Litig*., 503 F. Supp. 2d 611, 646 (S.D.N.Y. 2007) (motive adequately pled where the "defendants sold their own shares while at the same time misrepresenting corporate performance in order to inflate stock prices").  Unusual sales made when material information is withheld support a strong inference of scienter. *In re Scholastic*, 252 F.3d at 74.  To assess whether the insider trading activity is

---

[13] Defendants do not dispute that Artal and Hotchkin had the opportunity to sell their stock at artificially inflated prices.  Def. Br. at 18.

18

"unusual," courts may consider "the amount of profit from the sales, the portion of stockholdings sold, the change in volume of insider sales, and the number of insiders selling." *Id*. at 74-75.

Here, the insider sales by Artal and Hotchkin were unusual and significant in both dollar amount and percentage of holdings. Specifically, neither Hotchkin nor Artal had sold any WW stock since 2012. ¶241. Then, in August 2018, shortly after WW reaffirmed its long term guidance, Hotchkin sold 131,466[14] of his 215,395 shares, or *61%*, at an inflated price of $75.66 for proceeds of almost *$10 million*. ¶¶215, 240. In addition, Artal sold *8.625 million* shares of WW stock at $69 per share in the SPO for proceeds of *$595.5 million*, plus a further *6 million* shares at roughly $77.39 in August 2018 for proceeds of *$464.3 million*. ¶¶236-42. Artal's total Class Period sales were *more than 14.6 million shares*, or approximately *half* of the roughly 29 million shares it held (without any intervening sales) over the prior several years, for total proceeds of *over $1 billion*. ¶243. Thus, by any measure, Artal and Hotchkin sold significant amounts and percentages of stock during the Class Period.[15] Courts have found lesser insider sales sufficient to allege scienter at the pleadings. *See, e.g., Stevelman v. Atlas Res. Inc.,* 174 F.3d 79, 85 (2d Cir. 1999) (CEO's sale of 40% of his holdings for about $3.5 million "could clearly be characterized as 'unusual'" and permit an inference of scienter) (citation omitted); *George v. China Auto. Sys., Inc.*, 2012 WL 3205062, at *10 (S.D.N.Y. Aug. 8, 2012) (strong inference of scienter where individual defendants "sold over 25 percent of their shares" during the class period); *In re Complete Mgmt. Inc. Sec. Litig.*, 153 F. Supp. 2d 314, 328 (S.D.N.Y. 2001) (insider sales were

---

[14] While Hotchkin did exercise his RSU and PSU options to purchase these shares, Defendants omit that none of Hotchkin's options were due to expire until 2022 at the earliest. Def. Br. at 18.

[15] Notably, other WW insiders collectively sold roughly 60,000 shares for almost $5 million in proceeds during the Class Period, even though none of these insiders had previously sold any of their WW shares in the prior ten years before the start of the Class Period: Amouyal, Fajgenbaum, Stacey Mowbray (former President, North America), Michael Colosi (General Counsel and Secretary), and Thilo Semmelbauer (member of the Board of Directors). ¶244.

19

"probative evidence of scienter" where one defendant sold shares valued at $1.95 million, representing 33% of his holdings); *In re Oxford Health Plans, Inc.,* 187 F.R.D. 133, 140 (S.D.N.Y. 1999) (insider sales of 11% yielding a $78 million profit supported "strong inference" of scienter).

In response, Defendants assert that Hotchkin and other insiders "increased" their overall stock holdings during the Class Period, which they claim defeats scienter.  Def. Br. at 19.  But Defendants' fail to note that most of these "increased" holdings were either corporate stock grants or decisions to exercise in-the-money stock options, rather than decisions to increase their overall interest in WW.  Indeed, only Grossman made an open-market purchase during the Class Period, for a trivial 7,000 shares, which does not negate the strong inference of scienter here. *See, e.g.*, *Levy v. Gutierrez*, 2017 WL 2191592, at *14 (D.N.H. May 4, 2017) (rejecting argument that increase in shareholdings during class period defeated scienter where increase was an exercise of stock options, not open-market transactions); *Oxford*, 187 F.R.D. at 140 ("[V]ested options are not shares;" defendants "may have exercised options to buy at a very low price per share, in which case the shares would have been valuable to the defendants even after the stock plummeted").

