**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| IN RE WEIGHT WATCHERS INTERNATIONAL, INC. SECURITIES LITIGATION | No. 1:19-cv-02005-WHP |

**REPLY MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' SECOND
<u>CONSOLIDATED AMENDED CLASS ACTION COMPLAINT</u>**

Lynn K. Neuner
George S. Wang
Rachel S. Sparks Bradley
SIMPSON THACHER & BARTLETT LLP
425 Lexington Avenue
New York, New York 10017
Telephone: (212) 455-2000
Facsimile: (212) 455-2502

*Attorneys for Defendants*

# TABLE OF CONTENTS

**Page**

I.     This Court Can Consider SEC Filings, Press Releases, And Other Documents That Existed In The Public Domain During The Relevant Period ............................................... 1

II.    WW Fully Disclosed Its Inclusive, Diversified Membership Strategy ............................. 2

III.   WW Launched Innovations In December 2018 And Fully Disclosed Its Year-Round Program Innovation Strategy ...................................................................................... 4

IV.   WW's Cautionary Language Protects Its Disclosures ...................................................... 6

V.     Plaintiffs' Scienter Arguments Are Neither Cogent Nor Compelling ............................ 6

VI.   Plaintiffs Cannot Demonstrate Loss Causation Under Any Theory ................................ 8

VII.  Plaintiffs Have Not Stated A Section 10(b) Claim Against Artal Under *Janus* ................ 9

VIII.  Plaintiffs' Section 12(a)(2) Statutory Seller Arguments Are Unavailing .......................... 9

IX.   Plaintiffs' Section 15 And Section 20(a) Control Person Claims Must Fail .................... 10

CONCLUSION ............................................................................................................10

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*A Star Grp., Inc. v. Manitoba Hydro*,
  621 F. App'x 681 (2d Cir. 2015) ................................................................... 8

*Alpha Capital Anstalt v. Schwell Wimpfheimer & Assocs. LLP*,
  2018 WL 1627266 (S.D.N.Y. Mar. 30, 2018) ............................................. 8

*Chambers v. Time Warner, Inc.*,
  282 F.3d 147 (2d Cir. 2002) ......................................................................... 2

*Credit Suisse First Boston Corp. v. ARM Fin. Grp., Inc.*,
  2001 WL 300733 (S.D.N.Y. Mar. 28, 2001) ............................................. 10

*Elite Aviation LLC v. Credit Suisse AG*,
  588 F. App'x 37 (2d Cir. 2014) ................................................................... 3

*Gagnon v. Alkermes PLC*,
  368 F. Supp. 3d 750 (S.D.N.Y. 2019) ....................................................... 10

*In re Bristol-Myers Squibb Secs. Litig.*,
  312 F. Supp. 2d 549 (S.D.N.Y. 2004) ......................................................... 7

*In re Ferrellgas Partners, L.P., Secs. Litig.*,
  2018 WL 2081859 (S.D.N.Y. Mar. 30, 2018) ............................................. 8

*In re IndyMac Mortgage-Backed Secs. Litig.*,
  718 F. Supp. 2d 495 (S.D.N.Y. 2010) ....................................................... 10

*In re OSG Secs. Litig.*,
  971 F. Supp. 2d 387 (S.D.N.Y. 2013) ....................................................... 10

*In re SunEdison Securities Litigation*,
  300 F. Supp. 3d 444 (S.D.N.Y. 2018) ......................................................... 3

*In re TVIX Secs. Litig.*,
  25 F. Supp. 3d 444 (S.D.N.Y. 2014) ........................................................... 3

*Inst. Invs. Grp. v. Avaya, Inc.*,
  564 F.3d 242 (3d Cir. 2009) ......................................................................... 6

*Janus Capital Grp., Inc. v. First Derivative Traders*,
  564 U.S. 135 (2011) ..................................................................................... 9

*Lentell v. Merrill Lynch & Co.*,
  396 F.3d 161 (2d Cir. 2005) ......................................................................... 9

*Nguyen v. New Link Genetics Corp.*,
  297 F. Supp. 3d 472 (S.D.N.Y. 2018)............................................................................... 7

*Santa Fe Indus., Inc. v. Green*,
  430 U.S. 462 (1977)............................................................................................................ 4

*Sedighim v. Donaldson, Lufkin & Jenrette, Inc.*,
  167 F. Supp. 2d 639 (S.D.N.Y. 2001)............................................................................... 3

