K2PTWEIA

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

IN RE:  WEIGHT WATCHERS                    19 CV 2005 (WHP)
                                           19 CV 2528 (WHP)
------------------------------x

                                           New York, N.Y.
                                           February 25, 2020
                                           3:10 p.m.

Before:

                 HON. WILLIAM H. PAULEY III,

                                           District Judge

                        APPEARANCES

GRANT & EISENHOFER
      Attorneys for Plaintiffs
BY:  CAITLIN MOYNA
      DANIEL BERGER
      JONATHAN PARK

SIMPSON THACHER & BARTLETT
      Attorneys for Defendants
BY:  LYNN NEUNER
      GEORGE WANG
      ADAM SALTZMAN

K2PTWEIA

(Case called)

THE COURT:  Good afternoon.  As the clerk has already indicated, this is oral argument on the defendants' motion to dismiss.

Do you want to be heard, Ms. Neuner?

MS. NEUNER:  Yes, please, your Honor.

May I, your Honor?

THE COURT:  You may.

MS. NEUNER:  Good afternoon.  The complaint should be dismissed in its entirety and with prejudice because it fails to state a valid claim under either the Securities Act of 1933 or the Securities Exchange Act of 1934.  Our papers made several arguments for dismissal.  I would focus in the first instance on our position that plaintiffs have not pleaded actionable misstatements or omissions, as they would eliminate the complaint in its entirety.

Plaintiffs, your Honor, have two theories.  The first is that the company and defendants failed to disclose that the sign up of lapsed members was important to the company.  The second theory is that defendants did not disclose that they would not have a significant innovation to unveil in December of 2018.

With all respect, your Honor, both theories fail.  Plaintiffs themselves have withdrawn the lapsed member allegation for the '34 Act claim.  Our view is that it should

K2PTWEIA

have been withdrawn for both.

The plaintiffs perhaps saw that we have robust disclosures with respect to the lapsed members.

THE COURT:  Well, aren't the disclosures on lapsed members somewhat vague?

MS. NEUNER:  Your Honor, from our perspective they're not vague, and let me explain why, and I will do it in detail.

If you go to the first earnings call of 2018, Ms. Grossman, the CEO -- and I'm looking at the appendix A with respect to member recruitment to our brief, your Honor, Ms. Grossman says with specificity the following:  Looking at the U.S. as an example, approximately 40 percent of our member sign ups in Q1 were new to Weight Watchers, an increase in the proportion of first-time members compared to recent years.

Let me unpack that for a moment.  That means of the new subscribers, she is saying 40 percent were brand new to Weight Watchers, meaning the remainder were returning members who lapsed, in plaintiff's words, and have come back.  That means more than 50 percent of our new sign ups are returning members.  That's prior to the prospectus.

THE COURT:  How do prior earnings calls where Weight Watchers --

And I will use that nomenclature even though it's WW.

MS. NEUNER:  Yes.

THE COURT:  -- notes that the proportion of lapsed

members -- hasn't sufficiently disclosed that Weight Watchers needs to recruit lapsed members in order to be successful?

MS. NEUNER:  Your Honor, I'll tackle that in two ways. The first is -- and maybe this what you're asking as well -- does an earnings call count for purposes of the '33 Act claim? And second is:  Was that disclosure sufficient informationally to get to the point plaintiffs are raising?

First matters first.  We do believe under the case law that we cited, which is *In Re: TVIX*, and you will find that, your Honor, in that case the court stated that prior public information does not have to be included in a prospectus, and cites in turn to the *Merrill Lynch* case, which in turn cites to a Second Circuit case.

Our point here is that the prior earnings calls are in fact information available to the investors.  And I think that we are bolstered on this, your Honor, by the complaint itself, paragraph 73, with respect to lapsed members.  It's the plaintiffs who said Weight Watchers had not previously mentioned anything in its public filings and statements about the significant contribution that lapsed members made to its subscriber numbers.  Investors would not have known that growth could only be achieved through active recruitment of these lapsed members.  So plaintiffs in that paragraph, I think, acknowledged that prior public statements, in this case by the CEO on the first quarter earnings call, would count toward the

total information available to the shareholders.

To get to your second question, is that information substantively sufficient?  Your Honor, it's a member subscription business.  We actively state in our SEC filings that 80 percent of our revenues are from member sign ups.  So to then give the further granular detail that more than 50 percent, really to the realm of 60 percent, and you'll see on a subsequent disclosure on May 17 from the CFO that it was historically higher than that, 66 and two-thirds, to tell the investing public that two-thirds or 60 percent or more than 50 percent of our sign ups are from returning members, I think that does give the investors a very strong idea of where the sign ups are coming from.

