UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - :
                                                                  :
IN RE WEIGHT WATCHERS                 :          19cv2005
INTERNATIONAL INC. SECURITIES         :
LITIGATION                            :          OPINION & ORDER
                                                 _____
                                      :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - :

WILLIAM H. PAULEY III, Senior United States District Judge:

   This case presents a familiar narrative: when a company's earnings plunge and the stock tanks, shareholders flock to court for recourse. But not every stock drop is the product of securities fraud.

   Plaintiffs bring this putative class action against Defendants WW International, Inc. ("WW" and f/k/a Weight Watchers International, Inc.), Artal Luxembourg S.A., Artal International S.C.A., Artal Group S.A. (together with Artal Luxembourg S.A., Artal International S.C.A., "Artal"), Raymond Debbane, Mindy Grossman, and Nicholas Hotchkin (collectively, "Defendants") for violations of the Securities Act of 1933 (the "Securities Act") and the Securities Exchange Act of 1934 (the "Exchange Act"). At bottom, Plaintiffs allege that Defendants misled investors by failing to disclose that WW's new business model was reliant on recruiting lapsed members and that WW had abandoned its practice of releasing program innovations at the end of each year. Defendants move to dismiss the Second Amended Complaint under Federal Rules of Civil Procedure 12(b)(6) and 9(b) and the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4(b). For the reasons that follow, Defendants' motion to dismiss is granted.

<u>BACKGROUND</u>

Unless otherwise noted, the following facts are derived from the Plaintiffs'

Second Amended Complaint and are accepted as true for purposes of this motion.

I.      <u>The Parties</u>

Plaintiffs purchased shares in Weight Watchers (now known as "WW), a

publicly-traded company.  Mindy Grossman is the President and CEO of Weight Watchers, and

Nicholas Hotchkin serves as its CFO.  Raymond Debbane—the CEO of Artal—chairs Weight

Watchers' board of directors.  Artal has owned a major stake in Weight Watchers' from

September 1999 until it divested a significant portion of its Weight Watchers stock in 2018.

II.     <u>WW Overview</u>

Weight Watchers was founded in 1961 as a weight-loss program.  (Second

Consolidated Amended Class Action Complaint, ECF No. 86 ("SAC"), ¶ 47.)  When Jean

Nidetch founded the company, she "invited friends to her home in Queens to discuss the best

ways to lose weight."  (SAC ¶ 47.)  Weight Watchers expanded this in-person weight loss

meeting model to millions of members around the globe.  (SAC ¶ 47.)  To monetize these

meetings, members would pay a fee to attend and receive guides on how to lose weight.  (SAC

¶¶ 47, 49.)  More recently, Weight Watchers has capitalized on the internet by offering a suite of

online programs, including workshops and products for additional fees.  (SAC ¶ 47.)  Weight

Watchers also added a "points" system to aid subscribers in tracking what they eat.  (SAC ¶ 48.)

That system assigned specific point values to different foods, which allowed members to budget

calories.  (SAC ¶ 6.)

Historically, Weight Watchers' "'bread and butter' customers consisted of

middle-aged, white women."  (SAC ¶ 47.)  A significant proportion of WW's new subscriptions

come from people who had previously subscribed to the program but allowed their memberships to lapse.  (SAC ¶ 55.)

Weight Watchers also relied principally on a seasonal model.  (See SAC ¶¶ 50, 157.)  Most Weight Watchers customers subscribe between Thanksgiving and the post-New Year's period when many people make aspirational resolutions regarding diet and weight loss. (See SAC ¶¶ 50, 157.)  To monetize the seasonal nature of diets, Weight Watchers would release program innovations in early December of each year.  (SAC ¶ 51.)  These program innovations typically "took the form of offering a new benefit or an attractive modification to the Company's program (e.g., a simpler or improved diet plan, a new counseling program, or other new service benefit)."  (SAC ¶ 5.)  In that way, potential new subscribers would be motivated to join Weight Watchers as part of their New Year's resolutions.  (SAC ¶¶ 51–55, 158–62.)  Plaintiffs allege that program innovations would take between one and two years to develop and launch.  (SAC ¶ 54.)

In 2011, Weight Watchers launched its "PointsPlus" program that overhauled how points were calculated in the system.  (See Decl. of George S. Wang in Supp. of Defs.' Mot. to Dismiss, ECF No. 94 ("Wang Decl."), Ex. A.)[1]  This program revamped how Weight Watchers calculated points to encourage more "nutrient dense foods."  (Wang Decl. Ex. A, at 1.) In 2012, Weight Watchers introduced "WW 360," which allowed for expanded online weight loss tools.  (See Wang Decl. Ex. A.)  For its end of the year update in 2013, Weight Watchers offered a "Simple Start" program that eased new members' entry into the Weight Watchers ecosystem.  (See Wang Decl. Ex. B.)  In 2014, Weight Watchers added a feature for users to chat with experts and coaches.  (See Wang Decl. Ex. C.)  In 2015—much like in 2011—Weight

---

[1]      To support their motion to dismiss, Defendants attached numerous WW securities filings.  As discussed below, this Court will consider these documents.

Watchers changed its point calculation system with its "Beyond the Scale" program that included "SmartPoints." (See Wang Decl. Ex. D.) This program sought to reinvent Weight Watchers' point allocation by "translating complex nutritional information into one simple number," and "nudg[ing] members toward a pattern of eating that includes more lean protein, fruits and vegetables, and less sugar and saturated fat." (Wang Decl. Ex. D, at 1.) In 2016, Weight Watchers offered new subscribers an Apple Watch as an incentive to sign up and track their fitness goals. (See Wang Decl. Ex. E.) In 2017, Weight Watchers launched a "Freestyle" program which allotted zero points to certain foods. (See SAC ¶¶ 56–61, 163–68; Wang Decl. Ex. G.) This innovation was a major overhaul of the Weight Watchers points system and was immensely popular, precipitating a jump in Weight Watchers' earnings and stock price. (SAC ¶¶ 57–59, 61, 164–66, 168.)

III.    WW Changes its Business Model

        In February 2018, Weight Watchers determined to change its core ethos by transitioning from a weight loss program to a wellness program. Weight Watchers even changed its name from Weight Watchers to WW, to focus on wellness. (SAC ¶ 83.) In Grossman's words, WW sought to stress that "[b]eing healthier is not just about weight anymore. It's about overall health and wellness—being your best self." (SAC ¶ 60.) Broadening WW's appeal was key to this new strategy. (See SAC ¶¶ 60, 68–73.)

        Before the paradigm shift, WW subscribers were overwhelmingly comprised of middle-aged, Caucasian women. (SAC ¶ 55.) After the shift, WW sought to reach an array of demographic groups, including younger and more ethnically diverse groups that had historically been under-represented in the WW community. (SAC ¶ 83.) WW planned to achieve this goal in part by partnering with "brand influencers" and celebrities to draw a younger and more

diverse audience.  (See SAC ¶¶ 60, 92–93, 167.)  While engaging in this rebranding effort, WW failed to disclose that it would not implement a major program innovation at the close of 2018. (SAC ¶ 84.)

Initially, this strategy appeared to pay off.  In Q1 2018, overall recruitment numbers were up over the same period in 2017 and a significant percentage of the signups were brand-new to WW.  (See Wang Decl. Ex. P, at 5.)  WW's earnings also rose dramatically compared to Q1 2017.  (See Wang Decl. Ex. P, at 6.)

WW additionally sought to reduce the seasonality in its business model. Typically, people sign up for weight loss programs in the winter, especially around the beginning of the new year with people making New Year's resolutions.  (See SAC ¶¶ 2, 5, 50, 157; Wang Decl. Ex. JJ, at 7.)  But WW wanted to move away from that model for two reasons.  First, it would "inspire people to be healthier all year long," which would advance WW's transition from a weight-loss program to a wellness company.  (Wang Decl. Ex. K, at 10.)  Second, a year-round focus would reduce seasonality in WW's revenues.  (See Wang Decl. Ex. R, at S-7.)

Throughout 2018, WW launched a series of innovations to accomplish their goal of year-round wellness.  This included a line of kitchen tools and products in March, (see Wang Decl. Ex. M), a social impact campaign in May, (see Wang Decl. Ex. X), a "Summer of Impact" campaign to promote year-round health in June, (see Wang Decl. Ex. Y), a member referral program in July, (see Wang Decl. Ex. JJ, at 8–9), a meal-kit program in September, (see Wang Decl. Ex. JJ, at 11), and a membership rewards program in October, (see Wang Decl. Ex. JJ, at 10).

WW also launched a number of program innovations in December 2018.  This included a partnership with Aaptiv to offer curated workouts, a partnership with Headspace to

offer mediation, a social network, "FitPoints" which measured personalized activities, and a partnership with Blue Apron to have meal kits delivered that were automatically tracked in the WW system.  (See Wang Decl. Exs. MM, NN.)  However, Plaintiffs aver that these changes were a significant departure from WW's practice of releasing "meaningful" program innovations at the end of each calendar year.  (SAC ¶¶ 9, 20, 85.)

IV.   WW's Earnings Slide

WW's new strategies did not drive subscriber growth at the end of 2018.  WW was not able to attract as many new subscribers at it had previously touted.  (See SAC ¶ 13.) When reporting the 2018 results, WW lowered its earnings guidance for 2019 to $1.25–$1.50 per share compared with a reported $3.19 earnings per share.  (SAC ¶ 225.)  WW stock dropped precipitously.  It fell 33% from $29.57 at the close on February 26, 2019—before the earnings release—to $19.37 on February 27, 2019.  (See SAC ¶¶ 97, 227.)  Notably, this is a 72% decline from the stock's May 2018 secondary public offering price of $69.  (SAC ¶¶ 97, 227.)  During the earnings call accompanying this announcement, WW's CEO, Grossman, noted that the WW "campaign did not drive recruitment of our significant universe of lapsed members," and that WW's "winter advertising did not drive consumers, particularly our former members to action in the way we had hoped."  (SAC ¶ 89.)

V.   Secondary Public Offerings

During 2018, Artal reduced its WW holdings.  On May 15, 2018, WW conducted a secondary public offering ("SPO") in which the Company announced that Artal was selling 8.625 million of WW shares.  (SAC ¶¶ 183; Wang Decl. Ex. R.)  Through this SPO, Artal reduced its WW holdings from 44% to 33% and received $571,320,000.  (SAC ¶¶ 36, 39, 186; Wang Decl. Ex. R, at 1, S-10.)  A consortium of investment banks underwrote the SPO.  (SAC

¶¶ 33, 36, 66–67; Wang Decl. Ex. R, at S-30.)  The offering materials for the SPO included a registration statement, (SAC ¶ 65; Wang Decl. Ex. S), and prospectus supplement, (SAC ¶ 66; Wang Decl. Ex. R), which incorporated certain of WW's prior annual and quarterly SEC filings by reference.  (See Wang Decl. Ex. R, at S-36, S-37; see also SAC ¶ 82 ("[t]he Offering Materials . . . incorporated the 2017 10-K and the 1Q18 10-Q").)

In August 2018, WW conducted a second SPO of Artal shares.  Through underwriters, Artal disposed of approximately 6 million shares and reaped $456 million, thereby reducing its holdings from 33% to 22%.  (SAC ¶¶ 143, 151, 214.)