### 2.    The SAC Also Pleads That Defendants Acted with Conscious Recklessness

During the Class Period, Grossman, WW's President and CEO (¶138); Hotchkin, WW's CFO and President for Emerging Markets (¶139); and Debbane, WW's Chairman of the Board, actively participated in the day-to-day operations of WW (¶140).  Under the core-operations doctrine, it can be inferred that corporate executives, such as the Section 10b Individual Defendants, are aware of misrepresented or undisclosed matters involving a business's core operations. *See, e.g., In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 489 (S.D.N.Y. 2004) ("[T]he fact that those [false] statements concerned the core operations of the company supports the inference that the defendant knew or should have known the statements

20

were false when made."); *In re Aceto Corp. Sec. Litig.*, 2019 WL 3606745, at *10 (E.D.N.Y. Aug. 6, 2019) ("The Core Operations theory allows a court to draw an inference of scienter 'where the misrepresentations and omissions allegedly made by defendants were about their core operations.'"). Here, Grossman and Hotchkin were the most senior management of a business whose disclosures of "core operations" – the recruitment and retention of customers – were infected by misrepresentations, strongly supporting an inference of fraud. *See, e.g., Okla. Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.*, 367 F. Supp. 3d 16, 37 (S.D.N.Y. 2019) (Pauley, J.) ("The inference of scienter is also buttressed by Plaintiffs' 'core operations' allegations. Under the core operations theory, a court may infer that a company and its senior executives have knowledge of information concerning the core operations of a business, such as events affecting a significant source of revenue."); *Freudenberg v. E*Trade Fin. Corp*, 712 F. Supp. 2d 171, 201 (S.D.N.Y. 2010) ("Because Plaintiffs have alleged that Defendants were aware of or had access to information contrary to their public statements, that the misstatements concerned [the business's] core operations . . . and that Defendants benefited from the misrepresentations through stock sale[s], Plaintiffs have adequately pled scienter.").

In addition, given their positions as WW's most senior executives, it can be inferred that the Section 10b Individual Defendants (1) were aware that WW's decisions as to major program innovations would likely impair its ability to increase revenues in the critical late 2018-early 2019 period; (2) knew (or recklessly disregarded) that WW therefore had an obligation under Item 303 to affirmatively disclose how these circumstances created adverse uncertainties that made it likely that WW's past financial performance would not be indicative of future performance; and (3) knew (or recklessly disregarded) that the Company was in breach of that obligation. *See also Stratte-*

21

*McClure v. Morgan Stanley*, 776 F.3d 94, 101 (2d Cir. 2015) (violations of Item 303 disclosure obligations are also actionable under the Exchange Act).[16]

Further, Artal's and Hotchkin's insider sales of approximately ***14.8 million shares*** during the Class Period (including in the SPO), for total insider selling proceeds of ***over $1 billion***, support a strong inference of scienter. Viewing its allegations as true and holistically, the Complaint pleads Individual Defendants' scienter, which is attributed to WW.[17]

Defendants protest that the SAC's allegations are "implausible" (Def. Br. at 20), but their argument misconstrues the SAC. Defendants are liable not because "WW adopted a losing strategy and set WW up for failure by expanding their focus to new demographics and attempting to reduce the seasonality of their business," but because Defendants, just *weeks* after announcing an ambitious "strategic vision" to attain historic results (¶62), began making a series of statements about achieving those results on the basis of recruiting new members ***without*** disclosing either that successfully targeting lapsed members was essential to meeting those goals, or that WW would be abandoning its traditional business strategy of launching a major new year end program innovation. Plaintiffs' theory is thus anything but "implausible."

---

[16] Despite Defendants' claims (Def. Br. at 20), the SAC does not rely solely on the §10b Individual Defendants' corporate positions to plead their awareness, but also alleges various specific decisions in which they were involved. For example, CW1, a former WW executive, reported that Defendant Grossman took lapsed members "for granted" (¶55), and CW4 stated that Grossman ignored feedback from lapsed members (¶68). Grossman was also responsible for implementing WW's revised marketing campaign that ignored middle-aged, Caucasian women that were WW's "bread and butter" (CW3, ¶55; *see also* ¶¶60, 93) without telling investors of the importance of lapsed members.