*Staehr v. Hartford Fin. Serv. Grp., Inc.*,
  547 F.3d 406 (2d Cir. 2008)............................................................................................... 2

*Tellabs Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007)............................................................................................................ 6

**Regulations**

17 C.F.R. § 229.303 ...................................................................................................................... 5

Plaintiffs do not dispute the factual reality that mandates dismissal of the SAC: WW's stock price declined not because of misrepresentations, but because WW's business strategy to expand from a weight-loss-focused business to a holistic wellness business was not immediately as successful as it had hoped and expected.[1]  WW fully communicated its transformation plans. Indeed, faced with these disclosures, Plaintiffs have been forced to withdraw their Exchange Act claims based on the "lapsed members" allegations.  Opp. at 17 n.12.  Their attempt to hold onto their Securities Act claims regarding lapsed members is also doomed—WW's public disclosures both before the SPO and in the Offering Documents fully informed the market about the importance of resubscribers.  Plaintiffs' Exchange Act and Securities Act claims based on "program innovations" fare no better.  Plaintiffs essentially ask the Court to disregard WW's disclosures (including the very types of disclosures that Plaintiffs rely on in the SAC), which told investors both that WW was moving from year-end innovations to year-round innovations and the reasons why, *i.e.*, to reduce seasonality and keep the brand fresh throughout the year.  WW's disclosures eliminate any notion that WW insiders were defrauding the market to pump up the share price.  To the contrary, WW was striving to improve its business by expanding and diversifying its membership and unveiling program innovations more frequently for today's consumers who respond to real-time stimulus.  Plaintiffs' failure to allege any misstatement or omission mandates dismissal of the SAC in its entirety, as do other deficiencies discussed below.

## I.    This Court Can Consider SEC Filings, Press Releases, And Other Documents That Existed In The Public Domain During The Relevant Period

As an initial matter, this Court should reject Plaintiffs' request to ignore WW's public disclosures that undermine and contradict the allegations in Plaintiffs' Complaint.  Opp. at 11 &

---

[1]    Unless otherwise defined, all capitalized terms used in this brief have the same meanings as set forth in Defendants' motion (Dkt. 93).

n.5.  Plaintiffs cannot, on the one hand, argue that WW launched a major program overhaul

every year, *see* Opp. at 10–13, and then seek to exclude WW's public disclosures from prior

years showing that WW *never* launched such innovations in consecutive years.  Similarly, they

cannot argue that WW failed to launch significant program innovations at year-end 2018, *see*

Opp. at 12–13, while precluding WW from citing its disclosures explaining its 2018 strategy of

*year-round* innovations rather than only *year-end* innovation.  Plaintiffs' compulsion to ask the

Court to ignore these public disclosures reveals the flimsiness of their substantive arguments.

Moreover, it is well settled that, in deciding a motion to dismiss, a court may consider

public documents that bear on the adequacy of disclosures or show what information existed in

the public domain during the Class Period.  *E.g.*, *Chambers v. Time Warner, Inc.*, 282 F.3d 147,

153 (2d Cir. 2002); *Staehr v. Hartford Fin. Serv. Grp., Inc.*, 547 F.3d 406, 425 (2d Cir. 2008).[2]

## II.    WW Fully Disclosed Its Inclusive, Diversified Membership Strategy

Plaintiffs acknowledge that WW openly and repeatedly disclosed its strategy to

"broaden," "expand," and "diversify" its membership (*e.g.*, Opp. at 4), but contend that, in doing

so, WW violated the Securities Act by failing to disclose its "dependence" on "recruiting lapsed

members" (Opp. at 8).  This is legally untenable and runs counter to Plaintiffs' withdrawal of

their Exchange Act claims based on the same lapsed members allegations.  Opp. at 17 n.12.

Plaintiffs ignore WW's repeated disclosures regarding its strategy to recruit both new and

former members in the Offering Documents, such as that it worked to "attract new and returning

members" and that "members have historically demonstrated consistent loyalty to the brand and

a significant percentage have repeatedly resubscribed to the program."  Ex. L at 5; Ex. R. at S-4.

---

[2]    Plaintiffs themselves rely on the very type of materials they now ask this Court to ignore. *E.g.*, SAC ¶¶ 88–90, 221, 234 (earnings calls); ¶¶ 58, 142, 165, 206, 225, 282 (press releases).