So if you would take the next logical step in the plaintiffs' sequence to say the defendants were wrong because they abandoned that base, which they identify as middle age Caucasian women, and went strictly, and if you believe them, exclusively after a more diverse clientele, then the problem with that whole theory is that by seeking new, more diverse customers, it's not the case -- and defendants never said and plaintiffs cannot show anything that indicates that the company was in fact abandoning its core.  And it doesn't make sense, because the CEO and CFO are telling the American public and anyone else who wants to listen that core to their sign ups and recruitment numbers are the return of lapsed members.

So from our perspective, your Honor, the statements during the class period, both before and in the prospectus, and then there's a whole number of them after the prospectus, do, in detail, advise the investors that the composition of the sign ups depends, in part, on the lapsed members returning.

Now we have got both Exchange Act and '33 Act, so I focus so far on the May 3rd statement and the prospectus statement. The prospectus statement, again, this is May 14, states -- and I'm on page 5 of our appendix -- our meeting members have historically demonstrated consistent loyalty to the brand, and a significant percent have repeatedly resubscribed to the program. And that's on page S4 of the prospectus supplement.

Now if you go into the subsequent 2Q and 3Q earnings calls, you will see again direct citation to the 40 percent number. So in the August 6, 2Q, 2018 earnings call, you see an Exhibit BB at 4, the statement similar to what we saw in the first quarter, in the U.S., more than 40 percent of our member sign ups in Q2 were new to WW, an increase in the proportion of first-time members compared to recent years. I would say, again, the flip side of that coin has to be that 60 percent is returning member sign ups, and that this has been the case for what she refers to as recent years.

And then the last, your Honor, I will highlight -- sorry.

K2PTWEIA

THE COURT:  Doesn't just stating the proportions of lapsed members versus new members require investors to try to figure out that Weight Watchers would still need the lapsed members?

MS. NEUNER:  Your Honor, I take your point if this was a significant inference that had to be drawn.  And there are cases in the Southern District that said an omission is not cured where you have some information but the investors have to do too much math or would have too many assumptions to get to the final point.  That was *SunEdison* case that they referred to, and the judge said there were too many inferences, too much math.

Here, in all respect, we think it's a pretty obvious statement that if 40 percent are new sign ups, then the flip side of the coin is 60 percent is old members returning.  So we don't think that it's mysterious or requires other additional pieces of information in order for an investor to deduce that exact conclusion, which is that 60 percent -- and in fact more, up to 66 and two-thirds percent of Weight Watcher sign ups have historically been returning members.

And again, your Honor, you see that in the third earnings call of the year, November 1st, 2018, where the statement is again:  Provided more than 40 percent of our member sign ups in Q3 -- and so it's tracing Q1, Q2, Q3 -- were new to WW, an increase in the proportion of first-time members

K2PTWEIA

compared to recent years. So you're getting the historical flavor as well that over recent years it's been less than 40 percent of brand new members.

Your Honor, from our perspective, this disclosure shows that Mindy Grossman and Nick Hotchkin were not trying to hide the ball --

THE COURT: Would the Court need to decide whether those disclosures were material?

MS. NEUNER: Your Honor, respectfully, no. We saw that argument in the plaintiffs' brief. And this is not a materiality question. We're not saying that lapsed members are important or insignificant. We don't have to go there. What we are saying is this is a reality question. It's not materiality, it's the reality of what was said.

So we are coming forward and saying to you we don't believe there's either a misstatement or an omission, because if you look at our earnings calls and you look at our prospectus, there was full disclosure. And we don't think you have to decide was this a material issue or not, you can assume that it was material but then decide that there was sufficient disclosure for the investor.

And again, from our perspective, we'll just take one step back, which is the company was not saying we don't care about middle-aged white women, they were saying in the year 2018 with Oprah on the board and a new CEO who is a woman: We

care deeply about diversity and inclusiveness.  That doesn't mean that they want to shed the 3.5 million subscribers they already have, they said they wanted to grow to 5 million subscribers.  They wanted to get to a huge new number of subscribers and huge new revenue targets.  That was to bring more people under the tent, not to shunt the first tent and go to the new, more diverse tent.

And honestly, if you look at every single statement from Mindy Grossman about her strategic vision as the new CEO, you will see she is putting out a clarion call to move from a weight loss company to a wellness, holistic, healthy, billion dollar company.  And that's because weight loss is a multibillion dollar industry, and health and wellness is a multitrillion dollar business.  So she wasn't looking to shed the core group or returning or lapsed members, and we think that's also clear from our disclosures.

THE COURT:  Would you turn to the program innovations argument?

MS. NEUNER:  Yes, your Honor.

So moving to that one, the company historically disclosed its program innovations each year.  And the thrust of the plaintiff's complaint is:  In 2018 Weight Watchers, WW International, you hid the fact that you weren't going to do a big banner program innovation in December of 2018.

We say that doesn't work when you look at all of the

company's disclosures for two reasons:  First, we did have five innovations launched, unveiled in December 2018.  And as you know from the papers, it had to do with Aaptiv, Headspace, Blue Apron, Connect, and FitPoints.