Plaintiffs allege that Hotchkin sold 131,466 WW shares, which was approximately 61% of his WW holdings.  (SAC ¶ 215.)  However, this fact is contested by Defendants.  Defendants assert that in August 2018, Hotchkin exercised approximately 130,000 options and netted over $6 million.  (See Wang Decl. Ex. FF.)  Defendants aver that Hotchkin exercised his oldest RSU and PSU options,[2] which did not change the approximately 84,000 WW shares he held.  (See Wang Decl. Ex. V.)  Defendants further argue that if Hotchkin's RSU and PSU options are taken into account, Hotchkin increased his WW position due to his RSU vesting schedule.  (See Wang Decl. Ex. VV, at 75.)

VI.   Procedural History

On March 4, 2019, Plaintiffs filed this putative class action suit alleging Exchange Act violations against Defendants.  (See ECF No. 1.)  On March 21, 2019, a second action asserting substantially similar claims against WW was filed in this District.  (See ECF No. 63, at 1.)  On June 12, 2019, this Court consolidated the actions, appointed City of Omaha Police and

---

[2]      "RSUs" are restricted stock units and "PSUs" are performance stock units.  RSUs vest according to a predetermined schedule, and PSUs vest according to a schedule if certain predetermined performance metrics are met.

Fire Retirement System and the Weight Watchers Investment Group as co-lead plaintiffs, and appointed Scott+Scott Attorneys at Law LLP and Grant & Eisenhofer P.A. as co-lead counsel. (ECF No. 63.)  On July 31, 2019, Plaintiffs filed their Consolidated Amended Class Action Complaint.  (ECF No. 74.)  On September 27, 2019, Plaintiffs amended their complaint to add Securities Act claims relating to WW's secondary stock offering.  (ECF No. 86.)  Plaintiffs specifically allege Defendants violated Sections 11, 12(a)(2), and 15 of the Securities Act, and Sections 10(b) and 20(a) of the Exchange Act.  The putative class period is from May 4, 2018 to February 26, 2019.  (SAC ¶¶ 7, 13.)

Plaintiffs allege that the May 7, 2018 Prospectus and the May 10, 2018 Prospectus Supplement represented that WW sought to grow the company by seeking a more diverse membership base.  (See SAC ¶¶ 68–81.)  However, Plaintiffs allege that these prospectuses were fundamentally misleading because WW failed to disclose that even with their attempt at a broader membership base, WW still relied on recruiting lapsed members. Additionally, Plaintiffs allege that WW failed to disclose that it would no longer follow the "formula" and release a "meaningful" program at the end of 2018.  (See SAC ¶¶ 82–86.)

Plaintiffs allege that Artal saw the end of 2017 stock price as a great opportunity to divest.  Accordingly, Plaintiffs allege this provided motive for WW to conceal the fact that their strategy relied on recruiting lapsed members and that they did not plan to release a major program innovation in 2018.  Plaintiffs contend the truth was revealed on February 26, 2019, when WW announced disappointing 2018 earnings.  (SAC ¶ 13.)

Plaintiffs have withdrawn their Exchange Act claims with regard to the lapsed member allegations.  (Pls.'s Mem. of Law in Opp'n to Def.'s Mot. to Dismiss, ECF No. 95 ("Opp'n"), at 17 n.12.)  However, Plaintiffs still allege that WW's failure to disclose that

8

recruiting lapsed members was critical to their strategy violated Sections 11, 12(a)(2), and 15 of the Securities Act.

## DISCUSSION

I.     Legal Standard

    a.     Motion to Dismiss

On a motion to dismiss, a court accepts all facts alleged in the complaint as true and construes all reasonable inferences in a plaintiff's favor.  ECA, Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co., 553 F.3d 187, 196 (2d Cir. 2009).  Nevertheless, a complaint must "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quotation marks omitted). To survive a motion to dismiss, the court must find the claim rests on factual allegations that "raise a right to relief above the speculative level."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007); see also Iqbal, 556 U.S. at 678 ("The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." (quotation marks omitted)).  "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  Iqbal, 556 U.S. at 679.

Moreover, claims sounding in securities fraud must meet the heightened pleading requirements of Federal Rule of Civil Procedure 9(b).  Kalnit v. Eichler, 264 F.3d 131, 138 (2d Cir. 2001); Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1127–28 (2d Cir. 1994).  "Because Rule 9(b) offers defendants important protections, the Second Circuit applies Rule 9(b)'s heightened standard not only to claims explicitly alleging fraud, but also to claims sounding in fraud, such as where 'the wording and imputations of the complaint are classically associated

with fraud.'"  SEC v. Egan, 994 F. Supp. 2d 558, 564 (S.D.N.Y. 2014) (quoting Rombach v.

Chang, 355 F.3d 164, 172 (2d Cir. 2004)).  The PSLRA adds to these requirements, mandating

that "the complaint . . . specify each statement alleged to have been misleading, the reason or

reasons why the statement is misleading, and, if an allegation regarding the statement or

omission is made on information and belief, [that] the complaint . . . state with particularity all

facts on which that belief is formed."  15 U.S.C. § 78u-4(b)(1).

Accordingly, in addition to providing a facially plausible claim to relief, Plaintiffs

"must state with particularity the circumstances constituting fraud or mistake."  Fed. R. Civ. P.

9(b).  Although "[m]alice, intent, knowledge, and other conditions of a person's mind may be

alleged generally," Fed. R. Civ. P. 9(b), the relaxation of the particularity requirement for

conditions of mind must not be mistaken for a "license to base claims of fraud on speculation

and conclusory allegations," Acito v. IMCERA Grp., Inc., 47 F.3d 47, 52 (2d Cir. 1995)

(quotation marks omitted).  Plaintiffs must "allege facts that give rise to a strong inference of

fraudulent intent."  Chill v. Gen. Electric Co., 101 F.3d 263, 267 (2d Cir. 1996) (emphasis

omitted) (quoting Acito, 47 F.3d at 52).

   b.   Section 10(b) of the Exchange Act

To assert a claim under Section 10(b) of the Exchange Act, a "plaintiff must

prove (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a

connection between the misrepresentation or omission and the purchase or sale of a security; (4)

reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation."

Amgen Inc. v. Conn. Ret. Plans & Tr. Funds, 568 U.S. 455, 460–61 (2013) (quotation marks

omitted); see also San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos.,

75 F.3d 801, 808 (2d Cir. 1996) ("To state a cause of action under section 10(b) and Rule 10b-5,

a plaintiff must plead that the defendant made a false statement or omitted a material fact, with scienter, and that plaintiff's reliance on defendant's action caused plaintiff's injury."). Fraud claims are subject to two heightened pleading standards: they must satisfy both Rule 9(b) and the PSLRA's pleading requirements. See ATSI Commc's, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 99 (2d Cir. 2007). Under Rule 9(b), "the circumstances constituting fraud . . . shall be stated with particularity." Fed. R. Civ. P. 9(b). This requires a securities-fraud plaintiff to "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." Novak v. Kasaks, 216 F.3d 300, 306 (2d Cir. 2000). When pleading scienter under the PSLRA, "the complaint shall, with respect to each act or omission alleged to violate [§ 10(b)], state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). "The plaintiff may satisfy this requirement by alleging facts (1) showing that the defendants both had motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness." ATSI Commc's, 493 F.3d at 99.

c.   Section 20(a) of the Exchange Act

To plead a control person claim under Section 20(a) of the Exchange Act, "a plaintiff must show (1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." ATSI Commc'ns, 493 F.3d at 108.

d.   Section 11 of the Securities Act

"Section 11 of the Securities Act imposes liability on issuers and other signatories of a registration statement that, upon becoming effective, 'contain[s] an untrue statement of a

material fact or omit[s] to state a material fact required to be stated therein or necessary to make the statements therein not misleading.'" Litwin v. Blackstone Grp., L.P., 634 F.3d 706, 715 (2d Cir. 2011) (alterations in original) (quoting 15 U.S.C. § 77k(a)); accord In re Fuwei Films Sec. Litig., 634 F. Supp. 2d 419, 434 (S.D.N.Y. 2009).  To establish a prima facie claim under Section 11, "the plaintiff must allege that: (1) she purchased a registered security, either directly from the issuer or in the aftermarket following the offering; (2) the defendant participated in the offering in a manner sufficient to give rise to liability under section 11; and (3) the registration statement 'contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading.'" In re Morgan Stanley Info. Fund Sec. Litig., 592 F.3d 347, 358–59 (2d Cir. 2010) (quoting 15 U.S.C. § 77k(a)).  The Second Circuit in Rombach held that "while a plaintiff need allege no more than negligence to proceed under Section 11 . . . , claims that do rely upon averments of fraud are subject to the test of Rule 9(b)." 355 F.3d at 171.  Where the complaint does not allege that the defendants "affirmatively knew [of the omitted fact] and chose to conceal it" and asserts only that such information was available to the defendants, Rule 8 applies.  McKenna v. SMART Techs. Inc., 2012 WL 3589655 at *4 (S.D.N.Y. Aug. 21, 2012); see also In re Morgan Stanley Info. Fund, 592 F.3d at 358 ("However, if the pleading does not sound in fraud, then Rule 8(a) governs."); In re TVIX Sec. Litig., 25 F. Supp. 3d 444, 449 (S.D.N.Y. 2014) ("Where, as here, Section 11 claims sound in negligence rather than in fraud, Plaintiff's pleading must satisfy the basic requirements of Rule 8(a)(2) of the Federal Rules of Civil Procedure, rather than the heightened standard set by Rule 9(b).").

Moreover, "[w]hen analyzing offering materials for compliance with the securities laws, we review the documents holistically and in their entirety." In re Morgan

Stanley Info. Fund, 592 F.3d at 366; see also Stadnick v. Vivint Solar, Inc., 2015 WL 8492757, at *11 (S.D.N.Y. Dec. 10, 2015) (when "considering whether alleged misrepresentations and/or omissions constitute violations of the securities laws, a court must read the offering documents as a whole" (citing Olkey v. Hyperion 1999 Term Trust, Inc., 98 F.3d 2, 5 (2d Cir. 1996))), aff'd, 861 F.3d 31 (2d Cir. 2017).  The "central issue" a court considers in assessing sibling Securities Act claims "is not whether the particular statements, taken separately, were literally true, but whether defendants' representations, taken together and in context, would have misled a reasonable investor about the nature of the securities."  Olkey, 98 F.3d at 5 (quotation marks and alterations omitted).  Where "the risks of which plaintiffs complained were disclosed in the prospectus"—i.e., where a "reasonable investor" was informed "about the nature of the securities"—dismissal of the claims under Rule 12(b)(6) is appropriate.  Steinberg v. PRT Grp., Inc., 88 F. Supp. 2d 294, 300 (S.D.N.Y. 2000) (alterations omitted) (citing Olkey, 98 F.3d at 9); see also Stadnick, 2015 WL 8492757, at *11.  If the complaint's allegations "conflict with the plain language of the publicly filed disclosure documents, the disclosure documents control, and the court need not accept the allegations as true."  Sedighim v. Donaldson, Lufkin & Jenrette, Inc., 167 F. Supp. 2d 639, 646–47 (S.D.N.Y. 2001); see also Kleinman v. Elan Corp., PLC, 706 F.3d 145, 153 (2d Cir. 2013) (finding no actionable misstatement given language in disclosure document).  "While the objective of a prospectus is to solicit investment by the general public and the intended audience . . . encompasse[s] both sophisticated financial analysts and untutored lay persons, the prospectuses are not required to address [reasonable investors] as if they were children in kindergarten."  In re ProShares Tr. Sec. Litig., 728 F.3d 96, 102 (2d Cir. 2013) (alterations in original) (quotation marks and citation omitted).

e.   Section 12(a)(2) of the Securities Act

To state a claim under Section 12(a)(2), the plaintiff must allege: "(1) the defendant is a 'statutory seller'; (2) the sale was effectuated 'by means of a prospectus or oral communication'; and (3) the prospectus or oral communication 'include[d] an untrue statement of a material fact or omit[ted] to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading.'"  In re Morgan Stanley Info Fund, 592 F.3d at 359 (quoting 15 U.S.C. § 77l(a)(2) (alterations in original)).