[17] Here, WW's "corporate scienter" is alleged through the §10b Individual Defendants' scienter. *See In re BISYS Sec. Litig.*, 397 F. Supp. 2d 430, 443 (S.D.N.Y. 2005) ("[T]hough plaintiffs have not precisely identified which senior managers allegedly devised and directed these [accounting] improprieties, these allegations are also sufficient to give rise to a strong inference of conscious misconduct [by the corporate defendant]"); *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 513 F.3d 702, 708, 710 (7th Cir. 2008) (court may "draw a strong inference of corporate scienter without . . . nam[ing] the individuals who concocted and disseminated the fraud").

### C. The SAC Alleges a Section 10(b) Claim Against Artal

Defendants argue that Artal is not an appropriate Section 10(b) defendant under *Janus Capital Grp., Inc. v. First Derivative Traders*, 564 U.S. 135 (2011) because it never "made a statement." Def. Br. at 22. But *Janus* simply held that an investment manager was not liable under §10(b) for statements in prospectuses issued by an affiliated mutual fund. 564 U.S. at 148. Here, in contrast, Artal "made" the statements from which Plaintiffs' Section 10(b) claims arise because Artal *controlled* WW through its ownership and through the placement of its senior management on WW's Board. ¶¶36, 143-44. Defendants' reliance on *Janus* overlooks Artal's ownership and control of WW and its authority to determine whether and when WW would offer shares. *See City of Roseville Emp's Ret. Sys. v. Energy Sols., Inc.*, 814 F. Supp. 2d 395, 418 (S.D.N.Y. 2011).[18]

### D. The SAC Alleges Loss Causation

Defendants argue that the SAC does not allege any corrective disclosure. Def. Br. at 21-22. That is incorrect. Loss causation requires that "the subject of the fraudulent statement or omission was the cause of the actual loss suffered." *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 232 (2d Cir. 2014) (citation omitted). To do that, plaintiffs may allege *either* (a) "the existence of cause-in-fact on the ground that the market reacted negative to a corrective disclosure of the fraud" or (b) that the "loss was foreseeable and caused by the materialization of the risk concealed by the fraudulent statement." *Id.* Here, Plaintiffs allege that WW's (concealed) failure to develop a new program innovation presented a risk that was manifested in early 2019, when WW announced disappointing New Year subscriber numbers.

---

[18] Moreover, "signatories of misleading documents 'made' the statements in those documents." *In re Virtus Inv. Partners, Inc. Sec. Litig.*, 195 F. Supp. 3d 528, 541 (S.D.N.Y. 2016) (citation omitted). Here, because Artal's Managing Director (Debbane) and four other Artal-affiliated executives signed the Registration Statement and the 2017 10-K, ¶¶42-45, 140; Wang Decl., Ex. L at 119 (2017 10-K), Artal is liable under Section 10(b) for misstatements therein.

¶96.  Defendants knew they were taking this risk at least one year before it became manifest, and the manifestation of the risk contributed to a 33% decline in the price of WW's stock in a single day.  ¶97.  Defendants do not explain why this revelation of the risk is not a corrective disclosure.

## IV.    THE SAC ALLEGES CONTROL PERSON LIABILITY

Control person liability for Sections 15 and 20(a) requires (1) a primary violation by the controlled person and (2) control of the primary violator by the defendant.  *SEC v. Lek Sec. Corp.*, 276 F. Supp. 3d 49, 63-64 (S.D.N.Y. 2017).  Determinations of control are fact-intensive and rarely resolved on the pleadings. *See In re Alstom SA Sec. Litig.*, 406 F. Supp. 2d 433, 487 (S.D.N.Y. 2005).  Control person allegations need only meet the Rule 8(a) notice-pleading standard. *Neubauer v. Eva-Health USA, Inc.*, 158 F.R.D. 281, 284-85 (S.D.N.Y. 1994).