Plaintiffs deride such disclosures, setting up a strawman argument that because the Offering

Documents do not expressly refer to WW's "*dependence* on returning lapsed members," WW

violated the Securities Act.  Opp. at 10 (emphasis is Plaintiffs').  This argument is just semantics.

*See Sedighim v. Donaldson, Lufkin & Jenrette, Inc.*, 167 F. Supp. 2d 639, 646–47 (S.D.N.Y.

2001) (where "allegations conflict with the plain language of the publicly filed disclosure

documents, the disclosure documents control, and the court need not accept the allegations as

true").  Moreover, this Court is not limited to considering only the four corners of the Offering

Documents, but may consider all publicly available information.  *See, e.g.*, *In re TVIX Secs.

Litig.*, 25 F. Supp. 3d 444, 452 (S.D.N.Y. 2014) ("Sections 11 and 12(a)(2) do not require the

disclosure of publicly available information."), *aff'd sub nom. Elite Aviation LLC v. Credit

Suisse AG*, 588 F. App'x 37 (2d Cir. 2014).  Prior to and at the time of the SPO, WW made clear

that returning members were a key part of its subscriber base.  *E.g.*, Ex. P ("Looking at the U.S.

as an example, approximately 40% of our member signups in Q1 were new to Weight

Watchers."); Ex. T at 6 ("Typically, 2/3 of the people in our program have done Weight

Watchers before, 1/3 of the people are new to the brand.").[3]  Indeed, Plaintiffs recognize that

WW's dependence on resubscribers was a well-known fact.  Opp. at 1.  In the context of WW's

*member-driven business*, WW's disclosures made the importance of returning members plain to

any investor: its business depended on recruiting both brand-new and lapsed members.

At bottom, Plaintiffs' complaint is nothing more than a corporate mismanagement claim.

Plaintiffs clearly disagree with WW's strategy of expanding its target pool to a more diverse

---

[3]     Defendants' argument that WW disclosed the importance of lapsed members is not about
materiality.  *See* Opp. at 9–10.  It is about reality.  Plaintiffs' reliance on *In re SunEdison
Securities Litigation*, 300 F. Supp. 3d 444 (S.D.N.Y. 2018), is thus misplaced.  Defendants do
not ask Plaintiffs to make inferences from WW's disclosures, but just to read the plain language.

group of members.  Opp. at 4.  They highlight the Company's focus on a member base "diverse in age, gender and ethnicity" as if it is something nefarious.  It is not.  While Plaintiffs apparently would have focused exclusively on middle-aged Caucasian women and not tried to expand WW's customer base (a questionable business judgment in today's economy), the law is clear that disagreements about management decisions are not actionable under the securities laws. *Santa Fe Indus., Inc. v. Green*, 430 U.S. 462 (1977); Mot. at 16–17.  Moreover, a strategy to expand and diversify in no way implies abandoning WW's traditional membership base.

**III.    WW Launched Innovations In December 2018 And Fully Disclosed Its Year-Round Program Innovation Strategy**

Plaintiffs ask the Court to ignore WW's history of program innovations and its 2018 strategy to innovate year-round in favor of counterfactual allegations that WW did not disclose that it had no "meaningful" program innovation to launch in December 2018 in violation of the Securities Act and the Exchange Act.  Opp. at 10.  Plaintiffs' argument does not make sense.[4]

*First*, Plaintiffs do not dispute that WW launched program innovations in December 2018—they instead argue that these innovations were not "meaningful" under WW's historical "formula" for releasing year-end innovations.  Opp. at 11–12.  But "meaningful" is an undefined standard manufactured by Plaintiffs for this litigation that many prior year-end innovations would not meet.  Mot. at 14.  Plaintiffs use "meaningful" to mean *major program overhauls* on par with WW's December 2017 wholesale revamp of its food program called "Freestyle."  But WW has *never* launched such overhauls in consecutive years.  As described in WW's public

---

[4]    Plaintiffs' argument that the Court strike certain of Defendants' exhibits evidencing WW's historical innovation practice is baseless in light of Plaintiffs' reliance on Item 303 of Regulation S-K as to "trends" or "events and uncertainties" that invites comparison of going-forward and historical results.  Evaluation of Item 303 allegations necessarily *requires* evaluation of historical practice—it cannot be done in a vacuum.  *See* 17 C.F.R. § 229.303.