THE COURT:  But the key is what constitutes a "meaningful," in quotes, innovation, as opposed to just an innovation?

MS. NEUNER:  Great question, because that's the heart of the matter.  I think plaintiffs, to their credit, recognized that there were five innovations in December of 2018, but they said it wasn't meaningful, meaningful enough.

That's, in our world, a made-up word, but what I think they're getting at is a food program overhaul.  So you know Weight Watchers is about points, and there have been three significant point innovations prior to and during the class period.  So 2011 was Points Plus, 2015 was Beyond The Scale or SmartPoints, and 2017 was Freestyle, 200 foods with zero points.

Now this might sound kind of funny, but these things actually do matter to the subscribers.  However, Weight Watchers is very much a science-based business, and has been since its founding in 1963 with Jean Nidetch.  It has always called upon hardcore clinical science to prove up its weight loss program.  And that's why it's been so successful, because it delivers results.

K2PTWEIA

These new program innovations take time, so we agree with plaintiffs on that. They are in clinical testing with tens of thousands of subjects for six to twelve months. These program overhauls are foreshadowed like half a year in advance, and the CEO will say: We're about to unveil the new program points overhaul, it will be coming at the end of the year.

So there's pent-up momentum and then there's the big launch, and it's hugely successful, but that has never been done in consecutive years. And that's where, again, the company's disclosures come into play, because any investor, any analyst would know that you are not going to see Freestyle in 2017 and then have a dramatic new points or food program overhaul in December of 2018. You have to layer it in, and frankly, you cannot confuse your subscriber base.

THE COURT: How are prior disclosures, though, incorporated into the May prospectus?

MS. NEUNER: So your Honor, the May prospectus does directly incorporate the prior 10K from 2017. Our perspective is that the prior press releases, which is what the plaintiffs have an issue with in certain respects, but actually they don't have an issue with the historic press releases going back to 2011 to 2016, our view is that the Court can take judicial notice of those articles, if not for the truth, then for the fact that the announcement was made.

THE COURT: But what about, for example, Exhibit A,

K2PTWEIA

the December 3 press release regarding Weight Watchers 360. That press release is never referenced by plaintiffs in the second amended complaint.  How, therefore, is it incorporated by reference?

MS. NEUNER:  So your Honor, to answer you directly, I will not tell you it's incorporated by reference specifically, because I can't say that to you in good conscience.  But what I will say is that prior press release, so Exhibit A to the declaration, is, A, not actually being challenged by plaintiffs in their footnote 5, on their footnote motion to strike, and you can in fact look at the news release as a matter of judicial notice.

Now I have read your *Gagnon* decision where you actually parse through a fully briefed motion to strike, and you sated there:  I will look at news articles for the fact of what was said, even if I don't look at them for the truth of the substance.

So you could say Weight Watchers did or did not launch WW 360, but the point is they announced that that was what they were doing, and anyone who looked at the company's public disclosures would know you're not going to have a huge programmatic overhaul one year after another.  In fact, if you look at Ms. Grossman's statements in that 3Q 2018 call, she says exactly what the five innovations will be.  She names those five that I ticked off to you before and says that is

K2PTWEIA

what we will do between now and the end of the year.

So if you are really thinking about this under a '34 Act claim, that would be their, quote, corrective disclosure. The stock price didn't drop, the class period would end right there, but they're not alleging any of that.

People knew what those programmatic innovations would be for 2018, and they knew there wasn't going to be a massive redo of the point system because Freestyle was still in place. In fact, Mindy Grossman says on the same call:  We're still maximizing Freestyle, and we intend to do that and filter in additional innovations.

So I think the investing public can discern from Weight Watchers' historical performance that there's not going to be another Freestyle-like innovation in 2018.  So I'm tempted to say there was a programmatic evaluation at the end of December 2019, and that shows that every other year seasonality to innovations, but I accept that that's outside the record and happened after our briefing.

What I would also point out, though, is in the prospectus, your Honor, at S7, the company said we want to get away from these end-of-year launches.  It makes our earnings too bumpy.  So they specifically said at S7:  We intend to innovate throughout the year.

So that's happening May 7, and then what you see over the course of 2018 is seven different innovations get unveiled.

K2PTWEIA

THE COURT:  If you could answer, though, how were the pre-2018 innovations incorporated into the prospectus?

MS. NEUNER:  Your Honor, I would say that those press releases themselves were not incorporated, to give you a completely direct answer, but I would say that information that is publicly known does not have to be recited into the prospectus.  And for that I would cite to the *TVIX* case, the *Merrill Lynch* case that it cited, and the *Siebert v. Sperry-Rand Corp.* case from the Second Circuit that *Merrill Lynch* cited.  All of these cases amount to the following proposition:  Where information is already in the public realm, it does not have to be reasserted within the prospectus in order for the investor to be on notice of it.