Section 12(a)(2) only imposes liability on certain "statutory sellers."  "An individual is a 'statutory seller' . . . if he: (1) 'passed title, or other interest in the security, to the buyer for value,' or (2) 'successfully solicit[ed] the purchase [of a security], motivated at least in part by a desire to serve his own financial interests or those of the securities['] owner.'"  In re Morgan Stanley, 592 F.3d at 359 (alterations in original) (quoting Pinter v. Dahl, 486 U.S. 622, 642, 647 (1988)).  "Congress did not intend that the section impose liability on participants' collateral to the offer or sale" or even those whose conduct constituted "substantial participation in the sales transaction."  Pinter, 486 U.S. at 650–51.  A pleading must allege that a defendant did more than merely sign a registration statement or prospectus to allege liability under Section 12(a)(2).  See Citiline Holdings, Inc. v. iStar Fin. Inc., 701 F. Supp. 2d 506, 512 (S.D.N.Y. 2010) (noting that every Court of Appeals to consider the issue has concluded that "an individual's signing a registration statement does not itself suffice as solicitation under Section 12(a)(2)").  And "Section 12 liability cannot be imposed upon 'those who merely assist in another's solicitation efforts.'"  Shain v. Duff & Phelps Credit Rating Co., 915 F. Supp. 575, 581 (S.D.N.Y. 1996) (quoting Pinter, 486 U.S. at 651 n.27).

14

f.   Section 15 of the Securities Act

To plead a control person claim under Section 15 of the Securities Act, "plaintiffs must allege: (i) an underlying primary violation of the securities laws by the controlled person; (ii) control over the controlled person; and (iii) particularized facts as to the controlling person's culpable participation in the violation of the controlled person." DeMaria v. Andersen, 153 F. Supp. 2d 300, 314 (S.D.N.Y. 2001), aff'd, 318 F.3d 170 (2d Cir. 2003).

II.   Documents Incorporated by Reference

Defendants append a raft of SEC filings to their opposition.  Plaintiffs urge this Court to ignore these documents at the motion to dismiss stage.  However, this Court may rely on documents the "plaintiff has actual notice of . . . and relied upon . . . in framing the complaint."  Cortec Indus., Inc. v. Sum Holding L.P., 949 F.2d 42, 48 (2d Cir. 1991).

The Court may also "take judicial notice of public disclosure documents that must be filed with the Securities and Exchange Commission ('SEC') and documents that both 'bear on the adequacy' of SEC disclosures and are 'public disclosure documents required by law.'" Silsby v. Icahn, 17 F. Supp. 3d 348, 354 (S.D.N.Y. 2014) (quoting Kramer v. Time Warner, Inc., 937 F.2d 767, 773–74 (2d Cir. 1991)); see also ATSI Commc'ns, 493 F.3d at 98 (The Court "may consider any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit."); In re Bank of Am. AIG Disclosure Sec. Litig., 980 F. Supp. 2d 564, 570 (S.D.N.Y. 2013) (same), aff'd, 566 F. App'x 93 (2d Cir. 2014).

These SEC filings may be considered for the fact that they contained certain information and that their contents were publicly disclosed, but not for the truth of their contents.

See Staehr v. Hartford Fin. Servs. Grp., Inc., 547 F.3d 406, 425 (2d Cir. 2008); Roth, 489 F.3d at 509; see also Kramer, 937 F.2d at 774 (explaining that (1) "no serious question as to their authenticity can exist;" (2) the documents "are relevant not to prove the truth of their contents but only to determine what the documents stated;" (3) "a plaintiff whose complaint alleges that such documents are legally deficient can hardly show prejudice resulting from a court's studying of the documents;" and (4) a court "may take judicial notice of the contents of [these documents] as facts capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned" (quotation marks omitted)).

The documents that Defendants appended to their motion are all SEC filings. Moreover, many of the documents Defendants seek to introduce are directly referenced in the SAC.[3]  Accordingly, this Court may consider these documents.

III.    Confidential Witnesses

Plaintiffs rely on confidential witnesses ("CWs") to buttress their allegations. (See, e.g., SAC ¶¶ 19–25, 53–55, 68, 161–62, 187.)  WW implores this Court to ignore these allegations.  However—at the pleading stage—this Court sees little reason to do so.

To demonstrate the purported falsity of the challenged statements—as well as Defendants' fraudulent intent—Plaintiffs offer reports from five CWs.  Where a plaintiff relies on allegations from confidential witnesses, those sources must be "described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged."  Novak v. Kasaks, 216 F.3d 300, 314 (2d Cir. 2000).  Courts "will credit confidential source allegations, generally, in two situations."  Glaser

---

[3]      For example, the SPO registration statement that Defendants offer as Wang Decl. Ex. R is referenced repeatedly in the SAC.  (See, e.g., SAC ¶¶ 65, 139, 149, 183–184.)  And the 2018 Q3 earnings call transcript that Defendants offer as Wang Decl. Ex. JJ is also frequently discussed in the SAC.  (See, e.g., SAC ¶¶ 12, 218.)

v. The9, Ltd., 772 F. Supp. 2d 573, 590 (S.D.N.Y. 2011).  First, "when independent [adequately pled] factual allegations corroborate a confidential source's statements, the requirement of a description of the source's job is loosened."  Glaser, 772 F. Supp. 2d at 590 (quotation marks omitted).  Second, "in the absence of such well-pled corroborative facts, courts will credit confidential sources whose positions and/or job responsibilities are described sufficiently to indicate a high likelihood that they actually knew facts underlying their allegations."  Long Miao v. Fanhua, Inc., 442 F. Supp. 3d 774, 798 (S.D.N.Y. 2020) (quotation marks omitted).  While Plaintiffs do not offer independently corroborated facts—as described below—the CWs' prior positions indicate that they were likely aware of the facts alleged.

Plaintiffs offer statements from five former WW employees who worked at the company during the purported class period.  (See SAC ¶¶ 19–24.)  CW1 is a former WW executive who was involved with WW's program innovations.  (SAC ¶ 20.)  CW2 was an account executive.  (SAC ¶ 21.)  CW3 was a manager in the northeast focusing on tracking new subscribers and subscriber retention.  (SAC ¶ 22.)  CW4 was a product designer at WW focusing on program innovations.  (SAC ¶ 23.)  CW5 was the director of marketing for a division of WW.  (SAC ¶ 24.)  The CWs detail allegations consistent with their respective roles.  CW1, CW2, and CW3 describe WW's plans to abandon recruitment of lapsed members.  (See SAC ¶¶ 53, 55.)  CW1, CW2, CW4, and CW5 provide factual assertions regarding WW's alleged plan to abandon its end of the year program innovation model.  (See SAC ¶¶ 50–55.)  Given the CWs' respective positions, it is logical that they would have direct knowledge on these matters.

Here, Plaintiffs have "pled with particularity the knowledgeable positions occupied by each of the CWs, . . . many of whom had first-hand interactions with the Defendants concerning the matters alleged in the Complaint."  Freudenberg v. E*Trade Fin. Corp., 712 F.

Supp. 2d 171, 196 (S.D.N.Y. 2010).  These CWs were not low-level employees who would have

been unaware of WW's strategy with respect to lapsed members and program innovations.  See

In re Lehman Bros. Sec. & Erisa Litig., 2013 WL 3989066, at *4 (S.D.N.Y. July 31, 2013)

(rejecting CWs who "were loan level underwriters, not managers or corporate officers who could

have spoken to the company's practices broadly"); Local No. 38 Int'l Bhd. of Elec. Workers

Pension Fund v. Am. Express Co., 724 F. Supp. 2d 447, 460 (S.D.N.Y. 2010) (discounting

allegations of "low-level," "rank-and-file employees or outside contractors" who did not have

"contact with the [defendants]" or "access to aggregated data regarding credit risk"), aff'd, 430

F. App'x 63 (2d Cir. 2011).  Accordingly, this Court will consider the CWs' statements.

IV.    Falsity

        For Securities Act and Exchange Act claims, Plaintiffs must plead a "material

misrepresentation or omission by the defendant."  Amgen, 568 U.S. at 460; accord In re Fuwei

Films, 634 F. Supp. 2d at 434.  Statements of fact may be actionable if (1) they are false; or (2) if

they are literally true but misleading "through their context and manner of presentation."

Kleinman, 706 F.3d at 153; accord Gagnon v. Alkermes PLC, 368 F. Supp. 3d 750, 765

(S.D.N.Y. 2019); In re Lululemon Sec. Litig., 14 F. Supp. 3d 553, 571 (S.D.N.Y. 2014), aff'd,

604 F. App'x 62 (2d Cir. 2015) ("With respect to misstatements, there are two components to

this requirement: the statement must be false, and the statement must be material.").

        A violation of securities laws premised on misstatements cannot occur unless an

alleged material misstatement was false at the time it was made.  See San Leandro Emergency

Med. Grp. Profit Sharing Plan v. Philip Morris Cos., Inc., 75 F.3d 801, 812–13 (2d Cir. 1996)

(explaining that "plaintiffs have not alleged circumstances to show that the defendants lacked a

reasonable basis for their optimistic, but qualified, predictions as to the company's future

18

performance"). "Put another way, without contemporaneous falsity, there can be no fraud." In re Lululemon, 14 F. Supp. 3d at 571. "Falsity is a failure to be truthful—it is not a misapprehension, misunderstanding, or mistake of fact at the time a statement was made." C.D.T.S. No. 1 & A.T.U. Local 1321 Pension Plan v. UBS AG, 2013 WL 6576031, at *3 (S.D.N.Y. Dec. 13, 2013) (citing San Leandro, 75 F.3d at 813). To show actionable falsity, "plaintiffs must do more than say that the statements . . . were false and misleading; they must demonstrate with specificity why and how that is so." Rombach, 355 F.3d at 174; accord Kleinman, 706 F.3d at 152–53.

Moreover, claims for corporate mismanagement are not actionable under securities laws. See Santa Fe Indus., Inc. v. Green, 430 U.S. 462, 479 (1977) ("Congress by § 10(b) did not seek to regulate transactions which constitute no more than internal corporate mismanagement." (quotation marks omitted)). Plaintiffs' "fundamental disagreements with Defendants' business judgments . . . are not actionable under Section 10(b) and Rule 10b-5." Plumbers & Steamfitters Local 773 Pension Fund v. Canadian Imperial Bank of Commerce, 694 F. Supp. 2d 287, 303 (S.D.N.Y. 2010); see also In re Lululemon, 14 F. Supp. 3d at 562 ("This narrative requires the Court to stretch allegations of, at most, corporate mismanagement into actionable federal securities fraud. This is not the law." (citing Santa Fe Indus., 430 U.S. at 477–79)). Section 10(b) "prohibit[s] the full range of ingenious devices that might be used to manipulate securities prices," but it does not reach mere "instances of corporate mismanagement." Santa Fe, 430 U.S. at 477.