Artal and Debbane were both control persons for purposes of Section 15.  Specifically, these defendants controlled WW and Artal Luxembourg, who were primary violators of the 1933 Act (WW as issuer, and Artal Luxembourg as a selling shareholder).  ¶¶119-129.  The SAC alleges that Artal Luxembourg controlled WW as a party to the Voting Agreement with Oprah Winfrey, which required her to vote her shares as a group with Artal Luxembourg.  ¶122.  The SAC further alleges how Artal International, Artal Group and Debbane controlled Artal Luxemboug.  ¶123.  Specifically, Artal Group wholly owned Artal International, which wholly owned Artal Luxembourg, and Debbane was managing director of Artal International and signed the Registration Statement.  ¶¶42-45, 140.  *In re BioScrip, Inc. Sec. Litig.*, 95 F. Supp. 3d 711, 740-41 (S.D.N.Y. 2015) ("Directors and officers who sign registration statements or other SEC filings are presumed to control those who draft those documents."). These allegations are sufficient to allege control. *In re Parmalat Sec. Litig.*, 383 F. Supp. 2d 616, 626 (S.D.N.Y. 2005) (control alleged where "the defendant possessed 'the power to direct or cause the direction of the management and

24

policies of [the allegedly controlled] person, *whether through the ownership of voting securities, by contract, or otherwise*'") (emphasis added) (citation omitted).

Grossman, Hotchkin and Debbane are also control persons of WW under Section 20(a) because of their high-level positions within WW, their supervisory involvement in WW's day-to-day operations, and their ability to influence and control WW's decision-making. ¶¶281-287. Grossman was WW's CEO, Hotchkin was its CFO, and Debbane was Chairman of its Board and a member of the "office of the chairman" (as well as the Managing Director of WW's controlling shareholder, Artal). ¶¶138-140. Corporate officers presumptively have control over employees, and corporate officers and directors who sign SEC filings presumptively have control over those who draft the documents.[19] *City of Westland Police and Fire Ret. Sys. v. MetLife, Inc.*, 928 F. Supp. 2d 705, 721 (S.D.N.Y. 2013) ("Directors and officers who sign registration statements or other SEC filings are presumed to control those who draft those documents."). Grossman, Hotchkin and Debbane also signed WW's allegedly misleading quarterly SEC Form 10-Q financial reports, further evidencing their control. *Alstom*, 406 F. Supp. 2d at 487 ("[I]f that same officer or director has signed financial statements containing materially false or misleading statements, courts have held that control as to the financial statements is sufficiently pled.").[20]

## V.   CONCLUSION

For the foregoing reasons, the Court should deny Defendants' motion in its entirety.

---

[19] Defendants argue that "generic allegations" of a person's position within the company are insufficient to allege control person liability. Def. Br. at 24. They rely on the inapposite, *Sloane Overseas Fund, Ltd. v. Sapiens Int'l Corp., N.V.*, 941 F. Supp. 1369, 1378 (S.D.N.Y. 1996), which alleged just one defendant's mere 8% ownership. Here, in contrast, Artal had a voting majority, and there are specific allegations about the direct control of Debbane, Grossman and Hotchkin.

[20] Culpable participation need not be separately pled. *See In re Bear Stearns Mortg. Pass-Through Certificates Litig.*, 851 F. Supp. 2d 746, 773 (S.D.N.Y. 2012) ("[A] majority of judges in this District. . . have held [culpable participation] is not required.") (listing cases).

25

DATED:  December 10, 2019

**GRANT & EISENHOFER P.A.**

*/s/ Daniel L. Berger*
Jay W. Eisenhofer
Daniel L. Berger
Caitlin M. Moyna
Jonathan D. Park
485 Lexington Avenue
New York, NY 10017
Telephone: (646) 722-8500
Facsimile:  (646) 722-8501
jeisenhofer@gelaw.com
dberger@gelaw.com
cmoyna@gelaw.com
jpark@gelaw.com

**SCOTT+SCOTT ATTORNEYS AT LAW LLP**

*/s/ William C. Fredericks*
William C. Fredericks
Lauren McCabe
Anjali Bhat
The Helmsley Building
230 Park Avenue, 17th Floor
New York, NY 10169
Telephone: (212) 223-6444
Facsimile:  (212) 223-6334
wfredericks@scott-scott.com
lmccabe@scott-scott.com
abhat@scott-scott.com

*Co-Lead Counsel for Lead Plaintiffs and
the Proposed Class*

26