4

disclosures, over the past eight years, WW launched major program revamps only in 2011, 2015 and 2017.  Exs. A, D, G.  In other years—2012, 2013, 2014, 2016 and 2018—it launched what Plaintiffs would consider to be minor program innovations.[5]  The innovations WW rolled out in December 2018 were of a similar scale with those in 2012, 2013, 2014 and 2016.  Plaintiffs mock these December 2018 innovations (WW's partnerships with Blue Apron, Aaptiv, and Headspace) and ignore others entirely (WW's improvements to its "Connect" social network and its revamped "FitPoints" app).  Opp. at 12.  But this amounts to nothing more than Plaintiffs' dissatisfaction with WW's strategic business decisions, not securities violations.

*Second*, Plaintiffs do not dispute that WW launched innovations *throughout* 2018.  WW repeatedly discussed in 2018 its new strategy—consistent with its new holistic and democratized wellness focus—to release program innovations throughout the year rather than only at the end of the year.  Mot. at 14–15.  Indeed, in the Offering Documents, WW was clear: "We now innovate *throughout the year*, which helps reduce the seasonality of our business and increases excitement around our brand."  Ex. R at S-7.  Accordingly, WW released program innovations throughout 2018 in addition to year-end.  Mot. at 15.  Plaintiffs would have the Court believe that WW's disclosures about WW's year-round innovation strategy, as well as the facts of the numerous 2018 innovations, are irrelevant because WW did not state that it had "abandoned its practice of launching a major innovation at year end."  Opp. at 13.  But again, WW's disclosures made clear that it *did not* abandon its strategy of releasing year-end program innovations—and the "major" or "meaningful" modifier Plaintiffs employ has no basis in reality.  Mot. at 13–15.

---

[5]    *See* Ex. A (2012: WW 360, new digital and other program tools) Ex. B (2013: Simple Start, a two-week easy-starter plan); Ex. C (2014: 24/7 expert chat coaches available for members); Ex. E (2016: Apple Watch with an online membership).

## IV.    WW's Cautionary Language Protects Its Disclosures

Plaintiffs' argument that this Court should ignore the cautionary language surrounding WW's disclosures because its disclosures were not forward-looking and the cautionary language was too vague to warn investors that a shift in strategy could fail (Opp. at 13–14) is meritless. The Offering Documents clearly state that WW's disclosures include "'forward-looking statements,' . . . in particular, the statements about our plans, strategies and prospects," such as the "ability to develop new, innovative services"; "ability to successfully implement new strategic initiatives"; and ability to "effective[ly] . . . advertise[] and market[]."  Ex. R at v.  This language explicitly warned investors about the *specific* type of issues (member recruitment and program innovation) that Plaintiffs assert caused WW's stock to decline, and thus is not vague as a matter of law.  *See Inst. Invs. Grp. v. Avaya, Inc.*, 564 F.3d 242, 257 (3d Cir. 2009).

## V.    Plaintiffs' Scienter Arguments Are Neither Cogent Nor Compelling

Plaintiffs' Opposition does not overcome the implausibility of their scienter theory. Having withdrawn all Exchange Act claims regarding lapsed members (Opp. at 17 n.12), Plaintiffs now rest their scienter arguments solely on their counterfactual contention that WW failed to disclose that early 2019 enrollment would be disappointing because it had abandoned a year-end innovation strategy.  The question that Plaintiffs must answer, but do not, is why WW would have intentionally embarked on a losing business strategy?  There is no plausible answer. Plaintiffs' fraud allegations are far less compelling than the opposing inference of nonfraudulent intent—*i.e.*, WW launched its year-round innovation strategy because it thought it would be good business.  *Tellabs Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 323 (2007).

Plaintiffs point to certain Defendants' stock sales and recite the standard allegation that stock sales are evidence of scienter.  Opp. at 18–19.  But this is not a case where the alleged

misrepresentation would be expected to inflate a company's stock price.  Here, Plaintiffs charge Defendants with the supposed decision not to launch a "meaningful" year-end program innovation in 2018.  That would not inflate the stock price at all.  In the context of Plaintiffs' misrepresentation claims, the stock sales do not move the needle on pleading scienter.