So we believe that any of the pre-May 7 and May 10 statements, whether it's earnings calls or press releases, from the company are fairly imputed to the marketplace, they are baked into the share price, and they are known to the investor who is thinking about buying in the secondary public offering.

You're being and lenient with me on time, but I will move along so that I can cover a few other points.

The disclosures feeds into the loss causation.  So the loss causation argument is for the '34 Act claim.  You will see when you look at the complaint for loss causation, paragraphs 225, 226 and 227 and a hint of it in 253, that plaintiffs attributed the loss on February 26, 2019, to reduced earnings

per share guidance for 2019, after the class period, and for the decrease in member subscriptions. They then tied the decreasing member subscriptions to failure to attend to the lapsed members.

They are not, in those paragraphs, talking about the failure to launch a massive new innovation in December. And it doesn't even make sense, because by December 31st, everyone knew what the innovations were that were launched. And so if there was an omission or a misstatement, it was, A, corrected by Mindy Grossman on November 1st when she told you what the five innovations were, but B, certainly was known to the market by the end of December. So you don't have to wait all the way to February 26, almost two months later, in order for the market to realize: Weight Watchers, you didn't have a massive programmatic overhaul last December. It doesn't make sense.

So plaintiffs themselves weren't really relying on the program innovation hook for their loss causation argument, what they were leaning on pretty heavily was the lapsed member recruitment, and then you know what happened in footnote 12, they withdrew that for the '34 Act claim.

Your Honor, I will move to scienter. The stock sales, there plaintiffs are trying to make the case on motive and opportunity based on Artal sales and Nick Hotchkin's, the CFO, sales. As we demonstrated in our papers, Mr. Hotchkin exercised 131,000 of his most dated, least in-the-money

options.  Plaintiffs say he had proceeds of 9 million, it was netted to 6 million.  He held the same number of shares before and after because it was cashless exercises.

THE COURT:  I think I have your arguments on these points.

MS. NEUNER:  Very good, your Honor.  If I may, I will just touch upon Artal as a service to one of my clients, which is that they're not a statutory seller under 12(a)(2) and they're not a maker of a statement under Janus.  And I think your *Credit Suisse* case from 2001 on the statutory seller says all there needs to be said, which is in a firm commitment underwriting there is not transfer of title from, here Artal, to the ultimate purchaser.  It obviously goes to the underwriters, and as you said, you cannot collect on a Section 12 claim from your seller's seller.

This case actually is very similar to the *Janus* case, where the investment fund was not held responsible for the statements because they didn't actually make it.  Artal made no statements.  There are no allegations that Artal actively solicited, because it didn't.  The only allegation is that Artal-affiliated individuals like Ray Debbane signed the prospectus, but you can look at the exhibit, he clearly signed in his capacity, and it says that above the signature, as director.  And the case law has been quite clear that signatures of an individual do not bind the company.

K2PTWEIA

The last point, your Honor, is control person.  No primary violation is obviously what we're arguing, but there is a culpability requirement, and you personally have decided that in a Section 20(a) claim there has to be culpable conduct. Respectfully, that is the majority view of the Southern District judges, it's like 28 to 2 on that score, so we think the culpability requirement does need to be abided by.

THE COURT:  Thank you, Ms. Neuner.

MS. NEUNER:  Thank you very much, Judge Pauley.

THE COURT:  Ms. Moyna.

MS. MOYNA:  Good afternoon, your Honor.

I would like to address several of Ms. Neuner's points, and I will start with some of her '33 Act points, if that's okay with you, and in particular we'll start with the lapsed members here as well.

Now first it's important to keep straight the standards of a '33 Act claim, which I know your Honor is well aware of, but of course it's Rule 8, notice pleading, and courts have said that pleading a '33 Act claim is not difficult, it's a low bar for plaintiffs.

Now let's start first with:  Who are lapsed members? What exactly are we talking about when we're talking about lapsed members?  Because I think some of disclosures that Ms. Neuner pointed to get a little more confused when we talk about what lapsed members really are.  They are people with

prior experience with the Weight Watchers brand who stepped away from Weight Watchers for some period of time and who Weight Watchers historically had then sought to recapture as part of its subscriber base.

Now when Ms. Neuner pointed to some of her statements that purportedly disclosed the importance of lapsed members, it never use the term "lapsed member," and it used terms such as "member sign ups" or "returning members." Now it's unclear to me standing here, until actually I just heard Ms. Neuner speak, what that actually meant. It could have meant people who were subscribers and were happy and kept signing up and signing up. Maybe their subscriptions automatically renewed, I don't know, but it doesn't necessarily mean to me they were lapsed, that they had been away for some period of time and that Weight Watchers was reaching out and trying to grab them back in.