While much of the case law focuses on falsity at the time of the statement, see, e.g., In re Magnum Hunter Res. Corp. Sec. Litig., 26 F. Supp. 3d 278, 290–91 (S.D.N.Y. 2014), aff'd, 616 F. App'x 442 (2d Cir. 2015), WW argues that the statements were never false.

a.  Lapsed Members

To sustain their lapsed-member Securities Act claims, Plaintiffs allege that the offering documents—and WW's other public filings incorporated by reference into those offering documents—failed to clarify that WW still depended heavily on recruiting lapsed members.

i.  Challenged Statements

Plaintiffs allege that the May 7, 2018 registration statement, (Wang Decl. Ex. S), and the May 10, 2018 prospectus supplement, (Wang Decl. Ex. R), set forth WW's initiative to recruit new, diverse members.  Specifically, these offering documents stated:

- WW sought to "increase recruitment of new subscribers [by] expand[ing] [its] member base through a growing influencer community, effective marketing, and agile, brand-led innovations."  (SAC ¶ 71.)

- "[WW's] strong, widely-recognized and trusted brand allows [it] to more efficiently acquire new members and broaden our appeal to new audiences."  (SAC ¶¶ 74, 78.)

- WW's goal to "[c]ontinue to Broaden and Diversify our Influencer Network to Attract Members."  (SAC ¶ 75.)

- "[WW] [is] continually expanding [its] scope of influencers to include a diverse range of individuals, from celebrities to member ambassadors, to promote our brand and expand its appeal to a broader group of people across ethnicities, geographies, age, lifestage and gender."  (SAC ¶ 75.)

- "[WW] seek[s] to expand and strengthen [its] communities and diversify our reach across ethnicities, geographies, age, lifestage and gender through [its] strategic relationships with influencers."  (SAC ¶ 76.)

- "[WW] partnered with several key celebrities and influencers to begin diversifying [its] global reach across ethnicity, geography and gender, including most notably [its] strategic partnership with Oprah Winfrey." (SAC ¶ 77.)

But Plaintiffs allege that WW failed to disclose a crucial caveat: that WW was still highly dependent on recruiting lapsed members.  Relying on CWs, Plaintiffs aver that WW and its executives knew that the business model—despite its new direction—was dependent on Caucasian women who previously subscribed to the program.  (See SAC ¶¶ 80, 92, 93.)

        ii.    WW's Prior Disclosures

Plaintiffs ignore WW's disclosures.  WW sought to expand its membership base to a more diverse group, thereby reducing its reliance on lapsed members and middle-aged Caucasian women.  But WW did not say that they were abandoning their base—just expanding it.

At the beginning of 2018, WW announced that it sought to broaden its user base and incorporate a "broad cross-section of diversity: age, gender, race, ethnicity, geography and life stage."  (Wang Decl. Ex. K, at 14.)  WW wanted to "appeal[] to a broader audience who may not have considered Weight Watchers as a program for them in the past."  (Wang Decl. Ex. P, at 6.)  To reach that goal, WW began shifting its marketing away from purely targeting middle-aged Caucasian women.  But this is distinct from abandoning these past subscribers.  Rather, WW sought to supplement the return of lapsed subscribers with new members drawn from a more diverse pool.

Despite the change in its business model, WW continued to emphasize that it sought to advertise to both "new and returning customers."  (Wang Decl. Ex. L, at 8.)  WW reiterated that it sought to recruit both new and lapsed members through "[t]he word of mouth generated by our current and former customers" and its "strong brand and known effectiveness." (Wang Decl. Ex. L, at 8.)  As WW pursued this new strategy, it continued to inform investors of its revised business model and why WW believed the new direction would lead to success.  In

the offering documents themselves, WW touted its ability to "attract new and returning customers efficiently." (Wang Decl. Ex. R, at S-4.)

Indeed, even in the February 26, 2019 earnings call, which Plaintiffs allege is the corrective disclosure, the strategy and messaging appear linear and not a revelation of the truth. On that call, Grossman stated that while the "winter advertising did not drive consumers, particularly our former members, to action in the way we had hoped," it "was very geared to both attracting new members as well as lapsed members." (Wang Decl. Ex. QQ, at 6, 13.) While WW focused on attracting new and lapsed members, its efforts did not bear fruit. But this is more of a complaint about strategy than about the adequacy of disclosures. In WW's prospectus supplement, it emphasized its ability to "attract new and returning customers efficiently" and noted that "a significant percentage [of its members] have repeatedly resubscribed to the program." (Wang Decl. Ex. R, at S-4.) As such, the offering documents, when read as a whole, clearly demonstrate that WW sought to attract both new subscribers as well as lapsed members. See Sedighim, 167 F. Supp. 2d at 647–50.

Indeed, this case is similar to Nguyen v. MaxPoint Interactive, Inc., 234 F. Supp. 3d 540 (S.D.N.Y. 2017). There, to support Section 11 claims, plaintiffs alleged that defendant failed to disclose the extent of the defendant's reliance on a small number of customers in its registration statement. Nguyen, 234 F. Supp. 3d at 547. But the registration statement "disclose[d], in two places . . . that it ha[d] historically relied, [and] an expect[ed] to continue to rely, on a small number of customers for a substantial majority of our revenue, and the loss of any of these customers may significantly harm our business, results of operations and financial conditions." Nguyen, 234 F. Supp. 3d at 547 (quotation marks omitted). The court dismissed the claims because the defendant "disclosed that it was substantially reliant on a small number of

customers and more specifically that its top 25 customers accounted for nearly 50 percent of its revenue in the several years prior to the IPO." Nguyen, 234 F. Supp. 3d at 547. Here too, the offering documents themselves explicitly state that WW's strategy is to attract "new and returning customers." (Wang Decl. Ex. R, at S-4.)

> To bolster their argument that WW disclosed its reliance on lapsed members, Defendants also point to repeated statements where WW disclosed the percentage of subscribers who had previously subscribed. (See Wang Decl. Ex. P, at 6 ("Looking at the U.S. as an example, approximately 40% of our member signups in Q1 were new to Weight Watchers."); Wang Decl. Ex. T, at 6 ("Typically, 2/3 of the people in our program have done Weight Watchers before, 1/3 of the people are new to the brand.").) If Defendants were relying solely on these past membership metrics, such disclosure would likely be insufficient. Standing alone, it is difficult to view these statements as disclosing the risk about which Plaintiffs complain: that WW was still reliant on past subscribers. This demonstrates that WW was reliant on past subscribers, not that it will continue to be reliant on them. However, Defendants do not rely on these specific statements alone.

> At bottom, Plaintiffs' claims have little bearing on disclosure. Plaintiffs' opposition brief undermines their position and reveals that their claims are fundamentally about corporate mismanagement. They argue that "[b]ecause of the importance of middle-aged Caucasian women to WW, a marketing shift away from this demographic would risk WW's ability to sign up its lapsed members and grow its subscriber base." (Opp'n, at 1.) That is a complaint about strategy, not disclosures as required by securities laws. The fact that WW was not successful does not give rise to securities violations. See Acito, 47 F.3d at 53 ("[A] lack of clairvoyance simply does not constitute securities fraud."). Accordingly, Plaintiffs fail to plead a

false or misleading statement for their lapsed members claims.

      b.   <u>Program Innovations</u>

      Plaintiffs also contend that WW materially misled investors by failing to disclose that they would no longer be launching a "meaningful" program innovation at the end of the year.  However, Plaintiffs ignore WW's numerous disclosures that WW intended to do just that.

      i.   <u>Challenged Statements</u>

      Plaintiffs allege that while WW disclosed that it was engaging in a "significant rebranding initiative," it failed to disclose that this "did not involve the development of a program innovation to be launched in the fourth quarter of 2018, which had historically been critical to the Company's success in increasing subscriber recruitment (including lapsed member recruitment) in the all-important December–March period."  (SAC ¶ 84.)

      Plaintiff's CWs allege that by early 2018 WW had abandoned its plan to launch a "meaningful" year-end program innovation without telling investors.  (SAC ¶ 85.)  Because these programs normally took over a year to develop, Plaintiffs assert that WW and its executives were aware of this paradigm shift long in advance of the end of 2018.

      Plaintiffs allege that WW continued to mislead investors with its 10-Qs for the second and third quarters of 2018 by optimistically predicting increases in subscribers and revenue without disclosing that WW no longer intended to launch year-end program innovations.  (SAC ¶¶ 206–213, 218–224.)  Plaintiffs further argue that the SPO offering documents did not disclose that WW had abandoned the "formula" and would not release a "meaningful" program innovation in 2018.

      Plaintiffs contend that "meaningful" program innovations require one to two years of planning to launch.  Therefore, Defendants already knew prior to the start of 2018 that there

would be no "meaningful" year-end program innovation and failed to disclose that fact to investors.

          ii.    <u>WW's Prior Disclosures</u>

Plaintiffs' argument ignores the fact that WW was deliberately shifting away from this business model and repeatedly disclosed its intent to do so.  WW announced this change in its business model at the beginning of 2018.  WW sought to end its practice of launching programs in December and relying on large winter subscriptions.  WW saw two issues with its prior business model.  First, WW was transitioning from "weight" focused to "wellness" focused branding.  This entailed year-round wellness and not New Year's resolution diets which are typically abandoned by February.  WW announced a "bold" "strategic vision" to make wellness "accessible to all" by becoming a leading healthy living and wellness brand and year-long partner to its members, rather than exclusively a weight-loss program.  (Wang Decl. Ex. I.) Launching large scale innovations at the end of the year would be at odds with this new message. Second, the prior strategy produced seasonality in WW's earnings.  Since WW primarily derives revenues from membership fees, their old strategy resulted in significant upticks in revenue in Q1 of each fiscal year, with leaner quarters throughout.  (<u>See</u> Wang Decl. Ex. QQ.)  In an effort to stabilize earnings throughout the year and produce consistent, sustainable growth, WW wanted to attract new members year-round.

WW repeatedly disclosed its new strategy to reduce seasonality.  For example, during the May 17, 2018 earnings call, Hotchkin specifically noted that they were attempting to get away from a seasonal business model:

> Our business does follow a predictable seasonality.  40% of the people who join us do so in the first quarter.  But frankly, historically, that's where we've focused our marketing spend and <u>not a very efficient marketing model</u>, though in Q1, the ratio of

> subscriber value to cost per acquisition was 5x, the highest it's been in years and we're leveraging that expertise and marketing efficiency into this Summer of Impact campaign. <u>People want to be healthy year around, not just with the New Year's resolution</u>. And so we're taking the opportunity to be much more visible in the Summer, both in our marketing and in our other channels to celebrate food, family and fun and be much more visible globally this summer as we continue to build our brand and our momentum.

(Wang Decl. Ex. T, at 6 (emphasis added).)

> During the February 7, 2018 earnings call, Grossman commented that:

> Now we also know that the first quarter, as we've seen, is a great time to engage people in getting healthier in the new year, but <u>people want to get healthy all year around</u>. <u>So we're announcing a summer of impact, a global campaign launching in May</u>, which will celebrate Freestyle, Flex, Liberté, Your Way, <u>showing how we can be a powerful partner for health in people's lives all year long</u>. And it's going to be around food, family, fun and healthy.

(Wang Decl. Ex. J, at 18 (emphasis added).)  WW shifted away from the previous "formula" by rolling out program innovations throughout 2018.  For example, WW deployed their "Summer of Impact" program.  (See Wang Decl. Ex. Y.)  The name of this program put investors on notice that WW was no longer limiting itself to December program innovations.  In the May 3, 2018 earnings call, Grossman noted "[members] want to get healthy year-round, not just in January."  (Wang Decl. Ex. P, at 9.)  Grossman further emphasized that this was a change in strategy as "[h]istorically, [WW] [had] had little to no marketing presence during the summer months."  (Wang Decl. Ex. P, at 9.)  Additionally, WW launched a variety of program innovations, beginning in March 2018.  These included a new line of kitchen tools and products in March, (see Wang Decl. Ex. M); a social impact campaign in May, (see Wang Decl. Ex. X); a "Summer of Impact" campaign in June, (Wang Decl. Ex. Y); the "Invite a Friend" program in July, (see Wang Decl. Ex. JJ, at 8–9); a partnership with FreshRealm to create WW-branded quick-prep fresh meal kits in September, (see Wang Decl. Ex. JJ, at 11); and the launch of a membership

rewards program in October, (see Wang Decl. Ex. JJ, at 10). WW's disclosure of its intention to release program innovations throughout the year rather than in December—coupled with WW's actual release of year-round program innovations—adequately placed shareholders on notice of the company's plans.