Moreover, Plaintiffs admit that Ms. Grossman (allegedly a co-conspirator) increased her WW holdings with an open-market purchase of shares for $350,700.  Opp. at 17–22.  Her 500% increase in WW holdings during the Class Period is wholly inconsistent with fraudulent intent. Further, Plaintiffs would have the Court ignore Mr. Hotchkin's increase in his WW holdings and the increases of numerous other executives and directors during the Class Period, which again undermine Plaintiffs' claims of scienter.  *See In re Bristol-Myers Squibb Secs. Litig.*, 312 F. Supp. 2d 549, 561 (S.D.N.Y. 2004).  Contrary to Plaintiffs' argument, the fact that some of these increases were due to RSU grants rather than open-market purchases (Opp. at 20) is irrelevant.[6] The point is that the insiders who allegedly had fraudulent intent received extra stock and held it; they did not sell off their positions en masse.  The fact that Mr. Hotchkin exercised a portion of the options that made up more than half of his annual compensation and that Artal created value for its investors while remaining WW's largest shareholder is not suspicious or fraudulent.

Nor do Plaintiffs' generic "core operations" assertions salvage their scienter arguments. Plaintiffs argue that because Ms. Grossman, Mr. Hotchkin, and Mr. Debbane were "senior" at WW, the Court must infer scienter because the alleged omissions about WW's program innovation strategy went to WW's "core operations."  Opp. at 21.  But core operations allegations are not "independently sufficient to raise a strong inference of scienter."  *In re*

---

[6]    Stock options are not treated any differently than disposable stock for purposes of "demonstrating stock sales as a percentage of total holdings."  *Nguyen v. New Link Genetics Corp.*, 297 F. Supp. 3d 472, 496 (S.D.N.Y. 2018) (Pauley, J.).

*Ferrellgas Partners, L.P., Secs. Litig.*, 2018 WL 2081859, at \*19 (S.D.N.Y. Mar. 30, 2018). Plaintiffs' scienter theory defies common sense and its omissions allegations are entirely counterfactual (*see supra* Section IV); the core operations doctrine offers Plaintiffs no shelter.

## VI.    Plaintiffs Cannot Demonstrate Loss Causation Under Any Theory

Plaintiffs now attempt to overhaul their loss causation theory from the corrective disclosure theory alleged in the SAC to a materialization of the risk theory. SAC ¶ 254; Opp. at 23. Plaintiffs cannot amend their pleadings through briefing. *A Star Grp., Inc. v. Manitoba Hydro*, 621 F. App'x 681, 683 (2d Cir. 2015). Moreover, their attempt fails. Plaintiffs point to a single stock drop on February 26, 2019, which the SAC pleads was due to alleged corrective disclosures revealing the importance of lapsed members. SAC ¶ 254. Since Plaintiffs have withdrawn their Exchange Act claims based on lapsed members, they can no longer rely on this corrective disclosure theory. Instead, the Opposition argues that "WW's (concealed) failure to develop a new program innovation" was a risk that materialized in early 2019. Opp. at 23.

Under such a theory, "plaintiff's loss must be a 'foreseeable' consequence of the alleged misstatements and omissions." *Alpha Capital Anstalt v. Schwell Wimpfheimer & Assocs. LLP*, 2018 WL 1627266, at \*17 (S.D.N.Y. Mar. 30, 2018). Plaintiffs attribute WW's February 26, 2019 stock drop to lower-than-expected 2019 earnings guidance and member recruitment numbers. SAC ¶¶ 225−27. Nowhere do Plaintiffs allege that the drop was due to any failure to disclose a "meaningful" year-end program innovation in 2018. And WW repeatedly emphasized that a key risk it faced was the potential failure of program innovations. *E.g.*, Ex. L at 12, 36. Even under Plaintiffs' theory, where the risk that materialized is plainly apparent on the face of the allegedly concealing disclosures, "a plaintiff must allege (i) facts sufficient to support an inference that it was defendant's fraud—rather than other salient factors—that proximately

8

caused plaintiff's loss; or (ii) facts sufficient to apportion the losses between the disclosed and concealed portions of the risk that ultimately destroyed an investment." *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 177 (2d Cir. 2005).  Plaintiffs have made no attempt to do either.