And I think that's important because when Ms. Neuner is talking about 60 percent were lapsed members, I can do the math, yes, 100 minus 40 is 60, but I don't know necessarily that that means 60 percent were lapsed members.

And another thing is it talks about member sign ups. Now the way that Weight Watchers reported its subscribers was not to tell you how many people actually signed up in a particular quarter, it just gave you a number, say we have 3 million subscribers this year or this quarter. So I don't know how many were new. Maybe they had a few new member sign ups

that quarter, and 60 percent of them may or may not have been lapsed, so to me these disclosures really do not explain the importance of lapsed members to driving Weight Watchers subscriber numbers at all.

THE COURT:  So it's sort of like the gym membership that people sign up for and their credit card is debited every month and they're just not going and never get around to canceling it?

MS. MOYNA:  Exactly.  It could be, your Honor, I don't know.  And I think what this whole discussion points out and highlights is that this is certainly a fact question.  We don't know from pleadings what these disclosures that Ms. Neuner is bringing in from outside of our complaint and outside the prospectus what they even mean.  So I don't think that based on these disclosure that Ms. Neuner is pointing to that our claims should be dismissed.

Your Honor pointed out that a lot of these disclosures were made outside of the context of the registration statement and prospectus, and that's true.  And as you know, the law is very clear that making out, especially in a Section 11 case and when we're dealing with prospectus, it's very difficult to make out a truth on the market defense, which is what they're arguing, or put differently, they might be arguing a total mix of information argument, which is a form of materiality argument.  But in any event, it's very hard to make these

K2PTWEIA

arguments out in a case where you have a prospectus.

In particular, we have language in our prospectus on page 1, even before the table of contents, that says directs investors specifically to the prospectus, and there are cases -- unfortunately we did not cite this one in particular from 2017, Judge Koeltl, that says if that language is included in the prospectus, a truth on the market defense is inappropriate, end of story, and I can give you the citation if you would like.

THE COURT:  Please do.

MS. MOYNA:  It's *Fresno County Employees Retirement Association v. comScore*, 268 F.Supp.3d 526, 562 (S.D.N.Y. 2017).

THE COURT:  I would like to go back to a more fundamental question that has been bothering me a little bit in reviewing the briefs.  You're withdrawing your 10(b) claims based on lapsed members.  Why?

MS. MOYNA:  Well, your Honor, we thought with the lapsed member argument in particular it was important -- we thought it was important to streamline and simplify these claims.  We did want to take advantage of some of the law of the '33 Act law, in particular where investors are directed to look at the four corners of a prospectus.

We also looked at some of the statements that were made later in the class period in terms of falsity or an Item

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

K2PTWEIA

303 violation, and we didn't see it as strongly for the lapsed member argument. So those were sort of some of the reasons that made us decide to withdraw the '34 Act claim.

THE COURT: If your argument hinges on the prospectuses being misleading, didn't the prospectuses incorporate Weight Watchers' quarterly filings?

MS. MOYNA: I believe it incorporated the 2017 10K but none of the subsequent filings. And none of the statements Ms. Neuner pointed to were found in that 2017 --

THE COURT: I guess I'm still left wondering why you can't do both, bring the claim under the Exchange Act and under the Securities Act, especially since the lawsuit started with the Exchange Act claim.

MS. MOYNA: Well, first of all, I guess the initial complaint started with the Exchange Act claim, but our case in our mind has always really started with the '33 Act claim.

THE COURT: I guess I shouldn't ascribe what the original complaint is to your firm, but I'm just thinking about it.

MS. MOYNA: Well, these are some of the reasons, we wanted to streamline the allegations, we thought, again, in looking at some of the disclosures later on in the class period, the lapsed member argument didn't seem to fit as well, and we wanted to simplify and streamline our lapsed member argument to make it be just about the '33 Act.

THE COURT:  All right.  On the lapsed members claim, wasn't Weight Watchers trying to recruit a more diverse membership base?

MS. MOYNA:  It was, your Honor, and it did tell investors that.  It was actually very clear about that.  But I think there are a few things that it did not tell investors.  First of all, it didn't tell investors that this strategy was risky because such a huge percentage of its membership came from these lapsed members who were not part of the new diverse, what I like to call the everyone-else group.

Also, Ms. Neuner states that Weight Watchers did not give up on its lapsed members, but we actually have allegations from our confidential witnesses to the contrary.  In particular, CW-1, who is a high-ranking executive, she reported directly to one of the directors, a member of the board of directors, and she said specifically that Mindy Grossman no longer wanted Weight Watchers to be associated with middle-aged white women.

We also have an allegation, I forget which CW, from another CW that said towards the end of 2018 Weight Watchers realized it wasn't getting its lapsed members and there was a big scramble to sign up as many as they could, so they entered panic mode and they did an email blast to all their lapsed members.  We think these indicate that Weight Watchers did give up on the lapsed members and it certainly never disclosed that

to investors.