The offering documents themselves discussed WW's changing business model. "We now innovate throughout the year, which helps reduce the seasonality of our business and increases excitement around our brand." (Wang Decl. Ex. R, at S-7.) Indeed, had WW done what Plaintiffs argue they should have—only release innovations at the end of each year— Plaintiffs would likely have actionable claims. Then, WW would have announced a change in its core business operations and failed to follow through. "Against this backdrop, the challenged statements cannot be said to be untrue or materially misleading." Gagnon, 368 F. Supp. 3d at 767.

Plaintiffs also offer statements by CWs to bolster their claims. But the CWs' statements are not compelling when viewed through the lens of WW's multiple disclosures. Allegations "primarily based on the CWs' subjective views of how the Company should have managed such challenges, are not sufficient to demonstrate that any of the statements were inaccurate at the time they were made, or that any Defendant believed them to be so." In re Adient plc Sec. Litig., 2020 WL 1644018, at *15 (S.D.N.Y. Apr. 2, 2020); see also Long Miao, 442 F. Supp. 3d at 803 (rejecting CWs' statements because plaintiffs did not offer any "independent well-pled factual allegations that corroborate the confidential sources' statements" (quotation marks omitted)).

As such, Plaintiffs also fail to plead falsity for their program innovation claims.

c. Plaintiffs' Secondary Liability Claims

In light of the dismissal of the Section 11 and Section 10(b) claims against all Defendants, Plaintiffs' Sections 15 and 20(a) claims, which rely on the same underlying factual allegations, are also dismissed.  See Scott v. Gen. Motors Co., 46 F. Supp. 3d 387, 398 (S.D.N.Y. 2014), aff'd, 605 F. App'x 52 (2d Cir. 2015) (imposing control person liability under Section 15 requires an underlying Section 11 or Section 12 violation by the controlled person).  The same holds true for Plaintiffs' Section 20(a) control person claims because Plaintiffs failed to plead a primary violation.  ATSI Commc's, 493 F.3d at 108.

V.      Protected Forward-Looking Statements

As discussed above, Plaintiffs fail to plead actionable misstatements or omissions. While that alone is sufficient to resolve WW's motion, this Court addresses WW's remaining arguments for the sake of completeness.  See In re Skechers USA, Inc. Sec. Litig., 444 F. Supp. 3d 498, 523 (S.D.N.Y. 2020).

Defendants argue that their statements are protected by the PSLRA's safe harbor because they are forward looking and accompanied by meaningful cautionary language.[4]  Under the PSLRA's safe harbor, a defendant "shall not be liable with respect to any forward-looking statement" if (1) the forward-looking statement is "identified" as such and "accompanied by meaningful cautionary statements," or (2) the forward-looking statement is "immaterial," or (3) the plaintiff "fails to prove that the forward-looking statement . . . if made by a natural person, was made with actual knowledge by that person that the statement was false or misleading."  15 U.S.C. § 78u-5(c)(1)(A)–(B).  "Because the statute is written in the disjunctive, statements are

---

[4]      While the PSLRA safe harbor does not protect material omissions, see, In re Salix Pharm., Ltd., 2016 WL 1629341, at *9 (S.D.N.Y. Apr. 22, 2016) (citing City of Providence v. Aeropostale, Inc., 2013 WL 1197755, at *12 (S.D.N.Y. Mar. 25, 2013); In re Complete Mgmt. Inc. Sec. Litig., 153 F. Supp. 2d 314, 340 (S.D.N.Y. 2001)), Plaintiffs assert that this action is both a misstatement and omission case, (Sept. 20, 2019 Tr., at 10:3–11).

protected by the safe harbor if they satisfy any one of these three categories." Lopez, 173 F.

Supp. 3d at 25 (citing Slayton v. Am. Exp. Co., 604 F.3d 758, 766 (2d Cir. 2010)); see also In re

WEBMD Health Corp. Sec. Litig., 2013 WL 64511, at *7 (S.D.N.Y. Jan. 2, 2013) ("As the

Second Circuit has noted, the safe harbor is written in the disjunctive, meaning that a defendant

is not liable if any of these provisions apply.") (citing Slayton, 604 F.3d at 766).  Under the

bespeaks caution doctrine, "alleged misrepresentations in a stock offering are immaterial as a

matter of law [if] it cannot be said that any reasonable investor could consider them important in

light of adequate cautionary language set out in the same offering."  Halperin v. eBanker

USA.com, Inc., 295 F.3d 352, 357 (2d Cir. 2002).

   To fall within the "meaningful cautionary statements" prong of the safe harbor,

the cautionary language "must convey substantive information about factors that realistically

could cause results to differ materially from those projected in the forward-looking statement."

Slayton, 604 F.3d at 771.  In other words, "defendants must demonstrate that their cautionary

language was not boilerplate and conveyed substantive information."  Slayton, 604 F.3d at 772;

see also In re Salix, 2016 WL 1629341, at *11 ("Vague disclosures of general risks will not

protect defendants from liability." (quotation marks omitted)); Lopez, 173 F. Supp. 3d at 25

("Plaintiffs may establish that cautionary language is not meaningful 'by showing, for example,

that the cautionary language did not expressly warn of or did not directly relate to the risk that

brought about plaintiffs' loss.'") (quoting Halperin, 295 F.3d at 359).

   The PSLRA safe harbor also "specifies an 'actual knowledge' standard for

forward-looking statements," which means that "the scienter requirement for forward-looking

statements is stricter than for statements of current fact.  Whereas liability for the latter requires a

showing of either knowing falsity or recklessness, liability for the former attaches only upon

proof of knowing falsity." Slayton, 604 F.3d at 773 (quoting Institutional Inv'rs Grp. v. Avaya, Inc., 564 F.3d 242, 274 (3d Cir. 2009)).  For a forward-looking statement to be actionable, the plaintiff must show that the statement was "made with actual knowledge of [its] falsity by the speaker." In re Salix, 2016 WL 1629341, at *9 (citing 15 U.S.C. § 78u-5(c)(1)(B)(i)–(ii)); see also In re WEBMD, 2013 WL 64511, at *7 ("In evaluating forward-looking statements (as opposed to statements of current fact), a[n] inference of mere recklessness is not enough.").

The Second Circuit has held that "'[a] statement may contain some elements that look forward and others that do not,'" and that "'forward-looking elements' may be 'severable' from 'non-forward looking' elements." See In re Vivendi, 838 F.3d at 246 (quoting Iowa Pub. Employees' Ret. Sys. v. MF Glob., Ltd., 620 F.3d 137, 144 (2d Cir. 2010).  "However, when the present-tense portion of mixed present and future statements does not provide specific information about the current situation, but merely says that, whatever the present situation is, it makes the future projection attainable, the present-tense portion of the statement is too vague to be actionable apart from the future projection." In re Supercom Inc. Sec. Litig., 2018 WL 4926442, at *21 (S.D.N.Y. Oct. 10, 2018) (quotation marks omitted).

Many of the challenged statements are forward looking.  When WW discussed its goal to "increase recruitment of new subscribers [by] expand[ing] [its] member base through a growing influencer community, effective marketing, and agile, brand-led innovations," (SAC ¶ 71), WW is outlining its future plans.  That is necessarily a forward-looking statement.  WW stated that "[it] partnered with several key celebrities and influencers to begin diversifying our global reach across ethnicity, geography and gender, including most notably our strategic partnership with Oprah Winfrey."  (SAC ¶ 77.)  While this statement discusses WW's past partnerships, it is in the context of its future ability to expand its membership base.  As is the

statement "[w]e are continually expanding our scope of influencers to include a diverse range of individuals, from celebrities to member ambassadors, to promote our brand and expand its appeal to a broader group of people across ethnicities, geographies, age, lifestage and gender." (SAC ¶ 75.)  WW's statement that it sought to "[c]ontinue to Broaden and Diversify [its] Influencer Network to Attract Members" is also forward looking.  (SAC ¶ 75.)

However, some of WW's statements are not forward looking.  When WW executives discussed prior enrollment proportions, these were statements about the past, not the future.  (See, e.g., Wang Decl. Ex. P, at 6 ("Looking at the U.S. as an example, approximately 40% of our member signups in Q1 were new to Weight Watchers."); Wang Decl. Ex. T, at 6 ("Typically, 2/3 of the people in our program have done Weight Watchers before, 1/3 of the people are new to the brand.").)  Additionally, when WW stated that "[its] strong, widely-recognized and trusted brand allows [it] to more efficiently acquire new members and broaden our appeal to new audiences," (SAC ¶ 74), WW touted its present ability.  This is not a forward-looking statement.  Statements that WW's "winter advertising did not drive consumers, particularly our former members, to action in the way we had hoped," and it "was very geared to both attracting new members as well as lapsed members," (Wang Decl. Ex. QQ, at 6, 13), are clearly discussing past events and are not forward looking.  Accordingly, these statements do not fall within the safe harbor.

Having found that several of Defendants' statements are forward-looking statements, this Court addresses whether these statements were identified as such and accompanied by meaningful cautionary language, or whether Plaintiffs fail to allege that the statements were made with "actual knowledge" of their falsity.  In re Adient, 2020 WL 1644018, at *20.  A finding of either is sufficient to confer safe harbor protection.  See In re WEBMD,

31

2013 WL 64511, at *7 ("Defendants will not be liable as a matter of law for any forward-looking statements if the statements are identified as forward looking and accompanied by meaningful cautionary language; or, alternatively, if Plaintiffs fail to prove that the statement was made with actual knowledge that it was false or misleading.").

While this Court has already determined that the alleged statements lacked falsity—and thus, Defendants could not have had actual knowledge of the statement's falsity—the statements also contain meaningful cautionary language.  Defendants point to several statements in WW's 2017 10-K[5] that provide cautionary language.  Specifically, WW warned that (1) "[its] business success depends on [its] ability to attract and retain members;" (2) "[its] business depends on the effectiveness of [its] advertising and marketing programs, including the strength of our social media presence, to attract and retain members and subscribers;" (3) "[its] future success depends on [its] ability to develop and market new, innovative services and products and to enhance our existing services and products, each on a timely basis . . . .  We may not be successful in developing, introducing on a timely basis or marketing any new or enhanced product services;" and (4) "[it] may not be able to successfully implement [its] strategic initiatives and realize the intended business opportunities, [and] growth prospects."  (Wang Decl. Ex. L, at 15).

Such statements concern "the plans and objectives of management for future operations."  15 U.S.C.A. § 78u-5(i)(1)(b).  These warnings are not vague.  They disclose the <u>exact</u> risk of which Plaintiffs complain.  Indeed, it is hard to fathom what additional disclosures would be required.  Accordingly, WW's forward-looking statements are protected by the PSLRA's safe harbor.

---

[5]      This document is incorporated by reference into the SPO offering materials.  (<u>See</u> Wang Decl. Ex. R, at S-36.)