**VII.    Plaintiffs Have Not Stated A Section 10(b) Claim Against Artal Under *Janus***

Plaintiffs' Opposition does not save its Section 10(b) claim against Artal because Artal was not the "maker" of any allegedly false statement.  *See Janus Capital Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 141–43 (2011); Mot. at 22–23.  *Janus* warned against a "broader reading of 'make'" and explicitly rejected the theory Plaintiffs espouse here because Congress already established a control liability framework under Section 20(a).  *Id.* at 146.  The fact that Mr. Debbane or others affiliated with Artal signed the Registration Statement does not help Plaintiffs.  Mr. Debbane's signature, for example, was in his capacity as a Director of WW and not on behalf of Artal; Artal signed nothing.  This scenario is just the type *Janus* rejected.[7]

**VIII.    Plaintiffs' Section 12(a)(2) Statutory Seller Arguments Are Unavailing**

Plaintiffs' argument for an inappropriately broad interpretation of what it means to be a statutory seller for purposes of Section 12(a)(2) fails.  *First*, Plaintiffs argue in a footnote that Artal "passed title" in the SPO, citing only a single case that falls outside the context of a firm underwriting.  Opp. at 16 n.10.  Courts evaluating that context have held that it is the underwriter

---

[7]    Equally misplaced is Plaintiffs' contention that they have adequately alleged a Section 10(b) claim against Artal due to Artal's alleged ability to determine "whether and when WW would offer shares."  Opp. at 23.  The single case Plaintiffs cite does not support their argument.  There, the controlling entity owned 100% of the offeror's shares and had "direct control over all corporate transactions"—one example of which was "when and whether to sell the shares."  *City of Roseville Emps. Ret. Sys. v. EnergySolutions, Inc.*, 814 F. Supp. 2d 395, 418 (S.D.N.Y. 2011).  The "indicia of control" was so overwhelming that the court found that the controlling entity had "made" statements in the registration statement despite not having signed it.  *Id.*  Plaintiffs have not alleged that Artal exercised this level of control over WW and Artal did not.  Mot. at 24–25.

and not the offeror (*i.e.*, Artal) who passes title.  *See* Mot. at 23; *Credit Suisse First Boston Corp. v. ARM Fin. Grp., Inc.*, 2001 WL 300733, at *10 (S.D.N.Y. Mar. 28, 2001) (Pauley, J.).

*Second*, Plaintiffs unavailingly argue that Artal is a "solicitor" statutory seller because it allegedly participated in the preparation of the Offering Documents, due to individuals affiliated with Artal signing the Registration Statement.  Opp. at 15–16.  Plaintiffs' cases are no longer good law, as made clear by a case that Plaintiffs cite.  *See In re OSG Secs. Litig.*, 971 F. Supp. 2d 387, 402–03 (S.D.N.Y. 2013) ("[M]ore recent cases . . . have held that merely signing the registration statement or prospectus does not constitute solicitation.").[8]

## IX.     Plaintiffs' Section 15 And Section 20(a) Control Person Claims Must Fail

For the reasons stated in Defendants' motion and further explained herein, Plaintiffs have failed to allege a primary violation of the securities laws against Defendants and therefore Plaintiffs' control person claims under Section 15 and Section 20(a) must be dismissed.  Moreover, Plaintiffs' generalized allegations of control fail as a matter of law.  Mot. at 24–25.[9]

## **CONCLUSION**

For the foregoing reasons, the SAC should be dismissed in its entirety with prejudice.

---

[8]     Plaintiffs' other arguments fail.  The two cases Plaintiffs cite relied on allegations that the defendants actively "market[ed] the securities to [p]laintiffs."  *In re OSG*, 971 F. Supp. 2d at 403; *In re IndyMac Mortg.-Backed Secs. Litig.*, 718 F. Supp. 2d 495, 502 (S.D.N.Y. 2010); Opp. at 16.  Plaintiffs make no such allegations here; nor could they.  Artal did not contact Plaintiffs or market the Offering Documents.  As a matter of law, it is not a solicitor seller.  Mot. at 23–24.

[9]     Contrary to Plaintiffs' assertion (Opp. at 25 n.20), Defendants note that this Court rightly requires Plaintiffs to plead the element of culpable participation.  *See Gagnon v. Alkermes PLC*, 368 F. Supp. 3d 750, 776 (S.D.N.Y. 2019) (Pauley, J.).

Dated: New York, New York
       December 23, 2019

SIMPSON THACHER & BARTLETT LLP

By: _____

Lynn K. Neuner (lneuner@stblaw.com)
George S. Wang (gwang@stblaw.com)
Rachel S. Sparks Bradley (rachel.sparksbradley@stblaw.com)
425 Lexington Avenue
New York, New York 10017-3954
Tel.: (212) 455-2000
Fax: (212) 455-2502

*Attorneys for Defendants WW International, Inc. (f/k/a
Weight Watchers International, Inc.), Artal Luxembourg
S.A., Artal International S.C.A., Artal Group S.A.,
Raymond Debbane, Mindy Grossman, and Nicholas
Hotchkin*

11