THE COURT:  But even accepting that as true, isn't that really tantamount to a corporate mismanagement claim as opposed to a securities claim?  I mean Ms. Grossman decided to assume a risky strategy.

MS. MOYNA:  Well, it may have been mismanagement, but that's not what we're alleging.  We're not alleging that the strategy is actionable, we're alleging that the company's failures to tell their investors about the strategy are actionable, particularly in light of certain statements they made about their new marketing strategy.

THE COURT:  But doesn't their new marketing strategy as announced necessarily mean that they're going to spend less effort on trying to recruit lapsed members, which was their old strategy?

MS. MOYNA:  Well, I don't know that for sure.  It may, I guess, if we assume it has a particular advertising budget and now it's being diluted, but again, the other pieces is that investors didn't even know that lapsed members were important.  So they may have thought, oh, sure, let's get all these new diverse new people, the everyone-else category, that seems fine, but without knowing that lapsed members made up such a significant portion of the membership base, they wouldn't recognize the risks in that strategy.

Is there anything else your Honor would like me to

K2PTWEIA

address on the lapsed members?

THE COURT:  No, I think you could turn to the meaningful program innovation prong of your complaint.

MS. MOYNA:  Thank you, your Honor.  As you know, we have alleged this program innovation under both the '33 Act and the '34 Act, but I want to discuss first in the context of the '33 Act.  And one thing that struck me as Ms. Neuner was talking and you were engaging with her about the various program innovations and what constitutes a meaningful program innovation, I think the answer to that is it's a fact question that cannot be resolved on a motion to dismiss.

Now we alleged particular facts, again from our confidential witnesses, who explain what a program innovation, what the insiders of Weight Watchers understood a program innovation to mean.  And CW-1, again, was integral in developing this program innovation strategy, but it was corroborated by two other CWs.  We did not just allege that a program innovation is a significant food overhaul.  Paragraph 52 actually sets forth various types of program innovations which could be a food program innovation, a fitness innovation, a mindset innovation or a service channel innovation.

Now defendants actually pointed, going back I think as far as 2012, to several different program innovations, and they all fit into these categories with the exception of 2018.  In 2018 which they pointed to Aaptiv and Headspace.  These two are

K2PTWEIA

interesting in particular because in an earnings call, the defendant said in November, they said specifically:  We don't expect Headspace and Aaptiv to generate a big revenue boost. So this is obviously not the type of program innovation that our confidential witness was telling us about and that she knew Weight Watchers had abandoned.

THE COURT:  Wasn't Weight Watchers shifting away from end-of-the-year program innovations?

MS. MOYNA:  Well, that's interesting, because if they were, that would be stunning.

THE COURT:  Weren't they trying to become a wellness company as opposed to weight reduction?

MS. MOYNA:  They may have been, although I would argue -- so as you know, the purpose of the end-of-the-year program innovation was to capitalize on people who make New Year's resolutions.  And I did a quick Google search the other day, something like 70 percent of New Year's resolutions have to do with either weight loss or health, so it could be either weight loss or wellness as they're shifting now.  That doesn't mean they wouldn't want to take advantage of those New Year's resolution for people looking to improve their wellness in the new year.  This was fundamental and core to their business. This wasn't just some -- this was sort of like, I was thinking about it as sort of fundamental and core as say the Macy's Thanksgiving Parade might be to Macy's in launching their

K2PTWEIA

Christmas season, their holiday season.

So I think if investors understood that Weight Watchers was trying to sort of even out the seasonality of its business, it didn't necessarily think Weight Watchers was going to just give up on the end-of-the-year program innovation. This generated a huge pop in member subscribers every January that Weight Watchers counted on. In fact, I think typically the subscriber numbers would spike in January and dwindle throughout the year and spike again. So I don't think that investors could have possibly understood that they were giving up on the major program innovation. In fact, the importance of it was known -- and I'm not at all suggesting this was completely known to investors in November, but at least one analyst did pick up, because they knew how important it was, on the fact that there was not a major program innovation being announced to spike the sales in 2019.

But I think, again, we're getting at a lot of fact questions, as your Honor pointed out, a lot of documents that were introduced that were not cited in our complaint and that are being offered for the truth of what is in those documents not just to demonstrate what the market knew but to actually try to prove a fact about whether or not there was a program innovation.

THE COURT: But didn't Weight Watchers say, essentially, that they were changing to a wellness company and

K2PTWEIA

that they were going to be announcing programs throughout 2018, and in fact they did launch programs throughout 2018?

MS. MOYNA:  Well, again, I think even if they did intend to switch to a wellness company and wanted to launch programs throughout 2018, I think the end-of-the-year program innovation to drive the membership numbers in January was so fundamental and so core that investors could not possibly have understood that to mean that they were giving up on that fundamental part of their business.