VI.    Scienter

The PSLRA requires a plaintiff to plead with particularity facts giving rise to a strong inference of scienter, i.e., an intent to deceive, manipulate, or defraud.  See Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 313 (2007).  The inference must be "more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent."  Tellabs, 551 U.S. at 314.  Scienter may be established in two ways: (1) showing that defendants had the motive and opportunity to commit fraud; or (2) furnishing circumstantial evidence of conscious misbehavior or recklessness.  ATSI, 493 F.3d at 99; see also ECA, 553 F.3d at 198.

"Motive . . . could be shown by pointing to the concrete benefits that could be realized from one or more of the allegedly misleading statements or nondisclosures; opportunity could be shown by alleging the means used and the likely prospect of achieving concrete benefits by the means alleged."  S. Cherry St., LLC v. Hennessee Grp. LLC, 573 F.3d 98, 108 (2d Cir. 2009) (quotation marks omitted).  As to the circumstantial evidence prong, the Second Circuit has observed:

> at least four circumstances that may give rise to a strong inference of the requisite scienter: where the complaint sufficiently alleges that the defendants (1) benefited in a concrete and personal way from the purported fraud; (2) engaged in deliberately illegal behavior; (3) knew facts or had access to information suggesting that their public statements were not accurate; or (4) failed to check information they had a duty to monitor.

ECA, 553 F.3d at 198–99 (quotation marks omitted).

a.    Motive and Opportunity

"Motive can be shown when corporate insiders allegedly make a misrepresentation in order to sell their own shares at a profit."  In re Skechers, 444 F. Supp. 3d at

523 (quotation marks omitted).  However, "the mere fact that insider stock sales occurred does not suffice to establish scienter."  Constr. Laborers Pension Tr. for S. Cal. v. CBS Corp., 433 F. Supp. 3d 515, 543 (S.D.N.Y. 2020) (quotation marks omitted).  Rather, plaintiffs must establish that the sales at issue were "unusual" or "suspicious."  See, e.g., Acito, 47 F.3d at 54; In re Health Mgmt. Sys., Inc. Sec. Litig., 1998 WL 283286, at *6 (S.D.N.Y. June 1, 1998) ("Unusual insider trading activity during the class period may permit an inference of scienter; however, plaintiffs bear the burden of showing that any such sales are in fact unusual.").  "Whether the trading activities at issue were 'unusual' or 'suspicious' turns on a number of factors: (1) the amount of net profits realized from the sales; (2) the percentages of holdings sold; (3) the change in volume of insider defendant's sales; (4) the number of insider defendants selling; (5) whether sales occurred soon after statements defendants are alleged to have known were misleading; (6) whether sales occurred shortly before corrective disclosures or materialization of the alleged risk; and (7) whether sales were made pursuant to trading plans such as Rule 10b5-1 plans."  Glaser, 772 F. Supp. 2d at 587.

   i. Artal

    Plaintiffs allege that Artal sold approximately 14 million shares through two SPOs for over $1 billion.  (See SAC ¶¶ 2, 7, 11.)  This reduced Artal's WW ownership from approximately 44% to approximately 22%.  (See SAC ¶¶ 143, 151, 214.)  "Insider sales have been found unusual based on a variety of factors, including the amount of profit from sales."  Rothman v. Gregor, 220 F.3d 81, 94 (2d Cir. 2000).

    Courts in the Second Circuit have found that stock sales are not indicative of scienter when they are more than two months before the announcement in question.  See In re KeySpan Corp. Sec. Litig., 383 F. Supp. 2d 358, 385 (E.D.N.Y. 2003).  Trades that are "made a

short time before a negative public announcement," on the other hand, may be "suspiciously

timed." In re Oxford Health, 187 F.R.D. at 139; see also, e.g., Reilly v. U.S. Physical Therapy,

Inc., 2018 WL 3559089, at *14 (S.D.N.Y. July 23, 2018) ("Indeed, courts in this Circuit are

frequently skeptical that stock sales are indicative of scienter where no trades occur in the

months immediately prior to a negative disclosure."); In re BISYS Sec. Litig., 397 F. Supp. 2d

430, 444–45 (S.D.N.Y. 2005) (explaining that timing is more suspicious where defendants' stock

sales are "clustered at [the] end [of the putative class period], when insiders theoretically would

have rushed to cash out before the fraud was revealed and stock prices plummeted"). While

Artal's stock sales occurred long before any alleged revelation, their magnitude diminishes the

persuasiveness of this factor.

A "sale amounting to a large percentage of an individual's holdings may be

sufficient." In re SLM Corp., 740 F. Supp. 2d at 558; see also In re Scholastic Corp. Sec. Litig.,

252 F.3d 63, 75 (2d Cir. 2001) (selling 80 percent of holdings sufficient to establish motive).

Considering all of these context-specific factors, this Court concludes that Plaintiffs have pled

enough to raise a strong inference of scienter that is "at least as compelling as any opposing

inference one could draw from the facts alleged." Tellabs, 551 U.S. at 324. Both the gross

amount and percentage of holdings here clearly support scienter at the pleading stage.

Accordingly, Plaintiffs have pled scienter for Artal.

ii.   Hotchkin

Plaintiffs allege that Hotchkin sold a significant portion of his holdings during the

putative class period. Specifically, Plaintiffs assert that Hotchkin began the class period with

215,395 WW shares and sold 131,466 of those shares. (See SAC ¶¶ 215, 240.) This generated

nearly $10 million in proceeds and represented approximately 61% of Hotchkin's WW position.

(SAC ¶ 215.)  Hotchkin sold for an average share price of $75.28, (see SAC ¶¶ 215, 240), which is far above the $19.37 price at the end of the putative class period, (SAC ¶¶ 97, 227). Moreover, Plaintiffs allege that this was Hotchkin's first stock sale since 2012.  (SAC ¶ 241.)

Defendants counter that Hotchkin did not actually sell any shares.  Instead, they aver that he exercised RSU and PSU options, purchasing the shares for $3,617,760.82 and selling them for $6,328,399.12.  (Defs.' Mem. of Law in Supp. of their Mot. to Dismiss, ECF No. 93 ("Defs.' MOL"), at 18–19; see also Wang Decl. Ex. FF.)  Defendants argue that this Court should not consider Hotchkin's RSU and PSU exercise and thus, Hotchkin began and ended the putative class period with 83,929 WW shares.  Further, if this Court were to consider Hotchkin's RSUs and PSUs for purposes of alleging scienter, Defendants argue that this Court should take into account the additional RSUs that vested in November 2018.  (Wang Decl. Ex. O, at 77; Wang Decl. Ex. VV, at 75.)  If these are taken into account, Hotchkin actually increased his WW holdings by 18%.

The parties dispute whether stock options may be considered for purposes of demonstrating stock sales as a percentage of total holdings.  While the Second Circuit has yet to opine directly on this issue, most courts have expressed an inclination to include exercisable stock options.  In re eSpeed, Inc. Sec. Litig., 457 F. Supp. 2d 266, 290–91 (S.D.N.Y. 2006); see Rothman, 220 F.3d at 94 ("Taking into account [defendant's] vested options, he held more shares at the end of the [class period] than at the beginning." (quotation marks omitted)).  Other Circuits have taken more definitive positions.  The Ninth Circuit has held that "[s]tock options should be considered in calculating the percentage of shares sold unless the insider could not have exercised them."  Ronconi v. Larkin, 253 F.3d 423, 435 n.25 (9th Cir. 2001) (considering the "total number of shares and options").  The First Circuit, in Brennan v. Zafgen Inc., found

that "[a]fter accounting for [defendant's] vested options, he retained" the majority of his stock

holdings.  853 F.3d 606, 615–16 (1st Cir. 2017); see also City of Dearborn Heights Act 345

Police & Fire Ret. Sys. v. Waters Corp., 632 F.3d 751, 760–61 (1st Cir. 2011) ("[I]t is

appropriate to consider not only the shares of stock that [defendants] held prior to their sales, but

also the shares that they could have sold through the exercise of options.").

   Defendants argue that this Court need not wade into the issue of whether stock

options can evince scienter.  If the RSUs and PSUs count, then Hotchkin would have increased

his holdings by virtue of his RSUs vesting.  If the RSUs and PSUs are not considered, then

Hotchkin began and ended the class period with the same WW's position.  Under either

formulation, Plaintiffs fail to plead motive and opportunity.  Indeed, other courts in this District

have determined that minor stock sales—let alone no stock sales or stock purchases—do not

demonstrate motive and opportunity.  See Acito, 47 F.3d at 54 (selling 11% of defendant's

holdings not unusual); In re Skechers, 444 F. Supp. 3d at 523–24 (selling 4.9% and 5.9 % not

unusual); In re Gildan Activewear, Inc. Sec. Litig., 636 F. Supp. 2d 261, 271–72 (S.D.N.Y.

2009) (selling 22.5% and 4.9% of defendants' holdings not unusual); In re eSpeed, 457 F. Supp.

2d at 291 (selling 17.4% of defendants' holding, inclusive of shares and exercisable option, not

unusual); cf. Stevelman v. Atlas Res. Inc., 174 F.3d 79, 85–86 (2d Cir. 1999) (finding scienter

where a defendant sold approximately 40% of his stock).

   However, at this stage, this Court must confine itself to the pleadings.  See Iqbal,

556 U.S. at 678.  Defendants ask this Court to instead focus on WW's security filings.  While

this Court may consider such filings to determine what has been disclosed, this Court may not

rely on the truth of their contents.  Staehr, 547 F.3d at 425.  Looking only at the SAC, Plaintiffs

allege that Hotchkin sold approximately 60% of his WW shares.  This is sufficient to allege

motive and opportunity.  See Stevelman, 174 F.3d at 85–86.  Accordingly, at this stage, Plaintiffs

have alleged scienter for Hotchkin.

        iii.    Other Defendants

      Plaintiffs do not allege that either Grossman or Debbane sold any shares.  Indeed,

Grossman increased her WW position during the putative class period.  (See Wang Decl. Ex. O,

at 77; Wang Decl. Ex. VV, at 75.)  As such, Plaintiffs fail to plead motive and opportunity for

these Defendants.

    b.  Conscious Misbehavior or Recklessness

      Absent a showing of motive, a plaintiff may demonstrate scienter through

allegations regarding conscious misbehavior or recklessness, but "the strength of the

circumstantial allegations must be correspondingly greater."  ECA, 553 F.3d at 199 (quoting

Kalnit, 264 F.3d at 142).  "Conscious misbehavior," on one hand, "generally consists of

deliberate, illegal behavior."  In re Lululemon, 14 F. Supp. 3d at 573 (citing Novak, 216 F.3d at

308).  Recklessness, on the other hand, can be adequately pleaded where the allegations show

that defendants' conduct was "highly unreasonable" and constituted "an extreme departure from

the standards of ordinary care to the extent that the danger was either known to the defendant or

so obvious that the defendant must have been aware of it.'"  S. Cherry St., LLC v. Hennessee

Grp. LLC, 573 F.3d 98, 109 (2d Cir. 2009) (quoting In re Carter-Wallace, Inc. Sec. Litig., 220

F.3d 36, 39 (2d Cir. 2000)) (emphasis in original).  In other words, the recklessness required to

plead scienter is "conscious recklessness—i.e., a state of mind approximating actual intent, and

not merely a heightened form of negligence."  S. Cherry St., 573 F.3d at 109 (quoting Novak,

216 F.3d at 312) (emphasis in original).

      Circumstantial evidence can support a strong inference of scienter, under the

"conscious misbehavior or recklessness" theory, where defendants: "(1) benefitted in a concrete and personal way from the purported fraud; (2) engaged in deliberately illegal behavior; (3) knew facts or had access to information suggesting that their public statements were not accurate; or (4) failed to check information they had a duty to monitor." Employees' Ret. Sys. of Gov't of the Virgin Islands v. Blanford, 794 F.3d 297, 306 (2d Cir. 2015) (quotation marks omitted).