So investors might have thought they're trying to boost the numbers throughout the year and bring them closer to that December/January level, but not necessarily that you're just -- it's almost like they did the opposite, they were depressing everything to make it flat, but I don't think that's how investors would have understood those statements.

THE COURT:  Why shouldn't this Court consider Weight Watchers' SEC filings and the earnings call transcripts?

MS. MOYNA:  Well, the earnings call transcripts and SEC filings, to the extent they're being offered to demonstrate what the market understood, I think that's okay, and we have not challenged that.  But to the extent they're actually being offered to refute the merits on a factual level of our claims, in other words, whether or not there was an end-of-year program innovation or whether these other innovations counted as a major innovation of the type that we're alleging, it's

K2PTWEIA

inappropriate to consider those documents outside of the complaint.

THE COURT:  But you asked in response for a number of these exhibits to be stricken.  For example, Exhibit GG, which is a press release in which Weight Watchers announced that it's changed its name, it's referenced in your complaint at paragraph 216, so why should it be stricken?

MS. MOYNA:  Well, your Honor, I would have to look at Exhibit GG in particular.  I mean to the extent that I think documents are referenced in our complaint -- your Honor, I would have to really look at this Exhibit GG.  I'm not sure where it's referenced in our complaint or for what purpose.

THE COURT:  It's referenced at paragraph 216.  The headline is:  Weight Watchers becomes WW, reinforcing its motion to focus on overall health and well-being.

Why should that be stricken?

MS. MOYNA:  If it's being used to refute our facts about a major year-end program innovation, first of all, this happened in September of 2018, so it's not the type of year-end program that we're talking about, we're having a dispute about the facts.  If this is being offered to dispute a fact that we alleged, then we would submit it's improper to consider for that purpose.

THE COURT:  I thought your argument in your brief was different than that.  I mean in the brief you say that they're

K2PTWEIA

not referenced or integral to complaint.

MS. MOYNA:  Then I have to apologize, your Honor, because this was an oversight and it was an inadvertent inclusion of this exhibit within that rubric.

THE COURT:  Also, I mean some of your claims assert that Weight Watchers omitted material information.  Doesn't an allegation like that put you on notice that Weight Watchers is going to come forward with SEC filings to argue that they have disclosed the very information that you claim has been omitted?

MS. MOYNA:  Yes, it would, your Honor, and that's why we're not challenging documents that are being offered to show what was disclosed, but this was a lot of these documents and I don't have them all at the ready, but they were offered to refute facts that we allege, not just to demonstrate what was disclosed.

Is there anything else on that piece of the program information that you would like me to address?

THE COURT:  No, I think not, thank you.

MS. MOYNA:  So turning to the '34 Act claims and scienter, we don't need to allege motive, and we've alleged actual knowledge on the part of individuals.  Mindy Grossman, in particular, was at the helm of the company and responsible for the new strategies it was undertaking, and our CWs have alleged she was very hands on and knew what was going on.

As to Hotchkin, he actually mentioned in one of his

K2PTWEIA

conference calls that a program innovation was core to the company. So I don't think any of them can argue that the idea of a year-end program innovation was not a core operation, it's something that management would have and should have known.

Of course, as to our call, we did allege significant stock sales that were unusual. Artal had not sold any stocks since August 2012, and in 2018 it was cashing out to the tune of over one billion dollars in proceeds.

THE COURT: But for instance, didn't Hotchkin end the class period with more shares than he started the class period with?

MS. MOYNA: He did. But again, he had not sold any stocks since August 2012, and a lot of those stock acquisitions were as a result of his employee stock grants. And we don't need to allege motive as a Hotchkin, so we think this informs the scienter analysis and adds to the total mix of circumstances.

THE COURT: But he exercised options. How does that demonstrate scienter? I mean maybe he sold shares because he wanted to diversify his assets at that point.

MS. MOYNA: Well, your Honor, as we alleged, he had not sold any shares since August of 2012. His options were not due to expire for another three years. It was right in the middle of our class period. Those are our allegations.

On loss causation, I think sort of the key point

K2PTWEIA

that's missing, and what we have here is a materialization of the risk, and the point is that by not having a major program innovation in place to be launched in December of 2018, there was a risk that the December and January numbers would be disappointing. And that's exactly what the company disclosed in February of 2019. And so I think it's a pretty straightforward materialization of the risk on loss causation as to the program innovation allegations.

I'll just address Artal for a moment as a statutory seller. Under Section 12(a)(2) we don't have to allege that Artal actually passed title to the purchaser. We know that went through the underwriters. We can allege that Artal was an active solicitor and stood to profit from the sale, which is what happened here, and we made those allegations. Again, these are Rule 8 notice pleading allegations that we have alleged that Artal offered, sold, and/or solicited the purchase of Weight Watchers common stock, and certainly stood to profit. Those allegations have been sufficient in every case, including *OSG Securities*, which we cited in our briefs, and in *IndyMac Mortgage-Backed Securities*.