Under this prong, recklessness may be sufficiently pled where there are "[p]lausible allegations that a defendant had facts at his disposal contradicting material public statements, but then ignor[ed] such facts or proceed[ed] despite them." In re Lululemon, 14 F. Supp. 3d at 574 (citing Novak, 216 F.3d at 308–09). Where plaintiffs allege that defendants knew about or had access to contrary facts, however, "they must specifically identify the reports or statements containing this information." Novak, 216 F.3d at 309. "An allegation that a defendant merely ought to have known is not sufficient to allege recklessness." In re Lululemon, 14 F. Supp. 3d at 574 (quotation marks omitted). As such, "Second Circuit cases uniformly rely on allegations that [1] specific contradictory information was available to the defendants [2] at the same time they made their misleading statements." Das v. Rio Tinto PLC, 332 F. Supp. 3d 786, 813 (S.D.N.Y. 2018) (alterations in original) (quoting In re PXRE Grp., Ltd., Sec. Litig., 600 F. Supp. 2d 510, 536 (S.D.N.Y. 2009)).

The SAC is bereft of any allegations of deliberate, illegal behavior or recklessness. Plaintiffs offer only conclusory allegations that because Defendants were senior WW executives they were aware that WW had abandoned its plan to release a "meaningful" program innovation at the end of 2018. (Opp'n, at 21.) But Plaintiffs' theory would effectively vitiate scienter standards for any securities class action. Under Plaintiffs' theory, merely naming

senior executives as defendants would fulfill the Exchange Act and PSLRA's scienter element. Such a reading clearly contradicts the plain text of the Exchange Act and PSLRA.

Unable to establish conscious misbehavior or recklessness, Plaintiff's resort to the "core operations" doctrine.  (See Opp'n, at 20–21.)  But this is unpersuasive.  "The core operations doctrine permits an inference that a company and its senior executives have knowledge of information concerning the 'core operations' of a business."  Das, 332 F. Supp. 3d at 816 (quotation marks omitted).  "Core operations include matters critical to the long term viability of the company and events affecting a significant source of income."  Das, F. Supp. 3d at 816 (quotation marks omitted).  The core operations doctrine, however, "typically applies only where the operation in question constitute[s] nearly all of a company's business," and moreover, "does not independently establish scienter."  Das, F. Supp. 3d at 816 (alteration in original) (quoting Lipow v. Net1 UEPS Tech., Inc., 131 F. Supp. 3d 144, 163 (S.D.N.Y. 2015)).  "[A]t most," the doctrine "constitutes 'supplemental support' for alleging scienter."  Das, F. Supp. 3d at 816 (quotation marks omitted).  Because Plaintiffs offer no other independent basis for scienter, they fail to plead scienter against all parties except Artal and Hotchkin.

VII.    12(a)(2) Claims Against Artal

WW contends that Plaintiffs have not plead that Artal is a statutory seller.  The Securities Act does not define statutory seller.  Fed. Hous. Fin. Agency for Fed. Nat'l Mortg. Ass'n v. Nomura Holding Am., Inc., 873 F.3d 85, 139 (2d Cir. 2017).  A defendant is a statutory seller if it (1) "passed title, or other interest in the security, to the buyer for value," or (2) "successfully solicit[ed] the purchase [of a security], motivated at least in part by a desire to serve his own financial interests or those of the securities owner."  Pinter, 486 U.S. at 647.

"The Second Circuit has yet to define the activities that constitute successful

solicitation, but it has advised that an individual must have done more than engage in activities that were preliminary to the offering." Alpha Capital Anstalt v. Intellipharmaceutics Int'l Inc., 2020 WL 3318029, at *4 (S.D.N.Y. June 18, 2020). And "Section 12 liability cannot be imposed upon 'those who merely assist in another's solicitation efforts.'" Shain v. Duff & Phelps Credit Rating Co., 915 F. Supp. 575, 581 (S.D.N.Y. 1996) (quoting Pinter, 486 U.S. at 651 n. 27); see also Youngers v. Virtus Inv. Partners Inc., 195 F. Supp. 3d 499, 522 (S.D.N.Y. 2016) (same).

Plaintiffs do not allege that Artal actively or directly marketed WW securities. Cf. In re Vivendi Universal, S.A., 381 F. Supp. 2d 158, 186 (S.D.N.Y. 2003) (finding adequate allegations that CEO was statutory seller where he "regularly appeared before investors and financial news agencies to tout the financial vitality of Vivendi and thereby encourage investors to purchase Vivendi's securities"); In re WorldCom, Inc. Secs. Litig., 294 F. Supp. 2d 392, 423 (S.D.N.Y. 2003) (finding adequate allegations that underwriter was a statutory seller where underwriter "participat[ed] in 'road show' meetings").

While indirect solicitation can suffice to state a claim under Section 12(a)(2), see Capri v. Murphy, 856 F.2d 473, 478 (2d Cir. 1988), the Plaintiffs' allegations fall short. In Capri, the Second Circuit held that general partners in a mining venture were statutory sellers, even though they did not communicate directly with investors, because they specifically directed the promotional efforts and hired sales agents to act on their behalf. 856 F.2d at 478; cf. Youngers, 195 F. Supp. 3d at 523 (finding that defendants were not statutory sellers despite "supervis[ing] the wholesalers marketing of the funds to the brokers . . . [and] provid[ing] financial incentives" (quotation marks and citations omitted)). But here, Plaintiffs offer no such allegations.

Instead, Plaintiffs argue that by signing the Registration Statement, Artal is a statutory seller. (Opp'n, at 23–24.) The Second Circuit has not yet addressed whether signing a registration statement on its own makes an individual or entity a statutory seller. See Yi Xiang v. Inovalon Holdings, Inc., 254 F. Supp. 3d 635, 646 (S.D.N.Y. 2017). However, Citiline Holdings, Inc. v. iStar Fin. Inc held that, "an individual[] signing a registration statement does not itself suffice as solicitation under Section 12(a)(2)." 701 F. Supp. 2d 506, 512 (S.D.N.Y. 2010). The court based its holding on three reasons: First, "[e]very Court of Appeals to have considered the issue" has found signing a registration statement alone is not enough to make an individual a statutory seller. Citiline, 701 F. Supp. 2d at 512. Second, the statutory scheme expressly imposes Section 11 liability upon every signer of a registration statement, but does not do so for Section 12. This omission suggests a deliberate choice by legislators to decline to extend Section 12 liability to mere signers of the registration statement and require something more for an individual to be classified as a statutory seller. Citiline, 701 F. Supp. 2d at 512. Third, the Supreme Court's decision in Pinter, observed that "Congress did not intend to impose liability under Section 12 'for mere participation in unlawful sales transactions.'" Citiline, 701 F. Supp. 2d at 512 (quoting Pinter, 486 U.S. at 650). In sum, these reasons propel the conclusion that signing the registration statement alone is insufficient to make an individual a statutory seller. Following Citiline, numerous courts in this District have followed suit. See Youngers, 195 F. Supp. 3d 499 (following Citiline); Yi Xiang, 254 F. Supp. 3d at 645–46; In re Am. Realty Capital Properties, Inc. Litig., 2015 WL 6869337, at *3 (S.D.N.Y. Nov. 6, 2015) (dismissing Section 12(a)(2) claims for complaint's failure to allege that director defendants solicited securities); City of Westland Police & Fire Ret. Sys. v. MetLife, Inc., 928 F. Supp. 2d 705, 719–20 (S.D.N.Y. 2013); McKenna v. Smart Techs. Inc., 2012 WL 1131935, at *18 (S.D.N.Y. Apr.

3, 2012) (noting that all district court cases contrary to <u>Citiline</u> predate <u>Citiline</u> and failed to "consider rulings of Courts of Appeals outside the Second Circuit or the rationale underlying <u>Pinter</u>"). As such, Artal's signature on the registration statement is insufficient on its own to establish it as a statutory seller.

Plaintiffs counter that Artal "was a party to the underwriting agreement for the SPO, along with WW, Goldman Sachs & Co., LLC, Morgan Stanley & Co. LLC, and UBS Securities LLC." (SAC ¶ 36.) There, Artal "made representations and warranties to Weight Watchers and to the underwriters," that the "SPO was conducted as a result of Artal exercising [its] rights," and that an agreement "required Artal's consent to [WW]'s choice of underwriters for any public offering of shares owned by Artal." (SAC ¶ 36.) But Artal's representations and warranties and its consent to WW's choice of underwriters is akin to "mere[] assist[ance] in another's solicitation efforts." <u>Shain</u>, 915 F. Supp. at 581 (quotation marks omitted). Accordingly, Plaintiffs fail to establish that Artal is a statutory seller.

VIII.   <u>Section 10(b) Claim Against Artal</u>

In a lone paragraph, Defendants argue that this Court should dismiss the Section 10(b) claim against Artal because it was not a maker of any statement under <u>Janus Capital Group, Inc. v. First Derivative Traders</u>. 564 U.S. 135 (2011).[6] Specifically, Defendants aver that Artal does not have "ultimate authority over the statement." <u>Janus</u>, 564 U.S. at 142.

Liability under Section 10(b) only extends to the person or entity "making" the material misstatement. <u>Janus</u>, 564 U.S. at 141. The Supreme Court explained that:

> For purposes of Rule 10b-5, the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it. Without control, a person or entity can merely suggest what to say, not "make" a

---

[6]   The Supreme Court's recent decision in <u>Lorenzo v. Sec. & Exch. Comm'n</u> is not relevant for the question at hand. 139 S. Ct. 1094 (2019).

statement in its own right.   One who prepares or publishes a
statement on behalf of another is not its maker.

Janus, 564 U.S. at 142.

In Janus, the Supreme Court rejected primary liability for an investment adviser

based on its part in helping to prepare the public filings of its "legally independent" client.

Janus, 564 U.S. at 147.  The Supreme Court compared the relationship between the investment

advisor and the investment fund to that of a speechwriter and a speaker: "Even when a

speechwriter drafts a speech, the content is entirely within the control of the person who delivers

it.  And it is the speaker who takes credit—or blame—for what is ultimately said."  Janus, 564

U.S. at 143.  Based on this reasoning, the Supreme Court held that the mutual fund—which alone

"bears the statutory obligation to file the prospectus with the SEC"—was the sole maker of the

alleged misstatements.  Janus, 564 U.S. at 147.

Whether a defendant is the "maker" of the misstatement may depend on

inferential or circumstantial evidence.  "[I]n the ordinary case, attribution within a statement or

implicit from surrounding circumstances is strong evidence that a statement was made by—and

only by—the party to whom it is attributed."  Janus, 564 U.S. at 142–43.  The Supreme Court

found relevant that nothing "on the face of the prospectuses indicate[d] that any statements

therein came from [the investment adviser] rather than [the investment fund]—a legally

independent entity with its own board of trustees."  Janus, 564 U.S. at 147.

Plaintiffs argue that Artal made the alleged misstatements because Artal owns a

large stake in WW and has placed board members.  However, this falls short of demonstrating

that Artal has "ultimate authority" to make statements.  See In re Virtus, 195 F. Supp. 3d at 540–

41 (finding that defendant's CEO signing the registration statement, defendant's approval and

edits to offering documents, and logo prominently displayed on the offering documents was

44

sufficient to make statements attributable to defendant under <u>Janus</u>).