THE COURT: All right. I think I have your arguments, Ms. Moyna.

MS. MOYNA: Thank you.

THE COURT: Thank you.

Anything further, Ms. Neuner?

K2PTWEIA

MS. NEUNER:  May I, your Honor?

THE COURT:  Very, very briefly.

MS. NEUNER:  Okay.  I will be quick.

Your Honor, with the point of what's been included, it's both the 10K and the first Q2 2018, to answer your question directly.  That's at page 65 of 68 in our prospectus supplement.

Next, the CW who allegedly stated that Ms. Grossman abandoned the white women, she wasn't even there after the first quarter of 2018, so she left very early in the class period.

With respect to the notion that this was all a fact question, with all respect, one cannot make an allegation with qualitative words like "you don't have a meaningful program," and then when it's rebutted with factual disclosures say, "well, we just have a dispute about what is meaningful."

The plaintiffs claim that there were three types of innovations in their brief, and that December 2018 didn't qualify.  And this is on page 2, and Ms. Moyna just referred to it.  If you look at the five innovation from December 2018, they fit spot on.  We have fitness innovations with Aaptiv, we have mindset innovations with Headspace, and we have service channel innovations with Connect, FitPoints and Blue Apron.

THE COURT:  Blue Apron, right.

MS. NEUNER:  So they don't like the fact that we

K2PTWEIA

didn't do a point overhaul.  No one was anticipating that we would do a point overall so quickly after Freestyle, and Ms. Moyna just referred to the fact that a November 2018 analyst report says:  Ah, we see there's not going to be a point overhaul.

So on the whole notion there's a hidden surprise, it was out in the market.  Ms. Grossman told everyone what the innovations were going to be, analysts were reporting on it. By December, the facts are in the record book, and the risk that there wasn't a material innovation, your Honor, was then known by December.  It can't be the case that that's not revealed until February 26.

So with all respect, you said in the *Credit Suisse* case, the loss causation can be put to the side, you can look at materialization of the risk, but you still have to have a nexus between the loss and the allegedly hidden risk.  And here it's plaintiffs who said that the loss is attributable to other points.

I would further say, your Honor, in terms of the returning members, if you look at S4 of the prospectus supplement, it says very clearly member sign ups relying on returning members.  So that's very clearly defined in the prospectus supplement itself.

THE COURT:  What are lapsed members?  How did Weight Watchers define "lapsed members?"

MS. NEUNER:  A lapsed member is someone who was a member and let it end.  So the average duration -- this was all in the SEC filings -- is eight months.  That's been pretty good.  Weight Watchers has been moving -- part of the innovation year around is to get that to last longer.  They got it to nine months and now it's at ten months.  So a lapsed member is someone after four, eight, nine, ten months, let's it go, and as you alluded to, the credit card stops paying.

When that person signs up later, they are a returning member, and they count as a new member, just like the brand new new members count.  If you are someone who has been a continuous Weight Watchers member for the last 20 years, you're simply a renewal, you're not returning or lapsed.  If you have been a card carrying member of Weight Watchers for 20 years, you're not a returning member or a lapsed member, you are simply a renewal.

THE COURT:  I haven't looked, but has Weight Watchers announced its results this February?  I ask the question only because the results here were theoretically reported or were actually reported one year ago tomorrow.

MS. NEUNER:  Right.

THE COURT:  And how is Weight Watchers doing today?

MS. NEUNER:  So your Honor, you are allowed to take judicial notice of stock prices, and this is a very small chart, but I will show on the left side of this chart, this is

K2PTWEIA

a share price, this is from February of 2019, and there's the drop. It stays low for a little while, and it's been climbing, climbing, climbing, since right now it's at roughly 42.

THE COURT: Was that as of yesterday?

MS. NEUNER: Last Friday.

THE COURT: So things could be a lot different now.

MS. NEUNER: Well, I take your point, your Honor.

I would only say on the Nick Hotchkin and the Artal, and you said you had our arguments, you could have an unusual trade in the sense that Mr. Hotchkin previously did not diversify his portfolio, but that does not make it suspicious. And here's a point for you there: Mr. Hotchkin was the one who gave the specificity in the May 17, 2018 conference presentation. He didn't sell until August 30. That data about lapsed members had been in the marketplace for four months. So it's not as though he was trying to pump up the stock and dump it before the big truth got revealed.

Your Honor, in the end we do take the position that this is a question of criticism over corporate management decisions, and respectfully, under *Santa Fe* that is not a securities fraud.

Thank you, your Honor.

THE COURT: All right. Counsel, thank you for your arguments and your briefs, decision reserved.

Have a good afternoon.

K2PTWEIA

MR. BERGER:  Thank you.

MS. MOYNA:  Thank you, your Honor.

MS. NEUNER:  Thank you.

(Adjourned)