Moreover, Plaintiffs' allegations of control fall short of circumstances in which other courts in this District have determined parties had "ultimate authority" over statements. For example, in <u>IOP Cast Iron Holdings, LLC v. J.H. Whitney Capital Partners, LLC</u>, a judge in this District determined defendants were makers of actionable statements only after finding clear indicia of control.  91 F. Supp. 3d 456, 473 (S.D.N.Y. 2015).  These facts included ownership of (1) "an overwhelming majority of [the company]'s shares;" (2) "employees of [defendants] formed a majority of [the company]'s board;" (3) "[defendants] decided whether to sell [the company];" (4) "[defendants'] employees allegedly negotiated the Stock Purchase Agreement without any meaningful participation from [the company]'s own managers;" and (5) "[and one of defendants'] executive[s] signed the Stock Purchase Agreement on behalf of [the company] (in his dual capacity as an [company] officer)."  <u>IOP Cast Iron Holdings</u>, 91 F. Supp. 3d at 473–74; <u>see also</u> <u>In re Puda Coal Sec. Inc., Litig.</u>, 30 F. Supp. 3d 261, 267 (S.D.N.Y. 2014) (finding that underwriter defendants were makers of statements because "[t]he complaint alleges that the underwriters actively participated in creating the Prospectus, drafting it jointly with . . . management" including approving the documents, adding the underwriters' names to the front cover of the prospectus, and "solicit[ing] investors for the offering and distribut[ing] the prospectus to investors" (quotation marks omitted)).  By contrast, <u>none</u> of these facts are present in the case at hand.  Artal holds a minority interest, there is no allegation it participated in the preparation of the offering documents, and Debbane only signed the registration statement in his capacity as a WW director, (Wang Decl. Ex. S, at 28).

Plaintiffs' conclusory allegations that Artal controlled WW are insufficient.  <u>See</u> <u>McIntire v. China MediaExpress Holdings, Inc.</u>, 927 F. Supp. 2d 105, 136–37 (S.D.N.Y. 2013)

(rejecting plaintiffs' argument that because defendant "dominated and controlled" the maker, defendant had the ultimate authority over the statement).  Nor is this Court persuaded that Artal's approval of any documents would be sufficient under Janus.  See Gavin/Solmonese LLC v. D'Arnaud-Taylor, 68 F. Supp. 3d 530, 539 (S.D.N.Y. 2014), aff'd, 639 F. App'x 664 (2d Cir. 2016) ("Any role [defendant] played in the drafting process or in distributing the offering materials is insufficient to impose primary liability under Janus.").

Plaintiffs also argue that signing a registration statement is sufficient under Janus. "[C]ourts consistently hold that signatories of misleading documents 'made' the statements in those documents, and so face liability under Rule 10b-5(b)."  In re Smith Barney Transfer Agent Litig., 884 F. Supp. 2d 152, 163–64 (S.D.N.Y. 2012); see also City of Roseville Employees' Ret. Sys. v. EnergySolutions, Inc., 814 F. Supp. 2d 395, 417 (S.D.N.Y. 2011) ("Individual Defendants who signed the Registration Statements 'made' the statements under Janus."). However, Plaintiffs do not allege that Artal signed any of the offering documents.  Rather, Debbane signed the registration statement.  (See SAC ¶¶ 42–45, 140.)  Because Debbane is Artal's managing director, Plaintiffs counter that Artal has made the statement.  But Plaintiffs ignore the fact that Debbane signed as a director of WW, not as the managing director of Artal. (See Wang Decl. Ex. S, at 28.)  Accordingly, Artal did not sign the offering documents and Plaintiffs fail to plead that Artal made any statements under Janus.

IX.    Allegations of Control

Defendants also argue that Plaintiffs fail to allege control by Grossman, Hotchkin, Debbane, and Artal to support their Section 20(a) claim and by Debbane and Artal for their Section 15 claim.

To sustain control person claims, Plaintiffs must allege defendants have "the

46

power to direct or cause the direction of the management and policies of [the primary violators], whether through the ownership of voting securities, by contract, or otherwise." S.E.C. v. First Jersey Sec., Inc., 101 F.3d 1450, 1473 (2d Cir. 1996) (quoting 17 C.F.R. § 240.12b-2.). Notably, "the power to influence managerial decisions is not the same as power to direct the management and policies of the primary violator." In re BioScrip, Inc. Sec. Litig., 95 F. Supp. 3d 711, 740 (S.D.N.Y. 2015) (quotation marks omitted). Instead, "[a]ctual control is essential to control person liability." In re Blech Sec. Litig., 961 F. Supp. 569, 586 (S.D.N.Y. 1997). Ultimately, "[w]hether a person is a controlling person is a fact-intensive inquiry, and generally should not be resolved on a motion to dismiss." Katz v. Image Innovations Holdings, Inc., 542 F. Supp. 2d 269, 276 (S.D.N.Y. 2008) (quotation marks omitted).

Beginning with Grossman, Hotchkin, and Debbane, Plaintiffs have pled control. "[B]oilerplate allegations of control based on one's status as an officer or director" are generally insufficient to establish control. In re Virtus, 195 F. Supp. 3d at 542. Nevertheless, "if that same officer or director has signed financial statements containing materially false or misleading statements, courts have held that control as to the financial statements is sufficiently pled." In re Alstom SA, 406 F. Supp. 2d 433, 487 (S.D.N.Y. 2005). Here, Grossman, Hotchkin, and Debbane all signed various securities filings that Plaintiffs have alleged were false or misleading. (See SAC ¶¶ 40–41, 139.) Indeed, Grossman and Hotchkin typically led earnings call that Plaintiffs have cast as part of their fraudulent scheme. (See, e.g., SAC ¶¶ 89–90, 178.) As such, Plaintiffs plead control by Grossman, Hotchkin, and Debbane.

However, Plaintiffs' allegations against Artal are deficient. First, Plaintiffs offer that "Artal was party to a Voting Agreement with Oprah Winfrey, whereby Ms. Winfrey agreed to vote all of her Weight Watchers common stock to elect as directors any nominees designated

by Artal." (SAC ¶ 122.) But this agreement only aggregates approximately 46.3% of the total voting shares. (SAC ¶ 39.) Plaintiffs do not allege that Artal—through this agreement or otherwise—held a majority of the shares or the ability to appoint a majority of directors. See In re BioScrip, 95 F. Supp. 3d at 740 (finding that "approximately 26 percent of [the company] and . . . the right to designate two directors on [the company]'s eight-person board" was insufficient to establish actual control); see also In re Alstom, 406 F. Supp. 2d at 492 ("Minority stock ownership and the ability to appoint a minority of the board do not create power to direct management and policies, and thus do not constitute sufficient control."); In re Flag Telecom Holdings, Ltd. Sec. Litig., 352 F. Supp. 2d 429, 458–59 (S.D.N.Y. 2005) (concluding plaintiff failed to allege control where defendant only possessed 30 percent of voting shares and ability to appoint only three of nine board members). Moreover, it is unclear to what extent this agreement with Oprah Winfrey provided Artal with control over WW's day-to-day business or SEC filings.

Second, Plaintiffs argue that Debbane's signature on various SEC filings is sufficient to establish Artal as a control entity. But again, Debbane's signature on the registration statement and other SEC filings does not equate to Artal signing the documents. Rather, Debbane signed them as a WW director, not as the managing director of Artal. (See Wang Decl. Ex. S, at 28.)

Other than these two facts, Plaintiffs only assert conclusory allegations. These include that Artal had access to documents, (SAC ¶ 126), "the power to prevent the issuance of the statements or omissions or to cause them to be corrected," (SAC ¶ 126), and that Artal had "direct and supervisory involvement in the day-to-day operations of [WW]," (SAC ¶ 283). These allegations are insufficient to establish control.

To rebut allegations of control by Grossman, Hotchkin, and Debbane, Defendants

48

also argue that Plaintiffs have not pled culpable participation by any defendant.  In addition to alleging a primary violation for a control person claim, Plaintiffs must "allege particularized facts" of the defendants' "culpable participation in the fraud perpetrated by the controlled person."  Pa. Pub. Sch. Employees' Ret. Sys. v. Bank of Am. Corp., 874 F. Supp. 2d 341, 368–69 (S.D.N.Y. 2012).

Plaintiffs argue that they do not need to plead culpable participation.  "The Second Circuit has recognized this disagreement but not yet resolved it."  In re ForceField Energy Inc. Sec. Litig., 2017 WL 1319802, at *16 (S.D.N.Y. Mar. 29, 2017) (citing In re Lehman Bros. Mortg.-Backed Sec. Litig., 650 F.3d 167, 186 (2d Cir. 2011)).  "Most courts in this district have held that . . . culpable participation is a scienter requirement for which a plaintiff must allege some level of culpable participation at least approximating recklessness in the section 10(b) context in order to survive a motion to dismiss."  In re ShengdaTech, Inc. Sec. Litig., 2014 WL 3928606, at *10 (S.D.N.Y. Aug. 12, 2014) (quotation marks omitted) (collecting cases).  This Court has previously aligned itself with that majority and sees no reason to change its view.  See In re Virtus, 195 F. Supp. 3d at 542.

Under the PSLRA, "a plaintiff must allege 'culpable participation' and plead that element with particularity."  In re NQ Mobile, Inc. Sec. Litig., 2015 WL 1501461, at *4 (S.D.N.Y. Mar. 27, 2015).  This element may be established by pleading either conscious misbehavior or recklessness.  Steed Fin. LDC v. Nomura Sec. Int'l, Inc., 2001 WL 1111508, at *10 (S.D.N.Y. Sept. 20, 2001); see also In re Emex Corp. Sec. Litig., 2002 WL 31093612, at *10 (S.D.N.Y. Sept. 18, 2002) ("While the Second Circuit has not yet addressed the meaning of culpable participation at length, other than to state that a determination of § 20(a) liability requires an individualized determination of a defendant's particular culpability, courts have

required a showing of both fraudulent conduct and a culpable state of mind." (quotation marks omitted)).

   As discussed above, Plaintiffs have only pled scienter for Hotchkin and Artal. That fact—combined with Plaintiffs' failure to allege control by Artal—means that Plaintiffs have failed to allege control for all parties except Hotchkin.

X. <u>Loss Causation</u>

   Finally, Defendants argue that Plaintiffs fail to allege loss causation because there were no material omissions or misstatements.  This Court agrees with Defendants.

   "[T]o establish loss causation, a plaintiff must allege . . . that the subject of the fraudulent statement or omission was the cause of the actual loss suffered, i.e., that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security."  <u>Lentell v. Merrill Lynch & Co.</u>, 396 F.3d 161, 173 (2d Cir. 2005) (quotation marks and citation omitted).  The Second Circuit has equated "value" with "market value," i.e., share price.  In <u>Lentell</u>, the Second Circuit held that "[t]o plead successfully that [defendant]'s fraud caused their losses, plaintiffs were required to allege facts to establish that the [defendant]'s misstatements and omissions concealed the price-volatility risk (or some other risk) <u>that materialized and played some part</u> in diminishing the market value of [the shares at issue]."  <u>Lentell</u>, 396 F.3d at 176–77 (emphasis added).  But here, Plaintiffs fail to allege any fraudulent statements or omissions.  Without any fraudulent statements or omissions, there is no fraud that could have proximately caused Plaintiffs' injury.

<u>CONCLUSION</u>

For the foregoing reasons, Defendants' motion to dismiss is granted.  The Clerk

of Court is directed to mark this case closed.

Dated: November 30, 2020
      New York, New York

SO ORDERED:

_____
WILLIAM H. PAULEY III
U.S.D.J.

51